UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.   70-1220-W[1]
74-2982-C

PEDRO CASTRO et al.,
    Plaintiffs,

v.

NANCY BEECHER et al.,
    Defendants.

## MEMORANDUM IN SUPPORT OF DEFENDANT CITY OF BOSTON'S RENEWED MOTION FOR CLARIFICATION OF CONSENT DECREE

### I.   SUMMARY OF THE ISSUE FOR CLARIFICATION

The City of Boston hires police candidates pursuant to a consent decree that applies to all cities and towns with a minority population of one percent or more until such city or town achieves a complement of minorities commensurate with the percentage of minorities within the community.  See Castro v. Beecher, 365 F. Supp. 655 (D.Mass.1973); Castro v. Beecher, 522 F. Supp. 873, 875 (1981).

The City of Boston has always calculated parity under Castro by comparing the percentage of minorities in the entire police force to the percentage of minorities in the community, according to the latest census.  However, the decision in Quinn v. City of Boston, 325 F.3d 18 (1st Cir. 2003), which interpreted a similar consent decree governing the City's hiring of firefighters, ruled that the proper algorithm for calculating parity under that decree was to compare the percentage of minority entry-level firefighters to the percentage of minorities in the community.

---

[1] For filing purposes this Motion is brought under 03-12538-PBS, a case that contains related issues.

1

Since the City faces potential liability if it incorrectly construes the consent decree under which it hires police officers, and since the City wishes to honor its obligations under the law, the City has a compelling interest and requests that the Court clarify the consent decree and issue declaratory judgment as to whether:

When hiring new police officers pursuant to the terms of the consent decree, the complement of minorities for purposes of parity is to be calculated by: 1) comparing the percentage of minority *entry level* patrolmen to the percentage of minorities in the City's general population, or 2) comparing the percentage of minority officers in the *entire police force*, to the percentage of minorities in the City's general population.

## II.     THE CASTRO DECREE

The original case, above-captioned Docket No. 70-1220-W, began in 1970 on a complaint alleging that the defendants discriminated against blacks and Spanish-surnamed persons in the recruitment and appointment of policemen.[2] Castro v. Beecher, 334 F. Supp. 930, 934 (D.Mass.1971). Although the District Court found that the examinations given in 1968-1970 discriminated against minorities that did not share the prevailing white culture, it declined to grant preferential hiring to black and Spanish-surnamed applicants who had been the victims of the discrimination. Id. at 939-940; see also Castro v. Beecher, 386 F. Supp. 1281, 1283 (D.Mass.1975). On appeal the Court held that the Civil Service examinations in question were racially discriminatory and remanded the case with instructions that minority group persons who had been the victims of the discrimination be hired on a priority basis, provided they pass a non-

---

[2] As noted by the Court in Quinn v. City of Boston, 325 F.3d 18, 24 n.1 (1st Cir. 2003), throughout the litigation relating to consent decrees, the parties have used the term "blacks" as opposed to "African Americans." For historical coherence the Court adhered to that usage, and the Defendant does the same in this Motion.

2

discriminatory, job-related examination. Castro v. Beecher, 459 F.2d 725 (1st Cir. 1972); Castro, 386 F.Supp. at 1283. On remand, the Court approved and entered a consent decree. Castro, 365 F. Supp. at 655. The decree provided, among other measures, for the establishment of civil service certification priority pools consisting of certain black and Spanish-surnamed applicants, and for the implementation of affirmative recruitment programs for the purpose of recruiting black and Spanish-surnamed police applicants. Id. at 660.

In 1974 plaintiffs brought an action, above-captioned Docket No. 74-2982-C, pursuant to the All Writs Act for the purpose of clarifying and preserving the effect of the prior consent decree in light of proceedings that had taken place in the Massachusetts Superior and Supreme Judicial Courts. See Castro v. Beecher, 386 F. Supp. 1281 (D.Mass.1975). The Court, finding that some aspects of the decree went beyond the relief mandated by the Court of Appeals and possessed potential constitutional deficiencies, ordered that the parties arrive at a substitute consent decree, and recommended the remedy adopted in NAACP v. Beecher, 371 F. Supp. 507 (D.Mass.), aff'd, 504 F.2d 1017 (1st Cir. 1975).[3] Thereafter the two above-captioned cases were consolidated and the parties entered into a consent decree. The decree was approved and entered by the Court on July 7, 1975 ("the Castro decree").

Among other things, the Castro decree provided that the method and ratios of certification provided for by the decree shall apply to all cities and towns which have a

---

[3] The NAACP v. Beecher consent decree (subsequently referred to as the "Beecher decree") followed a ruling in 1974 that the Fire Fighter Entrance Examination used by the Massachusetts Division of Civil Service to screen candidate firefighters had historically discriminated against black and Hispanic applicants. Quinn v. City of Boston, 204 F.Supp.2d 156, 158 (2002). The Court ordered that any future examination be validated under EEOC guidelines, and that preferential hiring procedures be introduced to rectify the effects of past discrimination. Boston Chapter, NAACP, Inc., 371 F. Supp. at 521.

minority population of one percent or more until any such city or town achieves a complement of minorities commensurate with the percentage of minorities within the community, at which point further certification was to be made in accordance with existing Massachusetts law. Castro, 522 F. Supp. at 875. This parity target had been established by the Court in the Beecher decree.[4] Id.

### III. THE BASIS FOR REQUESTING CLARIFICATION OF THE CASTRO DECREE.

In the recent case of Quinn v. City of Boston, the First Circuit addressed the issue of parity under the Beecher decree. 325 F.3d at 18. The Plaintiff candidates in Quinn were not reached for hire by the Boston Fire Department as a result of enforcement of the Beecher decree. The candidates brought suit alleging that the City had discriminated against them on the basis of race. The District Court granted summary judgment to the defendants. Quinn, 204 F.Supp.2d at 163.

On appeal, the First Circuit identified the central issue as the meaning of parity and the manner in which it is to be calculated. Quinn, 325 F.3d at 28. Although the parties in Quinn agreed on the relevant time frame, as well as the sources of data, they disagreed on how the minority penetration in a particular fire department was to be measured, an issue that turned on the interpretation of the term "firefighter." Id. The candidates viewed the term "firefighter" as encompassing only the lowest rank, that is, entry-level members of the Boston Fire Department.[5] Id. at 30. The defendants viewed the term "firefighter" as encompassing all uniformed Boston Fire Department personnel,

---

[4] The "Beecher decree" is a phrase that includes the original decree and subsequent orders entered to fine-tune it. Quinn, 325 F.3d at 24. Similarly, as used in this Motion, the phrase "Castro decree" includes the original decree and subsequent agreements and supplements. The substance of these agreements and supplements are not relevant to the clarification requested by this Motion.

[5] The Court pointed out that throughout its decision, all references to "entry-level" positions were to be understood as meaning post-probationary non-officer positions. Id.

4

including officers. Id.  The City of Boston considered its method of calculation consistent with precedent. See, e.g. Mackin v. City of Boston, 969 F.2d 1273, 1276 (1992); NAACP v. Beecher, 371 F.Supp. at 523 ("Where, however, the policy has in effect resulted in the exclusion of minorities from the fire department, the policy must be changed and present effects of past discrimination must be remedied."); Id. at 523 ("As a city or town achieves a complement of minorities commensurate with the percentage of minorities within the community, certifications will be made according to existing Massachusetts law."); Boston Chapter, NAACP, Inc. v. Beecher, No. 72-3060-F, slip op. at 6 (D. Mass. Nov. 25, 1975)("No fire department . . . may be exempted . . . unless the appointing authority has first petitioned the Division that the percentage of post-probationary minority uniformed personnel equals the percentage of minorities in the city or town served by said department . . . .").

The Court, however, held that the proper parity formula should consider the percentage of minorities in the entry-level rank only of the Boston Fire Department. Id. at 35.  As a result of the First Circuit mandate in Quinn, the District Court ordered the City to hire four Quinn plaintiffs at the next immediate opportunity to fill vacancies in the firefighter ranks of the Boston Fire Department, contingent upon those plaintiffs meeting the requirements applicable to all candidate firefighters.[6]  Quinn v. City of Boston, 279 F.Supp.2d 51 (D.Mass. 2003).  That Order also provided for potential back pay awards for any economic loss suffered between the time plaintiffs would have been hired in November, 2000 and such time as plaintiffs entered service as Boston firefighters.  Six other white candidates who had scored consistently with the Quinn plaintiffs on the 1998 examination also sued the City following the First Circuit decision.  Ahern v. City of

---

[6] Of the five Plaintiffs in Quinn, one was appointed to the Department prior to the First Circuit's decision.

5

Boston, C.A.No. 03-11579-RGS.  Ultimately the City created a special firefighter entry class for the four Quinn plaintiffs and five of the six Ahern plaintiffs who were able to meet the instatement criteria of the Order, all of whom recently completed firefighter academy training.

Creating firefighter academy training for this small group of people outside the normal hiring cycle was unreasonably expensive for the City, but was necessary to cap back pay damage awards pursuant to the District Court order.  Nonetheless, back pay damages for the five Quinn plaintiffs will total approximately $80,000, plus pre-judgment interest at the federal rate.  Attorneys' fees and costs of $123,563.81 for the Quinn plaintiffs have been stipulated through May, 2004.   The Ahern plaintiffs did not seek back pay damages, but did receive attorneys' fees.   The Quinn plaintiffs' claims for emotional distress damages remain pending in litigation with the City.

Three additional suits have been filed against the City by sixteen candidates who sat for the 2000 firefighter examination, achieved a score of 99, but were not hired by the City in the 2001 or 2002 firefighter classes, as a result of the City's continued enforcement of the Beecher decree.   To the best of the City's knowledge, approximately twenty-two other candidates who scored 99 on the 2000 firefighter examination could potentially hold claims against the City.

To date, the City of Boston has calculated parity in the Police Department in the same manner as it calculated parity in the Fire Department: by comparing the percentage of minorities in the entire police force to the percentage of minorities in the community.  The City's policing needs require that it continue to appoint new officers, and the City is expected to appoint a new class of officers this Fall.  However, absent clarification from

6

this Court, the City faces potential liability regardless of how it interprets and applies the Castro decree.  If the City mis-calculates racial parity under the Castro decree and continues to apply the decree after parity has in fact already been reached, the City will, as it did in Quinn, owe damages to individuals who were denied appointment to the Department.  Conversely, if the City ceases to apply the Castro decree when parity has not yet been reached, the City may face liability from minority applicants who were not afforded their rights under the decree

The City maintains that its past method of calculating parity in the police department is consistent with precedent and was a good faith effort to comply with the dictates of Castro, which referred repeatedly to the police force as a whole rather to only entry level patrolmen.  See, e.g.  Castro, 365 F.Supp. 655 at 660 (the court originally stated "finding that the Proposed Decree is just, reasonable, and in the public interest, and more likely than any other proposed solution to give the people of the Commonwealth of Massachusetts effective, non-discriminatory, dedicated, and honorable police forces, the proposed decree is approved and entered…"); Castro, 459 F.2d at 737 (in deciding on the appropriateness that an appointing authority remain a party upon remand, the Appeals Court recognized that "the record amply demonstrates [the Boston Commissioner of Police's] willingness to assist in all efforts to achieve a wider racial and cultural representation on his force."); Castro, 334 F.Supp. at 935 (when considering statistics, the Court observed that, as compared to the population,  "in the Boston police force the blacks were only about 2% in 1960 and about 3.6% in 1970"); Id. at 936 ("when blacks are one-sixth of the Boston population they are only one-thirtieth of the Boston police force."); Id. at 949 (discussing how to produce "a police force with 15% wholly qualified

7

blacks"); 522 F.Supp. at 876 ( "…the minority population of Boston has increased during the intervening decade to 30 percent. The percentage of black and Hispanic officers in the Police Department, therefore, remains far below the percentage of minorities in the city and the parity level which the Court's prior remedial orders were designed to achieve."). Nonetheless, since the City will face liability and future damages if it is found to have improperly calculated parity under Castro, the City respectfully requests clarification from this Court as to whether parity has been achieved under the Castro decree, and whether the proper method for measuring parity is to:

(1) Compare the percentage of minority <u>entry-level</u> patrolmen to the percentage of minorities in the City of Boston's general population; or (2) compare the percentage of minorities in the <u>entire police force</u>, including entry-level patrolmen as well as officers, to the percentage of minorities in the City of Boston's general population.

    Respectfully submitted,

    DEFENDANT CITY OF BOSTON
    Merita A. Hopkins
    Corporation Counsel, City of Boston
    By its attorneys,

    S/Stephen G. Cox
    _____
    Stephen G. Cox,  BBO# 566943
    Assistant Corporation Counsel
    City of Boston Law Department
    Room 615, Boston City Hall
    Boston, Massachusetts 02201
    (617) 635-4064

    S/Betsy J. Facher
    _____
    Betsy J. Facher, BBO #637613

        Staff Attorney
        Office of the Legal Advisor
        Boston Police Department
        One Schroeder Plaza
        Boston, MA  02120
        (617) 343-4550

Dated:   July 15, 2004