UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PAUL DELEO, JR., *et al.*,<br><br>               Plaintiffs,<br><br>     v.<br><br>CITY OF BOSTON, *et al.*,<br><br>               Defendants. | CIVIL ACTION<br>NO. 03-12538-PBS |

**THE COMMONWEALTH DEFENDANTS' RESPONSE TO THE CITY OF BOSTON'S MOTION FOR CLARIFICATION OF THE *CASTRO V. BEECHER* CONSENT DECREE**

I.    INTRODUCTION

      The hiring of entry-level police officers in the City of Boston takes place pursuant to a federal court consent decree that remedies the effects of past discrimination against African-Americans and Hispanics (together, "minorities").[1]  See Exhibit 1 (Consent Decree dated June 27, 1975, hereinafter "1975 Decree").  Both the City of Boston and the Commonwealth of Massachusetts were parties to the original litigation that produced this so-called "Castro decree" because under Massachusetts law both are involved in police-officer hiring:  the Commonwealth's Human Resources Division ("HRD") administers a civil service examination for police recruits and then certifies qualified candidates to the city, which makes the final hiring decisions.[2]  The Castro decree does not require the Boston Police Department ("BPD") to hire

---

[1]     The consent decree uses the term "blacks" as opposed to "African-Americans."  See, e.g., Castro v. Beecher, 365 F. Supp. 655 (D. Mass. 1973).  For historical coherence, this memorandum henceforth will adhere to that usage.  For ease in reference, however, this memorandum will use the term "Hispanics" as a proxy for the cumbersome consent-decree term "Spanish-surnamed" individuals.  See id.  "Minority" or "minorities" means blacks and Hispanics collectively, while "non-minority" encompasses all other persons.  See Quinn v. City of Boston, 325 F.3d 18, 24, n.1 (1st Cir. 2003).

[2]     The original state defendant was the Director of the Massachusetts Civil Service Commission, which at the time was responsible for administering civil service examinations.  See Castro v. Beecher, 334 F. Supp. 930, 934 (D. Mass. 1971).  Later, the Department of Personnel Administration, a separate state agency, took over responsibility for administering the

(continued...)

any particular candidates.  1975 Decree.  Rather, the decree facilitates the hiring of minority

recruits by, among other things, directing HRD to assemble its list of qualified candidates by

alternating minority and non-minority candidates.  Id.  This affirmative action program is to

remain in place until Boston's police force achieves a complement of minorities commensurate

with the percentage of minorities in the community.  Id.  In other words, the decree ends when

parity is reached.  Id.  The decree's hiring protocol applies to all Massachusetts communities

with minority populations of at least one percent.  Id.  Scores of Massachusetts communities

originally subject to the decree have attained parity.[3]  Boston, however, hires pursuant to the

Castro decree, and did so most recently in March, 2002, and October, 2003, from a 2001

certification list that has since expired.

  The plaintiffs in DeLeo v. City of Boston, C.A. No. 03-12538-PBS (D. Mass.), are non-

minority males who took the 2001 police-recruit examination and unsuccessfully sought

employment as entry-level police officers in the BPD.  Amended Complaint.  They allege that

the Castro-decree hiring practices violate their constitutional and statutory rights.  Id.  Further,

the DeLeo plaintiffs seek an order enjoining the appointment, based on 2003 examination

results, of the fall, 2004, police-recruit class.  Subsequent to the filing of the DeLeo action, the

City of Boston filed a "Motion for Clarification of Consent Decree" seeking guidance from the

Court on the meaning of parity under the Castro decree.  Specifically, the city wonders whether

---

(...continued)
examinations.  The Department of Personnel Administration is now known as the Human
Resources Division ("HRD").  For ease of reference, this memorandum will refer to the state
defendant as HRD.  The original city defendant was the Commissioner of Police of Boston.  See
id.  While the consent-decree hiring protocol applies statewide, only the Boston Commissioner
was a named defendant in the original litigation, because the Court expected that all appointing
authorities would cooperate with the decree's requirements.  See Castro v. Beecher, 459 F.2d
725, 737 (1st Cir. 1972).

[3]  Since 1980, 80 communities have been exempted from the decree; as of July, 2004, 12
communities, including Boston, remain subject to the decree.  See Exhibit 2 (Affidavit of Toni
G. Wolfman, hereinafter "Wolfman Affidavit," ¶ 9, and Exhibit A thereto).

2

"the complement of minorities for purposes of parity [is] to be calculated by: (1) comparing the percentage of minority <u>entry-level</u> patrolmen to the percentage of minorities in the City of Boston's general population; or (2) comparing the percentage of minorities in the <u>entire police force</u>, including entry-level patrolmen as well as officers, to the percentage of minorities in the City of Boston's general population." <u>City of Boston Memorandum</u> at 1 (emphasis in original). The issue identified by the city -- "entry-level officers only" vs. "all sworn officers" -- is only one of the several parity issues that are likely to be contested in the <u>DeLeo</u> action. For example, the <u>DeLeo</u> plaintiffs will apparently argue that the relevant measurement of minorities in a community is not the city's overall minority population but rather the percentage of minorities in the city's employment-eligible population. <u>See Amended Complaint</u>.

In response to the city's "Motion for Clarification of Consent Decree," HRD has focused on the four key parity variables. The first part of the parity algorithm -- measuring minority penetration within a particular police force -- should be calculated by comparing the number of minorities who are post-probationary members of the uniformed police force, of any rank, to the number of authorized positions in the uniformed police force, of any rank (including authorized positions that are currently vacant). The second part of the parity algorithm -- measuring minority representation in the community -- should comprise the percentage of minorities in a community's overall population, including within the term "minority" those persons who check off on their federal census form both "African-American / Black" and some other race. Using these variables, Boston's police force is 33.40 percent black and Hispanic, while Boston's black and Hispanic population is 40.12 percent. <u>See Exhibit 3</u> (BPD Strength Report Prepared on 6/9/2004); <u>Exhibit 4</u> (federal census data). Thus, Boston has not achieved parity and the Castro decree still applies.

As explained, <u>infra</u>, the foregoing method of calculating parity is supported by precedent. It also adheres to the decree's language and purpose, and follows past practice under the decree

3

consensually engaged in by parties to the original litigation. Furthermore, this method is constitutionally sound because under it the decree today remains a narrowly tailored means of furthering the compelling governmental interest of eradicating the vestiges of past racial discrimination surrounding the certification and hiring of police officers in the City of Boston.

II.    OVERVIEW OF PARITY UNDER THE CASTRO DECREE

Blacks have resided in Boston since colonial times. See Robert C. Hayden African Americans in Boston:  More Than 350 Years 11-17 (1992); Steven J.L. Taylor Desegregation in Boston and Buffalo:  The Influence of Local Leaders 23 (1998) ("Boston has one of the oldest black communities outside of the South").  The percentage of black residents in Boston was 9 percent in 1960, and grew to 16.3 percent in 1970.  Boston by Race, at http://www.bpl.org/research/govdocs/bostonrace.pdf (based on sources found at http://www.bpl.org/research/govdocs/bospopsources.pdf).  Yet, as late as 1970, blacks represented only 3.6 percent of the Boston police force.  See Castro v. Beecher, 334 F. Supp. 930, 935 (D. Mass. 1971) (Wyzanski, J.) (hereinafter, "Castro I").  The Boston Police Department has a "well-documented" history of favoring non-minorities for appointment and promotion.  See Cotter v. City of Boston, 323 F.3d 160, 169 (1st Cir. 2003); see also Exhibit 2 (Affidavit of Toni G. Wolfman, hereinafter "Wolfman Affidavit," ¶ 12) (describing how "for many years the Boston Police Department limited its cadet program (the source of as many as one-third of its recruits each year) to well-connected white candidates").

The Castro litigation began in 1970 when unsuccessful black and Hispanic candidates for appointment as entry-level Boston police officers brought a civil rights complaint alleging racial discrimination in the recruitment, certification, and hiring of police officers throughout the Commonwealth.  See Castro I, 334 F. Supp. at 934.  Following trial, the district court made extensive findings, including findings that in 1960, blacks represented 9 percent of the population of Boston and but 2 percent of its police force and, in 1970, 16.3 percent of the

4

population and but 3.6 percent of the police force.  See id. at 935.  The district court held that

plaintiffs had been discriminated against.  See id. at 943.  Affirming, the First Circuit directed

the Commonwealth to develop a non-discriminatory civil service examination, and, so that relief

would "be more than token," ordered the district court and the parties to develop an affirmative

action program.  See Castro v. Beecher, 459 F.2d 725, 737 (1st Cir. 1972) (hereinafter, "Castro

II").

     From the beginning, the Castro plaintiffs envisioned parity as the benchmark for

determining when racial discrimination had been eliminated.  See Castro I, 334 F. Supp. at 951

(noting that plaintiffs sought preferential hiring for blacks and Hispanics "for some period of

time, perhaps until those minorities had a percentage of the police force corresponding to their

percentage of the population").  The original consent decree, however, had no explicit expiration

point, and instead established a race-conscious hiring protocol using four certification groups

that the parties and the court apparently thought would be exhausted sometime in the future.  See

Castro v. Beecher, 365 F. Supp. 655, 660-62 (D. Mass. 1973) (Wyzanski, J.) (hereinafter,

"Castro III") (on remand from the First Circuit, accepting parties' proposed Consent Decree and

Final Judgment, reproduced as Appendix A to the opinion); Castro II, 459 F.2d at 737.

     The parity benchmark was added to the decree in 1975 after the expiration of one of the

non-minority certification groups unexpectedly resulted in a situation in which the decree's

terms required according an absolute preference for an indefinite period of time to minority

candidates, in contravention of the one-to-one ratio the parties and the court intended.  See

Castro v. Beecher, 386 F. Supp. 1281, 1285-86 (D. Mass. 1975) (Caffrey, J.) (directing parties to

submit a modified consent decree to "eliminate this problem" and recommending the remedy

governing fire department hiring adopted in N.A.A.C.P. v. Beecher, 371 F. Supp. 507, aff'd 504

F.2d 1017 (1st Cir. 1974)); 1975 Decree.  The 1975 Decree first defined parity as "a complement

of Black and Spanish-surnamed post-probationary police officers commensurate with the

5

percentage of minorities within the community." 1975 Decree, ¶ 18 (explaining procedure for community to gain release from the decree's hiring protocol). The 1975 Decree also states more generally that "[a]s a city or town achieves a complement of minorities commensurate with the percentage of minorities within the community, certification will be made according to existing Massachusetts law." Id., ¶ 24. Subsequent supplements to the decree did not alter or address this parity benchmark.

The Castro decree's hiring protocol applies to all Massachusetts communities with minority populations of at least one percent. 1975 Decree. As of July, 2004, only 12 Massachusetts communities, including Boston, remain subject to the decree. Wolfman Affidavit, ¶ 9.

III.    A POLICE FORCE'S COMPLEMENT OF MINORITIES MEANS THE PERCENTAGE OF A COMMUNITY'S AUTHORIZED UNIFORMED POLICE FORCE THAT IS MADE UP OF TENURED BLACK OR HISPANIC OFFICERS OF ANY RANK.

A.    The Numerator of This Calculation Equals the Number of Tenured Minority Police Officers, of Any Rank.

A police force's complement of minorities for purposes of determining parity under the Castro decree means the number of minority members of the uniformed police force overall. That is the view expressed by the federal court in litigation under the Castro decree that took place soon after the parity target was established. In 1981, the district court concluded that the Castro decree should be modified to permit Boston to conduct police-force reductions in a race-conscious manner in order to maintain gains in minority representation. Castro v. Beecher, 522 F. Supp. 873, 877 (D. Mass. 1981) (Caffrey, J.), aff'd sub nom. Boston Chapter, N.A.A.C.P. v. Beecher, 679 F.2d 965 (1st Cir. 1982), judgment vacated sub nom. Boston Firefighters Union, Local 718 v. Boston Chapter, N.A.A.C.P., 461 U.S. 477 (1983) (remanding for consideration of

6

whether case was moot).[4]  The same district judge who had six years earlier directed the parties

to develop a consent decree with a parity benchmark defined parity as a city or town

"'achiev[ing] a complement of minorities commensurate with the percentage of minorities within

the community.'"  See Castro v. Beecher, 522 F. Supp. at 875 (quoting 1975 Decree, ¶ 24).

Judge Caffrey also noted that a 1976 supplemental decree that he had approved exempted from

the Castro hiring protocol "the police departments of 81 cities and towns which had attained

parity of the percentage of blacks and hispanics in police service with the percentage of blacks

and hispanics in municipal population according to then current census statistics."  Id. at 876

(emphasis added).  Furthermore, in discussing how massive police-force reductions based on

seniority would eviscerate gains made under the Castro decree, Judge Caffrey wrote of "the

representation of minorities in the Police Department," and "minority representation in the police

force."  Id.  Affirming, the First Circuit found support for conducting layoffs in a race-conscious

manner in the fact that both the Castro decree and the similar fire department decree "contain

language that warrants concluding that the certifying and appointing authorities are under an

affirmative duty to integrate the police and fire departments until the percentage of blacks and

hispanics in both departments approximates that of the general population."  See Boston

Chapter, N.A.A.C.P. v. Beecher, 679 F.2d at 973 (emphasis added), vacated sub nom. Boston

Firefighters Union, Local 718, 461 U.S. 477.  In sum, while the federal court has not had

---

[4]     Because this memorandum cites Castro v. Beecher, 522 F. Supp. 873 (D. Mass. 1981)
and Boston Chapter, N.A.A.C.P. v. Beecher, 679 F.2d 965 (1st Cir. 1982) as evidence of
contemporaneous judicial understanding of the Castro decree, it is of no consequence that the
cases were vacated on grounds having nothing to do with parity.  See Boston Firefighters Union,
Local 718 v. Boston Chapter, N.A.A.C.P., 461 U.S. 477 (1983) (vacating and remanding for
consideration of whether case was moot); Boston Chapter, N.A.A.C.P. v. Beecher, 716 F.2d 931
(1st Cir. 1983) (on remand, determining that issue of preferential layoffs was made moot by
Massachusetts legislation providing for additional public-safety funding); Boston Firefighters
Union, Local 718 v. Boston Chapter, N.A.A.C.P., 468 U.S. 1206 (1984) (vacating and
remanding for consideration of whether case was moot in view of recent Supreme Court
decision); Boston Chapter, N.A.A.C.P. v. Beecher, 749 F.2d 102 (1st Cir. 1984) (on remand,
finding that case was still moot).

occasion to resolve this precise issue under the Castro decree, these two cases -- decided within seven years of the establishment of the parity benchmark -- evidence a judicial understanding that minority penetration in a police force is measured by the number of minority members of the police force overall.

That judicial understanding comports with the parties' longstanding past practice under the decree. Wolfman Affidavit, ¶¶ 5-10. "Few things evidence a decree's meaning more persuasively than an immutable, decade-old pattern of past practice under the decree, consensually engaged in by all sides in the underlying litigation that produced the decree." See Mackin v. City of Boston, 969 F.2d 1273, 1276 (1st Cir. 1992). According to the attorney who has represented the Castro plaintiffs since April, 1980, and who in that capacity was personally involved in the exemption process, at no time during the 24 years of her representation "has any police department requested exemption based on the number of tenured entry-level police officers or the percentage of minorities among the entry-level category of police officers without also taking into account the rest of the uniformed personnel (including minority patrol officers who had been promoted)." Wolfman Affidavit, ¶¶ 2, 5, 9; see 1975 Decree, ¶¶ 18, 24. Rather, communities seeking exemption have provided the identity of all tenured minority officers in their police departments. Wolfman Affidavit, ¶¶ 6-8. This measurement has been consistently used, without challenge, from at least October, 1982, when this attorney was involved in Peabody's release from the decree's hiring protocol, to February, 2004, when Cambridge was released. Wolfman Affidavit, ¶¶ 9, 14.

Furthermore, as the head of HRD from 1983 to 1991 has explained: "At least since 1983, and, upon information and belief, prior to my appointment, the practice at the [HRD] has required covered appointing authorities to have a post-probationary Black and Hispanic police force proportionately equal to the Black and Hispanic population of the community as evidenced in the most recent federal census in order to be granted exemption from the Castro v. Beecher

8

decree." <u>Exhibit 5</u> (1990 Affidavit of David Haley, ¶ 3, executed in connection with <u>Cecelia Fagan, et al. v. City of Boston, et al.,</u> C.A. No. 89-2076-N (D. Mass.), hereinafter "HRD 1990 Affidavit"); <u>see also Wolfman Affidavit</u>, ¶ 13. This established understanding of the decree was memorialized in 1986 and 1987 memoranda circulated by HRD (hereinafter, "HRD 1986/1987 Memoranda"). <u>Exhibit 6</u> (HRD directs towns seeking exemptions to "[v]erify the total number of <u>post-probationary</u> (tenured) Black or Hispanic members of the uniformed force") (emphasis in original); <u>see also Wolfman Affidavit</u>, ¶ 10 ("It is my understanding that the process for requesting an exemption from the <u>Castro</u> consent decree that is set forth in those memoranda is fully consistent with the intention of the original parties to the <u>Castro</u> litigation and Judge Caffrey at the time the 1975 decree entered."). In sum, the original parties to the Castro litigation understood a police force's complement of minorities to include all officers of any rank.

The judicial understanding of the decree and the parties' longstanding past practice under it are consistent with the decree's two linguistic formulations of parity: "complement of Black and Spanish-surnamed post-probationary[5] police officers" and "complement of minorities." <u>1975 Decree</u>, ¶¶ 18, 24. While the Castro decree does not define "police officer," as a general matter the term encompasses sworn, uniformed members of the police department of any rank, in contradistinction to "patrolman" or "patrol officer," which refers more precisely to the entry-level rank. <u>See</u> <u>Webster's Third New Int'l Dictionary</u> 1754 (1993) (defining "police officer" as "a member of a police force"); <u>American Heritage Dictionary of the English Language</u> 1358 (4th ed. 2000) (defining "police officer" as a "policeman or policewoman," which in turn means a person "who is a member of a police force"); <u>Merriam-Webster OnLine Dictionary</u>, at

---

[5]     Entry-level police officers are "probationary" officers for 18 months: for the six months they attend the police academy and then for their first year on the job. <u>See Exhibit 7</u> (excerpt of transcript of deposition testimony of Edward P. Callahan, director of human resources of the Boston Police Department).

9

http://www.m-w.com (2004) (defining "police officer" as "a member of a police force").

Moreover, the First Circuit has recognized that "police officer" means any uniformed member of a police force. In 1998, the First Circuit read the language of a consent decree governing promotions within the BPD as applying only to promotional tests to the rank of sergeant, not to promotional tests to lieutenant and higher. <u>Boston Police Superior Officers Federation v. City of Boston</u>, 147 F.3d 13, 17 (1st Cir. 1998) (hereinafter, "Boston Superior Officers"). The Court reasoned that, while normally "police officer" refers to any member of a police department, "in [the] context" of the particular decree at issue, "'police officers' means not all officers -- the decree refers to the set of all officers as 'sworn officers' -- but instead 'patrolmen,' or those officers who might be elevated to sergeant." <u>Id.</u> at 18; <u>see</u> <u>also</u> <u>Quinn v. City of Boston</u>, 325 F.3d 18, 32 (1st Cir. 2003) (<u>Boston Superior Officers</u> held that "the term 'police officers' used in a consent decree governing promotions within the Boston Police Department did not include all police officers, but, rather, encompassed only patrolmen"); <u>Cotter</u>, 323 F.3d at 169 ("In 1965, only two percent of police officers in the City were not Caucasian, and only one minority held a position of sergeant or above. In 1978, only five-and-a-half percent of officers were African-American, and only three officers held a position of sergeant or above."); <u>Stuart v. Roache</u>, 951 F.2d 446, 448 (1st Cir. 1991) ("The result of this discrimination, MAAAP said, was a Department where, in 1978, only one (or .45 percent) of 222 sergeants was black, although blacks comprised 5.5 percent of the roughly 2200 police officers in the force and 20 percent of the population of Boston as a whole."); <u>id.</u> at 456, Appendix (reproducing BPD's "Goals and Timetables: Boston Police Sergeant," which distinguishes between "sergeants" and "patrol officers"). In sum, the judicial understanding of the correct measurement of a police force's "complement of minorities," and the parties' lengthy history of uncontested practice under the decree, are firmly rooted in the decree's plain language. <u>Contrast Quinn</u>, 325 F.3d at 34-35 (declining to adopt parties' past practice under decree governing fire

10

department hiring in part because the Court said the practice was "first inaugurated in 1987 (thirteen years after the entry of the [] decree)" and because the practice "change[d] the meaning of [the decree's] plain language").

Furthermore, to exclude higher ranks from a police force's complement of minorities would foster racial discrimination, the very behavior that the Castro decree was intended to eliminate.  That is, counting only patrol officers towards a force's parity goal would create an incentive for the force to keep all its minority patrol officers at the entry level, and thereby achieve release from the decree more quickly.  See Wolfman Affidavit, ¶ 12 (describing how some communities have manipulated their police officer hiring in an attempt to circumvent the goals of the Castro decree).  The parties and the court could not have intended such an absurd result.  See Navarro-Ayala v. Hernandez-Colon, 951 F.2d 1325, 1339 (1st Cir. 1991) (consent decrees should be interpreted according to ordinary contract principles).  Thus, while the Castro litigation and decree focused on discrimination in entry-level recruitment and hiring, the parity measurement was necessarily broader.  See id. at 1338 ("broad judicial discretion [is often] crucial for the district judge to secure complex legal goals") (citations and internal quotation marks omitted); Quinn, 325 F.3d at 43 (Lipez, J., dissenting); but see id. at 34 (majority opinion).  In sum, the language and purpose of the Castro decree, the past practice under the decree consensually engaged in by parties to the original litigation, and judicial precedent all compel the conclusion that, in calculating the percentage of minorities on a police force, the numerator equals the number of tenured black or Hispanic members of the uniformed force, of any rank.

B.     The Denominator of This Calculation Equals the Number of Authorized Police Officer Positions, of Any Rank, Including Positions That Are Currently Vacant.

The denominator for determining a police department's complement of minorities is the total number of authorized positions in the unformed force of the department, including positions

11

that are currently vacant. The parties to the Castro litigation have used that measurement for the past 24 years at least. See Wolfman Affidavit, ¶¶ 5-10; HRD 1986/1987 Memoranda; Mackin, 969 F.2d at 1276. The parties were no doubt mindful of the fact that to do otherwise would allow police departments to circumvent the decree by delaying hiring new officers for a time in order to gain "parity" more readily. See Wolfman Affidavit, ¶ 12; Quinn, 325 F.3d at 36 & n.9 (recognizing that where enjoined party has the power to reconfigure the contours of a relevant labor pool, the district court has "broad judicial discretion" to fashion a remedy to "prevent[] a public employer enjoined for discriminatory practices in violation of federal law from manipulating the remedy to suit its fancy") (citing Navarro-Ayala, 951 F.2d at 1338) (internal quotation marks omitted). The decree's language permits this commonsense approach. 1975 Decree. In sum, a police force's complement of minorities under the Castro decree means the percentage of the authorized uniformed force that is made up of tenured black or Hispanic officers of any rank.

IV.    A POLICE FORCE'S COMPLEMENT OF MINORITIES MUST BE COMPARED TO THE PERCENTAGE OF MINORITIES IN THE COMMUNITY'S GENERAL POPULATION.

    A.    The Proper Data Are General Population Statistics, Not the 'Qualified' Labor Pool.

    The Castro decree unambiguously requires the use of the percentage of minorities in a community's general population in the second part of the parity algorithm. 1975 Decree, ¶¶ 18, 24 (parity is "a complement of Black and Spanish-surnamed post-probationary police officers commensurate with the percentage of minorities within the community" or "a complement of minorities commensurate with the percentage of minorities within the community") (emphasis added). Nothing in the four corners of the decree or the course of the litigation indicates that the parties or the court intended to alter the decree's plain language by limiting "minorities within

12

the community" to the specific adult population that comprises the qualified labor pool.[6]  See

1975 Decree; Boston Chapter, NAACP v. Beecher, 679 F.2d at 973 (interpreting Castro decree

to require race-conscious hiring until the percentage of minorities on a police force

"approximates that of the general population") (emphasis added); Castro v. Beecher, 522 F.

Supp. at 875-76; cf. Quinn, 325 F.3d at 35-36 & n.9 (holding that Mackin, supra, had determined

that identical language in fire fighters decree referred to a community's general population).[7]

Accordingly, the Castro parties have correctly calculated parity using general population figures.

See Wolfman Affidavit, ¶¶ 5-10; HRD 1986/1987 Memoranda; Mackin, 969 F.2d at 1276.

      B.      A Community's General Population of Minorities Includes Persons Who Check
On Their Federal Census Form 'African-American / Black' and Some Other
Race.

In calculating the second part of the parity algorithm, the percentage of blacks within a

community includes persons who check on their federal census form "African-American /

Black" and some other race, an option first offered in the 2000 federal census.  See The New

Race Question: How the Census Counts Multiracial Individuals 1 (Joel Perlmann & Mary C.

---

[6]      It is of no consequence that before parity was even part of the Castro decree, the district
court and the First Circuit mused that looking to a community's qualified minority labor pool
might be an appropriate measure.  See Castro I, 334 F. Supp. at 949; Castro II, 459 F.2d at 737.
The district judge who entered the Beecher decree made specific mention of age requirements
for the fire fighter position, but recognized that it would be imprudent to measure parity with
reference to a labor pool that could be "manipulat[ed]" by the enjoined public employer in order
to circumvent the decree's purpose.  See Quinn 325 F.3d at 36 n.9.

[7]      In Mackin, plaintiffs alleged that the Boston Fire Department had met the parity target of
the Beecher consent decree because the percentage of minorities in the fire department exceeded
the percentage of minorities in Boston's general population at the time the decree was originally
entered.  969 F.2d at 1275.  In a case before a different district judge, the same challenge was
made to the Castro decree.  See Fagan v. City of Boston, C.A. No. 89-2076-N (D. Mass.);
Wolfman Affidavit, ¶ 13.  Both decrees use the phrase "the percentage of minorities within the
community" to refer to the second part of the parity algorithm.  The Mackin Court, in holding
that the correct data under the Beecher decree were contemporaneous population statistics, see
969 F.2d at 1276, necessarily also held that the relevant group was the general population, not
just the qualified labor pool, see Quinn, 325 F.3d at 35-36.  Soon after the First Circuit decided
Mackin, the Fagan plaintiffs dropped their action, which was still pending in the district court.
See Wolfman Affidavit, ¶ 13.

13

Waters eds., 2002) (hereinafter, "New Race Question").  Previously, census respondents were allowed to identify with only one race.  New Race Question 1.  Nationwide, almost 5 percent of previously identified blacks chose more than one race in the 2000 census.  New Race Question 340-41.

The federal Office of Management and Budget has ruled that, for purposes of civil rights enforcement, people who identify themselves as members of more than one race should be counted in the minority category.  Guidance on Aggregation and Allocation of Data on Race for Use in Civil Rights Monitoring and Enforcement, OMB Bulletin 00-02, Washington (March 9, 2000), available at http://www.whitehouse.gov/omb/bulletins/b00-02.html.  This approach, which recognizes that many if not most "multiracial" persons would previously have identified themselves in a single minority group, is consistent with the Castro decree's purpose.  See 1975 Decree; cf. Keyes v. School Dist. No. 1, 413 U.S. 189, 195-98 (1973) (agreeing that, in light of Latinos' history of discrimination and exclusion, they should be deemed a discrete and insular minority like blacks for purposes of school integration).

Hispanics are unaffected by the multiracial categorization allowed by the 2000 federal census because they are counted as an ethnicity, not as a race.  New Race Question 162.  In other words, since 1970, the federal census has included a separate question inquiring whether the respondent is of Hispanic origin.  New Race Question 5, 8, 42.  For purposes of the Castro decree, persons of Hispanic origin are counted as minorities regardless of which race or races they report on the census's race question.  To avoid double-counting, HRD calculates a community's minority population by adding the number of Hispanics, of any race, to the number of blacks -- including persons who check only "black" and persons who check "black" and some other race -- who do not identify themselves as Hispanic in the separate Hispanic-origin question.  See Exhibit 4.

14

V.     THIS METHOD OF CALCULATING PARITY IS CONSTITUTIONALLY SOUND.

The foregoing method of calculating parity is constitutionally sound.  HRD intends to brief the constitutional issues comprehensively in its opposition to the DeLeo plaintiffs' motion for a preliminary injunction.  Briefly, under this method the decree today remains a narrowly tailored means of furthering the compelling governmental interest of eradicating the vestiges of past racial discrimination surrounding the certification and hiring of police officers in the City of Boston.  See Cotter, 323 F.3d at 168-72 (holding that City of Boston's race-conscious promotion of police officers was constitutional); Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 237 (1995) ("The unhappy persistence of both the practice and the lingering effects of racial discrimination against minority groups in this country is an unfortunate reality, and government is not disqualified from acting in response to it.").

First, there is a "strong basis in evidence" to conclude that past discrimination surrounding the certification and hiring of police officers by HRD and the BPD justified the race-conscious hiring protocol of the Castro decree.  See Cotter, 323 F.3d at 169 (quoting Stuart, 951 F.2d at 450) (internal quotation marks omitted).  Just last year, the First Circuit found that the BPD's history of discrimination in hiring and promotion was "well-documented by past litigation and records," and thus justified the race-conscious state action at issue there.  Id. at 169.

Second, the Castro decree's provisions, including its parity target, are narrowly tailored to rectify the specific harm in question.  See Cotter, 323 F.3d at 171.  In conducting a narrow-tailoring analysis, the Court must consider:

> the extent to which (i) the beneficiaries of the order are specially advantaged; (ii) the legitimate expectancies of others are frustrated or encumbered; (iii) the order interferes with other valid state or local policies; and (iv) the order contains (or fails to contain) built-in mechanisms which will, if time and events warrant, shrink its scope and limit its duration.

Id. (quoting Mackin, 969 F.2d at 1278).

15

In 1992, the First Circuit upheld the constitutionality of the Beecher fire fighter degree against a charge of overbreadth for reasons that also apply to this case:  among them, that only qualified minority candidates were specially advantaged; that the decree did not require that minority aspirants be appointed; and that "the decree's life is limited, remaining in force only until its requirements have been met," Mackin, 969 F.2d at 1278, namely, until a city or town "achieves a complement of minorities commensurate with the percentage of minorities within the community," id. (quoting Beecher decree).  Last year, the First Circuit reaffirmed Mackin to some extent, finding that measuring parity under the Beecher decree with reference to a city's general population was constitutionally permissible.  See Quinn, 325 F.3d at 36 (citing City of Richmond v. J.A. Croson Co., 488 U.S. 469, 501 (1989)).  So, too, with the Castro decree.

The Quinn majority, however, also found that, with regard to the first part of the parity algorithm, "including higher ranks within the compass of the term 'firefighter' would mean that the Beecher decree was not narrowly tailored to serve its stated purpose."  Id. at 32.  The Quinn majority reasoned that including the higher ranks would impermissibly benefit minority fire fighters by somehow giving them preferences for promotions.  Id.  The Quinn majority's constitutional analysis was faulty.  Including higher ranks in the parity measurement -- whether under the Beecher decree or the Castro decree -- does not in fact grant minorities promotional preferences.  See id. at 43-44 (Lipez, J., dissenting).  Rather, this parity measurement -- as the Castro court and parties understood -- was a constitutionally permissible way to measure a given community's progress in overcoming the effects of past discrimination.  See Wolfman Affidavit, ¶¶ 11-12; Navarro-Ayala, 951 F.2d at 1338 ("broad judicial discretion [is often] crucial for the district judge to secure complex legal goals") (citations and internal quotation marks omitted).  The parity measurement is clear and relatively simple to apply; permits the progressive narrowing of the reach of the Castro Court's orders as each community achieved parity, without regard to statewide demographics or the progress (or lack thereof) of any other municipality;

16

and, perhaps most significantly, corrects for the impact of continuing discrimination within police departments. <u>See</u> <u>Wolfman Affidavit</u>, ¶¶ 11-12 (describing how "for many years the Boston Police Department limited its cadet program (the source of as many as one-third of its recruits each year) to well-connected white candidates, thereby significantly slowing its progress towards parity"). Moreover, even assuming <u>arguendo</u> this parity measurement provides some small incidental advantage to minorities in promotions, litigated court findings of entry-level discrimination are "sufficient to justify race-conscious remedies at both entry and promotional levels," because an employer like a police department that promotes from within cannot "segregate the results achieved by its hiring practices and those achieved by its promotional practices." <u>See</u> <u>Stuart</u>, 951 F.2d at 452 (quoting <u>United States v. Paradise</u>, 480 U.S. 149, 168-69 (1987)) (internal quotation marks omitted). In sum, the Castro decree, established to combat racial discrimination in the certification and hiring of police officers, is tailored with sufficient precision to withstand constitutional challenge.

17

VI.    <u>CONCLUSION</u>

      For the reasons stated herein, this Court should declare that parity under the Castro consent decree is calculated by comparing the "percentage of the authorized uniformed force which is made up of tenured Black or Hispanic officers of any rank," to the "percentage of the [community's] total population which is Black or Hispanic as determined by [the most recent federal] census," including as "Black" persons who check "black" and some other race on the census form.  <u>See</u> <u>1975 Decree</u>; <u>HRD 1986/1987 Memoranda</u>; <u>Wolfman Affidavit</u>.

                               Respectfully submitted,

                               THE COMMONWEALTH OF MASSACHUSETTS

                               By its attorneys

                               THOMAS F. REILLY
                               ATTORNEY GENERAL


                               /s/ Robert L. Quinan, Jr.
                               _____
                               Robert L. Quinan, Jr.
                               BBO # 553010
                               Victoria S. Cole
                               BBO # 654996
                               Assistant Attorneys General
                               Government Bureau
                               One Ashburton Place, Room 2019
                               Boston, MA 02108
                               (617) 727-2200, ext. 2554


Dated:  July 15, 2004

18

CERTIFICATE OF SERVICE

I, Robert L. Quinan, Jr., hereby certify that I have today, July 15, 2004, served a copy of The Commonwealth Defendants' Response to the City of Boston's Motion for Clarification of the <u>Castro v. Beecher</u> Consent Decree on all other parties, by first-class mail, postage prepaid.

19