UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| PAUL DELEO, JR., THOMAS BARRETT, MICHAEL CONNEELY, MATTHEW HOGARDT, BRENDAN DEVER, PATRICK ROGERS, CHRISTOPHER CARR, and BRIAN DUNFORD,<br>　　　　　　　　　　Plaintiffs<br><br>v.<br><br>CITY OF BOSTON, Massachusetts; MITT ROMNEY, in his capacity as Governor of the Commonwealth of Massachusetts; and COMMONWEALTH OF MASSACHUSETTS,<br><br>　　　　　　　　　　Defendants<br><br>BOSTON BRANCH OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE and MASSACHUSETTS ASSOCIATION OF MINORITY LAW ENFORCEMENT OFFICERS,<br><br>　　　　　　　　　　Intervenors | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Docket No. 03-12538-PBS |

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR
SUMMARY JUDGMENT AND/OR FOR PRELIMINARY INJUNCTION

## I.　　INTRODUCTION

The Plaintiffs, Paul DeLeo, Jr., Thomas Barrett, Michael Conneely, Matthew

Hogardt, Brendan Dever, Patrick Rogers, Christopher Carr, and Brian Dunford, hereby

submit their Memorandum of Law in Support of their Motions for Summary Judgment

and/or for Preliminary Injunction. Factual assertions are supported by the Plaintiffs'

attached Rule 56.1 Statement of Facts Not in Material Dispute ("SOF").

In March 2002 and October 2003, the City of Boston (the "City") failed to consider the Plaintiffs for positions as entry-level police officers in the Boston Police Department (the "Department") because of their race and/or gender based on a selection system that violates the Fourteenth Amendment to the United States Constitution (asserted through 42 U.S.C. § 1983); Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e; and Mass. Gen. Laws ch. 151B, § 4(1). (Compl. counts I, II, III.) The City hired lower-scoring and lower-ranked minority applicants, despite the fact that the percentage of minorities in the Department's entry-level ranks had already reached rough parity with the percentage of minorities in the general population of Boston and far exceeded the percentage of minorities in the relevant qualified labor pool. The City also hired lower-scoring female candidates without any constitutionally or statutorily permissible reason to do so. The Commonwealth of Massachusetts (the "Commonwealth"), through its Human Resources Division ("HRD"), is complicit in these constitutional and statutory violations through its role in creating and certifying the lists of eligible candidates for the City to consider in making its hiring decisions.

Defendants will likely attempt to justify their continuing race-based hiring practices by asserting themselves to be complying with the thirty-one (31) year old consent decree in the case of Castro v. Beecher, 365 F. Supp. 655 (D. Mass. 1973) (the "Beecher decree"). The Defendants reliance on this decree is misplaced because [1] the decree has expired because racial parity has been exceeded, and [2] the decree has expired because, at thirty-one (31) years of age, it has passed its constitutionally permissible lifespan.

In addition to requesting summary judgment for these per se violations of their civil rights, Plaintiffs request a preliminary injunction requiring [1] that the Commonwealth and the City immediately cease using race and/or gender as a factor in their selection system for the City of Boston Police Department and [2] that the Plaintiffs be permitted to go through the selection process for positions as police officers in the Department. As will be shown below, such injunctive and remedial relief is necessary to remedy the clear and patent violations of the Plaintiffs' civil rights.

## II.    SUMMARY OF FACTS[1]

In April 1973, the U.S. District Court for the District of Massachusetts approved and entered a voluntary consent decree regarding the recruitment and hiring practices for the Boston Police Department and other police departments in the Commonwealth.  SOR ¶¶ 1.4.5.  The decree ended the litigation in a case that had been asserted on behalf of a class of black and Hispanic individuals (hereinafter "minorities")[2] who complained that the Commonwealth and the relevant appointing authorities, "without having invidious intent," violated their rights by failing to give them a "non-discriminatory opportunity to be considered for positions as patrolmen . . . ."  Castro, 365 F. Supp at 663; SOF ¶ 1.

The original decree separated the candidates into four different priority groups based on the candidates' minority status and whether the candidates passed or failed certain police entrance examinations between 1968 and 1972, and it set forth the order in

---

[1] Factual assertions are supported by the Plaintiffs' attached Rule 56.1 Statement of Facts Not in Material Dispute ("SOF").

[2] The term "minorities" will refer only to blacks and Hispanics even though this term normally includes other racial classifications considered to be minorities within the meaning of federal and state law. Correspondingly, the term "non-minorities" will refer to all individuals other than blacks and Hispanics This usage will thus remain consistent with the terminology in the consent decrees and in all precedents relating to this and other consent decrees entered into by the City.

which candidates would be hired out of those priority groups. SOF ¶ 5. This decree was
modified in 1975 to address hiring practices following future examinations. SOF ¶ 7. The
updated <u>Beecher</u> decree required that after future examinations, candidates would be
ranked in two groups where Group A consists of qualified minority applicants and Group
B consists of qualified non-minority applicants. SOF ¶ 8. Within each group, the
candidates are ranked in order of statutory preferences such as veterans status and familial
relation to public safety officers killed or injured in the line of duty. SOF ¶¶ 6, 8. The two
lists (minority and non-minority) would then be merged so that – as relates to the Boston
Police Department – the first name is the highest ranking minority candidate (based on
statutory preference and test score) and the second name is the highest ranking non-
minority candidate, with the list alternating one minority for one non-minority until the
appropriate number of individuals was reached. SOF ¶¶ 9, 17, 18.

Once the City received such a certification list, it would instruct the applicants to
come in to the Department to sign the list indicating their willingness to accept a position
if offered to them. SOF ¶ 20. The City would then proceed down the certification list and
consider all the individuals in rank order without attempting to bypass higher-ranked
individuals for those with lower ranks. SOF ¶ 22. In so doing, it is uncontroverted that
the City would consider and select minority candidates who ranked lower than certain
unconsidered non-minority candidates due to lower test scores or lack of statutory
preferences. <u>E.g.,</u> SOF ¶ 35.

The modified <u>Beecher</u> decree was intended to remain in effect until the City
achieved "a complement of minorities commensurate with the percentage of minorities in

4

the community . . . ." SOF ¶ 10, Ex. 2 at ¶ 24. This comparison has been referred to as "rough parity." SOF ¶ 10.

According to the April 2000 U.S. Census, the minority population of the City of Boston was 38.26 percent of the general population. SOF ¶ 39. However, in April 2000, the minority percentage of the qualified labor pool for Boston police officers was much smaller. SOF ¶ 39. For example, Boston police officers must be U.S. citizens, and minority U.S. citizens comprise only 29 percent of the Boston population. SOF, Ex, K at ¶ 20. In addition, Boston police officers must have a high school degree or its equivalent, and minority individuals with high school diplomas comprise only 28.29 percent of the Boston population. SOF, Ex, K at ¶ 21. In addition, the age range for applicants for the Boston Police Department is nineteen (19) to thirty-one (31), and minority individuals in this age range comprise only 28.90 percent.[3] SOF, Ex, K at ¶ 19. When taken together, the percentage of minority individuals with the required age, education, and citizenship status is 21.72 percent. SOF ¶ 39, Ex. K at ¶ 22.

As of April 2000, minorities made up 34.90 percent of the tenured entry-level police officers in the Boston Police Department. SOF Ex. K (at internal Ex. E). As of March 2002, when the City hired a class of officers, minorities made up 37.39 percent of the entry-level police officers. SOF ¶ 40. As of June 2003, minorities made up 38.79 percent of the entry-level police officers. SOF ¶ 41. And as of October 2003, when the City hired another class of officers, minorities made up 38.82 percent of the entry-level police officers. SOF ¶ 42.

---

[3] Though the maximum age criteria was not established at the time of the April 2001 certification exam, the application information for that exam states that people aged 32 and over must meet certain "medical and physical fitness standards," indicating that the sought-after age range is only 19-31. SOF, Ex. 3 at 1. However, this distinction makes no difference since the population percentages based solely on citizenship and education level are low enough to show that parity has been reached. See infra part III(A)(1)(b).

As compared to the general population figures, the City achieved rough parity as of April 2000 when there was less than a four (4) percent difference in minority representation in the entry-level ranks of the Department and the general population.  SOF Ex. K at ¶ 23.  There was less than a one (1) percent difference at the time of the hiring class in 2002, SOF ¶ 43, and minority representation in the ranks outpaced that in the general population at the time of the hiring class in October 2003, SOF ¶ 44.  As compared to the qualified labor pool, using any qualification on its own or all of them together, minority representation in the entry-level police officer position was higher than that in the relevant Boston population. SOF Ex. K at ¶ 19-22.

The Plaintiffs in this case are all white men who sat for the police officer exam in April 2001 and applied for consideration for the Boston Police Department.  SOF ¶ 30.  Despite the fact that they all scored 100 or higher on the exam,[4] Plaintiffs were not reached for consideration by the City in either March 2002 or October 2003 when the City hired police officers based on the April 2001 test results.  SOF ¶ 31.  However, the City did consider and select minority applicants who scored lower than the Plaintiffs and who had no other statutory preference that would place them above the Plaintiffs in the rankings were race not considered. SOF ¶ 35.

In addition, during the October 2003 hiring period, the City requested from the Commonwealth a certification list consisting solely of female applicants, and the City ultimately hired eleven (11) candidates off this list.  SOF ¶ 36.  There is no consent decree or other court order requiring the Defendants to use gender in its hiring decisions.  SOF ¶ 3.  In the October 2003 hiring process, the City considered and selected female applicants

---

[4] Plaintiff DeLeo received a score of 101 because of a point he received for prior police experience.

who scored lower than the Plaintiffs and who had no other statutory preference that would

place them above the Plaintiffs in the rankings were race not considered. SOF ¶ 36.

The Plaintiffs all sat for the April 2003 exam and scored very well on this more

difficult exam. SOF ¶ 37. The City has requested a certification list from the

Commonwealth to begin the hiring process and expects to hire a new class for entry into

the Boston Police Academy in November 2004. SOF ¶ 38. The Commonwealth used the

racial-based quota system in creating the certification list. SOF ¶ 38.

## III.    ARGUMENT

A.    The Defendants' use of race- and gender-based considerations in hiring
entry-level police officers for the City of Boston violates federal and state
civil rights statutes and the Plaintiffs' right to equal protection under the
U.S. Constitution.

The City of Boston failed to reach and thus select Plaintiffs, who are non-minority

men, for positions as entry-level police officers in March 2002 and October 2003 while at

the same time selecting lower-scoring and lower-ranked minorities and women for those

positions. At issue is the Equal Protection Clause of the U.S. Constitution, which states

that "no state shall . . . deny to any person within its jurisdiction the equal protection of the

laws." U.S. Const. amend. XIV, § 1. Also at issue are the provisions of Title VII of the

federal Civil Rights Act of 1964 and state Chapter 151B which both make it unlawful for

an employer to fail or refuse to hire a person because of his race or sex. 42 U.S.C. §

2000e-2; Mass. Gen. Laws ch. 151B, § 4(1).[5]

---

[5] In employment discrimination cases, it has been held that the test of validity of an employment action
under Title VII is the same as under the Equal Protection Clause. Castro v. Beecher, 459 F.2d 725, 732-33
(1st Cir. 1972), cited in U.S. v. Chesterfield Cty. Sch. Dist., 484 F.2d 70 (4th Cir. 1973). Moreover, though
the Massachusetts Supreme Judicial Court is not bound to follow the interpretations of Title VII with regard
to the state antidiscrimination statutes, Cosme v. Salvation Army, 284 F. Supp. 2d 229 (D. Mass. 2003), the
Massachusetts court has applied the same standards in employment discrimination cases, e.g., Beal v. Board
of Selectman of Hinham, 646 N.E.2d 131, 139 (Mass. 1995).

It is well established that all racial classifications by governmental actors must be strictly scrutinized under the Equal Protection Clause. Gratz v. Bollinger, 539 U.S. 244, 270 (2003) (quoting Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 224 (1995)). See also City of Richmond v. J.A. Croson Co., 488 U.S. 469 (1989) (Croson); Wygant v. Jackson Bd. of Educ., 476 U.S. 267 (1986). The strict scrutiny under which governmental race-based actions must be measured requires that [1] any racial classification be justified by a compelling governmental interest, and [2] the means utilized by the government be narrowly tailored to achieve that goal.[6] Gratz, 539 U.S. at 270. Because racial classifications are potentially harmful to the entire body politic, strict scrutiny applies to such classifications regardless of whether the government's intent is considered benign or remedial. Adarand Constructors, Inc., 515 U.S. at 225-26, 235.

With regard to governmental classifications based on gender, those classifications are subjected to a heightened level of scrutiny as well. Nevada Dept. of Human Resources v. Hibbs, 538 U.S. 721 (2003). "For a gender-based classification to withstand such scrutiny, it must serve important governmental objectives, and the discriminatory means employed must be substantially related to the achievement of those objectives." Id. at 782-29 (citing U.S. v. Virginia, 518 U.S. 515 (1996) (internal quotation marks omitted)).

The Defendants expressly use racial classifications in selecting individuals for entry-level Boston police officer positions, hiring blacks and Hispanics (hereinafter "minorities") – other than those disqualified for cause – on a one-for-one basis with all other individuals (hereinafter "non-minorities"). The City also used gender-based

---

[6] It is undisputed that had the City and the Commonwealth followed the non-race based ranking system mandated by the Civil Service statute, the Plaintiffs would have been ranked and reached before most of the minorities hired in 2003.

requisitions and classifications in 2003 to hire a group exclusively consisting of women. These actions of the City in failing to consider the Plaintiffs for Boston police officer positions on grounds of race and gender fail to meet the required heightened levels of scrutiny required to support such actions; therefore, the Plaintiffs are entitled to judgment in their favor and to a proper remedy.

> 1.     The Beecher decree, though constitutionally permissible when entered by the Court, may no longer be relied upon because the decree expired under its own terms when the percentage of minorities in the entry-level police officer position attained rough parity with the percentage of minorities in the relevant community in the general population.

The District Court entered the original <u>Beecher</u> decree in 1973 and the modified decree in 1975 after the parties reached agreement as to how to remedy the racially discriminatory results of the written entrance examinations for police officers. <u>Castro v. Beecher</u>, 365 F. Supp. 655 (1973); <u>see</u> SOF, Ex. 1 & 2. Though the District Court and the Court of Appeals had made findings and conclusions about the disparate impact of the exam, the ultimate remedy for this discrimination was not imposed by the Court, but rather was agreed upon by all the parties and entered as a consent decree. <u>Castro v. Beecher</u>, 365 F. Supp. at 655, 660-61. The decree, as modified, required the Commonwealth to present certification lists of eligible employees to the City on a ratio of one minority to one non-minority, and to continue this practice until the City achieved "a complement of minorities commensurate with the percentage of minorities in the community . . . ." SOF, Ex. 2 at ¶ 24. In discussing identical language in a decree involving Massachusetts firefighters, the First Circuit stated that the benchmark established by this language is the attainment of at least "rough parity." <u>Quinn v. City of Boston</u>, 325 F.3d 18, 24 (1st Cir. 2003); <u>see also</u>

Boston Police Superior Officers Federation v. City of Boston, 147 F.3d 13, 21 (1st Cir. 1998) (BPSOF) (adopting the "rough parity" standard with regard to a consent decree relating to promotions within the Boston Police Department).

At the time it was entered, the Beecher consent decree complied with the constitutional requirement that it be specifically focused and narrowly tailored. See Boston Chapter, NAAACP, Inc. v. Beecher, 504 F.2d 1017, 1026-27 (1st Cir. 1974) (upholding a nearly identical decree imposed on the City with regard to its hiring of entry-level firefighters); Mackin v. City of Boston, 969 F.2d 1273, 1277 (1st Cir. 1992) (same). However, as discussed below, infra this part, though the decree was constitutionally permissible when entered, it has now expired under its own terms as parity has been achieved under any measure. Furthermore, without the decree to support the race-based hiring practices, the fact that parity has been achieved means that race-based hiring was not acceptable in 2002 and/or 2003 in the Boston Police Department.

> a.    Using the type of comparison applied by the First Circuit in Quinn, rough parity has been achieved, so the decree has expired and the Defendants could not use the decree to justify their race-based hiring practices.

On March 27, 2003, the First Circuit issued its decision in Quinn v. City of Boston, in which it held that the relevant comparison regarding a similar decree relating to firefighters was a comparison of the percentage of minorities in the entry-level ranks of the Fire Department to the percentage of minorities in the general population.[7] 325 F.3d. at 24. Even though this comparison is not necessarily narrow enough to pass constitutional

---

[7] As in this case, the decree in the firefighters case stated: "As a city or town achieves a complement of minorities commensurate with the percentage of minorities within the community, certification will be made according to existing Massachusetts law." Mackin v. City of Boston, 960 F.2d 1273, 1276 (1992). See also SOF, Ex. 1 ¶ 24.

muster, see infra part III(A)(1)(b), parity was achieved even under this broader comparison, so the decree expired under its own terms.

> i.    The first variable in the relevant comparison should be the percentage of minorities in the position of entry-level police officer.

In the Quinn decision, with regard to the first variable – i.e., the relevant percentage within the Fire Department (be it entry level firefighters or all uniformed personnel) that should be used in the parity comparison – the First Circuit found that there was no specific precedent on point and thus applied ordinary contract principles to the terms of the decree to make its determination as to what variable should be used. Id. at 29-30. In so doing, the Court placed the terms of the decree in context and determined that the relevant variable to consider was entry-level firefighters. Id. at 30-35. An important consideration for the First Circuit was that an interpretation that went beyond the remedy within the entry-level ranks would present an "insurmountable constitutional obstacle," since the result would be a remedy not "narrowly tailored to serve its stated purpose" of eliminating discrimination in recruitment and hiring. Id. at 32.

Similarly, putting the words of the police officer decree in context, and especially considering the fact that this decree was related to discrimination in "recruiting and hiring practices," Castro v. Beecher, 459 F.2d 725, 728 (1st Cir. 1972), the first variable to consider must also be the percentage of minorities in entry-level police officer positions. See also BPSOF, 147 F.3d at 18 (limiting reach of separate decree regarding promotions to only those promotions out of the entry-level rank of police officer because the original suit alleged bias in entry-level hiring).

Looking only to entry-level police officers for comparison also comports with relevant Supreme Court precedent. In Ward's Cove Packing Co. v. Antonio, 490 U.S.

642, 650 (1989), the Court held that the proper comparison in gauging employment discrimination is generally between the racial composition of the "at issue jobs" and the racial composition of the qualified population in the relevant labor pool. As the Plaintiffs did not apply for any of the higher-level positions in the Department, nor would they have been eligible to apply for such jobs without the prior experience in the entry-level ranks, the correct comparison here is with the "at issue job" of entry-level police officer.

> ii.    Though it may not be an acceptably narrow variable in this case, using a second variable consisting of the percentage of minorities in the general population leads to a finding that rough parity has been achieved and the decree has expired.

In the <u>Quinn</u> decision, the First Circuit held that *stare decisis* governed the second variable because the Court had already addressed the language of that variable in an earlier decision regarding this specific decree. 325 F.3d at 35. The Court thus used as the second variable for comparison the percentage of minorities in the general population. <u>Id.</u> Though the First Circuit's decision on this variable does not accurately apply to the police officer decree, as there is no earlier decision defining this variable (and thus no *stare decisis*), parity can be shown to have been achieved even using this broad variable.

As explained above, <u>supra</u> part III(A)(1), the decree requires only rough parity to be achieved before it expires. Using that approach, rough parity was achieved as early as April of 2000 because there was less than a four (4) percent difference in minority composition of the entry-level police officers and the general population at that time. SOF Ex. K (Aitken Aff.). The percentage of minority police officers was 34.90 percent as compared to the 38.26 percent of minorities in the general Boston population. Moreover, as of the time of the City's selection of a hiring class of police officers in March 2002, there was less than one (1) percent difference between the percent of minority officers and

the percentage of minorities in the general population. See id. Therefore, rough parity would definitely have been achieved by March 2002. However, even using a more technical approach, actual parity was achieved by at least June 30, 2003, when the percentage of minority patrol officers was 38.79 percent, as compared to the 38.26 percent of minorities in the general Boston population.

Using the former calculation — i.e., rough parity — the decree would have expired prior to March 2002, so the Defendants could not rely on the decree to support their race-based hiring criteria in March 2002 or October 2003. Using the latter calculation — i.e., actual parity as of June 2003 — the decree would have expired on or about that date, so the Defendants could not rely on the decree to support their race-based hiring criteria in October 2003.

Therefore, using even the broadest standard available, the Defendants violated the Plaintiffs' civil rights by failing to consider them for police officer positions in the City of Boston in March 2002 and/or October 2003 because of their race.

> b.    The proper comparison in this matter is the minority percentage of entry-level police officers compared to the minority percentage in the qualified labor pool, and this comparison necessitates a finding that parity has long-been achieved and that the Defendants could not use the Beecher decree to justify their race-based hiring practices in 2002 and/or 2003.

As explained above, supra part III(A)(1)(a)(i), the first variable for comparison here must be the percentage of minorities in the entry-level police officer ranks. However, unlike the holding in Quinn, the only appropriate second variable for consideration here is the percentage of minorities in the qualified labor pool.

As explained above, supra part III(A)(1)(a)(ii), the First Circuit relied on *stare decisis* in Quinn to conclude that the second variable for consideration should be the

percentage of minorities in the general population. In the instant matter, no court has ever addressed the expiration language in the <u>Beecher</u> decree, so there is no specific ruling that governs this variable. However, in its opinion addressing the original motion to enter the consent decree, the District Court noted that its willingness to accept the decree "does *not* imply that any group is entitled to a quota, nor to a fraction roughly corresponding to the fraction of the total population to which belong that group." <u>Castro v. Beecher</u>, 365 F. Supp. at 659 (emphasis in original). This comes as close as any language in the related proceedings to demonstrate that such a comparison is not appropriate.

The alternative argument set forth by the First Circuit in <u>Quinn</u> to justify the general population comparison was that the decree "unambiguously" required the use of general population figures and that the use of such figures was consistent with constitutional precedents. <u>Quinn</u>, 325 F.3d at 36. The Plaintiffs take issue with both prongs of that rationale.

First, the decree itself speaks only of "the percentage of minorities within the community"; it does not define whether this means the entire city or town or merely the community of individuals from whom police officers candidates may be drawn. Since the rest of the decree speaks in terms of recruitment and hiring, this unspecific reference to the "community" cannot be taken to mean anything more specific.

Second, and of much more pressing constitutional concern, using a comparison involving the entire population instead of the qualified labor pool results in a constitutionally overbroad comparison that is not "narrowly tailored" to achieve the stated goals of the decree. <u>Gratz</u>, 539 U.S. at 270. In employment discrimination cases, both Supreme Court and First Circuit precedents recognize the necessity of using a more

focused comparison to the qualified labor pool to meet the constitutional requirement of narrow tailoring. Croson, 488 U.S. at 501-02; Stuart v. Roache, 951 F.2d 446, 454 (1st Cir. 1991). See also Ward's Cove Packing Co. v. Antonio, 490 U.S. 642, 650-51 (1989); Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 996-97 (1988); Local 28 of Sheet Metal Workers v. EEOC, 788 U.S. 421, 479 (1986) (Local 28); New York Transit Auth. v. Beazer, 440 U.S. 568, 586 (1970); Hazelwood School Dist. v. U.S., 433 U.S. 299, 308 (1977); Intl. Bhd. of Teamsters v. U.S., 431 U.S. 324, 339-40 n. 20 (1977).

In upholding the use of general population figures, the First Circuit quoted language from Croson that employment discrimination cases allow for "statistical comparisons of the racial composition of the relevant population." Quinn, 325 F.3d at 36, citing Croson, 488 U.S. at 501. However, in the very next sentence in the Croson decision, the Supreme Court states:

> But where special qualifications are necessary, the relevant statistical pool for purposes of demonstrating discriminatory exclusion must be the number of minorities qualified to undertake the particular task.

Croson, 488 U.S. at 501-02. As is clear from the Croson decision and from a host of other precedents cited above, the relevant labor pool must be the comparison to avoid overbroad and unconstitutional remedies. See also Danskine v. Miami-Dade Fire Department, 253 F.3d 1255, 1295 (11th Cir. 2001) ("[A] government affirmative action plan should not be based on general population figures where there exists more refined data establishing the proper labor pool.").

As the affidavit of Dr. Norman Aitken makes clear, SOF Ex. K, the statistics demonstrate rough parity as of 2002 and/or 2003, even when looking at the whole population. However, when the statistics to take into account the relevant qualifications

for police officer candidates, the percentage of eligible minorities drops off significantly. The percentage of minorities within the relevant age range for police officer candidates was 28.90 percent in April 2000; the percentage of minorities who are U.S. citizens was 29 percent in April 2000; and the percentage of minorities with high school diplomas was 28.29 percent in April 2000.

Comparing the percentage of minority entry-level police officers to the percentage of minorities in the general population who meet any one of the above-stated eligibility requirements plainly demonstrates that parity was more than achieved by April 2000. Therefore, the <u>Beecher</u> decree had expired under its own terms prior to April 2000, and the Defendants violated the Plaintiffs' civil rights by failing to consider them for police officer positions in the City of Boston in March 2002 and/or October 2003 because of their race.

       c.     Putting aside the decree, it is no longer constitutionally permissible to rely on race because parity has been reached.

As has been demonstrated above, <u>supra</u> parts III(A)(1)(a)(ii) and III(A)(1)(b), the <u>Beecher</u> decree has expired by its own terms because rough parity has been achieved. Without the rationale of the <u>Beecher</u> decree, the Defendants can offer no constitutionally permissible reason to use racial quotas in their hiring practices. Therefore, the Defendants violated the Plaintiffs' civil rights by failing to consider them for police officer positions in the City of Boston because of their race.

       2.     Though it expired under its own terms, the <u>Beecher</u> decree must also be considered to have expired due to the passage of time, because thirty years is too long for a governmental entity to implement a remedial race-based hiring system for entry-level officers.

In the alternative, even if this Court were to determine that a relevant racial disparity still exists (which Plaintiffs strongly deny), the fact that the <u>Beecher</u> decree has

operated for thirty-one (31) years necessarily dictates its demise. In keeping with the need for "narrow tailoring," a valid affirmative action decree must be temporary. Local 28, 478 U.S. at 479. "This requirement reflects that racial classifications, however compelling their goals, are potentially so dangerous that they may be employed no more broadly that the interest demands." Grutter v. Bollinger, 539 U.S. 306, 342 (2003). All government use of race must therefore have a "logical end point."[8] Id. In this regard, affirmative action may be used to fix an imbalance, but it may not be used to maintain balance. Johnson v. Transp. Agency, Santa Clara Cty., Calif., 480 U.S. 616, 639-40 (1987).

As with the similarly worded firefighters decree, this Beecher decree was intended to be of limited duration. Cf. Mackin, 969 F.2d at 1275. In affirming the imposed decree in the firefighters case, the First Circuit noted that the decree was to be "carefully limited in extent and duration." Boston Chapter, NAACP v. Beecher, 504 F.2d 1017, 1027 (1st Cir. 1974). The decree is now operating in a different world than at the time of its inception. Many of the current beneficiaries, and those disadvantaged by the decree, had not been born in 1973, and those who were certainly were not able to advocate for themselves during the proceedings. Moreover, during this time, the Defendants have had other avenues for recruiting and retaining minority personnel, such as through the cadet program and through specific recruitment actions for officers speaking certain languages prevalent in minority communities.

---

[8] Following the Defendants' and Intervenor's logic would lead to the possibility that the percentage of minorities in the Department could far exceed the percentage of non-minorities in the Department and yet the terms of the decree would remain active. Since the percentage of minorities in the City is growing all the time, we could reach a point, for example, where the Department is comprised of 70 percent minorities, and yet the Defendants and Intervenors would argue the decree should still be in effect if the percentage of minorities in the general population was greater than 70 percent. Such an absurd result defies logic and the intent of the decree.

Plaintiffs therefore submit that at the time of their March 2002 rejections, which was twenty-nine (29) years after the entry of the <u>Beecher</u> decree, the decree had become a crutch for keeping racial balance as opposed to a tool to achieve racial balance. Plaintiffs therefore submit that the decree had exceeded its constitutional lifespan and must be considered to have expired by the time of their rejections in March 2002. The Defendants have therefore violated the Plaintiffs constitutional rights through their continued adherence to the decree.

> 3. The Defendants violated the Plaintiffs' civil rights by requisitioning, certifying, and hiring classes of female police officers without showing that such gender-based discrimination is substantially related to the achievement of an important government objective.

As with distinctions based on race, the government may not make arbitrary distinctions based on gender without running afoul of the Fourteenth Amendment and civil rights statutes. <u>See</u> Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e; Mass. Gen. Laws ch. 151B, § 4(1). Distinctions based on gender are subject to "heightened scrutiny" and may be upheld only if they serve "important governmental objectives" and if the means employed are "substantially related to the achievement of those objectives." <u>Nevada Dept. of Human Resources v. Hibbs</u>, 538 U.S. 721, 728-29 (2003), <u>citing</u> <u>U.S. v. Virginia</u>, 518 U.S. 515, 533 (1996). The government's justifications for such gender-based distinctions "must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females." <u>U.S. v. Virginia</u>, 518 U.S. at 533.

In July 2002, the City requisitioned a certification list to hire 15 female police officers, and it eventually made eleven (11) selections from this requisition as part of the October 2003 hiring class. The City has failed to specifically demonstrate that its preference for female officers is based on anything more than generalizations about the

18

talents and capacities of females or males; therefore, the Defendants' use of gender does not withstand the required heightened scrutiny. The Defendants have thus violated the Plaintiffs' civil rights by failing to consider them because of their gender and by hiring lower-scoring female candidates specifically because of their gender.

For all of the above reasons, the Defendants have violated the Plaintiffs' civil rights by failing or refusing to consider them for positions as police officers because of their race and/or their gender. The Plaintiffs have demonstrated that they would have been reached for consideration had the Defendants not violated their rights, see SOF ¶ 35, and they are therefore entitled to summary judgment in their favor on all counts.

    B.    A preliminary injunction ordering the Defendants to immediately cease using race and/or gender in the hiring process for the Department and to immediately consider the Plaintiffs for appointment as police officers is necessary to stem ongoing harm and is in the interest of justice.

Plaintiffs seek a preliminary injunction requiring the Commonwealth and the City to immediately cease and desist from using race and/or gender in the hiring process for police officers for the City of Boston Police Department. In addition, the Plaintiffs ask that the City be ordered to immediately consider them for police officer positions.

In deciding whether to grant a preliminary injunction, a district court must weigh the following four factors: [1] the likelihood of the movants' success on the merits; [2] the potential for irreparable harm to the movants; [3] a balancing of the relevant hardship to the non-movant(s) if the injunction were granted versus the hardship to the movants if the injunction were not granted; and [4] the effect of an injunction on the public interest. Lanier Prof. Svcs. v. Ricci, 192 F.3d 1, 3 (1st Cir. 1999).

19

An examination of the likelihood of success receives the most weight of the four prongs, and courts "have often found this furcula to be critical." Narragansett Indian Tribe v. Guilbert, 934 F.2d 4, 6 (1st Cir. 1991). In Gately v. Massachusetts, 2 F.3d 1221 (1st Cir. 1993), cert. denied, 511 U.S. 1082 (1994), the First Circuit affirmed the issuance of a preliminary injunction prohibiting the Commonwealth from enforcing the statutorily mandated retirement of police officers aged 55 or older, holding that the forced retirement likely violated the Age Discrimination in Employment Act and thus satisfied the first prong of the preliminary injunction standard. Id. at 1230. As was explained in detail above, supra part III(A), the Defendants violated the Plaintiffs civil rights when they failed to consider them for police officers positions. Plaintiffs are there likely to succeed on the merits of their case and meet the first prong of the injunction standard.

As to the factor of irreparable harm, in Elrod v. Burns, 427 U.S. 347, 373 (1976), the U.S. Supreme Court held that a finding of irreparable harm is presumed if it is found that a constitutional right is being threatened or impaired. Said another way, in cases alleging constitutional violations, "a successful showing on the first factor [substantial likelihood of success] mandates a successful showing on the second factor – whether the plaintiff will suffer irreparable harm." American Civil Liberties Union of Kentucky v. McCreary Cty., 354 F.3d 438, 445 (6th Cir. 2003). Having shown that they are likely to succeed in showing that the Defendants have violated their constitutional right to equal protection, irreparable harm is presumed.

Moreover, in Gately, the First Circuit held that these elements were satisfied where a preliminary injunction would protect employees' statutorily based civil rights and where delays could prevent some of the workers from remaining in touch with new

developments, impair their ability to come back to work if reinstated, and, if a new retirement date approached, prevent them from working in their "twilight" years altogether. Id. at 1234. In this case, as has been shown, Plaintiffs have very strong claims that their applications for police officer positions were unlawfully rejected. Plaintiffs are therefore losing pay, union seniority rights and benefits, and even their ability to accrue years of service to collect retirement benefits. But more importantly, the clock is ticking on the Plaintiffs' careers. The City requires individuals to serve for three (3) years in the police officer position before being able even to sit for an exam to advance into a detective or sergeant position. In addition, there is an age cutoff of 32 for new police officers, and several of the Plaintiffs are rapidly approaching that cutoff. Assuming that the City would set a maximum age only because it reflects an applicant's ability to have a successful career in that position, delays of any kind reflect an undeniable and irremediable harm, especially on the older Plaintiffs.

When balancing the equities, the most significant factor is that monetary damages alone could not compensate the Plaintiffs who desperately desire to become Boston Police Officers but who have been prevented by the City's repeated rejections. Money damages cannot compensate for the lost time and resulting impairment on the Plaintiffs' careers. The Defendants would suffer no demonstrable harm should the injunction be granted and the Defendants be directed to stop using their discriminatory hiring practices and to consider for police officer positions these deserving candidates, who all received perfect scores on the Commonwealth's police officer entrance examination.

Finally, it is in the public's interest that the Defendants stop using hiring practices that offend the principles of our Constitution and civil rights laws. Moreover, it is also in

the public interest that these deserving candidates be considered for police officer positions. The First Circuit has found preliminary injunctions to not harm the public interest and has affirmed such injunctions that were ordered to secure employment for those whose rights under 42 U.S.C. § 1983 have been violated. Mariani Giron v. Acevedo Ruiz, 834 F.2d 238, 239-40 (1st Cir. 1987); DeChoudens v. Government Development Bank, 801 F.2d 5, 10 (1st Cir. 1986); see also Ralph v. Lucent Tech., Inc., 135 F.3d 166 (1st Cir. 1998) (affirming preliminary injunction in ch. 151B, § 4(16) case requiring employer to permit the plaintiff to return to work part-time). Not only will the civil rights statutes be vindicated through the issuance of an injunction, but the Commonwealth and the City will be given a strong incentive to correct department-wide, systemic, per se discriminatory and unlawful policies. The alternative is to permit the Commonwealth and the City to continue their gross violations of the law during the years in which this case will be litigated and appealed.

In short, a preliminary injunction is required to ensure justice, and the Plaintiffs are thus entitled to such injunctive relief.

## IV.    CONCLUSION

For the foregoing reasons, the Plaintiffs respectfully request that this Court enter summary judgment in their favor on liability and enter a preliminary injunction requiring the Defendants to immediately cease using their discriminatory hiring practices and to immediately consider Plaintiffs for police office positions.

Respectfully submitted,

PAUL DELEO, JR., THOMAS BARRETT, MICHAEL CONNEELY, MATTHEW HOGARDT, BRENDAN DEVER, PATRICK ROGERS, CHRISTOPHER CARR, and BRIAN DUNFORD,

By their attorneys,

Harold L. Lichten, BBO #549689
Alfred Gordon, BBO #630456
Pyle, Rome, Lichten & Ehrenberg, P.C.
18 Tremont Street, Suite 500
Boston, MA 02108
(617) 367-7200

Date:   July 15, 2004

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served on the attorneys of record for each party by ___hand delivery___ on July 15, 2004.
(method)

Alfred Gordon