UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| PAUL DELEO, JR., THOMAS BARRETT, MICHAEL CONNEELY, MATTHEW HOGARDT, BRENDAN DEVER, PATRICK ROGERS, CHRISTOPHER CARR, and BRIAN DUNFORD, | ) ) ) ) ) |  |
| Plaintiffs, | ) ) |  |
| v. | ) ) | Civil Action No. 03-12538-PBS |
| CITY OF BOSTON, Massachusetts, MITT ROMNEY, in his Capacity as Governor of the Commonwealth of Massachusetts, and the COMMONWEALTH OF MASSACHUSETTS, | ) ) ) ) ) |  |
| Defendants, | ) ) |  |
| BOSTON BRANCH OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE and MASSACHUSETTS ASSOCIATION OF MINORITY LAW ENFORCEMENT OFFICERS, | ) ) ) ) ) ) |  |
| Intervenors. | ) ) |  |

_____

## INTERVENORS' RESPONSE TO THE CITY OF BOSTON'S MOTION FOR CLARIFICATION OF THE *CASTRO v. BEECHER* CONSENT DECREE

Since 1975, the Boston Police Department's hiring practices have been governed by a consent decree to remedy the effects of past discrimination against African-American and Hispanic[1] applicants (hereinafter the "Castro Decree," attached as Exhibit A). The plaintiffs, non-minority candidates for positions in the Boston Police Department who were not selected for police officer positions in 2002 and 2003, filed this action against the City of Boston and the Commonwealth of Massachusetts challenging the constitutionality of the Castro Decree and,

---

[1] The consent decree used the terms "black" and "Spanish-surnamed" as opposed to "African-American" and "Hispanic." See Exhibit A. For ease of reference, this memorandum will use the terms "African-American" and "Hispanic" as a proxy for the terms employed in the Castro Decree. The terms "minority" and "minorities," as used herein, refer to African-American and Hispanic individuals, and the term "non-minority" refers to all other persons.

alternatively, arguing that the decree has "expired by its own terms" and should no longer be used by the Boston Police Department in its hiring because parity has been reached.  The latter issue – whether parity has been reached – depends largely on the interpretation of the consent decree and, with that in mind, the City of Boston has moved for clarification as to how "parity," as described in the Castro Decree (i.e., "a complement of minorities commensurate with the percentage of minorities within the community"), should be calculated.

Intervenors, the National Association for the Advancement of Colored People and the Massachusetts Association of Minority Law Enforcement Officers (collectively, "Intervenors"), submit this memorandum in response to the City of Boston's Motion for Clarification of Consent Decree.  Intervenors concur with, and incorporate by reference, the arguments set forth in the Commonwealth Defendant's Response to the City's Motion for Clarification.  Specifically, as set forth below, Intervenors believe that the Commonwealth has correctly explained that "parity," as contemplated by the Castro Decree, should be assessed by comparing the percentage of African-Americans and Hispanics *of any rank* on the Boston police force with the percentage of African-Americans and Hispanics in the community of Boston as a whole.

## ARGUMENT

### II. The Applicable Law Governing Interpretation Of Consent Decrees Supports The Commonwealth's Interpretation Of The Castro Decree.

It is well-settled that consent decrees should be "construed for enforcement purposes basically as a contract," United States v. ITT Continental Baking Co., 420 U.S. 223, 238 (1975), and that "the usual considerations of contract interpretation" apply.  United States v. Boston Scientific Corp., 167 F. Supp. 2d 424, 430 (D. Mass. 2001) (Saris, J.) (quoting ITT Continental Baking and AMF, Inc. v. Jewett, 711 F.2d 1096, 1102 (1st Cir. 1983)).  Courts have identified

numerous factors to be considered when interpreting a consent decree, including (1) the language of the decree; (2) the circumstances surrounding its formation; and (3) its purposes. Boston Scientific, 167 F. Supp. 2d at 430 (internal citations omitted). Courts also look to the post-contract course of conduct as an important factor in interpreting consent decrees. Quinn v. City of Boston, 325 F.3d 18, 42 (1st Cir. 2003) (citing Navarro-Ayala v. Hernandez Colon, 951 F.2d 1325, 1353 (1st Cir. 1991) (Cyr, J., concurring in part and dissenting in part)); Mackin v. City of Boston, 969 F.2d 1273, 1276 (1st Cir. 1992) ("Few things evidence a decree's meaning more persuasively than an immutable decade-old pattern of past practice under the decree, consensually engaged in by all sides in the underlying litigation that produced the decree.").

When applied to the Castro Decree, these factors confirm that "parity" should be determined by comparing the percentage of African-Americans and Hispanics on the police force – calculated as the number of African-American and Hispanic tenured police officers *of any rank*, divided by the total number of police officers *of any rank*, including vacant positions – with the percentage of African-Americans and Hispanics in the community – calculated as the *total population* of African-American and Hispanic residents of Boston (including those residents who identify as multi-racial) divided by the *total population* of Boston residents.

        **A.**    **The Relevant Population Within The Police Force Is The Tenured Police Officers Of Any Rank.**

With respect to the first calculation, all four factors identified above – the language of the Castro Decree, the circumstances surrounding its formation, its purposes, and the conduct of the parties obliged to follow it – demonstrate that the percentage of African-Americans and Hispanics in the Boston police force should be calculated using numbers of police officers *of any rank*, and not just officers in entry-level positions.

The language of the Castro Decree expressly cites "post-probationary police officers" as the relevant population for purposes of assessing whether a municipality has achieved parity. See Castro Decree at ¶ 18, Exhibit A. Neither the Castro Decree nor its earlier iterations or later amendments makes any reference to "entry-level police officers," "patrolmen," or "patrol officers." This is in stark contrast to the consent decree interpreted in Quinn, 325 F.3d 18, which repeatedly incorporated the term "firefighter," the entry-level Fire Department analog to the term "patrolman."[2] Indeed, the fact that the Castro Decree specifically excludes probationary police officers (those attending the police academy or in their first year on the job) from the relevant population for calculating parity, but does not explicitly exclude superior officers, makes clear that no such exclusion was intended. As this Court has recognized, consent decrees should be construed narrowly "to mean precisely what they say." Boston Scientific, 167 F. Supp. 2d at 430 (internal citations omitted). Only by rewriting its terms could the Castro Decree be construed as limiting the relevant population to entry-level police officers.

As to the circumstances surrounding the formation of the decree and the purpose of the decree, the Castro Decree was intended to remedy the adverse impact of discriminatory hiring practices employed by police departments within the Commonwealth – not just the specific issue of disproportionately low hiring of minority candidates, but also the implications of such hiring practices on the racial composition of the police force as a whole. Specifically, the Castro court recognized numerous benefits of a diverse police force, including the fact that minority police officers can "communicate more easily with persons who share [their] background," generally

---

[2] Indeed, by applying the analysis in Quinn to this case, one gets a very different result. The Quinn Court found that, because the consent decree at issue *frequently referred to the term firefighter* (the term used within the Fire Department to refer to entry level officers), the population of entry-level officers was the relevant population for purposes of comparison. By the same reasoning, the fact that the Castro Decree makes *no reference whatsoever to patrolmen or patrol officers* (terms used within the Police Department to refer to entry level officers), and instead makes *frequent reference to the broader term police force*, indicates that the relevant comparison population for purposes of the Castro Decree is the entire police force. The Quinn analysis can support only this conclusion.

have a "more sympathetic understanding" of minority citizens, and are less likely to "treat [minority citizens] as suspect." Castro v. Beecher, 365 F. Supp. 655, 659 (D. Mass. 1973) (Wyzanski, J.) (Castro II); see also Castro v. Beecher, 459 F.2d 725 (1st Cir. 1972) (reversing Castro I on grounds that the limited relief granted by the District Court was "such as to relegate to the remote future the achievement of significant representation of black and Spanish-surnamed persons on metropolitan or Commonwealth *police forces*") (emphasis added); Castro v. Beecher, 522 F. Supp. 873, 875 (D. Mass. 1981) (summarizing procedural history and noting that Castro II recognized a public policy goal of "giv[ing] the people of the Commonwealth of Massachusetts effective non-discriminatory, dedicated, and honorable *police forces*…") (emphasis added).

This broader purpose of achieving a diverse (and therefore more effective) police force is evidenced by the consent decree itself, which defines its own success not in terms of the percentage of minorities hired for each entering class of police officers, but rather in terms of the percentage of minority officers in the police force as a whole. See Castro Decree at ¶¶ 18, 24, Exhibit A (requiring cities and towns to "achieve[] a complement of Black and Spanish-surnamed *post-probationary* police officers commensurate with the percentage of minorities within the community") (emphasis added). To the extent plaintiffs might attempt to limit the consent decree's purpose to remedying discrimination in *hiring alone* (a reading that presumably serves as a justification for their limiting the relevant "parity" population to entry-level patrolmen), Intervenors adopt the Commonwealth's argument that such a reading would create a disincentive for cities and towns to promote minority police officers, since promotion of minority officers would deplete the ranks of minority entry-level officers and delay compliance with the Castro Decree. Such a reading ignores both the historical circumstances surrounding the formation of the consent decree and the remedial intent of the decree.

Finally, the prior course of conduct between the parties to the litigation which gave rise to the decree clearly supports the Commonwealth's contention that parity should be assessed using numbers of police officers *at any rank*, and not just officers in entry-level positions. For almost thirty years, the Castro Decree has governed hiring of police officers in Boston and other cities and towns throughout the Commonwealth. Since then, at least 80 municipalities have applied for and received exemptions from the Castro Decree. See The Commonwealth Defendant's Response to The City of Boston's Motion for Clarification at 8-9. According to the attorney who has been most heavily involved in the enforcement of the decree since 1980, *in each instance where a city or town was exempted from the decree since 1980*, the relevant population used for purposes of assessing parity has been that of all tenured, post-probationary police officers (including vacant positions); the parties enforcing the decree have never used the population of entry-level officers or patrolmen as the relevant population for determining if parity has been achieved. See id.; Affidavit of Toni G. Wolfman (Exhibit 2 to Commonwealth Defendant's Response) at ¶¶ 8-9.

      **B.**    **The Relevant Community Population Is The Population Of The City As A Whole, Not The Qualified Labor Pool.**

With respect to the second calculation – "the percentage of minorities within the community" – as with the first, all four factors identified above (the language of the consent decree, the circumstances surrounding its formation, its purposes, and the conduct of the parties in enforcing it) support the position of Intervenors and the Commonwealth that the percentage of African-Americans and Hispanics in the Boston police force should be calculated using the *total population* of Boston residents, and of African-American and Hispanic Boston residents (including those who identify as multi-racial), and not the relevant labor pool, however defined.

The Castro Decree states that, "[a]s a city or town achieves a complement of minorities [in its police force] commensurate with the percentage of minorities within the community," it will be exempted from the decree.  See Castro Decree at ¶ 24, Exhibit A.  Thus, the consent decree expressly identifies the entire "community" (presumably of the city or town seeking the exemption) as the relevant comparison population for purposes of assessing whether parity has been achieved.  Neither the Castro Decree nor its earlier iterations or later supplements makes any reference whatsoever to the "qualified labor pool."  Given that courts must interpret consent decrees to "mean what they say," Boston Scientific, 167 F. Supp. 2d at 430 (internal citations omitted), the Castro Decree cannot be read as limiting the relevant "community" population to the qualified pool of potential applicants for positions in the Boston Police Department where no such limitation exists within the decree itself.

The circumstances surrounding the formation of the decree and the purpose of the decree also support the Commonwealth's interpretation that the relevant "community" population is the population of Boston as a whole.  Unlike other employment discrimination cases, where a consent decree may be targeted at the singular goal of eliminating discriminatory hiring practices, the Castro Decree addressed a wider range of policy goals including, significantly, the need for a police force that could work effectively with a racially diverse citizenship and police racially diverse neighborhoods.  Castro II, 365 F. Supp. at 659.  This broad purpose differentiates the Castro Decree from other employment discrimination consent decrees, whose purposes may have been limited to remedying internal discriminatory hiring practices, and cannot be achieved without using, as the relevant comparison population, the population of the city or town as a

whole.[3]  Thus, the broad policy goals of the Castro Decree, and the circumstances surrounding its formation, dictate that "the percentage of minorities within the community" should be calculated using the *total population* of African-American and Hispanic Boston residents (including those residents who identify as multi-racial) and the *total population* of Boston residents.

Finally, the prior course of conduct between the parties weighs heavily in favor of using the total population of Boston residents as the relevant comparison population.  According to the attorney most heavily involved in the enforcement of the decree since 1980, *in each instance where a city or town was exempted from the decree since 1980*, the methodology used for determining the "percentage of minorities within the community" has been to divide the number of African-American and Hispanic residents of the city, town, or relevant jurisdiction (including those who self-identify as multi-racial) by the total population of that city, town, or relevant jurisdiction, using federal census data.  See The Commonwealth Defendant's Response to The City of Boston's Motion for Clarification at 12-14; Affidavit of Toni G. Wolfman (Exhibit 2 to The Commonwealth Defendant's Response) at ¶¶ 6, 8.  Thus, the parties' course of conduct in enforcing the Castro Decree over nearly three decades supports the Commonwealth's contention that the relevant "community" population should be that of the City of Boston as a whole, not the relevant labor pool.

## **CONCLUSION**

For the foregoing reasons, Intervenors respectfully ask this Court to clarify the Castro Decree in keeping with the Commonwealth's interpretation of its terms, and in keeping with the course of conduct by the parties who have been carrying out the decree since 1975.

---

[3]  This broader goal of achieving a diverse police force that can effectively govern and diverse population also differentiates the Castro Decree from that in Quinn, since the same concerns regarding effective communication with diverse populations do not arise in the context of firefighters' employment.

|  |  |
|---|---|
|  | BOSTON BRANCH OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE and MASSACHUSETTS ASSOCIATION OF MINORITY LAW ENFORCEMENT OFFICERS, |
|  | By their attorneys, |
|  | /s/ Christopher R. Noyes |
|  | Harry T. Daniels (BBO #113800)<br>Mark D. Selwyn (BBO #565595)<br>Jennifer L. Carpenter (BBO #647214)<br>Christopher R. Noyes (BBO #654324)<br>christopher.noyes@wilmerhale.com<br>Wilmer Cutler Pickering Hale and Dorr LLP<br>60 State Street<br>Boston, Massachusetts 02109<br>(617) 526-6000 |
|  | Robin L. Alperstein<br>Wilmer Cutler Pickering Hale and Dorr LLP<br>300 Park Avenue<br>New York, New York  10022<br>(212) 937-7200 |
|  | Nadine Cohen (BBO #090040)<br>Lawyers' Committee For Civil Rights<br>  Under Law of the Boston Bar Association<br>294 Washington Street, Suite 443<br>Boston, Massachusetts   02108<br>(617) 482-1145 |
| Dated:  August 5, 2004 |  |

- 10 -

## CERTIFICATE OF SERVICE

I, Christopher R. Noyes, hereby certify that a copy of the foregoing has been served via facsimile and first class mail this 5th day of August, 2004 to the following attorneys of record:

Harold L. Lichten, Esq.
Pyle, Rome Lichten & Ehrenberg, P.C.
18 Tremont Street, Suite 500
Boston, MA  02108

Stephen G. Cox, Esq.
City of Boston
Boston City Hall, Room 615
Boston, MA  02201

Betsy Facher, Esq.
Office of the Legal Advisor
Boston Police Department
One Schroeder Plaza
Boston, MA  02120

Robert L. Quinan, Jr., Esq.
Attorney General's Office
One Ashburton Place, Room 2019
Boston, MA  02108-1698

/s/ Christopher R. Noyes

Christopher R. Noyes

BOSTON 1965781v2