UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.  03-12538-PBS

PAUL DELEO, JR., THOMAS BARRETT,
MICHAEL CONEELY, MATTHEW HOGARDT,
BRENDAN DEVER, PATRICK ROGERS,
CHRISTOPHER CARR, and BRIAN DUNFORD,
        Plaintiffs,

v.

CITY OF BOSTON, Massachusetts, MITT
ROMNEY, in his capacity as Governor of the
Commonwealth of Massachusetts; and the
COMMONWEALTH OF MASSACHUSETTS,

        Defendants,

BOSTON BRANCH OF THE NATIONAL
ASSOCIATION FOR THE ADVANCEMENT
OF COLORED PEOPLE and
MASSACHUSETTS ASSOCIATION OF
MINORITY LAW ENFORCEMENT
OFFICERS,
        Intervenors.

**DEFENDANT CITY OF BOSTON'S OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT AND/OR PRELIMINARY INJUNCTION**

I.     **INTRODUCTION**

        In March, 2002 and October, 2003, the City of Boston's Police Department

("Department") selected and hired entry-level police officers pursuant to both statutory

requirements and a federal court consent decree ("Castro Decree"), a decree that required the

consideration of police applicants' race by all cities and towns with a minority population of one

percent or more.[1]  See Castro v. Beecher, 365 F. Supp. 655 (D.Mass.1973); Castro v. Beecher,

522 F. Supp. 873, 875 (1981).  The Plaintiffs, who were not hired as police officers by the City,

have alleged that the Defendants' failure to consider them for police officer positions violated the

Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983, Title VII of the

Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and Mass. Gen. Laws ch. 151B, § 4(1).

Plaintiffs argue that they are entitled to Summary Judgment as to all counts of their complaint.

Alternatively, the Plaintiffs argue they are entitled to a preliminary injunction ordering the

Defendants to immediately cease considering applicants' race and/or gender when hiring Boston

police officers and to immediately consider the Plaintiffs for appointment as police officers.

## II.   ARGUMENT

### A.   THE PLAINTIFFS ARE NOT ENTITLED TO SUMMARY JUDGMENT SINCE A MATERIAL FACTUAL DISPUTE EXISTS AS TO WHETHER PARITY HAS BEEN ACHIEVED PURSUANT TO THE CASTRO DECREE, WHETHER THE DECREE'S AGE RENDERS IT UNCONSTITUTIONAL, AND WHETHER THE CITY'S CERTIFICATION OF FEMALES IS CONSTITUTIONAL.

The role of summary judgment is to pierce the boilerplate of the pleadings and provide a

means for prompt disposition of cases in which no trial worthy issue exists. See Suarez v. Pueblo

Int'l, Inc., 229 F.3d 49, 53 (1st Cir. 2000).  This device should be employed only when the

"pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

---

[1] The City directs the Court to the City of Boston's Motion For Clarification Of Consent Decree, filed July 15, 2004, for a history of the Castro Decree and a description of the process by which the City considers police officer candidates according to the rank ordered certification list prepared by the Commonwealth's Human Resources Division.   Additional historical information and perspectives are contained in Plaintiffs' Motion For Summary Judgment and/or for Preliminary Injunction, as well as The Commonwealth Defendants' Response To The City Of Boston's Motion For Clarification, both also filed on July 15, 2004.  The City does not repeat such background information here.

The Plaintiffs' claims in this case highlight material factual issues in dispute, such as whether the City has satisfied the dictates of the Castro decree and how parity should be defined pursuant to that decree. Accordingly, the Plaintiffs fail to establish that they are entitled to judgment as a matter of law.

       1.      **MATERIAL ISSUES OF FACT EXIST AS TO WHETHER PARITY HAS BEEN ACHIEVED**

       a.      **The Plaintiffs assume that *Quinn* is controlling.**

In the recent case of Quinn v. City of Boston, the First Circuit addressed the issue of parity under the Beecher Decree.[2] 325 F.3d at 18. The Plaintiff candidates in Quinn were not reached for hire by the Boston Fire Department as a result of City's application of the Beecher Decree. The candidates brought suit alleging that the City's application of the Beecher Decree had discriminated against them on the basis of race. The District Court granted summary judgment to the defendants. Quinn, 204 F.Supp.2d at 163.

On appeal, the First Circuit identified the central issue as the meaning of parity under the Beecher Decree and the manner in which parity is to be calculated under that Decree. Quinn, 325 F.3d at 28. Although the parties in Quinn agreed on the relevant time frame, as well as the sources of data, they disagreed on how the minority penetration in a particular fire department was to be measured, an issue that turned on the interpretation of the term "firefighter." Id. The candidates viewed the term "firefighter" as encompassing only the lowest rank, that is, entry-level members of the Boston Fire Department.[3] Id. at 30. The defendants viewed the term "firefighter" as encompassing all uniformed Boston Fire Department personnel, including

---

[2] The "Beecher Decree" is a phrase that includes the original firefighter decree and subsequent orders entered to fine-tune it. Quinn, 325 F.3d at 24. Similarly, as used in this Motion, the phrase "Castro Decree" includes the original police decree and subsequent agreements and supplements. For consistency with the City's prior motions this terminology is adhered to, although in their Motion the Plaintiffs refer to the police decree as the "Beecher Decree."

[3] The Court pointed out that throughout its decision, all references to "entry-level" positions were to be understood as meaning post-probationary non-officer positions. Id.

superior officers.  Id.  The First Circuit held that the proper parity formula should consider the percentage of minorities in the entry-level rank only of the Boston Fire Department.  Id. at 35.

To date, the City of Boston has calculated parity in the Police Department in the same manner as it historically calculated parity in the Fire Department: by comparing the percentage of minorities in the entire police force to the percentage of minorities in the community.  On July 15, 2004, the City of Boston filed a Renewed Motion For Clarification Of Consent Decree.  The City's Motion sought clarification of whether, when hiring new police officers pursuant to the terms of the Decree, the complement of minorities for purposes of parity is to be calculated by comparing the percentage of minority *entry level* patrolmen to the percentage of minorities in the City's general population, or comparing the percentage of minority officers in the *entire police force*, to the percentage of minorities in the City's general population.

As stated in its Motion, the City maintains that its current method of calculating parity in the Police Department is consistent with precedent and was a good faith effort to comply with both the dictates and purpose of Castro and its progeny, which repeatedly refer to the police force as a whole rather to only entry-level patrolmen.  See, e.g.  Castro, 365 F.Supp. 655 at 660 (the court originally stated "finding that the Proposed Decree is just, reasonable, and in the public interest, and more likely than any other proposed solution to give the people of the Commonwealth of Massachusetts effective, non-discriminatory, dedicated, and honorable police forces, the proposed decree is approved and entered…"); Castro v. Beecher, 459 F.2d 725, 737 (1st Cir. 1972)(in deciding on the appropriateness that an appointing authority remain a party upon remand, the Appeals Court recognized that "the record amply demonstrates [the Boston Commissioner of Police's] willingness to assist in all efforts to achieve a wider racial and cultural representation on his force."); Castro v. Beecher, 334 F. Supp. 930, 935

(D.Mass.1971)(when considering statistics, the Court observed that, as compared to the population, "in the Boston police force the blacks were only about 2% in 1960 and about 3.6% in 1970"); Id. at 936 ("when blacks are one-sixth of the Boston population they are only one-thirtieth of the Boston police force."); Id. at 949 (discussing how to produce "a police force with 15% wholly qualified blacks"); 522 F.Supp. at 876 ( "…the minority population of Boston has increased during the intervening decade to 30 percent.  The percentage of black and Hispanic officers in the Police Department, therefore, remains far below the percentage of minorities in the city and the parity level which the Court's prior remedial orders were designed to achieve.")

In response to the City's Renewed Motion For Clarification, the Commonwealth and the Intervenors have argued that the City's past practice correctly interpreted and applied the Castro decree.  These parties maintain that pursuant to the Castro Decree, a police force's compliment of minorities means the percentage of tenured minority police officers of any rank; i.e. the entire police force.  In support of their position, the parties cite prior litigation, the language of the Decree, the circumstances surrounding its formation, the Decree's purposes, as well as the conduct of the parties obliged to follow it.  Commonwealth Defendants' Response To The City Of Boston's Motion For Clarification Of The Castro v. Beecher Consent Decree, at 6-12; Intervenors' Response To The City Of Boston's Motion For Clarification Of The Castro v. Beecher Consent Decree, at 2-6.

Another factor that may distinguish the Court's analysis in Quinn concerning the computation of parity for firefighters under the Beecher Decree from the computation of parity for police officers under the Castro Decree is the unique nature of police work, which is furthered by a diverse police force.  Communities place more trust in a diverse police force and the resulting trust reduces crime rates and improves policing.  Cotter v. City of Boston, 323 F.3d

160, 172 (2003). Other Circuits have cited this operational needs justification as a compelling state interest. Id.; see also Petit v. City of Chicago, 352 F.3d 1111, 1114 (7th Cir. 2003); Patrolmen's Benevolent Ass'n of N.Y., Inc. v. City of N.Y., 310 F.3d 43, 52 (2d Cir. 2002); Reynolds v. City of Chicago, 296 F.3d 524, 530 (7th Cir. 2002); McNamara v. City of Chicago, 138 F.3d 1219, 1222 (1998); Wittmer v. Peters, 87 F.3d 916 (7th Cir. 1996); cf. United States v. Paradise, 480 U.S. 149, 167 n.18 (1987)(not deciding whether operational needs could be a compelling state interest).

The Plaintiffs in this case, arguing they are entitled to summary judgment, assume a particular outcome to the issue raised by the City's Motion for Clarification—an outcome different from the position set forth by the Commonwealth and the Intervenors. All calculations of parity contained in the Plaintiffs' Motion, including those made by their expert Dr. Norman Aitkin, use the percentage of minority entry-level patrolmen as the first variable in calculating parity, rather than using the percentage of minority officers in the police force as a whole—the factor which has been historically used by the City. Thus, the success of Plaintiffs' argument that parity has been achieved under the Castro Decree depends largely on whether the Plaintiffs correctly anticipate how the Court will rule on the City's Motion for Clarification. The Commonwealth and the Intervenors, however, have submitted arguments that raise a material issue of fact as to how the City's Motion should be decided, and render the Plaintiffs' presumptuous calculations insufficient to warrant their receiving judgment as a matter of law.

Further, even assuming that the Plaintiffs' use of only the percentage of minority entry-level patrolmen as the first variable in calculating parity is deemed correct, the Intervenors calculate that the correct percentage of minorities in the City of Boston is 39.8%, as opposed to

the 38.26% calculated by the Plaintiffs through their expert Dr. Aitkin.[4]  The Plaintiffs' own

facts are that in March, 2002 the percentage of minority tenured patrolmen was 37.39%, and in

October, 2003 the percentage of minority tenured patrolmen was 38.82%.  See Plaintiffs' Rule

56.1 Statement Of Facts Not In Material Dispute In Support Of Their Motion For Summary

Judgment, Exhibit K (and internal Exhibit E ).  Comparing these numbers to the Intervenors'

calculation of minorities in Boston, parity certainly was not achieved as of March, 2002, and

whether there was even rough parity in October, 2003 is an issue of material fact.

> **b.**   **The City's complement of police minorities must be compared
> to the percentage of minorities in the general population, not
> the "qualified labor pool."**

In framing the issue of whether parity had been reached under the firefighter consent

decree, the Court in Quinn identified a second variable: how one measures minority

representation in the community.  Under this variable, the Court looked to the percentage of

minorities in the community as a whole.  Quinn, 325 F.3d at 28.  Notwithstanding this ruling,

however, the Plaintiffs in this case now argue that "the only appropriate" second variable for

comparing minority police officers is to the percentage of minorities in the qualified labor pool.

Id. at 13.

The City of Boston moved for clarification of the Castro Decree only because it is not

clear if Quinn's holding as to the first variable, which relied upon an interpretation of the term

"firefighter," is applicable to the Castro Decree and the term "police officer."  The City did not

seek clarification of whether, when hiring police officers, it should consider minority

representation in the community as a whole, or only the percentage of minorities in the qualified

---

[4] It appears that Dr. Aitkin arrived at his conclusion that Boston is 38.26% minority by incorrectly using 140,305 as the number of Black or African Americans instead of 149,202, which is the correct number according to year 2000 census data.  See Plaintiffs' Rule 56.1 Statement Of Facts Not In Material Dispute In Support Of Their Motion For Summary Judgment, Exhibit K (and internal Exhibit E and F).  Dr. Aitkin correctly uses 85,089 as the number of Hispanic or Latinos.

labor pool for police officers, because the Court has spoken clearly on this issue. The Plaintiffs' conclusion otherwise is incorrect and inconsistent with the language of the Castro Decree, the past and present conduct of the parties that apply the Decree, and even with Quinn, the case upon which they otherwise place the most reliance.

First, the language of the Castro Decree is explicit and unambiguous. The Decree states that "[a]s a city or town achieves a compliment of minorities commensurate with the percentage of minorities within a community," it is no longer subject to the Decree. See Exhibit A.[5] The Decree also provides that a notification process for the appointing authority, and in turn the Director of Civil Service, commences when the authority "has achieved a complement of Black and Spanish-surnamed post-probationary police officers commensurate with the percentage of minorities within the community…" Id.

Second, as already argued by the Commonwealth and supported by affidavit, and joined by the Intervenors, in each instance where a city or town was exempted from the Decree since at least 1980, the second variable in the parity formula consisted of the percentage of minorities in that *entire* jurisdiction, not in the relevant labor pool. See Commonwealth Defendants' Response To The City Of Boston's Motion For Clarification Of The Castro v. Beecher Consent Decree, at 12-13; Affidavit of Toni G. Wolfman, Exhibit B at ¶8; Intervenors' Response To The City Of Boston's Motion For Clarification Of The Castro v. Beecher Consent Decree, at 7-8.

Using the percentage of minorities in an entire jurisdiction as the second variable is also consistent with the method currently used by the Boston Police Department when undertaking statistical comparisons relative to the Decree. See Deposition of Edward Callahan, Exhibit F at 27. The Department recognizes that diversity is important not just as a means of ameliorating

---

[5] Except where otherwise indicated, all Exhibit references in this Memorandum refer to the Exhibits attached to Defendant City Of Boston's Local Rule 56.1 Statement Of Facts And Supporting Exhibits In Opposition To Plaintiffs' Motion For Summary Judgment And/Or Preliminary Injunction, filed concurrently.

vestiges of past discrimination by the Department, but also because it is important for the
Department to reflect the community it serves.  Police officers serve a vital function in ensuring
the safety of citizens and visitors in the City of Boston and are called upon to interact with
Boston's diverse constituencies.  See Exhibit L.  The Department's ability to patrol the City is
enhanced by a racially and ethnically diverse police force, since a diverse police force increases
the confidence of Boston's citizens that the City's police officers share their experiences and
concerns.  Id.

Police officers do not interact only with individuals in the community who possess the
qualifications to be police officers.  In responding to calls for service, and in patrolling the City's
neighborhoods, Boston police officers interact with all segments of the City's population,
including people of wide ranging age, health, education and socio-economic background.  Id.
Thus, the Department's operational needs is a relevant consideration supporting the City's
consideration of the community as a whole, rather than only the relevant labor pool when
appointing and promoting police officers.  Cotter, 323 F.3d at 172.  The advantages attendant to
policing neighborhoods by officers who reflect the racial and ethnic make-up of the City as a
whole might not be realized if only the neighborhood's qualified labor pool were considered.[6]

Also, from an historical perspective, using the entire jurisdiction's percentage of
minorities is consistent with memoranda signed by the Commonwealth's Personnel
Administrator in 1986 and 1987.  See Exhibit B at ¶10 (and attached Exhibit C).  These
memoranda describe a process for requesting exemption from the Decree that is consistent with
the intention of the original parties and used consistently by the Commonwealth.  Id.

_____

[6] As ably argued by the Intervenors' expert Dr. Craig Lawson Moore, an additional problem is the difficulty in
determining the actual size of the eligible qualified labor pool or the extent of minority representation in that pool
based on the number and type of potential eligibility requirements.  See Affidavit of Dr. Craig Lawson Moore, at ¶¶
29-31.

Finally, the Plaintiffs' argument that parity should be determined by considering the percentage of minorities in the relevant labor pool, rather than the community at large, is inconsistent with <u>Quinn</u> itself, the case that forms the basis for their contention that the City has improperly calculated parity under the Castro decree.  The Court in <u>Quinn</u> endeavored to analyze the first variable in defining parity (the interpretation of the term "firefighter") only because it found the lower court, in granting summary judgment, had applied abstract principles of law and its own interpretation of judicial precedent.  325 F.3d at 29-30.  The lower court's conclusion was thus not subject to deferential review, and the path was opened for the First Circuit to engage in its own contract-based analysis.  <u>Id.</u>

When the Court reached the second variable, however, it agreed with the lower court's finding that the issue had already been resolved; the language "percentage of minorities within the community" unambiguously requires the use of the percentage of minorities in the general population of a community.  <u>Id.</u> at 35-36.  The Court agreed that it had already repudiated the notion that such language was overbroad.  <u>Id.</u>  The Court further held that its conclusion was consistent with cases cited by the firefighter candidates standing for the proposition that in affirmative action employment cases, minority representation is measured against the qualified labor pool.  <u>Id.</u>  The Court specifically stated that its decision was consistent with <u>City of Richmond v. J.A. Croson Co.</u>, 488 U.S. 469 (1989)(<u>Croson</u>).

The Plaintiffs, however, now premise their contention that they are entitled to judgment as a matter of law on their argument that the City's consideration of general population percentages is overbroad.  <u>Plaintiffs Motion For Summary Judgment and/or Preliminary Injunction</u> at 14.  In so arguing, the Plaintiffs cite <u>Croson</u>, the very case considered and referenced by the First Circuit, thereby essentially arguing that the First Circuit got it wrong in

Quinn.  Id.  While arguing that the Castro and Beecher consent decrees are virtually identical, the

Plaintiffs also claim that "percentage of minorities within the community," the precise phrase

deemed unambiguous in Quinn as contained in the Beecher Decree, is ambiguous in the Castro

Decree.  Id.  Finally, the Plaintiffs argue that since no case considers the identical phrase in the

Castro Decree, *stare decisis* does not apply.  Id. at 13-14.

The Plaintiffs' arguments are unpersuasive.  The language in the Castro Decree clearly

refers to "the percentage of minorities within the community," and nowhere references the City's

labor pool as a relevant consideration.   Nor have the parties ever considered the City's labor

pool as a relevant consideration during the many years that they have applied the Castro Decree.

Finally, the First Circuit clearly held that the same phrase in the Beecher Decree was

unambiguous and not overbroad.  Accordingly, the Plaintiffs, who now seek to advance an

interpretation of the Castro Decree that has never been adopted by the parties to that Decree or

the Courts, can hardly claim that there is no genuine issue as to any material fact and that they

are thus entitled to a judgment as a matter of law.

### 2.    THE CONSENT DECREE'S AGE DOES NOT RENDER IT UNCONSTITUTIONAL.

The Plaintiffs argue the Castro Decree is not narrowly tailored, and thus not

constitutional, because its' age of thirty-one (31) years "necessarily dictates its demise."

Plaintiffs Motion For Summary Judgment and/or Preliminary Injunction . at 17.  The Plaintiffs

thus claim that, even if parity has not been achieved, the Castro Decree has exceeded its

"constitutional lifespan."  Id. at 18.

In assessing an overbreadth challenge to an order directing race-conscious relief in the

context of public employment, a court should consider:

"[T]he extent to which (i) the beneficiaries of the order are specially advantaged, (ii) the legitimate expectancies of others are frustrated or encumbered, (iii) the order interferes with other valid state or local policies, and (iv) the order contains (or fails to contain) built-in mechanisms which will, if time and events warrant, shrink its scope and limit its duration." Mackin v. City of Boston, 969 F.2d 1273, 1278 (1992).

First, only qualified minority candidates are specially advantaged by the Castro Decree. No minority is placed on the eligibility list unless he or she has attained a passing score on the entrance examination, and the Decree does not require that minority aspirants be appointed, nor does it dispense with the statutory preferences mandated by state law. Second, the City's failure to appoint white applicants who may have had higher scores than some appointed minority applicants did not and does not disturb any legitimate expectation on their part. More than 14,000 people took the 2001 civil service exam, yet only forty-five (45) of the first ninety-one (91) people who accepted were reached for consideration of the March, 2002 police academy class, and only thirty-eight (38) of the first seventy-seven (77) people who accepted were reached for consideration of the October, 2003 police academy class. See Exhibit E; see also Plaintiffs' Motion For Summary Judgment and/or for Preliminary Injunction, Exhibits 8, 9. Given the small number of vacancies, the number of white candidates with statutory preferences, as well as the fact that by statute up to 33% of an academy class can be composed of people in the cadet program, the Plaintiffs could not reasonably have felt assured that they would be appointed, irrespective of the Decree. See Exhibits G, H; Donahue v. City of Boston, 304 F.3d 110, 113 n.2 (2002). Finally, the Decree does not interfere with, but rather promotes, the City's operational needs for maintaining a diverse police force and its efforts to remedy past discrimination. See Cotter, 323 F.3d 160, 169-172.

Moreover, notwithstanding Plaintiffs' argument to the contrary, the Castro Decree's life is in fact limited. The Decree will remain in force only until its requirements have been met.

<u>See</u> Exhibit A.  The Castro Decree's limited life is evidenced by the fact that, as of July, 2004, only twelve communities in Massachusetts remain subject to the Decree.  <u>See</u> Exhibit B (and attached Exhibit A).  In <u>Mackin</u>, considering and rejecting claims that the Beecher Decree was overbroad for similar reasons, the Court held that limitations of this sort are crucial factors in deflecting an overbreadth challenge.[7]  969 F.2d. at 1278.  If nothing else, the considerable time that has been needed for Boston to meet the terms of the Castro Decree evidences the extent and duration of past discrimination in the Boston Police Department.

3.  **THE CITY'S CERTIFICATION OF FEMALES IS CONSTITUTIONAL SINCE IT SUBSTANTIALLY RELATES TO THE ACHIEVEMENT OF IMPORTANT GOVERNMENTAL OBJECTIVES AND THE MEANS EMPLOYED ARE SUBSTANTIALLY RELATED TO THE ACHIEVEMENT OF THOSE OBJECTIVES.**

On July 23, 2002, the Director of Human Resources for the Boston Police Department, Edward Callahan ("Director"), forwarded to the Commonwealth's Human Resources Division ("HRD") a "Request For Gender-Based Selective Certification" for fifteen female police officer vacancies.  <u>See</u> Exhibit C.  The Director's request was made pursuant to Paragraph 10 of the Personnel Administration Rules of the Commonwealth HRD.  According to the request, of the 2,172 police officers employed as of July, 2002, 281 were female.  <u>Id.</u> at 4.  The basis for the gender-based selective certification request was described by the Director as the following:

> "Currently, female Boston Police Officers represent 12.7% of the make-up of the Boston Police Department.  It is the opinion of the Boston Police Commissioner that the Department could utilize the services of an additional number of female officers.  In addition to performing all of the other duties and responsibilities associated with the role of Boston Police Officer, the services of additional female police officers are required to assist with the care and custody (including the transport and searching) of female prisoners, which the Department will begin handling at a police district station on September 26, 2001.

---

[7] The City submits that the Court's decision in <u>Quinn</u> regarding the composition of the first parity variable in no way affects the applicability of <u>Mackin</u>'s analysis as to duration; <u>Quinn</u> did not hold the Beecher Decree and all its terms unconstitutional.  Indeed, <u>Quinn</u> explicitly affirmed the constitutionality of using the City's general population to calculate the second variable, as discussed in Section II.A.I.b, *supra*.

Additionally, the Department believes that additional female officers would be helpful in order to fulfill our obligations under the provisions of M.G.L. c.41 §97B, which mandates the Boston Police Department to 'make efforts to employ women police officers to serve in rape reporting and units.' The same statute requires that a 'victim of rape who is female shall, whenever possible, be interviewed initially by a female police officer.'" Id.

The Equal Protection Clause of the Fourteenth Amendment provides, in part, that "no State shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. The Clause does not mandate that every citizen be treated identically, rather, it requires an adequate explanation for treating groups differently. Cotter, 323 F.3d at 168. The Plaintiffs correctly state that distinctions based on gender may be upheld only if they serve important governmental objectives and if the means employed are substantially related to the achievement of those objectives. U.S. v. Virginia, 518 U.S. 515, 533 (1996).

The Plaintiffs argue that the City's requisition and hiring of a limited number of females was a violation of the male Plaintiffs' civil rights and they are entitled to judgment as a matter of law.[8] The sole argument put forward by the Plaintiffs in support of their allegation of a civil rights violation is the false assertion that the City has "failed to specifically demonstrate that its preference for female officers is based on anything more than generalizations about the talents and capacities of females and males..." Plaintiffs' Motion For Summary Judgment and/or for Preliminary Injunction, at 18.

To the contrary, the City has articulated that one of its reasons for seeking a limited "preference" for female officers was the need for female officers to assist with the care and

---

[8] The July, 2002 requisitioning, and subsequent hiring in October, 2003 of female officers is the only Equal Protection violation alleged in Plaintiffs' Motion relating to special certifications, and thus the only allegation responded to by the City. The Plaintiffs do not allege that the City's requisition of certification lists based on language skills constitute a constitutional violation, nor are prior requisitions of female-only certification lists challenged.

14

custody, most specifically the searching, of female prisoners. Following the District Court's decision in Ford v. Suffolk County, 154 F. Supp. 2d 131 (D.Mass. 2001), the Boston Police Department altered its practice of transporting female prisoners to Suffolk County Jail and assumed responsibility for transporting female prisoners directly to local district stations, where they are searched and booked pursuant to the Department's Rules and Procedures. According to the Boston Police Department's Rules and Procedures, Rule 318-C, Sec.4, all female prisoners "shall be subject to a custodial inventory search of their person and property at the time they are booked." See Exhibit D. Also, consistent with past practice as contained Rule 318, §§ 4, 9, female prisoners "shall be searched by a female Boston Police Officer." Id. Far from being based on generalizations about the talents and capacities, the Department's policy of having female prisoners searched by female officers serves the important governmental objectives of ensuring that all searches of female prisoners are constitutional, and that the searches are conducted in a manner that gives most protection to individual officers as well as the Department.

In the case of a lawful custodial arrest, a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a reasonable search under that amendment. United States v. Robinson, 414 U.S. 218, 235 (1973). Thus, if the arrest was lawful, a searching officer does not need to have any further justification for performing a full body search of an arrestee. See United States v. Bizier, 111 F.3d 214, 217 (1st Cir. 1997). Such searches must still be reasonable, however, and must be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures. United States v. Edwards, 415 U.S. 800, 808, n.9 (1974)(quoting Terry v. Ohio, 392 U.S. 1, 20 (1968)).

The pat frisking of individuals in the field as well as during the booking process is invasive. The search is performed by literally touching every part of a person's body, with particular emphasis on places where drugs, weapons, or other illicit or potentially dangerous items can be concealed. The search of a female in particular involves feeling the breast area to make sure nothing is tucked in a bra, as well as the waist and buttocks area to ensure nothing is in a waistband or between the buttocks. While this type of search is lawful, whether a particular search is reasonable under the Fourth Amendment may involve considering the gender of the person searching and the person being searched. See, e.g. Skurstenis v. Jones, 236 F.3d 678, 683 (11th Cir. 2000)(addressing the issue of gender in strip-search cases). Further, even apart from potential constitutional challenges of a search conducted by a male officer of a female, such a search exposes the officer as well as the Department to potential liability for claims such as harassment. It is both a reasonable and an important governmental objective to minimize the potential for litigation and liability.[9]

The City's need for an adequate number of females on the police force is important not only relative to female prisoners, but also to the predominantly female victims of sexual assault and rape. As the Director indicated in his July, 2002, request, M.G.L. c.41 §97B, mandates that the Boston Police Department make efforts to employ women police officers to serve in rape reporting and prosecution units. See Exhibit I. The same statute requires that a victim of rape who is female shall, whenever possible, be interviewed initially by a female police officer. Id. Obviously the ability of the police department to satisfy these obligations turns on the employment of an adequate number of female officers.

---

[9] In Cotter, the Court was skeptical of the City's claim that it promoted African-American officers in order to avoid litigation. 323 F.3d at 172. Such skepticism is irrelevant to the City's position here, which concerns potential litigation arising from claims brought by females who are searched by male police officers.

Even apart from constitutional concerns, the approval of the Director's request was in the discretion of the Commonwealth's Human Resources Division pursuant to M.G.L. c.31, § 21, which provides in part:

> "The administrator may limit eligibility for any examination for an original appointment to either male or female persons if the appointing authority requests such limitation in its requisition. Both male and female persons shall be presumed to be eligible for a promotional appointment to any civil service position; provided, however, that the administrator may limit such eligibility to either male or female persons if the duties and responsibilities of such position require special physical or medical standards *or require custody or care of a person of a particular sex.* Prior to any such limitation of appointment or promotion, the administrator shall submit in writing to the Massachusetts commission against discrimination a request for its recommendations on such proposed limitations." (emphasis added.) See Exhibit J.

Further, the presence of a sufficient number of female officers for purposes of searching prisoners and assisting women involved as victims of rape is important to the operational needs of policing, just as racial and ethnic diversity are. Cotter, 323 F.3d at 172. The presence of women is necessary for the Department to carry out its mission effectively and thus constitutes a compelling state interest. Id. Given the frequent reluctance of sexual assault victims to report and prosecute such assaults, the Department has a compelling state interest in seeking to increase the comfort level of female victims of such sensitive crimes by having them interviewed by female officers when possible.

In calendar year 2000, of the 22,216 arrests, 4,355 (19.7%) were female. See Exhibit C at 6. In calendar year 2001, of the 20,470 arrests, 3,392 (19.2%) were female. Id. at 7. At the time the Director requested a female-only certification list in July, 2002, only 12.7% of police officers were female. Id. at 6. In light of the disparity between the number of female officers as compared to females arrested, the hiring of additional female officers was substantially related to achieving the objective of ensuring constitutional treatment of female prisoners in a manner that

will best shield the City from potential litigation and liability. Further, the hiring of an adequate number of female officers was necessary to ensure that the Department was complying with its statutory obligations, was permitted by statute, and helped to satisfy its operational needs.

In moving for summary judgment the Plaintiffs assume the burden of establishing that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law. The Plaintiffs' have failed to provide any evidence that the reasons put forth by the Director in his request for a female certification list did not constitute important governmental objectives. The Plaintiffs have also failed to demonstrate that the request was not substantially related to the achievement of those objectives.[10] The Plaintiffs' Motion For Summary Judgment as to their claim that requisitioning, certifying and hiring a class of female police officers violated their civil rights should therefore be denied.

### B.    THE PLAINTIFFS ARE NOT ENTITLED TO PRELIMINARY INJUNCTION.

As an alternative to summary judgment, the Plaintiffs argue they are entitled to a preliminary injunction ordering the Defendants to "immediately cease using race and/or gender in the hiring process and to immediately consider the Plaintiffs for appointment as police officers." Plaintiffs' Motion For Summary Judgment and/or for Preliminary Injunction at 19.

In ruling on a preliminary injunction motion, a District Court must ask whether the moving party has established that: (1) it has a substantial likelihood of success on the merits; (2) there exists, absent the injunction, a significant risk of irreparable harm; (3) the balance of hardships tilts in its favor; and (4) granting the injunction will not negatively affect the public

---

[10] The City is mindful that this case was bifurcated into liability and damages, and thus at this stage addresses the issue of liability only. The City would point out, however, that as to damages the Plaintiffs offer no evidence that the requisition of a female-only certification list and ultimate hiring of eleven females was responsible for any of the Plaintiffs' alleged harm.

interest. TEC Engineering Corp. v. Budget Molders Supply, Inc., 82 F.3d 542, 545 (1st Cir.1996).

As a threshold matter, the precise nature of the relief being sought by the Plaintiffs' request for preliminary injunction is not clear.  If the Plaintiffs are not entitled to summary judgment and thus litigation continues, the postponement or reduction in size of the November, 2004 police Academy class would be the only injunctive relief with meaning to the Plaintiffs.  Such relief would unacceptably impair the City's compelling public safety needs.[11]

### 1.    THE PLAINTIFFS HAVE FAILED TO ESTABLISH THEY HAVE A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS.

In seeking to maintain their likelihood of success on the first prong for injunctive relief, the Plaintiffs rely on their summary judgment arguments.  As discussed in detail above in Section II.A *supra*, the Plaintiffs' argument that parity has already been achieved under the Castro Decree relies most heavily on their assumption that the Castro Decree should consider the percentage of minorities in the entry-level patrolmen only, rather than the percentage of minorities police officers in the force as a whole, a question not resolved by the Court's decision in Quinn, and a question which was the impetus for the City's Motion for Clarification.  The Commonwealth and the Intervenors have submitted material concerning prior litigation, the language of the Castro Decree, the circumstances surrounding its formation, the Decree's purposes, as well as the conduct of the parties obliged to follow it.  This material, as well as other considerations such as the Police Department's operational needs and what is the proper percentage of minorities in the community, do not merely create issues of material fact, but may very well support a factual finding that the compliment of minorities under the Castro Decree

---

[11] The Plaintiffs appear careful to not specify that this is the relief being sought, relief that was rejected out of hand by the District Court in the Quinn litigation.

means the percentage of tenured minority police officers of any rank, not the finding assumed by the Plaintiffs.

The Plaintiffs also predicate their argument that parity has been achieved on the erroneous contention that parity under the Castro Decree should be calculated by considering the percentage of minorities in the qualified labor pool, rather than the percentage of minorities in the community at large. The language in the Decree is clear, however, that the second variable in the parity formula consists of the percentage of minorities in the general community. The language in the Decree is clear, the interpretation is clear, and the interpretation has already been held unambiguous and not overbroad.

Finally, the Department's hiring of females pursuant to special female-only certification lists obtained from the Commonwealth serves the important governmental objectives of ensuring that all searches of female prisoners are constitutional, that the searches are conducted in a manner that gives most protection to individual officers as well as the Department, and that the City's statutory obligations as well as its operational needs are met.

The Plaintiffs have failed to demonstrate that they are entitled to judgment as a matter of law as to any claim in their Complaint, and based upon the facts in dispute as well as the law, they have equally failed to demonstrate that they have a substantial likelihood of success on the merits of their claim that the Defendants violated their civil rights when they failed to consider them for police officer positions.

2.    **THE PLAINTIFFS HAVE FAILED TO ESTABLISH THAT THERE EXISTS, ABSENT THE INJUNCTION, A SIGNIFICANT RISK OF IRREPARABLE HARM.**

The Plaintiffs argue that, by virtue of not being selected for police officer positions, they are being irreparably harmed in that they are losing pay, union seniority rights and benefits, their

ability to accrue years of service to collect retirement benefits, the potential to be excluded from future consideration due to their age, and the service time necessary for them to sit for an exam to advance to a detective or sergeant position.

The parade of horribles advanced by the Plaintiffs has no basis in reality, as is clearly demonstrated by the fact that adequate relief was available for the Plaintiffs in Quinn.[12]  As a result of the First Circuit mandate in Quinn, the City created a special firefighter entry class in November, 2003 for four of the plaintiffs, and five subsequent plaintiffs, who were able to meet the instatement criteria.  Each of those individuals received back-pay to the date they would have been hired (November 2000) had the Beecher Decree not been followed, *including* a payment representing an average of the overtime and detail pay their colleagues working since November, 2000 had made; each were paid at a rate as if they had actually been employed since November 2000; each received all seniority rights with regard to vacation time and retirement benefits as if they had actually been employed since November 2000; and the age of the individuals was not considered at the time they began service as firefighters, as long as they were eligible based on their age as of November, 2000.[13]

The *only* potential harm the Plaintiffs in this case could suffer by denying them injunctive relief is a delay in their opportunity to obtain promotions to higher civil service ranks.  The Plaintiffs are correct that individuals must serve for three years in the patrolman position before being eligible to sit for an exam to advance into a detective or sergeant position.  Nevertheless, any delay in the Plaintiffs' ability to be eligible for promotion does not rise to the requisite level of harm when considering a Motion For Preliminary Injunction, particularly in light of the weight of other factors in the Defendants' favor and the speculative nature of any officer's

---

[12] Since the Plaintiffs in this case are represented by the same counsel as the Plaintiffs in Quinn, an argument that harms will be visited upon the former that were not visited upon the latter is particularly vexing.

[13] The Plaintiffs do not specify what is meant by "union seniority rights and benefits."

eligibility for original appointment, let alone promotion to a higher rank at a later date.  What matters as to each party is not the raw amount of irreparable harm the party might conceivably suffer, but rather the risk of such harm in light of the party's chance of success on the merits. Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609, 617 (1980).

Further, the Plaintiffs ignore that their case has been bifurcated into liability and damages.  The question of whether using the Consent Decree and thus not reaching one or more of the Plaintiffs on the certification list constituted a constitutional violation is separate from whether one or more, or any, of the Plaintiffs would complete the hiring process and enter the academy.[14]  Arguments as to irreparable harm are thus speculative at this point and insufficient to justify a preliminary injunction, particularly given their failure to demonstrate a substantial likelihood of success on the merits.

**3.    THE PLAINTIFFS HAVE FAILED TO ESTABLISH THAT THE BALANCE OF HARDSHIPS TILTS IN ITS FAVOR.**

If Plaintiffs are not entitled to summary judgment and thus litigation in this matter continues, the only injunctive relief the Plaintiffs could possibly be requesting by their present motion is that the November, 2004 police class be prevented from going forward.  In considering the balance of hardships, the City's hardship if such an injunction were allowed outweighs any hardship the Plaintiffs may experience.[15]

If injunctive relief were granted to the plaintiffs, the citizens of Boston would suffer irreparable and considerable hardship since the City is currently operating with fewer officers than it had in previous years, and needs additional police officers as soon as possible in order to effectively ensure the safety of the community.   See Exhibit L.  In 1999, there were 2,246 police

---

[14] For any of the Plaintiffs to be hired they must still pass a physical abilities test and a psychological evaluation.
[15] The City's discussion of hardship and public interest are equally applicable to such an alternative as reserving spots for the Plaintiffs pending the outcome of litigation.

officers, and of those 1,558 were patrol officers.  <u>See</u> Exhibit K.  Currently there are 2,020 police

officers and only 1,398 patrol officers; 128 officers are out injured, 6 are on military leave, and

26 are on administrative leave or otherwise not on active duty.  <u>Id.</u>  The Department also expects

a decrease in the number of officers as of January 1st , due to the City's vacation buy-back

provisions.[16]

     As the affidavit of Superintendent James Claiborne attests, any delay or reduction on the

installation of a new class of police officers would impair the Department's ability to provide

adequate public safety.  <u>See</u> Exhibit L.  Conversely, if injunctive relief is denied and the Court

ultimately finds for the Plaintiffs as to both liability and damages, the Plaintiffs will be hired and

trained and will not suffer any material harm.   Following the First Circuit's decision in <u>Quinn</u>,

the City created a special firefighter entry class for the four plaintiffs and five of the six plaintiffs

in a later action who were able to meet the instatement criteria of the Order.  Creating firefighter

academy training for this small group of people outside the normal hiring cycle was expensive

for the City, but was necessary to cap back pay damage awards pursuant to the District Court

order.   The same rationale and result can be expected to be followed in this case if the Plaintiffs

prevail.  In short, if any of the Plaintiffs are found to have suffered a constitutional violation and

resulting damages, such harm will be remedied.  Sacrificing public safety and adversely

impacting the needs of the City's Police Department pending such a determination is an

unreasonable hardship upon not just the Department but also the citizens of the City of Boston

that outweighs the Plaintiffs' meager demonstration of harm.

    **4.**    <u>**THE PLAINTIFFS HAVE FAILED TO ESTABLISH THAT GRANTING THE INJUNCTION WILL NOT NEGATIVELY AFFECT THE PUBLIC INTEREST.**</u>

---

[16] Vacation time for City employees, including police officers, accrues effective January 1st of each year.  When an individual retires or leaves employment for any other reason the employee can be paid for any unused vacation time.

The public interest in hiring needed law enforcement officers is substantial and outweighs any public interest in the prevention of as yet unproven constitutional violations, as the facts contained in Section II.B.3 *supra* demonstrate. The Plaintiffs' claim that preliminary injunctions in general have been held to not harm the public interest hold no sway when considering their specific request, a request that invokes and affects public safety. The City's public safety would be compromised if the next Academy class was delayed or its numbers were reduced. See Exhibit L.

**III.     CONCLUSION**

For the foregoing reasons, the Defendant City of Boston respectfully requests that this Honorable Court DENY the Plaintiffs' Motion For Summary Judgment and DENY the Plaintiff's alternative request for preliminary injunction.

<div style="margin-left: 40%;">

Respectfully submitted,
DEFENDANT CITY OF BOSTON
Merita A. Hopkins
Corporation Counsel, City of Boston
By its attorneys,

</div>

S/Betsy J. Facher                                   S/Stephen G. Cox
_____              _____
Betsy J. Facher, BBO #637613              Stephen G. Cox,  BBO# 566943
Staff Attorney                                          Assistant Corporation Counsel
Office of the Legal Advisor                      City of Boston Law Department
Boston Police Department                        Room 615, Boston City Hall
One Schroeder Plaza                               Boston, Massachusetts 02201
Boston, MA  02120                                 (617) 635-4064
(617) 343-4550

Dated:   September 2, 2004