Page 1

```
 1   Volume:  I                    Pages: 1 - 132

 2             UNITED STATES DISTRICT COURT

 3         FOR THE DISTRICT OF MASSACHUSETTS

 4                           C.A. No. 03-12538-PBS

 5   ------------------------------------x

 6   PAUL DELEO, JR., THOMAS BARRETT,

 7   MICHAEL CONEELY, MATHEW HOGARDT,

 8   BRENDAN DEVER, PATRICK ROGERS,

 9   CHRISTOPHER CARR, and BRIAN DUNFORD,

10           Plaintiffs,

11      v.

12   CITY OF BOSTON, MASSACHUSETTS, MITT

13   ROMNEY, in his capacity as Governor of

14   the Commonwealth of Massachusetts, and the

15   COMMONWEALTH OF MASSACHUSETTS,

16           Defendants,

17   BOSTON BRANCH OF THE NATIONAL

18   ASSOCIATION FOR THE ADVANCEMENT

19   OF COLORED PEOPLE and

20   MASSACHUSETTS ASSOCIATION OF

21   MINORITY LAW ENFORCEMENT

22   OFFICERS,

23           Intervenors.

24   ------------------------------------x
```

Page 2

```
 1        DEPOSITION of EDWARD CALLAHAN, a
 2  witness called for examination by the
 3  Plaintiffs, taken pursuant to Rule 30 of the
 4  Massachusetts Rules of Civil Procedure, before
 5  Laurie K. Langer, Registered Professional
 6  Reporter and Notary Public in and for the
 7  Commonwealth of Massachusetts, at the offices of
 8  Pyle, Rome, Lichten & Ehrenberg, 18 Tremont
 9  Street, Boston, Massachusetts, on Tuesday, June
10  22, 2004, commencing at 10:10 a.m.
11
12  APPEARANCES
13
14    PYLE, ROME, LICHTEN & EHRENBERG, P.C.
15    By Harold L. Lichten, Esq.
16    Alfred Gordon, Esq.
17    18 Tremont Street, Suite 500
18    Boston, Massachusetts  02108
19    (617) 367-7200
20    For the Plaintiffs
21
22
23
24
```

Page 3

```
 1  (Appearances continued)
 2
 3    CITY OF BOSTON LAW DEPARTMENT
 4    By Stephen G. Cox, Esq.
 5    City Hall, Room 615
 6    Boston, Massachusetts 02201
 7    (617) 635-4064
 8    For the City of Boston
 9
10  THE COMMONWEALTH OF MASSACHUSETTS
11  OFFICE OF THE ATTORNEY GENERAL
12    By Robert L. Quinan, Esq.
13    One Ashburton Place, Room 2019
14    Boston, Massachusetts  02108
15    (617) 727-2200
16    For the Commonwealth of Massachusetts
17
18  WILMER CUTLER PICKERING HALE and DORR
19    By Robin L. Alperstein, Esq.
20    300 Park Avenue
21    New York, NY  10022
22    (212) 937-7262
23    For the Intervenor Defendants
24
```

Page 4

```
 1  (Appearances continued)
 2
 3    LAWYERS' COMMITTEE FOR CIVIL RIGHTS
 4    By Nadine Cohen, Esq.
 5    Tzung-bor Wei
 6    294 Washington Street
 7    Boston, Massachusetts  02108
 8    (617) 988-0609
 9    For the NAACP and MAMLEO
10
```

```
11        INDEX
12  ATTORNEY    EXAMINATION  CROSS   REDIRECT
13  Mr. Lichten     6              127
14  Ms. Alperstein        109
15  Mr. Quinan            126
16  EXHIBIT                    PAGE
17  1 City Website Page          23
18  2 Announcement Regarding the Administration
19  of an Entry Level Police Officer Test    25
20  3 Strength Report            37
21  4 Strength Reports           51
22  5 Cadet Appointments         63
23  6 Personnel Orders           69
24  7 Personnel Orders           69
```

Page 5

```
 1  (Index continued)
 2  EXHIBIT                     PAGE
 3  8 Notice From HRD to Commissioner Evans  70
 4  9 List of Tasks             72
 5  10 Civil Service Certification        73
 6  11 Civil Service Certification        74
 7  12 Eligible List            79
 8  13 Form 14                  80
 9  14 Standard Civil Service Public Safety
10  Requisition                80
11  15 Copy of the Requisition          83
12  16 Form 162                 88
13  17 Documents Relating to the Cutoff
14  Score                      96
15  18 Certification Hiring              99
16  19 Not Identified           101
17  20 Test Item Analysis For the 2001
18  Police Exam                102
19  21 Not Identified           102
20  22 Form 162                 104
21  23 Series of Documents              106
22
23  (Exhibits retained by counsel.)
24
```

PROCEEDINGS

EDWARD CALLAHAN,
called as a witness, being duly sworn, testified
as follows:

EXAMINATION

BY MR. LICHTEN:

1 
2 
3 
4 
5 
6 
7 
8 
9 
10 Q. Good morning, Mr. Callahan. Can you state your
11    full name for the record, please.
12 A. My name is Edward P. Callahan.
13 Q. And where are you employed, Mr. Callahan?
14 A. I'm employed by the Boston Police Department.
15 Q. And what is your title at the Boston Police
16    Department?
17 A. My title is director of human resources.
18 Q. And how long have you held that position?
19 A. Since September of 1986.
20 Q. So if I understand your testimony, for the last
21    18 years you've held the same position?
22 A. Yes, sir.
23 Q. Has the position changed in its scope or
24    responsibility or has it essentially remained

1    the same since 1986?
2 A. The role would be essentially the same.
3 Q. Who do you report to?
4 A. Today I report to Superintendent William J.
5    Casey.
6 Q. Okay. And what is his title?
7 A. His title is Chief of the Bureau of
8    Administration and Technology.
9 Q. And is that formerly the Bureau of
10    Administrative Services?
11 A. That's correct.
12 Q. Have you always reported to the Superintendent
13    of the Bureau of Administrative Services?
14 A. I've reported to whomever is the chief of the
15    Bureau of Administrative Services.
16    MR. COX: I'm sorry to interrupt. The
17    usual stipulations, just for the record?
18    MR. LICHTEN: I'm sorry.
19    MS. ALPERSTEIN: What are the usual?
20    MR. LICHTEN: All objections except as to
21    form will be reserved until trial. And do you
22    want the witness to read and sign his deposition
23    before or not before a notary?
24    MR. COX: Waive notary. We'll read and

1    sign.
2    MR. LICHTEN: Okay, that's fine.
3    MR. COX: Thirty days.
4    (Prior testimony read back.)
5    "Q: Have you always reported to
6    the Superintendent of the Bureau
7    of Administrative Services? A:
8    I've reported to whomever is the
9    chief of the Bureau of
10    Administrative Services."
11 Q. Since 1986 has that person been a uniformed
12    individual?
13 A. It's been both a uniformed individual and a
14    civilian manager.
15 Q. I see. During the time that you've been at the
16    Boston Police Department have you had
17    responsibility for overseeing matters relating
18    to the so-called Beecher Decree?
19 A. Yes.
20 Q. Can you tell me what your responsibilities have
21    been in that regard?
22 A. My responsibility is the overall management of
23    selection process for individuals seeking to
24    become employed as Boston Police officers.

1 Q. And in addition to that have you taken any
2    responsibility with respect to doing statistical
3    analysis to determine whether or not the
4    department has or is on its way to achieving
5    parody as described in the Beecher Decree?
6 A. Yes.
7 Q. And what did you do in that regard?
8 A. I prepared initially, I think, in 1990 and
9    maintain on an ongoing basis a Strength Report,
10    as I refer to it, or a spreadsheet that outlines
11    by race, by rank and by gender all sworn Boston
12    police officers.
13 Q. Okay. And from what sources of information do
14    you derive that data on the Strength Reports?
15 A. I derive it principally from, well, two
16    documents principally. One would be if a new
17    recruit class were selected I would include that
18    group of individuals as probationary police
19    officers. And secondly, from any promotional
20    documents that might be available during the
21    course of any given period of time, for
22    instance, if somebody was promoted from one rank
23    to another. And on a monthly basis I remove any
24    police officer who is retired or deceased, or

Page 10

1   through some other avenue leaves the department.
2   Q.   To the best of your knowledge the Strength
3        Reports that you prepare on a regular basis, are
4        they accurate?
5   A.   The Strength Report that I most recently
6        produced I believe to be entirely accurate.
7   Q.   The Strength Reports that you've been producing
8        since 1990 do you consider, or I think you said
9        1990, do you consider those to be accurate?
10  A.   At some point in the beginning of this year I
11       conducted an audit of the entire sworn work
12       force, something that I had not done since I
13       produced this thing in 1990, began producing it.
14       I did that because with the potential of a new
15       police commissioner it would be something that I
16       thought I ought to do, but simply had not done.
17       So I conducted a complete audit of every sworn
18       officer in the department by their rank, by
19       their race, by their gender. So, and I
20       discovered that there were some, some problems
21       later that I corrected as I went along.
22  Q.   Just so I'm clear, have you gone back and
23       corrected any other Strength Reports that you've
24       prepared or only produced the Strength Report in

Page 11

1        2004 which you believe to be more accurate than
2        the others?
3   A.   The 2004 Strength Report would be the most
4        accurate. I didn't have the resources to go
5        back over time. I spent about two weeks on the
6        audit as it was. It was the first time I had an
7        opportunity to do that type of work.
8   Q.   Okay. So when did you do this audit?
9   A.   It would have taken place probably in late
10       January of this year.
11  Q.   Do you recall when the Strength Report first
12       contained the information that was inclusive of
13       the information that you derived from the audit?
14  A.   It would have been probably in early February.
15  Q.   Okay. So if I understand your testimony the
16       Strength Reports that you produced prior to
17       January of 2004 were not based on the type of
18       audit that you did in 2004?
19  A.   That's correct.
20  Q.   Just so I'm clear, what are the differences, if
21       any, between the Strength Reports that you did
22       in, from 1990 through 2003 as compared to the
23       so-called audited Strength Reports you did in
24       2004?

Page 12

1   A.   One of the things I discovered was I was
2        overcounting, I think, tenured African American
3        males and I think as well with tenured Hispanic
4        males. Some overcounting.
5   Q.   Overcounting in what way?
6   A.   That I had more individuals with those
7        characteristics than, on the spreadsheet, than
8        were in actuality working for the department.
9   Q.   How did you come to that conclusion?
10  A.   Well, I derived that conclusion after completing
11       the audit.
12  Q.   I'll go back to that in a second. Let me ask
13       you some other questions first. I would like to
14       ask you some about what the requirements are to
15       become a Boston police officer, and let me do it
16       this way. As I understand it you have to meet a
17       certain age criteria to become a Boston police
18       officer; is that correct?
19  A.   That's correct.
20  Q.   What is that age criteria?
21  A.   The criteria today is that an individual cannot
22       have exceeded his 32nd birthday unless that
23       individual is a United States military veteran
24       upon which the upper age limit would be 36.

Page 13

1   Q.   And when did that go into effect?
2   A.   The age limit was restored about four or five
3        years ago.
4   Q.   Okay. So in 1999 or 2000?
5   A.   In 1999 to 2000 I believe the age limit was in
6        place. The upper age limit had been restored by
7        then.
8   Q.   Okay. Now, what is the lower age limit?
9   A.   Eighteen I believe is the lower age limit.
10  Q.   So you must be 18 at the time you take the exam
11       or at the time you're actually hired as a Boston
12       police officer?
13  A.   I believe that, I believe it's by the time one
14       takes the exam.
15  Q.   Okay. And if I understand it, if you're not a
16       veteran and you're over 32 years of age, since
17       1999 or thereabouts you would be ineligible to
18       become a Boston police officer?
19  A.   That's correct.
20  Q.   And if you're a veteran you're ineligible to
21       become a Boston police officer if you're over 36
22       years of age?
23  A.   Yes.
24  Q.   And this was as a result of the City of Boston

4 (Pages 10 to 13)

Page 14

1    passing a provision of the civil service law?
2  A.  Yes, it was.
3  Q.  Okay.  In addition to that requirement to become
4    a Boston police officer, does one have to have a
5    driver's license?
6  A.  Yes.
7  Q.  Does it have to be a Massachusetts driver's
8    license?
9  A.  Yes, it does.
10  Q.  If one does not possess a valid Massachusetts
11    driver's license can one be a Boston police
12    officer?
13  A.  No.
14  Q.  Okay.  In order to be a Boston police officer
15    what citizenship status must an individual have?
16  A.  One has to be a full citizen.
17  Q.  That is if you have a green card or some legal
18    entry into the United States that's not
19    sufficient?
20  A.  That's correct.
21  Q.  You have to be a full United States citizen?
22  A.  Yes.
23  Q.  And therefore, I take it, if you're not a full
24    United States citizen you're ineligible to

Page 15

1    become a Boston police officer?
2  A.  That's correct.
3  Q.  Now, is there a requirement that someone have a
4    certain level of education in order to become a
5    Boston police officer?
6  A.  Yes.
7  Q.  What is that level of education?
8  A.  A candidate must be either a high school
9    graduate or possess a G.E.D.
10  Q.  And if one does not have a high school diploma
11    or a G.E.D. certificate and they have not served
12    at least three years in the United States Armed
13    Forces with an honorable discharge or release
14    are they ineligible to become a Boston police
15    officer?
16  A.  Yes.
17  Q.  Now, in addition to the criteria we've just set
18    forth, is it a fair statement that in addition
19    to that to become a Boston police officer one
20    must pass a certain level of reading
21    comprehension in the English language?
22  A.  Well, the candidates have to pass an entry level
23    civil service examination which hopefully would
24    be geared towards measuring whether one can

Page 16

1    speak and understand the English language.
2  Q.  And is that test administered in English or in
3    Spanish?
4  A.  Primarily it's administered in English, but the
5    Commonwealth can administer it in Spanish if the
6    candidate requests.
7  Q.  With respect to when the Commonwealth
8    administers the test in Spanish, if someone
9    takes the test in Spanish and passes do they
10    then in addition to that have to pass a reading
11    comprehension test of some type in English in
12    addition to that?
13  A.  I'm not aware that that would be the case.  It's
14    something that I have not experienced.
15  Q.  All right.  Let me see if I understand this.  If
16    someone takes the Boston Police Department exam
17    in Spanish -- strike that.
18      Have there been people who have taken the
19    Boston Police Department exam in Spanish and
20    have been hired, if you know?
21  A.  I don't know the answer to that question.  We
22    don't administer the exam so it would be
23    knowledge that, I don't have knowledge of that.
24  Q.  Okay.  In addition to those criteria can you

Page 17

1    explain to me what requirement, if any, there is
2    before someone is hired as a Boston Police
3    Department officer to sign up on a civil service
4    form accepting the fact that they're interested
5    in employment, can you explain that to me?
6  A.  Sure.  Those candidates who scored high enough
7    to be in contention or are in contention are
8    required to come in and sign a civil service
9    list indicating their willingness to be
10    considered for appointment as a Boston police
11    officer.
12  Q.  What happens if the person doesn't come in by
13    the set date and sign that -- what do you call
14    that document?
15  A.  A certification, yes.
16  Q.  Strike that question.  What if the person does
17    not come in by the date set and sign that
18    certification?
19  A.  The candidate is not, is not put under
20    consideration.
21  Q.  Okay.  Now, if someone is in the active military
22    and because of that is unable to come in and
23    sign the certification, what happens to that
24    candidacy?

ESQUIRE DEPOSITION SERVICES
1-866-619-3925

Page 18

1  A.  On occasion a member of the military will notify
2     me that they're unavailable to sign and I would
3     have the authority to sign the list on their
4     behalf or a family member of theirs could come
5     in and sign the list on their behalf as well.
6  Q.  Okay.  And in that instance is there any
7     requirement that that individual is expected to
8     be out of the service by a certain date?
9  A.  Well, the candidate has to be available for
10    screening and quite often they're not because
11    they're in some far flung part of the world.  So
12    by virtue of their unavailability the candidacy
13    is put on hold.
14 Q.  I see.  And when you say the candidacy is put on
15    hold, are they considered in that group?
16 A.  They would, we would report back to the
17    Commonwealth -- in most cases the candidate who
18    is in the military will withdraw their candidacy
19    pending their release from the military.
20       MS. ALPERSTEIN:  I'm sorry?
21 Q.  He said pending their release from the military;
22    is that right?
23 A.  (Witness nods in the affirmative.)
24       MS. ALPERSTEIN:  Thank you.

Page 19

1  Q.  Okay.  Now, moving on.  Assuming someone has, is
2     in the group to be, it's been certified and
3     comes in and signs the list and meets all of the
4     other qualifications that we've spoken about, do
5     they have to undergo other qualifications in
6     order to be hired?
7  A.  Well, that would -- if a candidate was in that
8     position that would initiate the screening
9     process, a full-fledged screening process for
10    each candidate.
11 Q.  Does that include a psychological exam?
12 A.  Yes, it does.
13 Q.  And are there candidates who are not permitted
14    to go further in the hiring process because of
15    the results of the psychological exam?
16 A.  The psychological exam is the last step in the
17    process and there are individuals who have
18    failed to pass the psychological testing.
19 Q.  Is there a medical screening process?
20 A.  Yes, there is.
21 Q.  And is it a fair statement that the Boston
22    Police Department uses the initial entry level
23    hiring regulations promulgated by the human
24    resources division of the Commonwealth of

Page 20

1     Massachusetts?
2  A.  Yes.
3  Q.  Okay.  And who administers, for the City of
4     Boston, who administers that exam?
5  A.  Well, the medical review is undertaken by the
6     department, Office of Occupational Health.
7  Q.  That's run by Dr. Arnold?
8  A.  Dr. Chris Arnold is the department physician,
9     yes.
10 Q.  I take it someone has to meet those medical
11    criteria in order to go on in the hiring
12    process?
13 A.  Yes.
14 Q.  In addition to those criteria that we've talked
15    about or those qualifications is there also a
16    qualification relating to a background check?
17 A.  Yes, there is.
18 Q.  Explain that to me.  What is the department
19    looking for and what, what is disqualifying?
20 A.  Well, the department conducts a fairly
21    exhaustive background investigation of each
22    candidate that is under consideration.
23 Q.  Right.
24 A.  We look at the candidate's criminal history, if

Page 21

1     there is any.  We look at each and every
2     employment position the candidate had or held.
3     We look at the candidate's military history;
4     many of the candidates do have military
5     histories.  We check with their neighbors, we,
6     we look into every, essentially every facet of
7     their life.
8  Q.  Okay.  Are there any other qualifications or
9     barriers to be hired other than the ones that
10    we've discussed?
11 A.  One that comes to mind immediately would be the
12    issue of residency.
13 Q.  That is one has to be a resident of the City of
14    Boston in order to be considered?
15 A.  For one year preceding the date of the
16    administration of the examination.
17 Q.  Is that one of the issues that's looked at in
18    the background investigation?
19 A.  Yes.
20 Q.  If one doesn't have that residency criteria
21    satisfied they are ineligible for hire?
22 A.  That's correct.
23 Q.  Are there any other criteria that we missed?
24 A.  There has to be, one other would be a physical

6 (Pages 18 to 21)

Page 22

1    fitness test that each candidate must
2    successfully complete. The last step in the
3    process, if the candidate doesn't pass the
4    physical ability test the candidate isn't
5    appointed.
6  Q.  That's called the PAT?
7  A.  Yes.
8  Q.  That's what it's called?
9  A.  That's what it's referred to.
10 Q.  Who administers that?
11 A.  It's administered by the Commonwealth human
12     resources division.
13 Q.  Are there candidates that get through the other
14     requirements and do not pass the PAT?
15 A.  Yes, there are.
16 Q.  Are there any other criteria now?
17 A.  I think that would do it. The best I can
18     recall.
19 Q.  And then one also after that, if they're hired
20     have to go to the Boston police academy; is that
21     correct?
22 A.  Yes.
23 Q.  And they're probationary while they're in the
24     Boston police academy?

Page 23

1  A.  While they're in the Boston police academy
2      they're characterized as student officers and
3      they are indeed probationary officers at that
4      time as well. They have a one-year probationary
5      period -- I'm sorry, a year and a half.
6  Q.  The year and a half is the time they're in
7      the academy and then one year after that?
8  A.  Yes.
9  Q.  And there are people who are required to leave
10     or are terminated from the academy --
11 A.  Yes.
12 Q.  -- for failing to either meet the educational
13     requirements of the academy?
14 A.  I believe one of the reasons why someone would
15     leave, yes.
16 Q.  For failing to meet the physical requirements of
17     the academy?
18 A.  Yes.
19 Q.  And failing to meet the good conduct
20     requirements of the academy?
21 A.  Yes.
22 Q.  I'm going to show you.
23     (Deposition Exhibit 1 marked for
24     identification.)

Page 24

1  Q.  I'll call that plaintiff's -- I'm sorry. We'll
2      call that Callahan Exhibit No. 1. I'm showing
3      you a document labeled as Callahan Exhibit No.
4      1; can you identify that document, please?
5  A.  It is a document produced by the City that is
6      published on its, its primary website.
7  Q.  Okay. And does it relate to the qualifications
8      to become a Boston police officer?
9  A.  Yes, it does.
10 Q.  Are you familiar with that document?
11 A.  I have not seen this document, I think, that
12     often. But it's a web page that I don't go to.
13     But I've seen it before.
14 Q.  Okay. Can you just briefly -- all I'm trying to
15     find out is whether that's an accurate statement
16     of the qualifications one needs to be a Boston
17     police officer or whether there are any
18     inaccuracies?
19 A.  Well, right off the bat I can see where I, the
20     age for 18 should be 19. This is essentially
21     the requirements.
22 Q.  Okay. If I understand what you just said where
23     it says 18 it should say 19?
24 A.  No, it should say 19. I should have said -- I

Page 25

1      said 18, I should have said 19.
2  Q.  So the document is accurate but what you said
3      before is not accurate?
4  A.  That's correct. It's very rare we see anybody
5      that young.
6  Q.  I'm showing you a document which I'll call
7      Callahan Deposition Exhibit No. 2 for
8      identification purposes. And ask you if you're
9      able to identify this document.
10 A.  This is an announcement that's promulgated by
11     the Commonwealth's human resource division
12     regarding the, an announcement regarding the
13     administration of an entry level police officer
14     test.
15     (Deposition Exhibit 2 marked for
16     identification.)
17 Q.  Now, I would like to ask you to go to page 4 of
18     this document, please. Under the section
19     Spanish Speaking Applicants; do you see that?
20 A.  Yes.
21 Q.  Okay. And it says, and I'm reading here, you
22     must take -- "you may take the examination in
23     the Spanish language. If you do you will also
24     have to pass another written examination given

7 (Pages 22 to 25)

Page 26

1   on the same day that tests your ability to read
2   and understand English. If you wish to take the
3   examination in Spanish you must send a separate
4   letter," et cetera; do you see that?
5   A.  I do.
6   Q.  Does that refresh your memory about whether or
7       not if someone takes the exam in Spanish they
8       have to pass an English reading comprehensive
9       test?
10  A.  Yes, it does.
11      MS. ALPERSTEIN:  Objection.
12  Q.  And just so I'm clear, are you saying that now
13      that you've read this you remember there is such
14      a procedure?
15  A.  Yes, I do.
16  Q.  Okay. Now, do you have any knowledge as to,
17      with respect to those individuals who take the
18      Boston Police Department exam in Spanish how
19      many end up taking and then actually passing the
20      English reading comprehension test that they
21      have to take?
22  A.  I do not know.
23  Q.  Have you ever seen any data on that?
24  A.  No, I have not.

Page 27

1   Q.  Now, let me get back to these Strength Reports.
2       First of all, in connection with your job as
3       director of human resources, as I understand
4       your testimony you do undertake to make a
5       statistical comparison of uniformed minorities
6       within the police department compared to their
7       percentages in the City of Boston to determine
8       whether some parody has been breached under the
9       Beecher Decree?
10  A.  Yes.
11  Q.  And what data do you use, first of all, to
12      determine what the percentages of minorities are
13      in the population?
14  A.  I review the most current United States census
15      reports.
16  Q.  So for the, since 1999 -- strike that.
17      Since 2000 what data have you been using
18      for the census data?
19  A.  2000 census.
20  Q.  And that's the data that you've been using up
21      until the present time?
22  A.  Yes.
23  Q.  And as a result of that 2000 data what is the
24      benchmark that you've been using describing what

Page 28

1   the percentage of minorities are in the
2   population in the City of Boston?
3   A.  If my memory serves me correct I believe the
4       benchmark would be 38.5 percent of the
5       residents.
6   Q.  I think we may have rounded something off, but.
7   A.  Somewhere in that, in the ballpark.
8   Q.  Okay. And just so I understand, you compare
9       that to all uniformed officers, probationary and
10      non-probationary, non-probationary or only
11      non-probationary officers? That is when you
12      look at the uniform ranks what are you looking
13      at?
14  A.  The tenured officers, non-probationary.
15  Q.  So you exclude the probationary officers?
16  A.  That's correct.
17  Q.  And for what reason do you exclude the
18      probationary officers?
19  A.  It's my understanding that one of the tenets of
20      the decree is that only non-probationary police
21      officers be counted.
22  Q.  So that wasn't a judgment you made, that was a
23      judgment you understand is part of the consent
24      decree?

Page 29

1   A.  Yes.
2   Q.  Now, to become a sergeant, lieutenant or captain
3       one has to take a promotional exam; is that
4       correct?
5   A.  That's correct.
6   Q.  Okay. And not to delve into other litigation
7       we've been involved in, the Boston Police
8       Department has hired firms who have devised
9       Boston Police Department promotional exams that
10      are more than reading and writing tests; is that
11      correct?
12  A.  Yes.
13  Q.  Okay. And you've been doing that for the last
14      15 years or so?
15  A.  On and off. But since about 1985.
16  Q.  Okay. And those involve in baskets and video
17      simulations as well as a written portion?
18  A.  Yes.
19  Q.  And to be eligible to become a sergeant in the
20      Boston Police Department how many years must you
21      have served on the Boston Police Department?
22  A.  Three years.
23  Q.  Now, with respect to detectives in the Boston
24      Police Department, since sometime in the 1990s

8 (Pages 26 to 29)

Page 30

1   one has had to take an exam to become a
2   detective?
3   A.  Since about 1989.
4   Q.  1989.  But to get an answer to my question.
5       Since 1989 have you had to take an exam in order
6       to become a detective?
7   A.  Yes.
8   Q.  What are the eligibility criteria to be eligible
9       to sit for the exam?
10  A.  First and foremost three years as a patrol
11      officer would be the minimum --
12  Q.  I see.
13  A.  -- period of time one would need to have before
14      you can take the test.
15  Q.  And once the exam is given and the marks are
16      registered does the commissioner have an extra
17      level of discretion with respect to detectives,
18      picking detectives that he doesn't have with
19      respect to picking sergeants, lieutenants and
20      captains?
21  A.  Yes.
22  Q.  Can you explain that for the record, please.
23  A.  Under the collective bargaining agreement
24      between the City and the Boston Police Patrolman

Page 31

1       Association 40 percent of the grade for
2       detective would be based on one's training and
3       experience, the other 60 percent of the grade
4       would be based on the written knowledge test.
5   Q.  Okay.  And then within the higher scores does
6       the commissioner have a level of discretion with
7       respect to who he picks out of those?  He or
8       she.  Excuse me.
9   A.  That's an interesting question.  I believe the
10      commissioner could reject a higher scoring
11      candidate if he or she would want to.  But I
12      cannot recall it happening.
13  Q.  So as far as you know the commissioners have
14      after applying the 60 percent training and
15      experience and 40 percent exam have hired --
16          MS. COHEN:  Objection.  I think you stated
17      the opposite.
18  Q.  Sorry.
19  A.  It's reversed.
20  Q.  I appreciate that.  Thank you.  Let me restate
21      the question.  If I understand your answer,
22      after taking the 40 percent part of the mark
23      that's related to training and experience and
24      the 60 percent relating to the written exam, as

Page 32

1       far as you can remember since 1989 the
2       commissioner has hired that person from the top
3       of the list?
4   A.  To the best my recollection, yes.
5   Q.  Now, for sergeant, lieutenant and detective is
6       that also the case?
7   A.  No.
8   Q.  Okay.  And that is from time to time the
9       commissioner has elected to bypass individuals
10      for promotion in order to get to lower rank
11      individuals in order to improve minority, the
12      minority percentages in the promotional forces;
13      is that right?
14  A.  Yes.  Particularly to the rank of sergeant.
15  Q.  And that has been upheld on several occasions by
16      courts; is that correct?
17  A.  Yes, it has.
18  Q.  So if I understand your testimony, there have
19      been times over the last 15 years when the
20      commissioner has selected minorities with lower
21      scores on the promotional exam than higher
22      ranked individuals in order to achieve a, try to
23      achieve parity in the promotional ranks; is that
24      correct?

Page 33

1   A.  Well, in an attempt to improve diversity.
2   Q.  Improve diversity?
3   A.  Yes.  That's correct.
4   Q.  Okay.  Now, at some point in time in 2003 you
5       became aware, I take it, of a decision of the
6       United States Court of Appeals in the case of
7       Quinn, et al., versus the City of Boston?
8   A.  Yes.
9   Q.  And I'm not asking whether you agree or disagree
10      with that, but you were aware in that case that
11      the Court indicated that the formula at least
12      for picking firefighters should be comparing the
13      minority population in the City of Boston with
14      the minority population in the entry level rank;
15      is that correct?
16  A.  Yes.
17  Q.  Have you ever done that in the, for the Boston
18      Police Department since that decision came down?
19  A.  I'm sorry, Counsel, I dont understand the
20      question.
21  Q.  I'll rephrase it.  After the decision came down
22      I take it it's a fair statement that you were
23      aware that there was at least a possibility that
24      the Boston Police Department may have to do a

9 (Pages 30 to 33)

Page 34

1  different type of analysis --
2      MS. COHEN:  Objection.
3  Q.  -- to determine parity; is that correct?
4      MR. COX:  Objection.
5  Q.  You may answer.
6  A.  I wouldn't do a different type of analysis, I
7      would continue the ongoing analysis,
8      essentially, on an ongoing basis.
9  Q.  My question is simply since that decision has
10     come down or even before then, have you ever
11     attempted to compare the number of minority
12     entry level police officers in the Boston Police
13     Department with their numbers in the general
14     population?
15 A.  I believe I did that on one occasion, yes.
16 Q.  When was that?
17 A.  Probably shortly after the fire case had been
18     adjudicated.
19 Q.  So sometime in 2003?
20 A.  Yes.
21 Q.  Do you recall what you determined?
22 A.  I performed that analysis in conjunction with
23     one of our former attorneys, Bill Hoch.
24 Q.  Uh-huh.

Page 35

1  A.  I don't remember the percentage that we came up
2      with.  I think one of the questions we had was
3      whether we should be including --
4      MR. COX:  Don't testify about anything that
5      may, conversations with Bill Hoch.  It depends
6      on --
7  Q.  All I'm asking you is what the results -- right.
8      I'm not going to ask you about your
9      conversations with him.
10 A.  Sure.  I don't remember what the -- I just, I
11     know I did it.  But I don't recall what the
12     actual percentage of the entry level rank was
13     vis-a-vis the, the issue of parity.  But I think
14     it was obviously a higher number of, the number
15     was higher, the percentage was higher based on
16     the entry level rank.
17 Q.  Is it a fair statement that when you did this
18     analysis you determined the number was higher
19     than 38.5 percent?
20 A.  Well, I was, I -- oh, God.  I don't know if that
21     was the case.
22 Q.  Okay.
23 A.  I more recollect doing the percentage of African
24     Americans and Hispanics vis-a-vis the entry

Page 36

1  level rank.  I don't recall whether we actually
2  matched it up at the time.
3  Q.  What did you recall that number being?
4  A.  It would be higher than the 33.4 percent that
5      you see as a result of the entire work force.
6  Q.  Do you recall what that number was?
7  A.  I do not.
8  Q.  And did you -- did you yourself speak to anyone
9      at HRD about that analysis that you did?
10 A.  No.
11 Q.  Where is that analysis?
12 A.  I had done it with Attorney Hoch and I believe
13     he would have had it in his files.  I don't have
14     a copy.  I have to qualify, he may have actually
15     done the analysis himself and I provided the
16     data.
17 Q.  Okay.  Is it your testimony as you sit here
18     today that you have no knowledge one way or the
19     other as to whether when you did that analysis
20     the number of entry level police officers in the
21     Boston Police Department achieved parity with
22     the number of minorities in the general
23     population?
24     MS. ALPERSTEIN:  Objection.

Page 37

1  A.  I just don't recall what the percentage was.  It
2      was probably close.  But exactly what it was, I
3      don't know.
4      (Deposition Exhibit 3 marked for
5      identification.)
6  Q.  I'm showing you what has been marked as
7      Deposition Exhibit No. 3 and I ask you if you
8      can identify what this is for the record,
9      please.
10 A.  This is a Boston Police Department Strength
11     Report prepared by me on 10/27/03.
12 Q.  Okay.  So these were the so-called Strength
13     Reports that you were talking about before; is
14     that correct?
15 A.  Yes.
16 Q.  And just so I'm clear on your testimony, is it
17     your testimony that you were creating these
18     documents on a monthly basis since 1990 or on
19     some other basis and if so can you tell me what
20     that basis was?
21 A.  I primarily produced a document when there's a
22     change in anything that would take place --
23 Q.  I see.
24 A.  -- regarding an attrition issue or promotional

10 (Pages 34 to 37)

Page 38

1    issue or appointment issue.
2    Q.  I see.
3    A.  But I generally produced then once a month.
4        Actually, print them hard copy about once a
5        month.
6    Q.  So I've been given a number of them but I
7        haven't been given, you know, 12 a year for five
8        years.  So are there actually in existence
9        Strength Reports for every month in the last
10       four or five years?
11   A.  Well, there are probably more -- there are
12       probably reports for more than once a month.
13   Q.  Okay.  Where are those kept, do you --
14   A.  I maintain them.
15   Q.  So you have a file on those?
16   A.  Yes.
17       MR. LICHTEN:  May I ask, do you have any
18       problem producing that?
19       MR. COX:  No.
20       MR. LICHTEN:  We'll follow up with a
21       letter.
22       MR. COX:  Okay.
23   Q.  Now, as I understand it a class was put on in
24       October of 2003; is that correct?

Page 39

1    A.  Yes.
2    Q.  And do you recall when that class actually began
3        at the academy, was it in October of 2003?
4    A.  Yes, it was.
5    Q.  Okay.  And this document which is Deposition
6        Exhibit No. 3, is this a document that you
7        prepared?
8    A.  Yes, it is.
9    Q.  Okay.  And did you prepare this on October 27,
10       2003?
11   A.  Yes, I would have.
12   Q.  Do you know why you produced it on October 27,
13       2003?
14   A.  It's most likely because the class entered the
15       academy that day.
16   Q.  Okay.
17   A.  Or that week.
18   Q.  Gotcha.  Now, in coming to your, the percentages
19       that you arrived at here, you excluded
20       probationary officers; is that right?
21   A.  That's correct.
22   Q.  If I understand it you excluded actually two
23       classes of officers, the one who had just gone
24       into the academy in October of 2003 and a prior

Page 40

1    class that had gone in in March of 2002?
2    A.  Yes.
3    Q.  So by October of 2003 the March '02 class, those
4        individuals who are listed here were out of the
5        academy but still probationary police officers
6        working actual positions in the department; --
7    A.  Yes.
8    Q.  -- is that right?
9    A.  That's correct.
10   Q.  Okay.  And these individuals would have no
11       longer been probationary, if I understand it,
12       sometime -- well, in the fall of 2003; is that
13       right?
14   A.  Sometime in the fall of 2003, yes.
15   Q.  Okay.
16   A.  Just by way of clarification, not all
17       probationary police officers arrive at that date
18       at the same time.  We deduct time for sick leave
19       or injured leave or whatever.  But primarily
20       they don't go in, they don't all become
21       probationary, usually don't become all in one
22       day.
23   Q.  Just so that I can understand it.  As of October
24       27, 2003 is it your testimony or understanding

Page 41

1    that the class of March 2002 was still
2    probationary or had they become permanent?
3    A.  They were still probationary.
4    Q.  And when as best you can surmise would they have
5        become permanent?
6    A.  Sometime in the fall of '03.
7    Q.  Well, October 27th is the fall of 2003.
8    A.  Well, it may have been.  It depends on how long
9        the academy was in place.  And it's,
10       unfortunately it's never set.  It could be a
11       28-week academy, it could be 29 week academy.
12   Q.  Let's see if I understand this.  If we take the
13       date the academy starts do we then take the
14       period of the academy and add a year to find out
15       the probationary time or is it 18 months from
16       the time they start the academy or which is it?
17   A.  That was a question that was raised at one
18       point, I believe it would have been, I believe
19       it was settled on the full 18 months rather than
20       adding on time after the academy now.
21   Q.  The date after you start the academy it's 18
22       months?
23   A.  Yes.
24   Q.  Okay.  Well, I'm no mathematician but by my

11 (Pages 38 to 41)

Page 42

1  calculation if you started a class in March of
2  2002, by October 27, 2003 those people would be
3  permanent, am I --
4  A.  Yes, they would have been.
5  Q.  -- mistaken?  So is it, as you look at this now,
6  would it have been appropriate in your opinion
7  to have counted the '02 class in these numbers?
8  A.  Well, I'm trying to think of the reason why I
9  did not count them at that time.
10  Q.  Sure.
11  A.  I believe that -- I believe we were reviewing 48
12  individuals in the fall of '03 to determine who
13  specifically would become permanent when.
14  Q.  Okay.
15  A.  Deducting all of that time and some of them had,
16  you know, illnesses or whatever.  So that review
17  was taking place.  But ultimately sometime
18  thereafter or shortly thereafter.
19  Q.  Now, let me ask you a couple of questions about
20  this document.  You prepared this document dated
21  October 27, 2003 by looking at what data?
22  A.  Well, this is a spreadsheet that's contained on
23  an Excel spreadsheet.  I'm not looking at any
24  particular data, when a, when a change has to

Page 43

1  be -- when I initiate a change in the
2  spreadsheet it's generally based on a personnel
3  order that would in effect be an announcement
4  that something has happened to a police officer,
5  either to promote him or her or to remove him
6  from the spreadsheet.
7  Q.  Or retired?
8  A.  Or retired.  A retirement document of some sort.
9  Q.  This document that you prepared on October 27,
10  2003, was it based upon these personnel orders
11  up until that time?
12  A.  Yes.
13  Q.  Now, on this document -- by the way, do you
14  recall providing this document to the Boston
15  Globe?
16  A.  The Boston Globe is always asking for
17  information on the Boston Police Department so I
18  provide our legal office with whatever they ask
19  me to do.  So I'm sure -- I would be surprised
20  if they didn't have it.
21  Q.  Okay.  Did you ever attempt on this Strength
22  Report to do an analysis of the total number of
23  tenured entry level police officers to the
24  numbers in the general population?

Page 44

1  A.  I don't believe I did.
2  Q.  To your knowledge, other than the testimony that
3  you gave already about the calculation you made
4  with Attorney Hoch, on any other occasion since
5  2002, since 2003 has the Boston Police
6  Department to your knowledge attempted to make a
7  calculation of the number of tenured entry level
8  police officers with the numbers, with the
9  relative percentages of minorities in the City
10  of Boston population?
11  A.  Well, the spreadsheet calculates the percentage
12  for us.  So it's always available.  But did
13  we -- you know, I'm aware of what the City, the
14  38 percent on the, based on the census.  So in
15  terms of, you know, we're aware of the
16  situation, we actually analyzed it or not, we're
17  aware of both numbers.
18  Q.  Well, let's see if I can understand it.  I take
19  it from that that you have done calculations as
20  to what the percentage of entry level police
21  officers are that -- strike that.
22  I take it you've done calculations as to
23  what the percentage of minority entry level
24  police officers are compared to the percentages

Page 45

1  of the, in the whole police department; is that
2  correct?
3  A.  Well, this spreadsheet is calculating the entire
4  work force rather than just the entry level.
5  Q.  Right.  But my question is now, and I'm trying
6  to relate this to the Quinn case, and maybe I
7  misunderstood your testimony.  Have you on an
8  ongoing basis since 2003 also done a calculation
9  which doesn't appear on here that is taking the
10  percentage of the entry level tenured minority
11  police officers and comparing them to the total
12  number of police officers in the department?
13  A.  No.
14  Q.  You haven't done that?
15  A.  Not on an ongoing basis, no.
16  Q.  Other than the time you did that in your
17  conversation with Mr. Hoch, have you or anyone
18  else at the department to your knowledge done
19  that?
20  A.  I haven't, and to my knowledge, to my knowledge
21  nobody else has.
22  Q.  Okay.  So when you refer to that Excel
23  spreadsheet having the numbers you weren't
24  referring to the -- you were referring to the

12 (Pages 42 to 45)

Page 46

1    total tenured minority population, uniformed
2    minority population in the Boston Police
3    Department, not to the entry level ranks?
4    A.  That's correct.
5    Q.  And with respect to this document which is dated
6    October 27, 2003, you have not done that
7    calculation; is that correct?
8    A.  With respect to this document?
9    Q.  Yes.
10   A.  I did not, no.
11   Q.  Just so I'm clear on your testimony, do you have
12   any reason to believe that the data contained on
13   this document, which is Deposition Exhibit No.
14   3, is inaccurate in some way?
15   A.  Well, shortly after the fall of 2003 I began to
16   be concerned about the accuracy of the
17   spreadsheet, that's why I conducted an audit.
18   Regarding this particular document whether I was
19   concerned about -- I had a general concern that
20   there, that there was a potential that it wasn't
21   completely accurate, but not related to this
22   document itself.
23   Q.  And this audit, does this appear in some
24   document form?

Page 47

1    A.  I could check whether I had notes. I kept a,
2    the spreadsheet on the computer screen, it was
3    altering it habitually as we went along, but,
4    you know -- I may have notes regarding the
5    thing, but I would have to check. I may have
6    discarded them.
7    Q.  Maybe I misunderstand the nature of this audit.
8    Was this audit some study with voluminous number
9    of documents; what was this audit?
10   A.  What I did was I went through personnel files of
11   the officers, I reviewed civil service
12   certifications, their race, I checked the City's
13   files, the computerized data files, I looked at
14   photographs of officers as well. So I used any
15   document that I could get my hands on to verify
16   the race and the gender, the rank of all of the
17   candidates.
18   Q.  Okay. And does the result of this audit appear
19   on a Strength Report in 2004?
20   A.  It would have been the first Strength Report I
21   produced after the audit was completed.
22   Q.  Okay. And when was that?
23   A.  It was probably in early February.
24   Q.  Okay. Now, let me ask you this, how do you

Page 48

1    determine whether someone is a minority or not?
2    A.  Well, I'm looking at, of course, one of the
3    documents I do look at to determine the race of
4    a candidate is the civil service certification
5    upon which their names appear. So those lists
6    would indicate whether somebody was Hispanic or
7    black.
8    Q.  That is you actually look at whether they were
9    listed as Hispanic or black when they were hired
10   as a result of the civil service list?
11   A.  Yes. The civil service lists were among the
12   documents that I check.
13   Q.  Do you check anything else?
14   A.  As I testified I did look at photographs, I
15   looked at the personnel files, I looked at the
16   officer's own characterization of his own race.
17   Q.  Now, what would that appear on?
18   A.  That would appear on some entry level documents,
19   particularly the documents that would be used
20   during the screening process. Most importantly
21   our initial application, I believe, would
22   indicate whether the candidate would be required
23   to put his or her race on the application.
24   Q.  Okay. Now, if you know, what determines whether

Page 49

1    or not someone is black for the purposes of your
2    calculation in the Boston Police Department,
3    other than self-identification?
4    A.  Self-identification would be important, but we
5    do have a computerized bank of photographs of
6    every employee and I did look at an awful lot of
7    photographs as I was going through this
8    particular exercise.
9    Q.  Okay. And how do you determine from a
10   photograph whether someone is black or not?
11   A.  Not an easy thing to do at times. But there
12   were individuals who were clearly not Caucasian
13   whose photographs I looked at and I would take
14   that photograph and match it up to what the
15   candidate had identified him or herself as and
16   then look at the civil service list as well.
17   Q.  Okay. Let's see if I understand it. If you're
18   aware, how black does someone have to be to be
19   considered black for the purposes of the Boston
20   Police Department?
21   A.  I do not know how to answer that question.
22   Q.  Is it one half, one quarter, do you know?
23   A.  I do not know.
24   Q.  How about with respect to Hispanic?

13 (Pages 46 to 49)

Page 50

1 A. I think generally the decree, one of the issues
2 of the provisions of the decree is a Spanish
3 surname, Hispanic surnamed individuals is what
4 we look at.
5 Q. Just so --
6 A. And self-identification as well.
7 Q. Okay. If someone is Spanish surnamed but has
8 lived in the United States all of their life and
9 their parents have lived in the United States
10 all of their life, do you consider them Hispanic
11 for the purposes of your calculation?
12 A. Yes.
13 Q. Are you aware as to whether that's what -- are
14 you aware of what the Beecher Decree says with
15 respect to how you count such a person?
16 A. I believe that the, one of the provisions would
17 be whether the individual comes from a Spanish
18 speaking household.
19 Q. So you would agree that there are people with
20 Spanish surnames who don't, who do not come from
21 Spanish speaking households; is that correct?
22 A. Who have been hired?
23 Q. Yes.
24 A. I believe that's a potential, yes.

Page 51

1 Q. My question is when you do your calculation have
2 you, have you made any determination whether
3 people with Spanish surnames come from a Spanish
4 speaking household or not so as to whether they
5 count as Hispanic under the Beecher Decree?
6 A. The detectives who conduct the background
7 investigations physically conduct a home visit
8 for all of the candidates. But I can't say for
9 certain that there are individuals who, who are
10 hired who definitively come from a house where
11 Spanish is spoken or raised in a home where
12 Spanish was spoken.
13 (Deposition Exhibit 4 marked for
14 identification.)
15 Q. I'm showing you what is labeled as Callahan
16 Deposition Exhibit No. 4, and I'll represent to
17 you that this is simply all of the documents,
18 all of the Strength Reports provided by your
19 counsel to me in response to a request for
20 documents and interrogatories that I made to
21 him. Let me first ask you, I take it from your
22 testimony that this does not nearly constitute
23 all of the Strength Reports during this period?
24 A. That's correct.

Page 52

1 Q. And that you have a file that has all of those
2 Strength Reports?
3 A. Yes, I do.
4 Q. And you have it in an Excel spreadsheet form?
5 A. Well, I have hard copies that I keep in it, --
6 Q. I see.
7 A. -- our file.
8 Q. And you also have a, you have it in some sort of
9 computer file?
10 A. Yes, but it changes, the computer file changes.
11 When there's a need.
12 Q. Do you keep that on a disc?
13 A. On a hard drive on the network.
14 Q. If you look -- let's do it this way. I'm going
15 to keep -- do you still have the October 27th
16 document, Deposition Exhibit No. 3?
17 A. Yes, I do.
18 Q. If you can put those side to side for a second.
19 The first document on Deposition Exhibit No. 4
20 appears to be a Strength Report on May 12, 2004;
21 is that correct?
22 A. That's correct.
23 Q. Okay. Now, let me stop you right now and let me
24 ask you a couple of questions. As I understand

Page 53

1 it now the Boston Police Department entry level
2 exam that the plaintiffs took and are
3 complaining of was a 2001 exam; is that correct?
4 A. I don't know. The Commonwealth gives these
5 exams every two years. It could have been a
6 2003 exam. No, it was probably 2001.
7 MR. COX: Only if you know. Don't guess.
8 Q. Okay. Well, you're aware that they're
9 complaining about their failing to be hired in
10 March of 2002 and October of 2003; is that
11 right?
12 A. Yes.
13 Q. So as you sit here your best understanding is
14 that that was a result of an exam that was given
15 in 2001?
16 A. Yes.
17 Q. Now, that exam expired; is that correct?
18 A. Yes.
19 Q. Okay. When did it expire?
20 A. It would have expired probably in the fall of
21 2003.
22 Q. Okay. So the October 2003 class that was hired
23 was the last class that was hired off of that
24 exam?

14 (Pages 50 to 53)

Page 54

1   A.  That's correct.
2   Q.  And at some point in time in 2002 and 2003 the
3       department had intended to put on another class
4       but had to cancel it for financial reasons?
5   A.  Yes.
6   Q.  When was that, do you recall?
7   A.  The class was canceled in January of 2003.
8   Q.  Okay.
9   A.  And the class that went in October of 2003 was
10      the same group of individuals.
11  Q.  I see.  Okay.  Now, the Boston Police Department
12      is currently doing hiring; is that correct?
13  A.  Yes.
14  Q.  And first of all, I notice from your Strength
15      Reports it looks to me that the number of patrol
16      officers has decreased dramatically from the
17      late '90s to the present; is that a fair
18      statement?
19  A.  Yes.
20  Q.  It looks like your numbers are down three or
21      400; is that fair?
22  A.  Yes.
23  Q.  And as I understand it over the last several
24      years because of the municipal economy, because

Page 55

1       of the municipal economy, the department,
2       although they've wanted to hire has not been
3       able to hire; is that right?
4   A.  I think a more fair statement would be that
5       we've not been able to hire as many as we would
6       like.
7   Q.  Currently has the department estimated the
8       number of vacancies that they would anticipate
9       or like to fill over the next two years?
10  A.  Yes.
11  Q.  What is that number?
12  A.  Sixty eight.
13  Q.  And the current hires that are going to take
14      place, when do you anticipate those individuals
15      entering the academy?
16  A.  I think the most likely date would be late
17      November.
18  Q.  Of --
19  A.  Yes.  2004.
20  Q.  And how many individuals do you expect to be
21      part of that group?
22  A.  Thirty eight.
23  Q.  Okay.  So as I understand it, 38 would mean that
24      you would require a certification of 77

Page 56

1       individuals from the HRD?
2   A.  Yes.
3   Q.  And then if I understand, if my math is okay,
4       that means that you intend to hire another class
5       of 40 after that?
6   A.  Thirty.
7   Q.  Thirty.  Okay.  My math isn't that good.  When
8       do you anticipate doing that?
9   A.  I think the anticipated time would be April of
10      '05.
11  Q.  April of '05, so less than a year from now?
12  A.  Yes.
13  Q.  Does the department have any plans one way or
14      the other as to whether it would hire anymore
15      individuals off the current list?
16  A.  I believe that the group in April would be,
17      would be also off the current list.
18  Q.  Right.
19  A.  April '05.  After that, --
20  Q.  Yes.
21  A.  -- again, it would depend upon the City's
22      finances.  But I believe those two classes are
23      the only groups that I'm aware of that they plan
24      on hiring.

Page 57

1   Q.  If I understand your testimony, the only thing
2       that's been planned so far is that the
3       department would like, or would like or intends
4       to make 68 hirings of entry level police
5       officers off the current civil service list
6       ending in April of '05?
7   A.  Yes.
8   Q.  And as to whether you would hire anymore police
9       officers off this current list after that, there
10      are no plans one way or another at this point?
11  A.  Not at this point, no.
12  Q.  Now, going back to Deposition Exhibit No. 4, the
13      first page is a Strength Report from May 12,
14      2004; is that correct?
15  A.  Yes.
16  Q.  Okay.  And this Strength Report is after the
17      audit; is that correct?
18  A.  Yes.
19  Q.  Now, if we -- and this also continues to have
20      the March 2002 class and the October 2003 listed
21      as probationary and not tenured; is that
22      correct?
23  A.  Yes.  There are two individuals remaining from
24      the March of '02 class who had not achieved the

15 (Pages 54 to 57)

### Page 58

1    permanent status.
2  Q.  I see.  So other than those two the others are
3      all in the class, are all counted now as
4      permanent?
5  A.  That's correct.
6  Q.  Okay.  And if we look at the totals the minority
7      tenured in October 27, 2003 was 33.98?
8  A.  Yes.
9  Q.  And the minority tenured is 33.47 in May of
10      2004?
11  A.  Yes.
12  Q.  Okay.  And these documents include any
13      adjustments that you've made as a result of this
14      audit; is that correct?
15  A.  That's correct.
16  Q.  Now, if we go to the second page of the document
17      which is dated January 8, 2004, --
18  A.  Yes.
19  Q.  -- does that have the result of the audit on it?
20  A.  It does not.
21  Q.  Okay.  So if I understand your testimony, it is
22      that the first results of the so-called audit
23      are not in this package of documents?
24  A.  Probably a report that was produced in February.

### Page 59

1      Sometime in February.
2  Q.  So it's not in this, these documents?
3  A.  No.  That's correct.
4      MS. COHEN:  Excuse me, is that February of
5      2004?
6  A.  That's correct.
7  Q.  I've got to take a minute.  Excuse me.
8      (Short break taken.)
9  Q.  Looking at Deposition Exhibit No. 3, looking at
10      the second page of Deposition Exhibit No. 4, and
11      comparing it to the first page of Deposition
12      Exhibit No. 4.
13  A.  I don't have numbers on these, Counselor, I'm a
14      little confused by it.
15  Q.  Looking at the 10/27/03 Strength Report.
16  A.  Got it.
17  Q.  Comparing that to the May 12, 2004 Strength
18      Report --
19  A.  Right.
20  Q.  -- and the January 8, 2004 Strength Report.  Are
21      you able to point out to me what this alleged
22      overcounting of minorities was in the entry
23      level ranks?
24  A.  Well, it just wasn't at the entry level rank.

### Page 60

1      It was an overcounting somewhere in this thing;
2      in other ranks as well.
3  Q.  Okay.  Well, let me see if I can pursue that.
4      If we look at January 8, 2004, --
5  A.  Okay.
6  Q.  -- for example, which is the second page of the
7      multi-page exhibit; --
8  A.  Yes.
9  Q.  -- do you have that?
10  A.  I do.
11  Q.  Which is Deposition Exhibit No. 4.  It lists the
12      number of black patrol officers as 301; is that
13      correct?
14  A.  Yes.
15  Q.  And if we look at -- that's January 8th.  If we
16      look at --
17      MS. ALPERSTEIN:  Objection.  It's black
18      male patrol officers.
19      MR. LICHTEN:  What did I say?
20      MS. ALPERSTEIN:  I think you said patrol
21      officers.
22  Q.  I'm sorry, I meant black male patrol officers,
23      it's 301?
24  A.  Yes.

### Page 61

1  Q.  And if we look at May 12, 2004 it lists 300; is
2      that correct?
3  A.  Yes.
4  Q.  So there's not much of a difference?
5  A.  No.  There wasn't a great difference between
6      black males, I don't think, no.
7  Q.  Where was the difference?
8  A.  Let's look at black females -- let me see.  It
9      looks like there was a difference of three black
10      females, it looks like there was a difference of
11      two Hispanic males.  There was a difference of,
12      there was a difference of three, three Hispanic
13      females.  Not a lot of difference, and I, for
14      some reason or other I thought it would be a
15      greater difference, but these were issues I was
16      attempting to resolve.
17  Q.  So there wasn't much difference after your
18      audit?
19  A.  No, there wasn't.
20  Q.  And these differences from January to May could
21      also be based upon other reasons such as
22      promotion or retirements; is that right?
23  A.  January to May, --
24  Q.  Yes.

ESQUIRE DEPOSITION SERVICES
1-866-619-3925

Page 62

1  A.  -- yes, we did have, from January to May of '04,
2      primarily Caucasians who would have retired.
3  Q.  That is thereby if Caucasians retired that would
4      increase the number, the percentages of
5      minorities in the ranks of the department; is
6      that correct?
7  A.  Yes. There haven't been a lot of retirements
8      since January at this point.
9  Q.  Okay. Now, as I understand it, in addition to
10     the type of hiring we've talked about, the
11     department also has a cadet program; is that
12     right?
13 A.  Yes.
14 Q.  And can you tell me how the cadet program runs?
15 A.  Well, the cadet program is essentially an
16     apprenticeship program that allows for young
17     Bostonians to have an opportunity to come to
18     work for the department to spend a minimum of
19     two years as a cadet and to effectively learn
20     their way around the department. Ultimately
21     there is a provision that allows cadets to gain
22     a preference, an appointment as police officers.
23 Q.  What is that preference?
24 A.  Well, it's a pretty strong preference. Under a

Page 63

1      labor agreement with the Cadet Association --
2  Q.  Uh-huh.
3  A.  -- and under a statute we generally appoint
4      one-third of all police officer vacancies with
5      individuals from the cadet program.
6  Q.  And how, if at all, does the department attempt
7      to foster diversity in the hiring among the
8      cadet program?
9  A.  Well, we have diversified the cadet program.
10 Q.  I'm sorry, what?
11 A.  We have diversified the cadet program. Police
12     Commissioner Paul Evans made a commitment to
13     diversify the cadet program I think in 1995.
14     And the department has made efforts to bring
15     young people of color into the cadet program.
16 Q.  Okay. Have they made these efforts in your
17     opinion successfully or unsuccessfully?
18 A.  Successfully.
19 Q.  Okay.
20        (Deposition Exhibit 5 marked for
21        identification.)
22 Q.  I'm showing you a document which has been marked
23     as Deposition Exhibit No. 5. And ask you if
24     you've seen this document before. I think --

Page 64

1      what I'll do from now on I'll give you the
2      marked document so you won't have trouble with
3      the numbers.
4  A.  Thank you.
5  Q.  Let me take back what you've already got so you
6      won't get confused. Have you seen this document
7      before and if so can you identify what it is?
8  A.  It's a compilation of individuals that have been
9      appointed as cadets since Paul Evans was
10     appointed as police commissioner.
11 Q.  And this reflects the race of the individual?
12 A.  Yes.
13 Q.  Okay. And whether or not they're Hispanic?
14 A.  Yes.
15 Q.  And how was it determined whether or not the
16     person was black, white or Hispanic?
17 A.  Well, through self-identification, through
18     documents that the candidate would provide,
19     birth certificates as well.
20 Q.  And just so I'm clear, do all cadets who want to
21     become police officers become police officers or
22     is there a winnowing out process between those
23     who are hired as cadets and those who want to
24     become police officers?

Page 65

1  A.  There is definitely a winnowing out process.
2      About 80 percent of the individuals who enter
3      the cadet program go on to become police
4      officers.
5  Q.  I see. And they still have to meet the same
6      eligibility criteria to be a Boston police
7      officer that we've gone over in the beginning of
8      this deposition?
9  A.  Yes.
10 Q.  And what if anything do they have to -- what
11     score, if anything, do they have to achieve on
12     the written exam in order to be considered?
13 A.  They merely have to achieve a passing grade.
14 Q.  As I understand it, we've looked at some
15     documents on this, it looks like in most years
16     in the recent, last ten or 15 years 70 has been
17     considered the passing score?
18 A.  Yes.
19 Q.  Do you know why that is?
20 A.  I do not know. It's a passing score established
21     by the Commonwealth but I don't know the
22     reasoning behind it.
23 Q.  Okay. Has the Boston Police Department ever
24     taken any steps to ensure that the entrance

17 (Pages 62 to 65)

Page 66

1   level exam for the Boston Police Department has
2   been validated in some statistically accepted
3   way?
4   A.  Not to my knowledge, no.
5   Q.  I take it that's because you don't administer
6       the exam?
7   A.  That's correct.
8   Q.  And has the Boston Police Department ever
9       considered or attempted to come up with an entry
10      level hiring exam process that more closely
11      resembles the process used for superior officers
12      which would involve other types of simulated
13      exercises?
14  A.  There have been informal discussions over the
15      years to do something along those lines, but I
16      think primarily the financial cost is what has
17      prohibited us from doing so.
18  Q.  Now, let me see if I understand the process for
19      hiring.  When the department determines that it
20      has vacancies, and for the purpose of this
21      discussion we'll say 50 vacancies, as I
22      understand it you request a certification from
23      HRD and that would have under the two plus one
24      formula twice the number of vacancies plus one;

Page 67

1       is that right?
2   A.  Yes, sir.
3   Q.  So in that scenario it would be 101?
4   A.  It could be 101.  It could be more than that if
5       we, if the 101st individual was in the tie group
6       we would get the whole tie group.
7   Q.  The whole tie group?
8   A.  Yes.
9   Q.  And then the next step is the individuals have
10      to sign; is that correct?
11  A.  Yes.
12  Q.  Okay.  Now, when the list is presented to you is
13      it by that time already structured so there's
14      one Caucasian for every minority on the list?
15  A.  Yes.
16  Q.  So when the list is presented to you it's whose
17      first, the minority or Caucasian?
18  A.  I believe the minority is the first candidate on
19      the list.
20  Q.  So it's a minority candidate and then a
21      Caucasian candidate followed by a minority and a
22      then a Caucasian so on down the entire list?
23  A.  Yes.
24  Q.  And that's been the way it's been ever since you

Page 68

1       were the H.R. director?
2   A.  Yes.
3   Q.  Now, other than a disqualification for cause,
4       that is bad results from background check, bad
5       results from medical tests, failure to pass the
6       physical abilities test, are you aware of any
7       commissioner in the time that you've been at the
8       department ever making a discretionary bypass?
9   A.  Well, I can say the commissioners, all the
10      commissioners I've worked for have not played
11      any role in the hiring of police officers.  And
12      no police commissioner's asked me to reject
13      anybody.
14  Q.  So if I understand it, in the time that you've
15      been there, assuming that everyone meets the
16      eligibility requirements that we've gone over,
17      including the strenuous background check and the
18      physical abilities test, they're not, they would
19      not be bypassed?
20  A.  Then couldn't be bypassed without good cause.
21  Q.  But as far as you know it hasn't happened; is
22      that correct?
23  A.  I don't think a police commissioner would have
24      the legal authority to reject anybody without

Page 69

1       cause.
2   Q.  Well, that would be news to a lot of police
3       chiefs around the state, but, anyway.
4   A.  Not under the Castro Beecher, sir.
5   Q.  You go right down the list?
6   A.  Yes.
7   Q.  The current hiring that you're doing, have you
8       already put in the requisition for the 38
9       officers that you're hiring?
10  A.  Yes, we have.
11  Q.  And you receive back a list already --
12  A.  Yes.
13  Q.  -- that had 77 names on it?
14  A.  At least 77 names, yes.
15  Q.  Okay.  And that list again was structured,
16      minority, Caucasian, minority, Caucasian so on
17      down the list?
18  A.  Yes.
19      (Deposition Exhibits 6 and 7 marked for
20      identification.)
21  Q.  I'm showing you deposition Exhibits 6 and 7, and
22      ask you if you can identify what these documents
23      are, please.
24  A.  These are Boston Police Department personnel

Page 70

1   orders that are announcing the appointment of
2   two particular police classes, one in October of
3   2003 and the other in March of 2002.
4   Q.  Okay.  So if I understand that, if we wanted to
5   figure out from all of these documents who
6   actually got hired in a particular class, this
7   would be an accurate document of who those
8   people were?
9   A.  It would be one of the accurate documents that
10  would be available.
11      MS. ALPERSTEIN:  Could you clarify which
12  one is 6 and which one is 7?
13      MR. LICHTEN:  Yes.  6 is April 19, 2002.
14      MS. ALPERSTEIN:  Thanks.
15      MR. LICHTEN:  And 7 is October 29, 2003.
16  Q.  Now -- well, let me do it this way.
17      (Deposition Exhibit 8 marked for
18  identification.)
19  Q.  I am showing you what is Deposition Exhibit No.
20  8 and ask you if you can identify what this is.
21  A.  Well, this is a notice from HRD to Commissioner
22  Evans and subsequently myself announcing the
23  fact that HRD has added an individual to a
24  particular certification.

Page 71

1   Q.  Okay.  Here's my question.  On the second full
2   sentence it says, "this name should be placed
3   before the name of Stacy Hightower, CB; would
4   the CB stand for a designation?
5   A.  Yes.
6   Q.  What is that designation?
7   A.  It would indicate that Stacy Hightower would be
8   an African American candidate.
9   Q.  What does the C stand for?
10  A.  I would think it stands for consent decree, but
11  I don't know.
12  Q.  And the B --
13  A.  I was wondering about that myself.
14  Q.  And the B?
15  A.  Black, I believe.
16  Q.  And it says, "please advance your minority
17  applicants accordingly."  What does it mean when
18  it says, "please advance your minority
19  applicants accordingly"?
20  A.  That's a good question.  I noticed that on a
21  bunch of documents.  I never, we never advanced
22  anybody accordingly.  We're going down the list
23  in strict rank order fashion, selecting whomever
24  happens to be there.  So I really, I really

Page 72

1   don't know what HRD is referring to when they
2   state that.  Whether at one point the candidates
3   were moved up on the list, I don't know.
4   Q.  But when a person is added to the list all I'm
5   trying to find out is does it, is the list
6   restructured so they're still a minority and
7   then a Caucasian all the way down?
8   A.  Yes.
9   Q.  So even if you got a decision from the civil
10  service commissioner or determination from HRD,
11  let's say, that five white applicants should be
12  placed at the top of the list, you would still
13  interoperse them with minority applicants?
14  A.  Yes.  Or HRD would.
15  Q.  HRD would.  Gotcha.  Thank you.
16      (Deposition Exhibit 9 marked for
17  identification.)
18  Q.  Just showing you what has been marked as
19  Deposition Exhibit No. 9 and ask you if you can
20  identify that for the record, please.
21  A.  Sure.  This is a list of tasks that have been
22  determined to be the type of tasks that are
23  generally performed by patrol officers and civil
24  service communities throughout the Commonwealth.

Page 73

1   Q.  And to your knowledge is this an accurate
2   description of what the duties of a police
3   officer are?
4   A.  Yes.
5       (Deposition Exhibit 10 marked for
6   identification.)
7   Q.  I'm showing you Deposition Exhibit No. 10 which
8   has been provided to me by the Boston Police
9   Department in response to discovery requests and
10  I'm wondering if you can identify for me what
11  this is.
12  A.  This is a civil service certification that was
13  provided to the human resource division of
14  the Commonwealth.  It's the list that we would
15  have worked off of for the March of '02 class.
16  Q.  Okay.  So this was the list that you worked off
17  of for the March of '02?
18  A.  Yes.
19  Q.  Okay.  Now, if we look at the second page and
20  the third page and the fourth page, there are a
21  number of places where there's no signature.
22  What if anything can we conclude from the fact
23  that there's no signature?
24  A.  That the candidate did not respond to the call

19 (Pages 70 to 73)

Page 74

1   to come in and express a willingness to be
2   considered.
3   Q.  And that could be because the person has already
4       taken a public safety job somewhere else?
5   A.  That's a possibility, yes.
6   Q.  Could have already been hired as a Boston police
7       officer or Boston firefighter?
8   A.  Yes.
9   Q.  Or simply decided they weren't interested?
10  A.  Yes.
11  Q.  Okay.  Have you ever determined when you get a
12      certification what the race of the signature is?
13  A.  No, I never have.  But it probably would be in
14      the 85 to 90 percent range.
15  Q.  So there would be a 10 to 15 percent attrition
16      rate just for coming in and signing?
17  A.  Yes.
18  Q.  And if I understand it from what you said, this
19      list is arranged by minority and Caucasians
20      interspersed one after the other on this list?
21  A.  Yes.
22  Q.  Thank you.
23          (Deposition Exhibit 11 marked for
24      identification.)

Page 75

1   Q.  Okay, I'm showing you another document, I
2       realize it looks like the other one, but it
3       appears to be a civil service certification for
4       a different date, is that correct, if you look
5       on page 2?
6   A.  Yes.
7   Q.  And is this the certification for the -- this is
8       a certification for that?
9   A.  This is a, I guess we could call it a general
10      certification.  We used multiple certifications
11      that year for the October.  The class ultimately
12      went in in October of 2003.  But this was the
13      primary certification that was issued that
14      particular period of time.
15  Q.  So this was -- this was the primary
16      certification that you used for the October
17      2003?
18  A.  Yes.
19  Q.  Okay.  And that's, just for the record, that's
20      Exhibit No. 11; is that right?
21  A.  Yes.
22          MS. ALPERSTEIN:  For the record, the date
23      on this is August 6, 2002?
24          MR. LICHTEN:  Yes.

Page 76

1   Q.  And again, where there are no signatures that
2       means the person did not go forward in the
3       process; is that correct?
4   A.  That's correct.
5   Q.  And again this list is arranged by minority and
6       Caucasian interspersed one after one on the
7       list?
8   A.  Yes.
9   Q.  Just so I'm clear, with respect to the October
10      2003 hiring, I wasn't clear on your answer.  Was
11      this the list that was used or was there another
12      list that was used?
13  A.  I believe there were two other lists that were
14      used.
15  Q.  All right.  And did they include these names or
16      were they different?
17  A.  They may have included some of those names.  One
18      of the lists was for women and one was for a
19      small, a limited number of Chinese speakers.
20  Q.  I see.  So with respect to the main group of
21      hires Exhibit 11 was the list that was used?
22  A.  Yes.
23  Q.  And that was the general civil service list.  In
24      addition, as I understand it, in the fall of

Page 77

1       2003, in the class that you hired there were
2       some so-called paragraph 10 hirings; is that
3       right?
4   A.  That's correct.
5   Q.  One was a group of female officers?
6   A.  Yes.
7   Q.  How many were they?
8   A.  I think ultimately we hired 11 but I'll have to
9       check that.  I know we hired two Chinese
10      speakers off another certification we used at
11      that point, period of time.
12  Q.  And the 11 women were hired strictly off of a
13      paragraph 10 female list.  That is there were
14      only females on the list?
15  A.  That's correct.
16  Q.  And whose decision was it to request to hire
17      females strictly off of a female list?
18  A.  Paul Evans instructed me to prepare a
19      requisition for a certification for females
20      only.
21  Q.  And those names, did they come off the
22      requisition that you already had, the main
23      requisition?
24  A.  Some of them did.  And some of them were the

Page 78

1     lower scoring on the main list and had bumped up
2     when it was females only.
3 Q. I see. How were they ranked with respect to
4     minorities, that is were they the same
5     interspersement?
6 A. Yes.
7 Q. So even on that list it was one Caucasian
8     female -- one minority female followed by one
9     Caucasian female right on down the list?
10 A. Yes.
11 Q. Is it fair to say that at no time have you ever
12     undertaken, with respect to the October 2003
13     hiring, to determine who would have been on the
14     list if the hiring hadn't been off of the list
15     that was structured as one minority and one
16     Caucasian, that it was just based upon standing
17     on the civil service scores?
18     MR. COX: Objection.
19     MS. ALPERSTEIN: Objection.
20     MR. LICHTEN: I'm shocked.
21 Q. Do you understand my question?
22 A. No.
23 Q. At any point in time did you attempt to
24     determine who would have been hired had the

Page 79

1     department not used a so-called Beecher list,
2     having one minority for every one Caucasian?
3 A. No, I did not.
4 Q. So you never attempted to calculate whether any
5     of the plaintiffs in this case would have been
6     reachable on the certification under the two
7     plus one formula had there been, had you not
8     been using the consent decree civil service
9     list?
10 A. I never conducted any such analysis.
11 Q. Do you recall on this list of 77 how far down
12     you got?
13 A. I have to take a look at it. I would have to
14     take a look at it to see if I could make a
15     determination. There are other documents that
16     would show that maybe better than the actual
17     certification itself.
18 Q. All right. We may get to those. Hopefully we
19     will.
20     (Deposition Exhibit 12 marked for
21     identification.)
22 Q. I'm showing you Exhibit 12 which has been
23     provided to me by the City and ask you if you've
24     seen this document before?

Page 80

1 A. This appears to me to be an eligible list.
2 Q. Okay.
3 A. Although, I don't know if I've actually seen
4     this before. I haven't, no.
5 Q. You've not seen this document before?
6 A. I don't believe so.
7 Q. Okay. You don't know where this document comes
8     from?
9 A. No. It looks like it's produced by HRD.
10 Q. Okay. That makes it easier.
11     (Deposition Exhibit 13 marked for
12     identification.)
13 Q. I'm showing you what's Exhibit No. 13 and asking
14     you if you can identify what that is, please?
15 A. This is referred to as a Form 14 which is an HRD
16     reporting form. They have several. This
17     particular document outlines the individuals who
18     were selected into that class who came via the
19     cadet program.
20 Q. Okay. And does that form indicate whether or
21     not those individuals are minorities or not?
22 A. It does not, no.
23     (Deposition Exhibit 14 marked for
24     identification.)

Page 81

1 Q. I'm showing you what's been marked as -- I'm
2     showing you what's been marked as Deposition
3     Exhibit No. 14 and asking you if you can
4     identify for the record what this document is?
5 A. The first page is a standard civil service
6     public safety requisition that is filed with HRD
7     to, in effect, notify them of the number of
8     vacancies that we have. It's a two-page
9     document.
10     The, attached to that is the actual
11     response to our request, the certification.
12     This is for the group that went in in March of
13     2002. And that's what it is.
14 Q. Okay. And it looks to me that there is a
15     request on that round of hiring for a Cape
16     Verdean list?
17 A. Yes. In 2002 I believe we did use a, we did
18     make a request of HRD to select a number of Cape
19     Verdean speakers.
20 Q. Okay. And I noticed that there are other places
21     where there is a requisition for Creole speaking
22     individuals. For what population in Boston is
23     it necessary to have Creole speaking police
24     officers?

21 (Pages 78 to 81)

Page 82

1   A.   I believe the request would have been for
2        Haitian Creole speakers in order to help provide
3        police services to the booming Haitian
4        population of the city.
5   Q.   If I understand your testimony, the City of
6        Boston has had a booming expansion in people
7        coming from Haiti to live in Boston?
8   A.   Yes.
9   Q.   Okay.  And as a result the Boston Police
10       Department has from time to time used paragraph
11       10, selective certifications, to try to get
12       individuals who speak Haitian Creole?
13  A.   Yes.
14  Q.   Do you know how many of those, that population
15       increase in the Haitian population have
16       citizenship status?
17  A.   No.
18  Q.   But you have used the fact that there's this
19       growth in the Haitian population to justify
20       hiring from a special Creole speaking list?
21  A.   Yes.
22  Q.   Now, over the years as I understand it when
23       you've hired cadets, representatives of the
24       NAACP have asked you to provide documents

Page 83

1        demonstrating which of these are minorities and
2        which of these are not; is that correct?
3   A.   Yes.
4   Q.   And you have provided those?
5   A.   I believe we would have provided them through
6        HRD.
7   Q.   Are you aware as to whether or not the NAACP
8        since you've been at HRD has ever objected to
9        the group of cadets that you've hired?
10  A.   I'm unaware of any objection by the NAACP.
11       (Deposition Exhibit 15 marked for
12       identification.)
13  Q.   Can you tell me what that is, please?
14  A.   This was a copy of the requisition that I filed
15       with HRD in order to receive the attached
16       certification to commence the hiring process
17       that took place in the fall of 2002 going into
18       2003.  The class ultimately entering the academy
19       in October of 2003.
20  Q.   Okay.  And again, where people have not signed
21       the list that's an indication that they were not
22       eligible; is that correct?
23  A.   Yes.
24  Q.   And if you turn to page 13 at the very bottom.

Page 84

1        Do you see the name of Paul Deleo, one of the
2        plaintiffs in the case?
3   A.   Let's see if I'm on the right page.
4        MS. COHEN:  Exhibit 15?
5        MR. LICHTEN:  Yes.
6   A.   They're numbered at the top and the bottom.
7   Q.   Just look at the bottom.
8   A.   I've got it.
9   Q.   Okay.  And do you -- do you see that?
10  A.   Yes, I do.
11  Q.   If you turn to the next page do you see Thomas
12       Barrett's name halfway down the next list?
13  A.   I do.
14  Q.   Now, as I understand this the way this worked is
15       the class that was being considered, that is
16       that were eligible to be promoted to be hired by
17       the commissioner were the 77 who signed the
18       acceptance; is that right?
19  A.   That would have been the pool of candidates,
20       yes.
21  Q.   The pool of candidates.  And that after you got
22       to 77, the people weren't being asked to sign
23       the list after that?
24  A.   I think on this occasion the Commonwealth had

Page 85

1        given us, unfortunately, about 900 names.  We
2        allow everybody to sign a list if they come in.
3        So there were hundreds of people who had come in
4        to sign on this particular list.  I think if I'm
5        thinking of the right time.  Maybe I'm not.
6        This is page 18.  I think there were more than
7        18 pages of this thing, it went on endlessly.
8        That's my recollection.  I have to say that on
9        more than one occasion the Commonwealth gives us
10       many more names and in this particular case I
11       think it was hundreds of initial names.
12  Q.   But it was only 77 that you were allowed to
13       consider?
14  A.   Yes.
15  Q.   Okay.
16  A.   From the pool of 77 candidates, yes.
17  Q.   Under the civil service rule?
18  A.   Yeah.
19  Q.   Okay.  And if I understand the process, if you
20       take these 77 and along the way someone doesn't
21       pass the background check or doesn't pass the
22       medical you don't then substitute someone to
23       create that 77?
24  A.   We do not, no.

Page 86

1  Q.  So if you have 77 individuals and 30 are
2      disqualified for whatever reason, you're only
3      left with the remaining 47 to hire from?
4  A.  That would be the case if the last person was in
5      a tie group of a fairly, no matter how many.
6  Q.  I see.
7  A.  Those individuals would have equal eligibility,
8      they would be within the tie group.  So that
9      expands the pool of candidates.
10 Q.  Gotcha.  And -- okay.  And, again, you've made
11     no attempt to determine whether if the
12     department was hiring based on a non-Beecher
13     list, that is a straight list made up of scores,
14     whether or not Mr. Deleo would have been one of
15     the 77 or not?
16 A.  Well, the most important aspect of that is I
17     have no idea what these people scored so it
18     would be impossible for us to reconstruct the
19     list from the get go.  If we wanted to do that.
20 Q.  Gotcha.
21 A.  We obviously are prohibited from seeing the
22     scores.
23 Q.  But if we just wanted to count how close
24     Mr. Deleo came to the pool of 77 we just count

Page 87

1      the signatures in front of him; is that right?
2  A.  Absent the decree?  Was the question absent the
3      decree?
4  Q.  No, even with the decree.  If we wanted to see
5      how close he came to being part of the 77 who
6      were considered --
7  A.  Yes.
8  Q.  -- we should count the number of signatures in
9      front of him?
10 A.  Yes.
11 Q.  Okay, thank you.  Now, for 2004 have you gotten
12     returns, signature returns?
13 A.  We have a list in place and candidates have
14     indeed signed it.  So the screening process is
15     underway.  Is that your question, Counsel?
16 Q.  Yes.
17 A.  Yes.  Underway probably for the last month and a
18     half.
19 Q.  Okay.  And how many are in that group?
20 A.  Well, we asked for 38 vacancies so it would be
21     double that, it would be potentially plus one
22     would be the total number of candidates would be
23     in the current pool.
24 Q.  Okay.  Let me see here.  I don't know if this is

Page 88

1      addressed to Mr. Quinan or to you.  I was given
2      the requisition and the list, but it doesn't, I
3      wasn't given the signatures, so it may have been
4      that it's just a more recent document.
5  A.  Can I address that?
6  Q.  Sure.  Of course.
7  A.  It's the last thing that we returned to the
8      Commonwealth after the selection process is
9      over.
10 Q.  I see.
11 A.  Because the document would require not only the
12     signature of the candidate, but there's a box we
13     check off if the individual was selected or not.
14     So we wouldn't be returning that until the
15     selection is made.
16 Q.  But you have that document now?
17 A.  Yes, I do.  The Commonwealth wouldn't have it
18     but I would have it.
19     MR. LICHTEN:  May I get a copy of that?
20     MR. COX:  (Nods in the affirmative.)
21     MS. COHEN:  Excuse me, what list was that,
22 which date?
23     MR. LICHTEN:  It's dated April 8, 2004.
24     (Deposition Exhibit 16 marked for

Page 89

1      identification.)
2  Q.  I'm showing you what's been marked as Deposition
3      Exhibit No. 16 and ask you if you can identify
4      what this document is.
5  A.  This is one of HRD's reporting documents
6      referred to as a Form 162.  It is a compilation
7      of the names of all of the individuals who
8      signed this civil service certification.
9  Q.  Right.
10 A.  And it also outlines the reasons why, sometimes
11     general terms, why the individual was not
12     selected --
13 Q.  Right.
14 A.  -- as to -- or whether or not he was selected or
15     not selected.
16 Q.  Let me just -- I want to understand some of the
17     terms on that.  So if we look at the far
18     right-hand corner the NS means, not selected?
19 A.  Yes.
20 Q.  The S means selected?
21 A.  Yes.
22 Q.  If I understand it, the NS could be for a
23     variety of reasons, it could be for medical, for
24     psychological, for a background check, or

23 (Pages 86 to 89)

Page 90

1    residency or one of those kinds of things?
2  A.  Yes.
3  Q.  But as far as you know it's not for, it's not
4      because the commissioner didn't like that person
5      and wanted someone else?
6  A.  That's right.
7  Q.  The S is the people who were selected; --
8  A.  Yes.
9  Q.  -- is that correct?
10 A.  Yes, it is.
11 Q.  So if we look on the first page it looks like
12     half or less than half of the people who signed
13     the thing were actually selected?
14 A.  Yes.
15 Q.  Is that the normal attrition rate?
16 A.  Well, it's a pretty substantial attrition rate.
17     As we go through this process there are
18     candidates who withdraw as well; but it looks
19     about right to me.
20 Q.  Fifty percent attrition rate?
21 A.  I would think so.
22 Q.  And this list is organized as the other lists
23     are, that is minority, Caucasian, minority,
24     Caucasian, so on?

Page 91

1  A.  Yes.  The requirement here is this particular
2      list mirrors the certification in terms of
3      placement of the names.
4  Q.  Let's try to understand some of the -- CB, as I
5      understand it, is a minority candidate; is that
6      right?
7  A.  The first individual there would be a minority
8      candidate who happens to be a United States
9      military veteran, yes.
10 Q.  That's my next question.  The star designates
11     what?
12 A.  That individual is a designated United States
13     military veteran.
14 Q.  That's what the star designates?
15 A.  The asterisk or star, yep.
16 Q.  What's the, the next one, Mr. Orlandi, he's got
17     a D and two stars; what does that mean?
18 A.  He's a Caucasian who is a disabled United States
19     military veteran.  The double star or double
20     asterisk means disabled veteran.  The D for
21     whatever reason I don't know, designates
22     somebody to be Caucasian, or non minority.
23 Q.  Looking at this document can you tell where the
24     minority veterans stop?  I take it you can do

Page 92

1      that?
2  A.  I can do that.  It stops on, the minority stops,
3      it looks like the bottom of page 4.  It looks
4      like Jacqueline Solana, if I'm reading this
5      correctly, Jacqueline Solana.  The page number
6      up here, Counselor, if you come down.  It would
7      be on the first page.
8  Q.  I'm sorry?
9  A.  I'm referring to page -- I'm referring to the
10     page number because this mirrors the
11     certification.  So my fault there.
12 Q.  I'm thinking there goes my case.
13 A.  So it will be page, again, on the front page,
14     page 4, bottom of page 4, Jacqueline Solana, it
15     looks like the last minority veteran.
16 Q.  Okay.  Well, I don't see a star under Ms.
17     Solana's name.
18 A.  That's right, she would not be a veteran.
19 Q.  So the last minority veteran would be whom?  It
20     looks to me it would be Winston Deleone?
21 A.  Yes, it probably would be Winston Deleone.
22 Q.  So that would be page 3?
23 A.  Right.
24 Q.  Okay.  So if I understand it, after Mr. Deleone

Page 93

1      who is the last minority on this list who has a
2      veterans preference and therefore would have the
3      right notwithstanding the Beecher Decree to be
4      placed on the top of the list by reason of the
5      veterans preference, the rest of the minorities
6      on this list are there as a result of the
7      Beecher Decree and their test score?
8  A.  Yes.
9  Q.  And this list only contains the people who were,
10     signed the list?
11 A.  Yes.
12 Q.  Okay.  And if we want to see how far you got in
13     the hiring process we would look for the last
14     persons -- that is how far down the list you
15     got, we would look for the last person selected?
16 A.  Yes.  With these tie groups it's interspersed as
17     well.  The last individual selected looks to be
18     like --
19 Q.  It looks like Stephanie Healey.
20 A.  Who was selected as well from a female list that
21     we were using simultaneously.
22 Q.  Okay.
23 A.  It can get very confusing with all of these
24     multiple lists.

24 (Pages 90 to 93)

Page 94

1     MR. COX:  Can we clarify that the selected
2   check is for the third name down which is Jason
3   Smith.
4  A.   Yeah, that is the case, actually.  You're right.
5   So Stephanie Healey was indeed appointed that
6   year, but off a different list.
7  Q.   Just so we're clear.  It says here she was not
8   reached?
9  A.   She was not reached on the main list but was
10   selected off the female list.
11  Q.   So she was actually hired?
12  A.   Yes, she was.  So in terms of my reporting back
13   to HRD my requirement is to report back off each
14   particular list, what happened to each
15   candidate.
16  Q.   I see.  Okay.  So the last person selected on
17   this list was Jason Smith and as I understand it
18   he was, he was on page 11 of the certification
19   list?
20  A.   Yes.
21  Q.   He was a minority, a black minority?
22  A.   Yes.
23  Q.   He had no veterans preference?
24  A.   That's correct.

Page 95

1  Q.   And he was selected?
2  A.   Yes.
3  Q.   Okay.  And if we go just three names below that
4   you get to Paul Deleo; is that correct?
5  A.   Yes.
6  Q.   Who is one of the plaintiffs in this case?
7  A.   Yes.
8  Q.   And if you go just another five or six names
9   down you get to Thomas Barrett?
10  A.   Yes.
11  Q.   And if you go another six or seven names down
12   you get to Chris Carr?
13  A.   Yes.
14  Q.   And what this document doesn't show you is that
15   after the veterans preference stop, and the
16   minorities are placed on this list by reason of
17   their civil service exam score and the
18   requirements of the Beecher Decree, you don't
19   know what those scores were on the exam from
20   this document?
21  A.   Yes.
22  Q.   But --
23  A.   I do not know.
24  Q.   But you do get -- do you get other documents

Page 96

1   that let you know what the scores of the
2   minorities and non minorities are?
3  A.   The only scores that I get are those provided to
4   me by the cadets.  Otherwise, I don't get an
5   opportunity to see the scores.
6  Q.   You just get the list?
7  A.   I just get a list without scores, yes.
8  Q.   Thank you.
9     (Short break taken.)
10     (Deposition Exhibit 17 marked for
11   identification.)
12  Q.   Showing you what's been marked as Deposition
13   Exhibit No. 17.  First let me ask you whether or
14   not you've ever seen this before?
15  A.   I have not.
16  Q.   And generally do you receive documents relating
17   to the cutoff score?
18  A.   I've never received a document regarding the
19   cutoff score.
20  Q.   Drawing your attention to page 3 at the bottom,
21   it talks about the test for English reading
22   comprehension; do you see that?
23  A.   Yes.
24  Q.   And it appears to say that 29 applicants took

Page 97

1   the exam in Spanish?
2  A.   Yes.
3  Q.   And it says the 21 did not pass the reading
4   comprehension test; do you see that?
5  A.   I do.
6  Q.   Based upon that do you have any understanding as
7   to generally how many people take the exam in
8   Spanish and actually pass the reading
9   comprehension test?
10  A.   It would appear to be very few.
11  Q.   And have you -- do you say that of your own
12   knowledge or just from reading this document?
13  A.   Just from this document.
14  Q.   You have no independent knowledge?
15  A.   None whatsoever.
16  Q.   Okay.  So if I understand it, whether or not
17   someone speaks English well enough, speaks or
18   writes English or understands English well
19   enough to be a Boston police officer is a matter
20   determined by HRD and not by the Boston Police
21   Department?
22  A.   Initially, yes.  But I think once a candidate
23   gets into the police academy and has to go
24   through a rigorous academic program, you know,

25 (Pages 94 to 97)

Page 98

1    that's where, I guess, I guess where it's all
2    hashed out.
3    Q.   Have there been problems in that regard while
4        you've been --
5    A.   There have been problems, yes.
6    Q.   With respect to someone's command of the English
7        language?
8    A.   I think that in some instances the command of
9        the English language has probably hindered
10       individuals from graduating.
11   Q.   The academy?
12   A.   Yes.
13   Q.   Because they have to take tests in English?
14   A.   Yes.
15   Q.   You don't give the tests in Spanish in the
16       academy?
17   A.   No.
18   Q.   And the orders and instructions are all in
19       English?
20   A.   Yes.
21   Q.   Okay, now, so that I understand it, when you do
22       a special paragraph 10 certification, let's say
23       for Creole speaking officers or Spanish speaking
24       officers or some other dialect, how does that

Page 99

1    relate to the hiring off of the Beecher Decree
2    list, the one-for-one hiring; that is how do the
3    two relate?
4    A.   There are instances where there are Caucasian
5        candidates who claim to speak a particular
6        language, so they're included on a one-for-one
7        breakdown.  For the most part, for instance,
8        looking at French Creole, it's rare for a
9        Caucasian to claim to speak Haitian Creole.
10       Generally that list would be all Haitians,
11       native from Haiti who would not be Caucasian.
12   Q.   And some of these Haitians on this special
13       Creole speaking list I take it would not be
14       people who would otherwise be within the top 60
15       or 77 that are certified to you for hire?
16   A.   They could be.  But it would probably be
17       unusual.
18   Q.   So if I understand it, it doesn't affect your
19       hiring off the regular Beecher list the number
20       who are being hired on a non-selective
21       certification basis?
22   A.   Yes.  That's correct.
23   Q.   Let me show you this document.
24       (Deposition Exhibit 18 marked for

Page 100

1    identification.)
2    Q.   Showing you Exhibit No. 18.  First of all, have
3        you ever seen this document before?
4    A.   I have not.
5    Q.   Okay, this appears to relate to a certification
6        hiring that took place in 1998 when you were
7        still an H.R. director, and let me ask you, if
8        you go to the fifth paragraph, second sentence,
9        it says "of the 45 candidates given a
10       conditional offer from the regular list, 21 are
11       minorities and 24 are non minorities."  Do you
12       see that?
13   A.   I do.
14   Q.   And the reason that it's not exactly even as I
15       understand it with minorities and Caucasians is
16       the fact of who gets disqualified during the
17       hiring process; is that right?
18   A.   Yes, that's correct.
19   Q.   And that's not an uncommon result to have
20       slightly more minorities or slightly more
21       Caucasians from the regular list; is that right?
22   A.   It's not unusual.
23   Q.   Okay.  Now, if I understand that, the six Creole
24       speaking officers, four Spanish speaking

Page 101

1    officers, three Vietnamese speaking officers,
2    those are 13 hires that are in addition to the
3    45 listed in paragraph number 5?
4    A.   Yes.
5        (Deposition Exhibit 19 marked for
6        identification.)
7    Q.   I'm showing you what has been marked as
8        Deposition Exhibit No. 19.  I take it from your
9        last answer you haven't read this either; is
10       that correct?
11   A.   That's correct.
12   Q.   This appears to be from a July 2001 exam?
13   A.   I think the exam was in April.
14   Q.   I'm sorry, April of 2001 exam; is that right?
15   A.   Yes.
16   Q.   So this would be the exam that we're talking
17       about with respect to the hirings made in March
18       of 2002 and October of 2003?
19   A.   Yes.
20   Q.   Again, if you go to the third page there is also
21       a description there of people who took the test
22       in Spanish?
23   A.   Yes.
24   Q.   Okay.  And it looks to me, if that's correct,

26 (Pages 98 to 101)

Page 102

1    that of the 24 applicants who took the police
2    officer examination in Spanish only four
3    received a passing mark; is that right?
4 A.  Yes.
5 Q.  And that means they did not get a 70?
6 A.  I would imagine that would be the, be the score
7    that they would have had to achieve, yes.
8        (Deposition Exhibit 20 marked for
9    identification.)
10 Q.  I'm going to show you what's been marked as
11    Exhibit 20 and ask if you've seen this document
12    before.
13 A.  I have not.
14 Q.  Do you know what it is?
15 A.  By its heading it indicates a test item analysis
16    for the 2001 police exam.
17 Q.  I could have gotten that far on it.  Do you know
18    what the document is?
19 A.  Other than what the heading tells me I have no
20    idea.
21 Q.  Okay.  Maybe our HRD folks can help us out on
22    that.
23        (Deposition Exhibit 21 marked for
24    identification.)

Page 103

1 Q.  Showing you what's been marked as Exhibit 21 and
2    ask you if you've seen this type of document
3    before?
4 A.  No, I have not.
5 Q.  Okay.  So when you get the list back from civil
6    service as I understand it you don't know
7    whether any minorities, putting aside their
8    veterans preference, have received 100 or 99 or
9    98 or 97; you have no idea what their score is?
10 A.  Not by looking at the list, of course.  But if
11    the scores aren't there.  But occasionally a
12    candidate will tell us what they received.
13 Q.  I'm sure if they got a good score they'll tell
14    us.
15 A.  Yeah, they'll tell us.
16 Q.  When you hire a minority candidate or a
17    Caucasian candidate for that matter, you don't
18    know whether or not they've scored a 72 or a 97
19    on the exam; is that right?
20 A.  That's correct.
21 Q.  And you're not given a document such as this
22    which let's you know how many minorities and non
23    minorities score well or poorly on the exam?
24 A.  I'm not provided any such document.

Page 104

1 Q.  That will shorten things up, won't it?
2        (Deposition Exhibit 22 marked for
3    identification.)
4 Q.  I'm showing you what's been marked as Deposition
5    Exhibit No. 22 --
6 A.  Yes.
7 Q.  -- and ask you if you can tell me what this
8    document is.
9 A.  Again, this is one of HRD's reporting forms.  A
10    Form 162.  It is a form that was produced
11    following the selection for the October 2003
12    class for the female certification.
13 Q.  Gotcha.  So this is similar to the document that
14    we already went over with respect to the general
15    civil service list, but only this is limited to
16    females?
17 A.  Yes.
18 Q.  Okay.  And can you tell from this how many
19    females were hired exclusively from the female
20    paragraph 10 list?
21 A.  It looks like there were 11 females selected
22    from this list.
23 Q.  Okay.  As I understand it the requisition was
24    for 15 but only 11 were selected?

Page 105

1 A.  Yes.
2 Q.  And if I'm looking at this correctly, they're
3    listed on this list, minority, Caucasian,
4    minority, Caucasian; am I correct?
5 A.  Yes.
6 Q.  If we want to again figure out whose a veteran,
7    that is who would have a preference anyway, we
8    look at the stars and we see here the stars go
9    down to Sloan, Keri and not further than that?
10 A.  Yes.
11 Q.  And as to what the actual raw scores of the rest
12    of the females hired are you do not know?
13 A.  I don't know.
14 Q.  It looks to me that less than half of the
15    individuals on this first page were selected; do
16    you know why that is?
17 A.  Unfortunately as we move through the screening
18    process, particularly the end of the screening
19    process, numerous, several of the female
20    candidates determine that being a police officer
21    was probably not in their best interest and
22    dropped out at the last moment.
23 Q.  Do you have a higher attrition rate from signing
24    up until hire of females than you do of males?

27 (Pages 102 to 105)

Page 106

```
1    A.  Yes.
2    Q.  How about, if you know, of minorities versus non
3        minorities?
4    A.  I would think that the minority attrition rate
5        is probably slightly higher than non minorities.
6    Q.  But close to non minorities?
7    A.  Yes.
8            (Deposition Exhibit 23 marked for
9        identification.)
10   Q.  I'm showing you Deposition Exhibit No. 23, a
11       series of documents provided to me by HRD and
12       ask you if you can identify these documents?
13   A.  The front, the first page is a letter from me to
14       Denise Gray-Singleton who at one time worked for
15       HRD.  Just letting her know I'm filing civil
16       service requisitions for 38 police officer
17       vacancies and 15 female police officer vacancies
18       asking her for two separate lists.
19           The next two documents are the, for the
20       main list and following that we have a more
21       comprehensive application that we were required
22       to fill out and to submit to HRD regarding our
23       specific needs for female candidates.
24   Q.  Okay.  If we look at page, at the very bottom it
```

Page 107

```
1        says page 6.
2    A.  Yes.
3    Q.  Is that the reason why the department asserted
4        it was appropriate to have a gender based
5        selective certification?
6    A.  Yes.
7    Q.  And who made this document up?
8    A.  I drafted this statement in conjunction with our
9        legal office.
10   Q.  I see.  Now, if you go to page 10 there is a
11       reference to this Chookis case; is that correct?
12   A.  Yes.
13   Q.  This was a case in state court?
14   A.  As best I can recall, yes, it was.
15   Q.  As far as you know was the, was there any claim
16       in that case that the department's actions had
17       violated the 14th Amendment to the United States
18       Constitution?
19   A.  Not to my knowledge.
20   Q.  And it says in here that, "all female persons
21       arrested or detained by members of the Boston
22       Police Department are transported to the Suffolk
23       County Jail."  It says that in the memo.  Is
24       that true or not true?
```

Page 108

```
1    A.  This memo?  I believe it was --
2            MR. COX:  If you know.
3    A.  Yeah, I don't.  I don't really know.
4    Q.  Let me ask it this way, do you know of any Court
5        who has upheld, based upon a claim of
6        discrimination, the right of the Boston Police
7        Department now or in the last five or six years
8        to hire females, exclusively females off of the
9        female list?
10   A.  Not that I'm aware of.
11   Q.  Are you aware in the time that you've been at
12       the department in the last 19 years of any
13       discrimination against women in hiring in the
14       Boston Police Department?
15   A.  I'm unaware of any determination that
16       discrimination had been made.
17   Q.  Are you aware of any, based on your experience
18       as H.R. director for the Boston Police
19       Department, do you believe that the Boston
20       Police Department has during the time that
21       you've been there in the last 18 or 19 years
22       engaged in any discrimination with regard to the
23       entry level hiring of Female police officers?
24           MR. COX:  Objection.
```

Page 109

```
1    A.  I don't think we have.  But clearly the veterans
2        preference has impacted the ability for women to
3        get appointed.  A vast majority of the veterans
4        are male.
5    Q.  Have you yourself had any discussions with HRD
6        as to whether or not the department, the Boston
7        Police Department, has satisfied its obligations
8        under the Beecher Decree with respect to entry
9        level hiring and therefore was not required to
10       do hiring in accordance with the Beecher Decree
11       anymore?
12           MR. COX:  Objection.
13   A.  I have not had those discussions with H.R.
14   Q.  Well, I guess that's all I have.  Thank you very
15       much.  I'm sure there will be other questions.
16           MS. COHEN:  Can we take ten minutes?
17       (Short break taken.)
18
19           EXAMINATION
20
21   BY MS. ALPERSTEIN:
22   Q.  Good afternoon, Mr. Callahan.
23   A.  Good afternoon.
24   Q.  I have just a few questions for you.  With
```

28 (Pages 106 to 109)

Page 110

1    respect to the screening process for candidates
2    who have been selected off of the list that you
3    discussed earlier with Mr. Lichten, is it the
4    case that you do not know that, with respect to
5    the plaintiff, Mr. Deleo, whether or not he
6    would have passed a background check?
7  A.  I don't know anything about Mr. Deleo's
8    background.
9  Q.  If he had been reached off of that list he would
10    have had to meet every single one of those
11    requirements that you went through with
12    Mr. Lichten earlier?
13  A.  Yes, he would have.
14  Q.  And you have no way of knowing sitting here
15    today whether if he would have passed the
16    physical exam, medical exam, the psychological
17    exam, the residency requirement and all of the
18    other requirements that you went over with
19    Mr. Lichten earlier?
20  A.  That's correct.
21  Q.  And that would be the case with respect to every
22    one of the eight plaintiffs in this case?
23  A.  Yes.
24  Q.  Could you explain how the City makes a decision

Page 111

1    for hiring when a score is tied?
2  A.  Under the rules as promulgated by HRD,
3    individuals in a tie group have equal
4    eligibility.  Unfortunately, some of these tie
5    groups can be very large and we like to look at
6    kids who have a college degree; absent those who
7    don't, again, it's a judgment call at all times,
8    but, you know, we look at the totality of the
9    candidate's background.  That's if we've done the entire
10    candidates.  That's if we've done the entire
11    background.  We've got two kids to pick out of a
12    hundred, it's a tremendous waste of resources to
13    do everybody.  But we make the best judgment
14    call that we can.
15  Q.  What are the factors that would enter into that
16    judgment call other than the screening and the
17    scores on the test which are of course tied?
18        MR. LICHTEN:  That is for a tie score?
19        MS. ALPERSTEIN:  For a tie score, yes.
20  A.  Again, it would be looking at candidates who,
21    you know, have exemplary backgrounds, who can
22    meet the medical requirements, can do the
23    physical ability test and who are
24    psychologically and emotionally fit to be police

Page 112

1    officers.
2  Q.  In the case where there are a number of
3    applicants who are tied, say a number of 10 or
4    20, would you go through the screening check for
5    all of those applicants and then make the
6    decision about whom to pick from those tied
7    applicants?
8  A.  We probably would with that number of
9    individuals.
10  Q.  Thank you.
11  A.  Can I just also say that if we -- we would
12    desperately try to avoid getting into a large
13    tie group if at all possible.  You know what I
14    mean.  We may stop the screening process before
15    we hit a tie group with 100 individuals waiting
16    to be selected.  I know the fire department I
17    believe did it by lottery, but we try to avoid
18    that process, that problem.
19  Q.  Mr. Callahan, do you know the percentage of
20    Caucasians who applied to the police department
21    who happen to have a statutory preference as a
22    general matter?
23  A.  I don't know what the percentage would be.  I
24    couldn't give you an exact percentage of those

Page 113

1    who have a statutory preference.  There are
2    indeed a lot of individuals exiting the military
3    at the current time, and those who are entering
4    and exiting, so there is a marked increase in
5    those with a veterans preference.  But as to the
6    percentage of individuals who are Caucasian with
7    a preference I couldn't even make a guess.
8  Q.  You can't even make a ballpark rough estimate?
9  A.  I wouldn't have any way of knowing unless I
10    reviewed an eligibility list which obviously
11    could be done, but.
12  Q.  With respect to minority candidates, do you have
13    any idea what percentage of minority applicants
14    who have veteran or other statutory preferences
15    would apply?
16  A.  If you look at some of the lists that we had
17    today, provided today, I think you'll see there
18    appear to be fewer minorities who have statutory
19    preference, particularly the veterans issue,
20    than Caucasians.  But again I couldn't give....
21  Q.  And I believe you testified earlier that one of
22    the tenets to hiring women as well is lack of
23    statutory preferences available to a woman
24    because of the military status?

29 (Pages 110 to 113)

Page 114

1   A.  I think that, and it's pretty clear, that the
2        veterans preference statute generally is applied
3        to males.  There are many more males who have
4        veterans preference than females so that has
5        hindered our ability to hire as many women as we
6        would like.
7   Q.  And there are many more white males with
8        veterans status than minorities?
9   A.  On some of these lists that would indicate yes
10       to me.
11  Q.  I would like to direct your attention to an
12       exhibit that has been previously marked as
13       Callahan 5.  If you just look at the top couple
14       of lines.  Can you -- do you have it in front of
15       you?  It appears on the face of the document
16       that only three cadets were hired in 2002; is
17       that correct?
18  A.  Yes.
19  Q.  Thank you.  And all three of those candidates
20       were white males?
21  A.  Yes.
22  Q.  I believe you testified that up until
23       approximately 1995 when Commissioner Evans made
24       it a priority that one-third of hires that were

Page 115

1        cadets it was not necessarily any effort at
2        diversity outreach?
3   A.  Well, with respect to the cadet program in its
4        entirety there were very few minorities who were
5        selected into the Boston police cadet program at
6        that period of time.
7   Q.  What changes did Commissioner Evans make to
8        rectify that problem?
9   A.  Well, he mandated a more comprehensive
10       recruitment strategy for cadets, was the first
11       step we had to undertake.  And then he, he
12       instructed me to ensure that the selection, the
13       group of individuals who were ultimately
14       selected was a diverse pool of individuals.  So
15       he made a decision as the police commissioner to
16       diversify and he instructed me to do that.
17  Q.  And roughly what percentage of cadets are now
18       minority based on changes that have been
19       implemented?
20  A.  About 42 percent.
21       MR. LICHTEN:  You meant, like, currently?
22       MS..ALPERSTEIN:  I actually did mean
23       currently.
24  A.  Currently.  The cadet pool is down, we have 10

Page 116

1        or 12 cadets in the department at the present
2        time.  I would say it's about the same, 40
3        percent.  We're about to hire another group as
4        well.
5        MR. LICHTEN:  I didn't understand when he
6        said 42 percent what time period he was
7        referring to.
8        MS. ALPERSTEIN:  I appreciate the
9        clarification.
10       MR. QUINAN:  Did we get clarification?
11  A.  Commissioner Evans' era appointments, that's
12       what I was referring to.
13  Q.  Mr. Callahan, if I ask you to look back at
14       exhibit, previously marked Exhibit No. 14 for
15       just a moment.
16  A.  Okay.
17  Q.  If you could turn to page 14 of the document,
18       based on the number on the bottom right-hand
19       corner.
20  A.  Okay.
21  Q.  Do you see the second line down for Timothy
22       Jenkins, it says D-tie end.
23  A.  Timothy Jenkins?  Yes.
24  Q.  So Mr. Jenkins was the end of a previously tied

Page 117

1        group of non-minority applicants?
2   A.  Yes.
3   Q.  And then the next D candidate which is a
4        non-minority candidate is John, B-a-n-i-k-j-r.
5        Do you see that that's the beginning of another
6        D tie group?
7   A.  Yes.
8   Q.  Can you thumb through that document and tell me
9        where that tie group ends.  The one that begins
10       with John F. B-a-n-i-k-j-r.
11       MR. LICHTEN:  Where are you?
12       MS. ALPERSTEIN:  Page 14 at the bottom.
13       MR. LICHTEN:  Of Exhibit number?
14       MS. ALPERSTEIN:  Of Exhibit No. 14.
15  Q.  And just so the question is clear for the
16       record, I am asking Mr. Callahan to identify
17       where the tie that begins with John F.
18       B-a-n-i-k-j-r, where that ends.
19  A.  It ends with the last candidate on the list,
20       Jonathan M. White.
21  Q.  How many candidates are tied for that last
22       place?
23  A.  I didn't count them, but there's generally 12 on
24       a page, 12 names on the page, half of them would

ESQUIRE DEPOSITION SERVICES
1-866-619-3925

Page 118

```
1    be on that group. We're probably looking at
2    close to, I don't know.
3         MR. COX: Do you want him to estimate or do
4    you want him to count?
5         MR. LICHTEN: It's mathematically
6    ascertainable.
7    A. One, two, three, four, five, six pages, thirty
8    six and -- about 40 individuals.
9    Q. I myself count 40. So there are 40 in this tie
10   group at the bottom?
11   A. Yes.
12   Q. And if you turn to, I guess it would be the
13   bottom of page 3 of this same Exhibit 14 which
14   is the front of the certification list. There
15   are 45 permanent full-time police officers that
16   are requisitioned, that this is designed to
17   provide applicants for?
18   A. Yes.
19   Q. There are 91 of the first tie, and 40 of those
20   were tied?
21   A. It looks like 40 are tied, if they all signed,
22   and it looks like most of them did sign the list
23   indicating their willingness. It looks like 40
24   individuals were tied at that point.
```

Page 119

```
1    Q. Is 40 an unusually large number of ties or is
2    that a normal number?
3    A. I've seen tie groups that are much larger than
4    that.
5    Q. Do you have any recollection of how this tie
6    group was handled with respect to the hiring
7    process?
8    A. It was handled by virtue of the fact that we did
9    not get into the tie group.
10   Q. You never reached it?
11   A. We never reached it. We didn't get that far
12   down.
13   Q. But this was the list from -- was this not the
14   list of people who were hired in March, the
15   March 2002 hire class?
16   A. Yes, it was.
17   Q. And then the same list was used in the later
18   October 2003 hiring class? The same set of
19   people?
20   A. Well, I think the list certainly reconfigured as
21   time goes on. Individuals gain veterans
22   preference, whatever. And it popped up on the
23   list for various places. Maybe the same names,
24   but maybe not the same complete position on the
```

Page 120

```
1    list.
2    Q. So is it the case that you're not -- strike
3    that.
4         Is it ever the case you have a separate
5    certification list for those who have lost jobs
6    in other municipalities or townships who are
7    seeking reemployment with the City of Boston?
8    A. Yes, there is. That does happen.
9    Q. What are the circumstances under which that
10   happens?
11   A. If an individual police officer is laid off
12   within a civil service community in
13   Massachusetts that individual has, that
14   individual's name is placed on what's referred
15   to as a reemployment list. We actually have a
16   reemployment list that we're working with at the
17   present time. If the individual remains laid
18   off from his civil service position, he or she
19   becomes eligible for appointment with the Boston
20   police or any civil service community that's
21   hiring. I think there were three individuals
22   that are under consideration at this point.
23   Q. How are those people considered in connection
24   with the existing certification list with those
```

Page 121

```
1    who have never been previously appointed?
2    A. Two separate lists entirely.
3    Q. How does the City make a choice about whether to
4    reach the reemployment list if they're working
5    off of a different certification list?
6    A. The requirement is to select from the
7    reemployment list first.
8    Q. So does that end up almost acting as a
9    preference for those seeking reemployment over
10   those who have not been previously employed?
11   A. Yes.
12   Q. The three people that are currently being
13   considered from the reemployment list that you
14   just referenced, do you know what their race is?
15   A. I believe that they're all Caucasians.
16   Q. Do you know how many people are on that
17   reemployment list?
18   A. It's a substantial list. I think there are
19   upwards of one hundred names on that list.
20   Q. Why is it only three are being considered?
21   A. Because the remaining group have been
22   reemployed.
23   Q. And just to clarify, had they not been
24   reemployed, any of those on that reemployment
```

31 (Pages 118 to 121)

Page 122

1    list would be given consideration prior to the
2    people on the existing certification list?
3  A.  Yes.
4  Q.  I have basically two more questions. If I could
5    direct your attention to Callahan 16 that's been
6    previously marked by Mr. Lichten. Could you
7    turn to, at the bottom of the page there are
8    page numbers, to the second page which is
9    actually stamped page 91.
10  A.  Okay.
11  Q.  A little bit past half way down you'll see the
12    name Sharon Woods Tumes. And under, two columns
13    over there is a heading, not a heading, but it
14    says DI, D as in dog, I, rather than D or C; do
15    you know what the I stands for?
16  A.  That would mean that Sharon Woods M. Tumes was
17    Asian. We're finding people who are
18    obviously -- this is how HRD characterizes
19    individuals.
20  Q.  So two down --
21  A.  Her mother is Spanish, I believe her father,
22    someone in the family was Asian.
23  Q.  I did not mean to interrupt your answer.
24  A.  Sorry.

Page 123

1  Q.  So two down, John Gonzalvais is also Asian?
2  A.  John Gonzalvais was listed by HRD, as being, I
3    presume he might be part Asian as well.
4  Q.  Right. Okay.
5  A.  I just want to clarify, I believe what the I
6    refers to is Asian. But I don't know what the D
7    refers to that's used for Caucasian either, so.
8  Q.  D refers -- does D refer to non minority?
9  A.  It does, yes.
10  Q.  Non minority as to the consent decree?
11  A.  Yes.
12  Q.  If you keep on that same exhibit under the,
13    under the heading Selected?
14  A.  Yes.
15  Q.  Have you ever -- actually, it doesn't appear on
16    the face of that exhibit, but have you seen in
17    previous incarnations of that type of document
18    the abbreviation NSIP?
19  A.  Yes.
20  Q.  Could you tell me what that stands for?
21  A.  That stands for No Show Initial Processing.
22    Candidates who sign the list and then don't come
23    in to be fingerprinted, photographed, fill out
24    an application. That happens fairly frequently.

Page 124

1  Q.  Are they given one shot to do that in their
2    route?
3  A.  Unless they have a pretty substantial excuse for
4    not being there. As long as they put it in
5    writing and generally have a reasonable excuse
6    for not being available.
7  Q.  You mentioned earlier that in calculating parity
8    under the consent decree you looked to the
9    census data for the population part of the
10    calculation?
11  A.  Yes.
12  Q.  And that census data that you have looked to I
13    guess most recently has been the 2000 U.S.
14    census?
15  A.  Yes.
16  Q.  Does the department ever look at population
17    figures for other purposes, for example, with
18    respect to requisitions, do they -- strike that.
19    With respect to the special requisitions
20    that the department occasionally puts forward,
21    does the department look to the population of
22    the community served in terms of the minority
23    breakdown in terms of seeking those
24    requisitions?

Page 125

1  A.  Yes, we do.
2  Q.  Where does that population data come from, if
3    not from the most recent census?
4  A.  It comes from the U.S. census, that's the data
5    that we provide to HRD and their application for
6    the requisition to fill vacancies with bilingual
7    police officers.
8  Q.  So when you testified earlier that there had
9    been an explosion in the number of, I think it
10    was Haitians, Creole speaking Haitians --
11  A.  Yes.
12  Q.  -- in the Boston area, that comment was based on
13    the U.S. census data?
14  A.  Yes, it was.
15  Q.  Do you know whether those numbers have increased
16    since the, or have any sense as to whether those
17    numbers have increased since the 2000 census?
18  A.  I have no idea.
19  Q.  Would that be the case with respect to any of
20    the minority population or to other different
21    language speaking groups?
22  A.  I haven't seen any data showing that these
23    groups have grown since then.
24    MS. ALPERSTEIN: Thank you.

32 (Pages 122 to 125)

Page 126

1     MR. QUINAN: I have maybe two or three
2  questions.
3          EXAMINATION
4
5  BY MR. QUINAN:
6  Q.  Mr. Callahan, when you are reviewing the U.S.
7     census data for purposes of determining the
8     percentage of minorities in this general
9     population of the City of Boston, do you count
10    those who identify themselves as biracial,
11    African American, for example, and some other
12    race, or multi racial on the U.S. census forms?
13 A.  No.
14 Q.  Different topic. Are cadets compensated and if
15    so how does their compensation compare with new
16    police officer hires who are going through the
17    police academy?
18 A.  The cadet program is one step above indentured
19    servitude. They earn $379 a week. So they're
20    significantly undercompensated vis-a-vis the
21    police officers. Vacancies are up, positioning
22    you hope to aspire to gain at some point which
23    is why they go through that process.
24 Q.  And they're required to serve for a minimum of

Page 127

1     two years?
2  A.  Minimum of two years.
3
4          EXAMINATION
5
6  BY MR. LICHTEN:
7  Q.  I have two quick follow ups. If I understood
8     your answers to some recent questions if there's
9     a, if you get to a tie and there are 20 or 30 or
10    40 people in that tie and you have to decide,
11    there the commissioner will use discretion to
12    choose the person whom he or she thinks is the
13    best qualified candidate; did I understand that
14    correct?
15 A.  Well, generally the commissioner would not
16    personally be involved. But he would delegate
17    to myself, particularly myself, and in
18    conjunction with other department officials to
19    look at the candidates and pick the best
20    candidate that we can determine.
21 Q.  Okay. So you wouldn't go by how people are on
22    the list if they're tied on the list?
23 A.  No. Because that would be irrelevant. The same
24    group.

Page 128

1  Q.  And you don't go by looking at their fractional
2     score?
3  A.  No.
4  Q.  So for example, if someone was already a police
5     officer, let's say a Boston municipal police
6     officer, that would be something that would
7     assist them in being selected among the ties?
8  A.  That certainly would be helpful.
9  Q.  If someone had already gone through the
10    Boston -- I'm sorry, had already gone through
11    another police academy and was working as a
12    police officer in another neighboring community
13    that would be helpful to them --
14 A.  Yes.
15 Q.  -- if they were tied?
16 A.  Yes, indeed.
17 Q.  And if they worked for the D.A.'s office as an
18    investigator that would be helpful to them?
19 A.  Sure.
20 Q.  And finally with respect to the reemployment
21    list, if one agrees to be hired as a Boston
22    police officer off the reemployment list having
23    been a police officer somewhere else, are they
24    subject to the residency requirement?

Page 129

1  A.  They're subject to the labor agreement with,
2     with the BPPA and the City's residency ordinance
3     in that they have to live in the city upon date
4     of appointment. And the way the thing is
5     configured now, remain so as a resident during
6     the entire time of their employment.
7  Q.  So I take it that's been a drag on police
8     officers from other cities accepting positions
9     for the City of Boston?
10 A.  Oh, absolutely it has, yes.
11 Q.  That's all I have. Okay.
12        (Whereupon, the deposition concluded at
13    approximately 1:21 p.m.)
14
15
16
17
18
19
20
21
22
23
24

33 (Pages 126 to 129)

Page 130

```
1   COMMONWEALTH OF MASSACHUSETTS)
2   SUFFOLK, ss.                  )
3
4
5        I, Laurie Langer, Professional
    Reporter and Notary Public in and for the
6   Commonwealth of Massachusetts do hereby certify
    that there came before me on the 22nd day of
7   June, 2004, at 10:10 o'clock a.m. the person
    hereinbefore named, who was by me duly sworn to
8   testify to the truth and nothing but the truth
    of his knowledge touching and concerning the
9   matters in controversy in this cause; that he
    was thereupon examined upon his oath, and his
10  examination reduced to typewriting under my
    direction; and that the deposition is a true
11  record of the testimony given by the witness.
12
13
         I further certify that I am neither
14  attorney or counsel for, nor related to or
    employed by, any of the parties to the action in
15  which this deposition is taken, and further that
    I am not a relative or employee of any attorney
16  or counsel employed by the parties hereto or
    financially interested in the action.
17
18       In witness whereof, I have hereunto
    set my hand and seal this 29th day of June,
19  2004.
20
21
22            NOTARY PUBLIC
              Commission Expires
23            9/20/07
24
```

Page 131

```
1   ERRATA SHEET DISTRIBUTION INFORMATION
2   DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS
3
4      ERRATA SHEET DISTRIBUTION INFORMATION
5        The original of the Errata Sheet has been
6   delivered to Mr. Cox, Esquire.
7        When the Errata Sheet has been completed
8   by the deponent and signed, a copy thereof
9   should be delivered to each party of record and
10  the ORIGINAL forwarded to Mr. Lichten, Esquire.
11
12       INSTRUCTIONS TO DEPONENT
13  After reading this volume of your deposition,
14  please indicate any corrections or changes to
15  your testimony and the reasons therefor on the
16  Errata Sheet supplied to you and sign it. DO
17  NOT make marks or notations on the transcript
18  volume itself. Add additional sheets if
19  necessary. Please refer to the above
20  instructions for errata sheet distribution
21  information.
22
23
24
```

Page 132

```
1   ATTACH TO THE DEPOSITION OF EDWARD CALLAHAN
2   CASE: Deleo v. Boston  DATE TAKEN: 6/22/04
3            ERRATA SHEET
4   Please refer to page 131 for errata sheet
5   instructions and distribution instructions.
6   PAGE    LINE    CHANGE         REASON
7        _____
8        _____
9        _____
10       _____
11       _____
12       _____
13       _____
14       _____
15
16       I have read the foregoing
17  transcript of my deposition and except for any
18  corrections or changes noted above, I hereby
19  subscribe to the transcript as an accurate
20  record of the statements made by me.
21
22       Executed this ____ day of_____, 2004
23       _____
24       EDWARD CALLAHAN
```

34 (Pages 130 to 132)