UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 03-12538-PBS

---

PAUL DELEO, JR., THOMAS BARRETT, MICHAEL CONEELY, MATTHEW HOGARDT, BRENDAN DEVER, PATRICK ROGERS, CHRISTOPHER CARR, and BRIAN DUNFORD,
     Plaintiffs,

v.

CITY OF BOSTON, Massachusetts, MITT ROMNEY, in his capacity as Governor of the Commonwealth of Massachusetts; and the COMMONWEALTH OF MASSACHUSETTS,

     Defendants,

BOSTON BRANCH OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE and MASSACHUSETTS ASSOCIATION OF MINORITY LAW ENFORCEMENT OFFICERS,
     Intervenors.

---

**DEFENDANT CITY OF BOSTON'S LOCAL RULE 56.1 STATEMENT OF FACTS AND SUPPORTING EXHIBITS IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND/OR PRELIMINARY INJUNCTION**

Defendant, City of Boston ("City") hereby opposes Plaintiffs' Motion For Summary Judgment and/or Preliminary Injunction. In support of its Opposition, the City of Boston concurs with, and incorporates by reference, the Intervenors Opposition To Plaintiffs' Rule 56.1 Statement Of Facts, which responds to the Plaintiffs' Statement of Facts ("P's SOF") and

1

contains additional facts, with the exception of the following paragraphs to which the City hereby separately responds:[1]

3.      The District Court decision in Castro v. Beecher, 365 F.Supp. 655 (D.Mass. 1973) speaks for itself as to what conclusions it was asked to make and what conclusions it came to concerning the process of appointing police officers. Separate court decisions and consent decrees concern the process of promoting police officers.

10.     The City also does not dispute that the January 7, 1975 Consent Decree in Castro v. Beecher ("1975 Castro Decree") provides that "[a]s a city or town achieves a complement of minorities commensurate with the percentage of minorities within the community, certification will be made according to existing Massachusetts law," i.e., without regard to the Consent Decree. As to the remaining facts in Ps' SOF ¶ 10, the City disputes the implication that the Castro Decree requires rough parity or that the holding in Quinn v. City of Boston, 325 F.3d 18 (2003) is applicable to the Castro Decree.

11.     The Boston Police Department ("BPD") does not dispute that it monitors employee statistics to determine whether the BPD has achieved parity between the percentage of minorities in the general population and the percentage of minority sworn officers in the Boston Police Department as a whole. However, the BPD disputes that it monitors for "rough" parity. The testimony of Ed Callahan, Director of Human Resources for the Boston Police Department, regarding the method that the City uses to determine whether parity has been reached under the 1975 Castro Decree, does not suggest that "rough" parity is the goal. See Exhibit F at 27:1-28:21 (no reference to "rough parity").[2] The 1975 Castro Decree does not include the phrase

---

[1] The City has based its responses on a courtesy draft the Intervenors forwarded to the City, and is correct as of the time of the City's filing. In the even there are subsequent additions or alterations, the City reserves the right to amend its responses appropriately.

[2] Unless otherwise indicated, Exhibit references are to documents attached hereto.

2

"rough parity." See Exhibit A, ¶¶ 18, 24 (using the term "commensurate"). The City of Boston did not alter its method of calculating parity after the First Circuit's decision in Quinn. See Exhibit F at 33:4 to 34:8 (stating that after Quinn, Callahan "wouldn't do a different type of analysis, I would continue the ongoing analysis, essentially, on an ongoing basis."). The City does not dispute that the BPD assesses the percentage of minorities in the police force based on "strength reports" prepared by Ed Callahan, or that Mr. Callahan updates those strength reports when there is a personnel change in the police force. Id. at 9-10. The BPD determines the percentage of minorities in the community based on the latest census data available. The BPD disputes plaintiffs' assertion as to the percentage of minorities reflected in the 2000 census and maintains that there currently exists a material fact in dispute as to how to calculate the percentage of minorities in the City of Boston.

15.     The City does not dispute that, *at present*, the Commonwealth Human Resources Division ("HRD") "does not undertake any independent review prior to the examination to determine whether the candidate does indeed meet these requirements." However, the City disputes the conclusory assertion that HRD did not undertake such review prior to the April 2001 exam. Sally McNeely, Director of the Organizational Development Group for the Commonwealth of Massachusetts, testified that "HRD did do independent verification of residency for a number of years," but that she did not "know if [HRD] did it at the time of this [the April 28, 2001 police officer civil service] exam or not." (Deposition of Sally McNeely ("McNeely Tr.") at 29.)   The City does not have sufficient knowledge to admit or deny whether the Commonwealth HRD verifies an individuals race to the extent that is implied in P's SOF ¶ 15, or whether HRD may in the future choose to conduct independent reviews to determine if candidates meet the eligibility requirements.

27.     The City concurs with and incorporates paragraph 27 of the <u>Intervenors Opposition To Plaintiffs' Rule 56.1 Statement Of Facts</u>, and would add that upon information and belief, some non-minorities have passed the Spanish examinations administered by HRD.

28.     The City disputes that the cadet program "maintains" an approximately 40 to 42% "minority complement." Mr. Callahan testified to the current minority breakdown of the cadets, but did not state that a particular percentage is aimed for or "maintained." <u>See</u> Exhibit F at 115-116. For example, he testified that only three cadets were hired in 2002, all of whom were non-minority. <u>Id.</u> at 114.

35.     The City does not dispute that had HRD not used a race-based approach in ranking the candidates considered for the October 2003 hiring class and instead ranked them all according to only statutory preferences and test scores, that the Department would have reached non-minority veterans with passing scores ahead of the non-veteran minority candidates who lacked any statutory preference. However, the City disputes the Plaintiffs' speculative contention that all of the Plaintiffs would have been reachable for consideration by at least October 2003 if race had not been considered by HRD in assembling a certification list for Boston Police Officers. Indeed, as Plaintiffs themselves acknowledge, the Plaintiffs all lack statutory preferences and 25 non-minorities with statutory preferences were not reached during the selection process for the March 2002 hiring class. <u>See</u> P's SOF para. 32.

37.     The City does not dispute the Plaintiffs' representations concerning the scores they, or any other candidates allegedly received on any civil service examination but lacks information to confirm or deny such representations as the City does not receive candidates' scores from HRD. Similarly, the City disputes the contention that the April 2003 exam was more difficult than prior

4

examinations administered by the Commonwealth and states that it cannot speak to the relative difficulty of such examinations, which it neither prepares nor administers.

38.   The City does not dispute that it has begun the process for a new round of hiring by submitting a requisition to HRD for a class to enter the Academy around November 2004, and does not dispute that it is selecting officers in accordance with the rank-ordered certification list received from HRD.  However, upon information and belief, the Boston Police Department now anticipates hiring 45 police officers to enter the Academy in approximately November, 2004.

39.   The City states that there currently exists a material fact in dispute as to how to calculate the percentage of minorities in the City of Boston, as evidenced by the different calculations by the Plaintiffs' expert and the Intervenors' expert, and whether the minority population within the "eligible labor pool" can be calculated from the census data.

43.   The City disputes that before the round of hiring in March 2002, the minority composition of entry-level police officers had already reached rough parity with the minority composition of the general population of Boston and states that there currently exists a material fact in dispute as to how to calculate the percentage of minorities in the City of Boston, as evidenced by the different calculations by the Plaintiffs expert and the Intervenors' expert.  The City lacks information as to what minority population existed at any given point of time within the "eligible labor pool" and disputes whether such a calculation can be accurately determined from the census data.  Accordingly, the City disputes that in March 2002, the minority composition of entry-level police officers "exceeded the minority composition of the relevant labor pool."  Finally, the City maintains that a material issue of fact exists as to whether parity under the Castro Decree is to be calculated by considering the minority composition of entry

5

level police officers, rather than the minority composition of officers throughout the police force—the measure historically used by the City. .

44.     The City disputes that "before the round of hiring in October 2003, the minority composition of entry level police officers had already exceeded the minority composition of the entire Boston population" and states that there currently exists a material fact in dispute as to how to calculate the percentage of minorities in the City of Boston, as evidenced by the different calculations by the Plaintiffs expert and the Intervenors' expert.  The City lacks information as to what minority population existed at any given point of time within the "eligible labor pool" and disputes whether such a calculation can be accurately calculated from the census data.  Accordingly, the City disputes that as of October 2003, the minority composition of entry-level police officers "exceeded the minority composition of the relevant labor pool."

45.     The City lack sufficient information to dispute or agree with Paul DeLeo's claims about himself.

46.     The City lack sufficient information to dispute or agree with Thomas Barrett's claims about himself.

47.     The City lack sufficient information to dispute or agree with Michael Conneely's claims about himself.

48.     The City lack sufficient information to dispute or agree with Matthew Hogardt's claims about himself.

49.     The City lack sufficient information to dispute or agree with Brendan Dever's claims about himself.

50.     The City lack sufficient information to dispute or agree with Patrick Rogers claims about himself.

51. The City lack sufficient information to dispute or agree with Christopher Carr's claims about himself.

52. The City lack sufficient information to dispute or agree with Brian Dunford's claims about himself.

57. The City disputes that the consent decree's terms are unambiguous and have separately moved to clarify whether the complement of minorities for purposes of parity is to be calculated by comparing the percentage of minority entry level patrolmen to the percentage of minorities in the City's general population, or comparing the percentage of minority officers in the entire police force, to the percentage of minorities in the City's general population.

60. Disputed to the extent paragraph 60 does not precisely reflect testimony. Edward Callahan testified that "as to the percentage of individuals with a [veterans] preference, [he] couldn't even make a guess," and that "there appear to be fewer minorities who have statutory preference, particularly the veterans issue, but again [he] couldn't give…" See Exhibit F at 113.

61. Disputed to the extent paragraph 61 does not precisely reflect testimony. Edward Callahan testified: "I think that, and it's pretty clear, that the veterans preference generally is applied to males. There are many more males who have veterans preference than females so that has hindered our ability to hire as many women as we would like."

63. Disputed to the extent paragraph 63 is speculative.

65. Disputed to the extent paragraph 65 is speculative.

66. Disputed to the extent paragraph 66 is speculative.

68. Disputed to the extent paragraph 68 is speculative as to whether a Plaintiff will be reached, much less hired, from that Certification.

69. The City lack sufficient information to dispute or agree with paragraph 69.

7

70.     Disputed.

### DEFENDANT CITY OF BOSTON'S ADDITIONAL FACTS IN SUPPORT OF ITS OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND/OR PRELIMINARY INJUNCTION

The City also submits the following additional facts, which for ease of reference it consecutively numbers following the last numbered paragraph of the Intervenors Opposition To Plaintiffs' Rule 56.1 Statement Of Facts:

71.     The Castro Decree states that "[a]s a city or town achieves a compliment of minorities commensurate with the percentage of minorities within a community," it is no longer subject to the Decree.  See Consent Decree (Exhibit A at ¶24).

72.     The Decree also provides that a notification process for the appointing authority, and in turn the Director of Civil Service, commences when the authority "has achieved a complement of Black and Spanish-surnamed post-probationary police officers commensurate with the percentage of minorities within the community…"  Id. at ¶20.

73.     In each instance where a city or town was exempted from the Decree since at least 1980, the second variable in the parity formula consisted of the percentage of minorities in that entire jurisdiction, not in the relevant labor pool.  See Affidavit of Toni G. Wolfman (Exhibit B at ¶8).

74      Using the percentage of minorities in an entire jurisdiction as the second variable is consistent with the method currently used by the Boston Police Department when undertaking statistical comparisons relative to the Decree.  See Deposition of Edward Callahan (Exhibit F at 27).

75.     Using the entire jurisdiction's percentage of minorities is consistent with memoranda signed by the Commonwealth's Personnel Administrator in 1986 and 1987.  See Exhibit B at ¶10 (and attached Exhibit C).

76.     These memoranda describe a process for requesting exemption from the Decree that is consistent with the intention of the original parties and used consistently by the Commonwealth. Id.

77.     More than 14,000 people took the 2001 civil service exam, and only forty-five (45) of the first ninety-one (91) people who accepted were reached for consideration of the March, 2002 police academy class, and only thirty-eight (38) of the first seventy-seven (77) people who accepted were reached for consideration of the October, 2003 police academy class.  See Exhibit E.

78.     The Decree will remain in force only until its requirements have been met.  See Exhibit A.

79.     As of July, 2004, only twelve communities in Massachusetts remain subject to the Decree.  See Exhibit B (and attached Exhibit A).

80.     On July 23, 2002, the Director of Human Resources for the Boston Police Department, Edward Callahan ("Director"), forwarded to the Commonwealth's Human Resources Division ("HRD") a "Request For Gender-Based Selective Certification" for fifteen female police officer vacancies.  See Exhibit C.

81.     According to the request, of the 2,172 police officers employed as of July, 2002, 281 were female.  Id. at 4.

82.     The basis for the gender-based selective certification request was described by the Director as the following:

> "Currently, female Boston Police Officers represent 12.7% of the make-up of the Boston Police Department. It is the opinion of the Boston Police Commissioner that the Department could utilize the services of an additional number of female officers. In addition to performing all of the other duties and responsibilities associated with the role of Boston Police Officer, the services of additional female police officers are required to assist with the care and custody (including the transport and searching) of female prisoners, which the Department will begin handling at a police district station on September 26, 2001.
>
> Additionally, the Department believes that additional female officers would be helpful in order to fulfill our obligations under the provisions of M.G.L. c.41 §97B, which mandates the Boston Police Department to 'make efforts to employ women police officers to serve in rape reporting and units.' The same statute requires that a 'victim of rape who is female shall, whenever possible, be interviewed initially by a female police officer.'" Id.

83. According to the Boston Police Department's Rules and Procedures, Rule 318-C, Sec.4, all female prisoners "shall be subject to a custodial inventory search of their person and property at the time they are booked." See Exhibit D.

84. Past practice, as contained Rule 318, §§ 4, 9, provides that female prisoners "shall be searched by a female Boston Police Officer." Id.

85. M.G.L. c.41 §97B, mandates that the Boston Police Department make efforts to employ women police officers to serve in rape reporting and prosecution units. See Exhibit I.

86. The same statute requires that a victim of rape who is female shall, whenever possible, be interviewed initially by a female police officer. Id.

87. The approval of the Director's request was in the discretion of the Commonwealth's Human Resources Division pursuant to M.G.L. c.31, § 21, which provides in part:

> "The administrator may limit eligibility for any examination for an original appointment to either male or female persons if the appointing authority requests such limitation in its requisition. Both male and female persons shall be presumed to be eligible for a promotional appointment to any civil service position; provided, however, that the administrator may limit such eligibility to either male or female persons if the duties and responsibilities of such position require special physical or medical standards *or require custody or care of a person of a particular sex.* Prior to any such limitation of appointment or promotion, the

administrator shall submit in writing to the Massachusetts commission against discrimination a request for its recommendations on such proposed limitations." (emphasis added.)

88.  In calendar year 2000, of the 22,216 arrests, 4,355 (19.7%) were female. See Exhibit C at 6.

89.  In calendar year 2001, of the 20,470 arrests, 3,392 (19.2%) were female. Id. at 7.

90.  At the time the Director requested a female-only certification list in July, 2002, only 12.7% of police officers were female. Id. at 6.

91.  In 1999, there were a total of 2,246 police officers in the Department, and of those 1,558 were patrol officers. In 1999, a total of 57 officers retired, and of those 43 retired in the month of January. See Exhibit K.

92.  In 2000, there were a total of 2,187 police officers in the Department, and of those 1,477 were patrol officers. In 2000, a total of 64 officers retired, and of those 40 retired in the month of January. Id.

93.  In 2001, there were a total of 2,162 police officers in the Department, and of those 1,459 were patrol officers. In 2001, a total of 71 officers retired, and of those 56 retired in the month of January. Id.

94.  In 2002, there were a total of 2,138 police officers in the Department, and of those 1,462 were patrol officers. In 2002, a total of 83 officers retired, and of those 54 retired in the month of January. Id.

95.  In 2003, there were a total of 2,044 police officers in the Department, and of those 1,433 were patrol officers. In 2003, a total of 153 officers retired, and of those 82 retired in the month of January. Id.

96. As of August, 2004, there are a total of 2,020 police officers in the Department, and of those 1,398 are patrol officers. As of August, 2004, 128 officers are out injured, 6 are on military leave, and 26 are on administrative leave or otherwise not on active duty. Id.

97. Due in part to recent retirements, the BPD is currently operating with fewer officers than it had in previous years, and needs additional police officers as soon as possible in order to effectively ensure the safety of the community. See Exhibit L.

98. A new Academy Class of police officers is slated to begin in November 2004. The City's public safety would be compromised if the Academy class were delayed or its numbers were reduced. Id.

99. The police officers who are assigned to BFS serve a vital function in ensuring the safety of citizens and visitors in the City of Boston and are called upon to interact with Boston's diverse constituencies. Id.

100. In responding to calls for service, and in patrolling our city's neighborhoods, Boston police officers interact with all segments of the City's population, including people of wide ranging age, health, education and socio-economic background. Id.

101. The Boston Police Department's ability to patrol the City is enhanced by a racially and ethnically diverse police force, since a diverse police force increases the confidence of Boston's citizens that the city's police officers share their experiences, and concerns. Id.

102. Vacation time for City employees, including police officers, accrues effective January 1st of each year. When an individual retires or leaves employment for other reasons the employee can be paid for any unused vacation time. For this reason, a further decrease in the number of officers can be expected this January. See Exhibit K.

103. In 2003, 153 officers retired or otherwise left the Department. Id.

                                          Respectfully submitted,
                                          DEFENDANT CITY OF BOSTON
                                          Merita A. Hopkins
                                          Corporation Counsel, City of Boston
                                          By its attorneys,

| | |
|---|---|
| S/Betsy J. Facher | S/Stephen G. Cox |
| _____ | _____ |
| Betsy J. Facher, BBO #637613 | Stephen G. Cox,  BBO# 566943 |
| Staff Attorney | Assistant Corporation Counsel |
| Office of the Legal Advisor | City of Boston Law Department |
| Boston Police Department | Room 615, Boston City Hall |
| One Schroeder Plaza | Boston, Massachusetts 02201 |
| Boston, MA  02120 | (617) 635-4064 |
| (617) 343-4550 | |

Dated:   September 2, 2004