UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| PAUL DELEO, JR., THOMAS BARRETT, MICHAEL CONNEELY, MATTHEW HOGARDT, BRENDAN DEVER, PATRICK ROGERS, CHRISTOPHER CARR, and BRIAN DUNFORD, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Civil Action No. 03-12538-PBS |
| CITY OF BOSTON, Massachusetts, RUTH BRAMSON, in her Official Capacity as Chief Human Resources Officer for the Commonwealth of Massachusetts, and THE COMMONWEALTH OF MASSACHUSETTS, | ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| BOSTON BRANCH OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE and MASSACHUSETTS ASSOCIATION OF MINORITY LAW ENFORCEMENT OFFICERS, | ) ) ) ) ) ) | |
| Intervenors. | ) ) | |

_____)

## INTERVENORS' OPPOSITION TO PLAINTIFFS' MOTION
## FOR SUMMARY JUDGMENT AND/OR PRELIMINARY INJUNCTION

Harry T. Daniels (BBO #113800)
Mark D. Selwyn (BBO #565595)
Jennifer L. Carpenter (BBO #647214)
Christopher R. Noyes (BBO #654324)
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, Massachusetts 02109
(617) 526-6000

## TABLE OF CONTENTS

Page:

PRELIMINARY STATEMENT ................................................................................2

COUNTER-STATEMENT OF FACTS ...................................................................4

    A.    The 1975 Castro Decree .......................................................................4

        1.    Origins, Purpose and Requirements of the 1975 Castro Decree...................4

        2.    Course of Performance of the 1975 Castro Decree .......................................6

    B.    Parity Has Not Been Reached Under the 1975 Castro Decree ...............................7

    C.    The Police Entrance Examinations Still Disadvantage Minorities and Advantage Non-Minorities Such as Plaintiffs ...........................................................................9

        1.    The 2001 Police Entrance Examination Had an Adverse Impact on Minorities...................................................................................................9

        2.    The 2003 Police Entrance Examination Has an Adverse Impact on Minorities...................................................................................................9

    D.    Plaintiffs Lack Standing to Bring This Suit or to Seek a Preliminary Injunction .10

        1.    Plaintiffs Fail to Show That They Would Have Been Reached For the March 2002 Class...................................................................................10

        2.    Plaintiffs Fail to Show That They Would Necessarily Have Been Reached for the October 2003 Class.........................................................................11

        3.    Plaintiffs Cannot Show That They Would Be Reached, Much Less Hired, for the November 2004 Class....................................................................12

ARGUMENT.......................................................................................................12

I.    Relevant Legal Standards .................................................................................12

    A.    Summary Judgment ...........................................................................12

    B.    Preliminary Injunction.......................................................................13

II.    Plaintiffs fail to meet their evidentiary burden to show that they have standing ..............14

        1.    Plaintiffs Fail to Establish That They Have Standing to Challenge the March 2002 Police Officer Appointments ..................................................15

2.      Plaintiffs Fail to Establish That They Have Standing to Challenge the October 2003 Police Officer Appointments ...............................................16

3.      Plaintiffs Lack Standing to Challenge the November 2004 Class .............18

III.    The 1975 Castro Decree is a Judicially-Approved and Constitutional Response to Racial Discrimination ..........................................................................................................18

    A.     The 1975 Castro Decree Survives Strict Scrutiny ..................................18

        1.      The Proper Calculation of Parity ..................................................20

            a.)     The numerator:  meaning of "complement of Black and Spanish surnamed post-probationary police officers"................................20

            b.)     The denominator:  meaning of "within the community"...............21

        2.      Calculating Parity Based on the Minority Population of Boston is Not Overbroad........................................................................................23

IV.    The 1975 Castro Decree Has Not Expired, and Cannot Expire, "By its Own Terms" .....26

    A.     Parity Has Not Been Achieved ...............................................................26

    B.     The 1975 Castro Decree's Age Does Not "Dictate its Demise" ...........................27

    C.     The 1975 Castro Decree Cannot "Expire By Its Own Terms"..............................28

V.    Plaintiffs Are Not Entitled to a Preliminary Ijunction.......................................................28

    A.     Plaintiffs Will Not Succeed on the Merits of Their Claims...................................28

    B.     Plaintiffs Will Not Suffer Irreparable Harm Without a Preliminary Injunction....29

        1.      Plaintiffs' Delay in Seeking Injunctive Relief Demonstrates Lack of Irreparable Harm........................................................................................29

        2.      The Harms Identified By Plaintiffs Are Monetary in Nature and Do Not Merit Injunctive Relief........................................................................30

        3.      Plaintiffs' Constitutional Allegations Do Not Create a Presumption of Irreparable Harm........................................................................................31

    C.     The Balance of the Equities Tips Against Plaintiffs and in Favor of Defendants and Intervenors ........................................................................................32

    D.     Denial of Plaintiffs' Motion for a Preliminary Injunction is in the Public Interest35

1.    A Diverse Police Force Reflective of the Community is in the Public
      Interest.................................................................................................35

2.    Remedying Past Discrimination is in the Public Interest............................36

CONCLUSION........................................................................................................37

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| PAUL DELEO, JR., THOMAS BARRETT, MICHAEL CONNEELY, MATTHEW HOGARDT, BRENDAN DEVER, PATRICK ROGERS, CHRISTOPHER CARR, and BRIAN DUNFORD, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 03-12538-PBS |
| CITY OF BOSTON, Massachusetts, RUTH BRAMSON, in her Official Capacity as Chief Human Resources Officer for the Commonwealth of Massachusetts, and THE COMMONWEALTH OF MASSACHUSETTS, | ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| BOSTON BRANCH OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE and MASSACHUSETTS ASSOCIATION OF MINORITY LAW ENFORCEMENT OFFICERS, | ) ) ) ) ) ) | |
| Intervenors. | ) ) | |

_____)

### INTERVENORS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND/OR PRELIMINARY INJUNCTION

Intervenors Boston Branch of the National Association for the Advancement of Colored People ("NAACP") and Massachusetts Association of Minority Law Enforcement Officers ("MAMLEO") (collectively, the "Intervenors") submit this memorandum in opposition to Plaintiffs' Motion for Summary Judgment and/or Preliminary Injunction, which seeks to discard a narrowly-tailored, judicially-approved consent decree designed to remedy the lingering, continuing effects of discriminatory hiring practices of the BPD ("BPD"). As set forth below,

Plaintiffs have failed to meet their heavy burden of demonstrating their entitlement to judgment as a matter of law or to the extraordinary remedy of a preliminary injunction.

## PRELIMINARY STATEMENT

Plaintiffs predicate their claims upon a combination of numerical errors, inconsistent legal arguments, and novel theories that have no basis in the law generally or in the history of the 1975 Castro Decree specifically. When it suits their purposes, Plaintiffs contend that <u>Quinn v. City of Boston</u> – which employed a textual analysis that, if adopted here, would lead to a result <u>opposite</u> to what Plaintiffs advocate – controls the measure of parity in this case. When it does not suit their purposes, however, Plaintiffs reject <u>Quinn</u> without even trying (and without being able) to distinguish it, and resort to the argument, flatly contradicted by the law in this jurisdiction, that a consent decree that has not achieved its stated goals must be lifted simply because it is "old."

Plaintiffs' Motion for Summary Judgment must be denied because, based on the evidence Plaintiffs themselves have relied upon, the BPD has not achieved parity under the 1995 Castro Decree. Indeed, based upon this evidence, this Court could and should grant summary judgment in the Defendants' and Intervenors' favor since Plaintiffs' failure to show that parity has been reached defeats their claims as a matter of law. At a minimum, the Intervenors have raised a genuine issue of material fact as to whether the BPD has achieved parity under the 1975 Castro Decree, and summary judgment must be denied. The cornerstone of Plaintiffs' argument – that minorities comprise only 38.26% of the population of Boston – is founded on a numerical error contained in their expert's affidavit. Once the actual number of African Americans and Hispanics is considered, it is clear that the minority population of Boston is, *by the most conservative estimate,* 40.12% – and therefore substantially greater than the percentage of

minorities in either the collective police officer ranks of the BPD (33.4%), or in the entry-level police officer ranks alone (38.7%).

Under any relevant standard, including the measure Plaintiffs advocate here, the BPD has not achieved "a complement of minorities commensurate with the percentage of minorities in the community," which is the standard stipulated in the 1975 Castro Decree. Whether measured based on the percentage of minorities who are post-probationary police officers, as set forth in the 1975 Castro Decree and consistently calculated by the parties to that Decree and those subject to its strictures since its entry, or based on the percentage of minorities holding the position of entry-level police officer, parity has not been reached. As a result, the City and the Commonwealth were required to hire entry-level police officers in March 2002 and October 2003 in accordance with the terms of the 1975 Castro Decree, and they will be required to do so for the anticipated November 2004 class. The City could not have selected any Plaintiff without violating the 1975 Castro Decree and discriminating against the minorities whom that Decree protects. Thus, there was no "reverse discrimination," Plaintiffs' constitutional and statutory rights were not violated, and Plaintiffs' claims fail as a matter of law.

Plaintiffs also fail to meet their threshold burden of establishing that they meet the constitutional requirements for standing. In particular, they fail to adduce evidence of a causal connection between the Defendants' failure to appoint them police officers and the challenged 1975 Castro Decree. The undisputed facts demonstrate that no Plaintiff would have been hired (or even reached) for the March 2002 class absent the 1975 Castro Decree; that no Plaintiffs have established they would have been appointed (or even considered) for the October 2003 class absent the 1975 Castro Decree; and that no Plaintiff will be appointed (or even reached) for the November 2004 class if the City of Boston is released from the 1975 Castro Decree. At a

minimum, a genuine issue of material fact exists as to whether any Plaintiff, and, if so, which of them, has standing, and summary judgment must be denied.

These failures also doom Plaintiffs' Motion for a Preliminary Injunction. As a matter of law, the Court may not grant the extraordinary remedy of a preliminary injunction when a genuine issue of material fact exists as to standing. Moreover, because Plaintiffs have not shown – and cannot show – that parity has been achieved, Plaintiffs cannot prevail on the merits. The alleged failure to realize a "lifelong dream of being a police officer" is not a cognizable basis of injury so as to constitute irreparable harm, and therefore any harm shown to result from the failure to hire Plaintiffs can be fully compensated by the monetary damages Plaintiffs seek. Finally, both the balance of the equities and consideration of the public interest tip in favor of denying injunctive relief. Plaintiffs' combined motion should be denied in its entirety, and their complaint dismissed.

## COUNTER-STATEMENT OF FACTS[1]

### A.     The 1975 Castro Decree

1.     Origins, Purpose and Requirements of the 1975 Castro Decree

In 1970, Black and Hispanics who had unsuccessfully sought appointment as entry-level Boston police officers brought a lawsuit against the City and Commonwealth that alleged racial discrimination in the recruitment, certification and hiring of police officers throughout the Commonwealth. See Castro v. Beecher, 334 F. Supp. 930, 934 (D. Mass. 1971) (Wyzanski, J.) (Castro I). The case went to trial, after which the District Court made extensive factual findings (including finding a large discrepancy between the percentage of minorities in the police force and the percentage of minorities in the population of Boston) and reached legal conclusions,

---

[1]     The Intervenors' factual assertions are supported by their Opposition to Plaintiffs' Rule 56.1 Statement of Facts Not in Material Dispute ("Ints' SOF"), filed contemporaneously herewith.

including the conclusion that the plaintiffs had suffered discrimination. See id. at 935, 943. The First Circuit affirmed the finding of discrimination on appeal, but reversed as to remedy. Castro v. Beecher, 459 F.2d 725, 736 (1st Cir. 1972) (Castro II). Deeming the remedy ordered by the district court inadequate, the Court of Appeals directed the Commonwealth to develop a non-discriminatory civil service examination and ordered both the district court and the parties to develop an affirmative action program so that relief would "be more than token." Id. at 737.

Accordingly, the parties negotiated and proposed a consent decree approved by Judge Wyzanski on April 15, 1973. See Castro v. Beecher, 365 F. Supp. 655, 660-62 (D. Mass. 1973) (Castro III). The purpose of the 1975 Castro Decree thus was to remedy *documented* past discrimination in hiring by creating a police *force* reflective of the community. See id. at 655 (noting that the decree was entered after full hearings, findings of fact, conclusions of law, and several opinions); see also Cotter v. City of Boston, 323 F.3d 160, 169 (1st Cir. 2003) (observing BPD's "well-documented" history of favoring non-minorities for appointment and promotion).

This original consent decree did not address the terms under which a community could be relieved of its obligations under the decree, despite the fact that the Castro plaintiffs had envisioned that the determination whether racial discrimination had been eliminated would be based on whether "minorities had a percentage of the police force corresponding to their percentage of the population" – in other words, parity. See Castro I, 334 F. Supp. at 950.

In 1975, the parties and the district court modified the original consent decree to add an explicit formula for determining when a community could be released from the consent decree. That formula, set forth in Paragraph 18 of the modified consent decree (i.e., the "1975 Castro Decree"), defines the relevant benchmark as: "whenever a[n] …appointing authority …has achieved a complement of Black and Spanish-surnamed post-probationary police officers

commensurate with the percentage of minorities within the community..."  (See Plaintiffs'
Statement of Facts ("Ps' SOF"), Ex. 2 ¶ 18.)  The 1975 Castro Decree also explains that "[a]s a
city or town achieves a complement of minorities commensurate with the percentage of
minorities within the community, certification will be made according to existing Massachusetts
law."  (Id. ¶ 24.)  Thus the 1975 Castro Decree adopts parity as the triggering mechanism for
exemption.

No appointing authority is permitted to simply decide for itself that it is entitled to be
release from the 1975 Castro Decree.  The Decree provides a reporting mechanism that serves as
a check on any individual town or community's ability to be relieved from the 1975 Castro
Decree.  (See Intervenors' Statement of Facts ("Ints' SOF") ¶ 55.)  In particular, it requires the
City of Boston to inform the Commonwealth when the City believes parity has been achieved
and to provide evidence supporting the claim that parity – i.e., a complement of minorities
commensurate with the percentage of minority post-probationary police officers within the
community – has been reached.  (Id.)  The Commonwealth must then provide the evidence to the
Castro plaintiffs, who have 30 days to object.  (Id.)  Disputes over whether parity has in fact been
achieved may be raised on motion with the court.  (Id.)  The court is thus the final arbiter of
whether parity has been achieved.

2.    Course of Performance of the 1975 Castro Decree

Throughout the life of the 1975 Castro Decree, the parties to the decree have calculated
parity based on the plain and unambiguous terms:  by determining whether the percentage of
minority police officers in the relevant police force as a whole is equal to the percentage of
minorities in the community's entire population.  (See Ints' SOF ¶¶ 54-57.)  Communities were
subject to the 1975 Castro Decree at its inception; today, only twelve – including the City of
Boston – remain under its aegis.  (Id. ¶ 58.)  Every city or town that has been released from the

Decree has complied with these terms of Paragraph 18: each has submitted evidence demonstrating either than less than 1% of the population is minority, or that it has achieved parity, i.e., that its police force as a whole contains a percentage of minorities equal to or greater than the community's entire minority population. (Id. ¶¶ 54-57.)

The parties to the 1975 Castro Decree – the individual cities and towns, the Commonwealth, and the plaintiffs – have always, and without exception or dispute, calculated parity according to this formula, because this is the formula set forth in the decree. (Id. ¶ 53; see also Ps' SOF Ex. 2, at ¶ 18.

**B.     Parity Has Not Been Reached Under the 1975 Castro Decree**

If parity is calculated the way that the parties to the 1975 Castro Decree have always done so, the City of Boston has not yet achieved that measure. The method requires a comparison of the percentage of post-probationary minority police officers in the BPD as a whole to the percentage of minorities in the population of Boston as a whole, based on the most recent census data.[2] (Ints' SOF ¶¶ 53-54). Under this method, the *minimum* percentage of minorities in the City of Boston based on the 2000 census data is 40.12%. (See SOF ¶ 39 and Ex. A (Affidavit of Craig Lanson Moore ("Moore Aff.")) ¶ 16, 24-27.) This measure, however, undercounts the total number of minorities because it does not include those minorities who are both Black and Hispanic; when these numbers are included, the percentage of minorities is actually 42.11%. (Moore Aff. ¶ 16, 24-27.) Further, the census data on which these calculations are based likely understates the actual percentage of the Boston population that is minority. (Id. ¶ 28.) See also D'Vera Cohn, "Census Head Count to Stand; Adjustments Rejected; U.S. Funds at Stake," THE WASHINGTON POST, October 18, 2001, at A37 (reporting statement by Census

---

[2]     The 1975 Castro Decree does not require that the population be measured based on census data. See Ints' SOF ¶ 55 (citing Ps' SOF Ex. 2, ¶ 18.).

Director that "[t]he net undercount of Hispanics and African Americans has been reduced [in the 2000 census] . . . [but] there may actually have been an over-count of the white population"); Mireya Navarro, "Census Missed 103,000 in City; Many in Hispanic Areas, Bureau Data Shows," THE NEW YORK TIMES, December 7, 2002, at B3 (reporting that although the "2000 count was an improvement over the 1990 census and in less need of adjustment . . . the missing would still include vast numbers of the poor, minority groups and others who have been historically overlooked.  According to numbers released this week, the 2000 census missed 3.2 million people nationwide.").

Based on the census data, parity has not been reached, because at no point has the percentage of minorities in the BPD reached 40.11%, much less 42.11% -- nor even 39.77% (the number that Plaintiffs' expert, Dr. Aitken, would have reached had he performed his calculation correctly.  (See Moore Aff. ¶ 23-27 and Exs. D-G thereto.)  The percentage of minorities in the Boston Police force was 30.64% as of April 2000; 31.74% as of April 2001; 32.10% as of March 27, 2002; 33.98% as of October 22, 2003; and 33.40% as of June 9, 2004 – all well below the most conservative measure of 40.12% of the Boston population comprising minorities.  (Moore Aff. ¶ 27 and Ex. F.)  Even using the calculation of 39.77% (which is an incorrect measure as it does not count Blacks who identify themselves as both Black and another race that is not Hispanic), parity has not yet been reached.[3]  (See id.)

Even if parity is measured in the manner Plaintiffs advocate, i.e., by comparing the percentage of post-probationary minority police officers in the rank of patrolman to the percentage of minorities in the population of Boston as a whole, parity has not been achieved.[4]

---

[3]     The City of Boston has not requested exemption from the consent decree nor has it indicated that parity has in fact been reached.

[4]     Plaintiffs' suggestion that the relevant "community" is not the City of Boston but, instead, those in the community eligible to be hired as a police officer (SJ Br. at 13-16), even if it could be credited – which it cannot – cannot be applied to measure parity based on the data provided by Plaintiffs.  (See Moore Aff. ¶¶ 29-31.)

(See Moore Aff. ¶¶ 23-27.)  The percentage of post-probationary patrolmen who were minorities

was 34.90% as of April 2000; 36.83% as of April 2001; 37.39% as of March 27, 2002; 38.82%

as of October 22, 2003; and 38.70% as of June 9, 2004 – all below the conservative measure of a

40.12% minority population of Boston.  (Moore Aff. ¶ 27 and Ex. D.)  Even using the

inappropriate calculation of 39.77%, parity has not yet been reached.  (See id.)

### C.  The Police Entrance Examinations Still Disadvantage Minorities and Advantage Non-Minorities Such as Plaintiffs

#### 1.  The 2001 Police Entrance Examination Had an Adverse Impact on Minorities

The 2001 police entrance examination's passing score was apparently set at 70% to

reduce adverse impact on minorities.  (See Ints' SOF Ex. 64.)  The adverse impact on minorities

was, however, not fully ameliorated by the passing rate of 70%.  That is because, given the

number of applicants with statutory preferences, the only applicants without statutory

preferences who have any chance at being considered for police officer are those with the highest

scores on the examination.  (Id. ¶ 62.)  The adverse impact broken down by score is substantially

higher at the highest scores than it is at the passing rate.  (Id. ¶ 64.)  For example, of the 304

persons taking the 2001 exam who scored 100, only 15, or 5%, were minority.  (Id. ¶ 64 (citing

Attachment I to James Hartnett Report to Toni Wolfman dated July 13, 2001).)  The affect of

this adverse impact at the very highest scores is to virtually shut minorities without statutory

preferences out of consideration for entry level police officer.[5]

#### 2.  The 2003 Police Entrance Examination Has an Adverse Impact on Minorities

Similarly, the 2003 police entrance examination also adversely impacts minorities,

regardless of the 70% passing rate.  (See Ints' SOF ¶ 64.)  As with the 2001 exam, the adverse

---

[5]    The statutory preferences, moreover, also confer an advantage upon non-minorities and males.  See Ints' SOF ¶¶ 60, 61.

impact on minorities who took the April 2003 examination was significant when broken down by score. (Id. ¶ 64.) The adverse impact broken down by score is substantially higher at the highest scores than it is at the passing rate. (Id. ¶ 64.) For example, of the 185 persons taking the 2003 exam who scored 97 or higher, only three were minority; of the 346 persons taking the 2003 exam who scored 96 or higher, only seven were minority. (Id. ¶ 64 (citing Attachment J to Bramson Report to Toni Wolfman dated July 1, 2003).) Again, given the number of applicants with statutory preferences, the only applicants without statutory preferences who have any chance at being considered for police officer are those with the highest scores on the examination. (Id. ¶ 62.) The effect of this adverse impact at the highest scores is to virtually shut minorities without statutory preferences out of consideration for entry level police officer.[6]

### D.    Plaintiffs Lack Standing to Bring This Suit or to Seek a Preliminary Injunction

#### 1.    Plaintiffs Fail to Show That They Would Have Been Reached For the March 2002 Class

No Plaintiff claimed a statutory preference other than residency for the April 2001 police entrance exam. (See Ints' SOF ¶¶ 35, 68.) At least 25 non-minority candidates with statutory preferences were not reached for consideration for the March 2002 class because of the 1975 Castro Decree. (See Ps' SOF ¶ 32; Ints' SOF ¶ 35, 68.) Twelve minorities were hired for the March 2002 class pursuant to the 1975 Castro Decree. (Id. ¶ 34.) Therefore, in the absence of the 1975 Castro Decree, 25 non-minority candidates with statutory preferences would have been considered for the 12 "open" spots before any Plaintiffs were considered. (See Ints' SOF ¶ 35.) Accordingly, no Plaintiff could have been or would have been considered for the position of, much less hired to be a, police officer in the March 2002 class. Moreover, given that all of the

---

[6]    The statutory preferences, moreover, confer an advantage upon non-minorities and males. See Ints' SOF ¶ 60, 61. So, too, does the fact that one-third of each hiring class must come from the cadet program, which is not subject to the 1975 Castro Decree and has historically served as a vehicle for non-minorities to be hired into the BPD. (See Ints' SOF ¶ 28; Ps' SOF ¶ 28.)

- 10 -

12 "open" slots would have gone to non-minorities in the absence of the 1975 Castro Decree, it is inconceivable that the City would not have pursued an alternative hiring mechanism to ameliorate the decrease in diversity affecting its operational need for minority police officers and the adverse impact on minorities that would have resulted from hiring only those with a statutory preference.  (See Ints' SOF ¶ 35.)  Thus, it is highly unlikely that all of these 25 non-minorities would have been reached – making it all the more unlikely that any Plaintiff would have been considered (much less hired) for the March 2002 class in the absence of the 1975 Castro Decree.  (Id.)

> 2.    Plaintiffs Fail to Show That They Would Necessarily Have Been Reached for the October 2003 Class

Fourteen non-minorities with statutory preferences were not reached for consideration for the October 2003 police officer class.  (See Ints' SOF ¶ 34.)  The BPD selected 12 minority candidates without statutory preferences for the October 2003 class.  (See Ps' SOF Ex. 26.)  Even in the absence of the 1975 Castro Decree, these 12 "open" slots would have been filled first from the 14 non-minorities with statutory preferences, and therefore not all Plaintiffs, and possibly none of them, would have been reached.  Further, three minorities with statutory preferences were selected for the October 2003 class.  (See id.)  Thus, only a small fraction of the October 2003 class would have been minority and no minorities without a statutory preference would have been selected.  (Ints' SOF ¶ 35.)  In the absence of the 1975 Castro Decree, the BPD likely would have engaged in alternative hiring practices to ameliorate the adverse impact upon minorities associated with the 2001 police entrance examination as well as the decrease in diversity (for which they have an operational need in order to police communities of color effectively and gain the communities' support in fighting crime).  (Id.)  Thus, of the few spots remaining for candidates without a statutory preference that would be available after the

fourteen non-minorities with a statutory preference not previously reached were exhausted, not

all such spots (and perhaps few or none of them) would have gone to non-minorities.  (Id.)

> 3.  Plaintiffs Cannot Show That They Would Be Reached, Much Less Hired, for the November 2004 Class

Every non-minority (53 candidates) on the April 2004 Certification has a statutory

preference in addition to the residential preference.  (See Ints' SOF ¶ 68; Ps' SOF Ex. 29.)

Twenty-two minorities on the April certification have a statutory preference.  (Ints' SOF ¶ 68.)

The BPD seeks to hire 38 officers from that certification.  (Ints' SOF ¶ 67.)  No Plaintiff has a

statutory preference other than a claim of residency.  Accordingly, even in the absence of the

1975 Castro Decree, no Plaintiff will be reached, much less hired, from the April 2004

Certification.  (See id.)

## ARGUMENT

## I.    RELEVANT LEGAL STANDARDS

### A.    Summary Judgment

To obtain summary judgment, Plaintiffs must demonstrate that "'the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that the moving party is

entitled to a judgment as a matter of law.'"  Nieves v. McSweeney, 241 F.3d 46, 49-50 (1st Cir.

2001) (quoting Rule 56(c)).  Summary judgment "should be bestowed *only* when no genuine

issue of material fact exists and the movant has successfully demonstrated an entitlement to

judgment as a matter of law."  Noel v. Town of Plymouth, 895 F. Supp. 346, 350 (D. Mass.

1995) (quoting In re Varrasso, 37 F.3d 760, 762 (1st Cir. 1994) (emphasis added)).  Conclusory

allegations are insufficient.  The moving party must identify specific facts, and "cannot prevail

on its motion for summary judgment if any essential element of its claim or defense requires trial." Lopez v. Corporacion Azucarera de Puerto Rico, 938 F.2d 1510, 1516 (1st Cir. 1991).

Only after "the moving party has properly supported its motion for summary judgment," does "the burden shift[] to the non-moving party, who … must set forth specific facts showing there is a genuine issue for trial.'" Baron v. Hickey, 242 F. Supp.2d 66, 71 (D. Mass. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)). Ultimately, the Court must view the "facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." Barbour v. Dynamics Research Corp., 63 F.3d 32, 36 (1st Cir. 1995).

## B.   Preliminary Injunction

In determining whether to grant injunctive relief, a court must consider and balance four factors: (1) whether the movant has exhibited a likelihood of success on the merits of its claims; (2) whether the movant risks irreparable harm if the injunction is not granted; (3) in light of the movant's likelihood of success, whether the injury complained of by the movant outweighs any harm which granting the injunction would inflict on the non-movant; and (4) whether the public interest will be adversely affected by the granting of the injunction. See Concrete Machinery Co. v. Classic Lawn Ornaments, Inc., 843 F.2d 600, 611 (1st Cir. 1988); Montblanc-Simplo GmBH v. Staples, Inc., 172 F. Supp. 2d 231, 234 (D.Mass. 2001).

"'The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies.'" E.E.O.C. v. Astra USA, Inc., 94 F.3d 738, 743 (1st Cir. 1996) (quoting Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 506-07 (1959)). Irreparable harm is proven if, absent the injunction, plaintiffs will "suffer[ ] substantial injury that is not accurately measurable or adequately compensable by money damages." Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 19 (1st Cir. 1996). "A finding of irreparable harm must be grounded

on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." Charlesbank Equity Fund II v. Blinds to Go, Inc., 370 F.3d 151, 162 (1st Cir. 2004). "[A] preliminary injunction is not warranted by a tenuous or overly speculative forecast of anticipated harm." Ross-Simons, 102 F.3d at 19.

## II.    PLAINTIFFS FAIL TO MEET THEIR EVIDENTIARY BURDEN TO SHOW THAT THEY HAVE STANDING

Article III standing –a threshold inquiry that a defendant may raise at any time – is a constitutional requirement for any case to proceed. See Donahue v. City of Boston, 304 F.3d 100, 115 (1st Cir. 2002) (standing is a threshold issue in all cases because it is grounded in the case-or-controversy requirement of Article III); Town of Norwood v. FERC, 202 F.3d 392, 405 (1st Cir. 2000). Plaintiffs bear the burden of establishing that they have standing to pursue this case. See Donahue, 304 F.3d at 116 (plaintiffs "must ensure that [they] establish[] standing for each claim *and for each form of relief sought*") (emphasis added) (citing Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 210-211 (1995)). To establish Article III standing, a plaintiff much demonstrate: (1) actual or threatened injury in fact to a cognizable interest, (2) that the injury is causally connected to the defendant's action, and (3) that the injury can be abated by a remedy the court is competent to provide. See New England Regional Council of Carpenters v. Kinton, 284 F.3d 9, 17 (1st Cir. 2002); see also Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). The burden of a plaintiff to establish standing at the summary judgment stage is considerably higher than at the motion to dismiss stage. See Lujan, 504 U.S. at 561. ("In response to a summary judgment motion . . . the plaintiff can no longer rest on such 'mere allegations' [to establish standing]" but "must set forth my affidavit or other evidence specific facts" (quotation omitted)).

Plaintiffs here cannot meet their burden. They lack standing because they have adduced no evidence that their claimed injury is causally connected to Defendants' actions, and because even if they had, they fail to show that their injuries are redressable by the specific relief sought.

1. <u>Plaintiffs Fail to Establish That They Have Standing to Challenge the March 2002 Police Officer Appointments</u>

In particular, Plaintiffs lack standing to challenge the City of Boston's decision not to hire them for the March 2002 class because Plaintiffs have not shown and cannot show that the City would have reached them on the certification list, much less have hired them, in the absence of the 1975 Castro Decree. Plaintiffs admit that at least 25 non-minorities with statutory preferences would have been considered before Plaintiffs for the 12 spots that were awarded to minorities under the 1975 Castro Decree. (<u>See</u> Ps' SOF ¶ 32; Ints' SOF ¶ 35.) Plaintiffs do not provide evidence that they would have been appointed to, or even considered for, the March 2002 class. (<u>See</u> Ints' SOF ¶ 35.)

Plaintiffs attempt to circumvent this problem by conflating the March 2002 and October 2003 results in paragraph 35 of their SOF. In particular, they state that without the 1975 Castro Decree, "all of the Plaintiffs would have been reachable by at least October 2003." (Ps' SOF ¶ 35.) They make no such statement with respect to the March 2002 class and therefore concede that they would not have been reached. (<u>See id.</u> ¶¶ 32-35.) Further, the purported evidentiary support for the contention that Plaintiffs would have been reached (pp. 54-55 and 69-70 of the McNeely deposition) provides no such support. (<u>See</u> Ints' SOF ¶ 35.) Ms. McNeely testified merely that those with the highest scores are considered first after those with statutory preferences are exhausted. (<u>Id.</u>; <u>see also</u> Ps' SOF Ex. B at pp. 54-55, 69-70.) Ms. McNeely did not state that any Plaintiff would have been reached in the absence of the 1975 Castro Decree for either hiring class, and Plaintiffs' only evidence indicates that 25 non-minorities with statutory

preferences were <u>ahead of them</u> for consideration for 12 slots.  (<u>See</u> Ints' SOF ¶¶ 35; Ps' SOF ¶¶ 32-35.)  Thus, there is *no evidentiary support whatsoever* for the conclusion that any Plaintiff would have been appointed, or even reached, for the March 2002 class.

Further, all 12 of those spots would likely not have been awarded to non-minority veterans even in the absence of the 1975 Castro Decree because of the decrease in diversity on the police force and the adverse impact on minorities that such a result would have produced; to avoid that result, the City would likely have considered alternative constitutional means of achieving diversity.  (<u>See</u> Ints' SOF ¶ 35 n. 5.)  With at least 25 non-minorities with statutory preferences ahead of them and likely some minorities without statutory preferences, there is no circumstance under which the City would  have reached Plaintiffs for consideration for the position of police officer for the March 2002 class in the absence of the 1975 Castro Decree. Therefore, the City's "failure" to consider Plaintiffs is not causally related to the 1975 Castro Decree itself, and Plaintiffs lack standing to challenge the 1975 Castro Decree based on the fact they were neither reached nor hired.  <u>See</u> <u>Lujan</u>, 504 U.S. at 500-61.

Plaintiffs lack standing to challenge the March 2002 hiring decisions of the City and Commonwealth for the additional reason that their claimed injuries are not redressable by an injunction of the use of the 1975 Castro Decree.  <u>Id.</u>  In particular, because Plaintiffs would not have been reached in the absence of the 1975 Castro Decree, enjoining the use of that Decree as Plaintiffs request would not redress their failure to be considered or appointed, and there is no basis upon which the Court may require Plaintiffs to be considered.  (<u>Id.</u>)

2.    <u>Plaintiffs Fail to Establish That They Have Standing to Challenge the October 2003 Police Officer Appointments</u>

Likewise, Plaintiffs have not shown and cannot show that the City would have reached them all, much less have hired them, in the absence of the 1975 Castro Decree for the October

2003 hiring class.  Fourteen non-minorities with statutory preferences were not reached and

would therefore be considered before Plaintiffs for the 12 "slots" awarded to minorities without

statutory preferences pursuant to the 1975 Castro Decree.  (See Ints' SOF ¶¶ 34-35.)  If these

non-minorities were all considered and met the other qualifications, no Plaintiff would have been

reached or hired.  Plaintiffs offer no evidence as to whether there would have been a need to go

beyond the 14 non-minorities with statutory preferences, and, of course, the Court may not infer

that the BPD would have needed to do so.[7]  See Barbour v. Dynamic Research Corp., 63 F.3d 32,

36 (1st Cir. 1995) (court must "view the facts in the light most favorable to the non-moving

party, drawing all reasonable inferences in that party's favor").  Further, even if the BPD

exhausted these fourteen non-minorities without filling all 12 of the slots, the City would not

likely have awarded the slots all to non-minorities due to the resulting decrease in diversity and

adverse impact on minorities.  (Ints' SOF ¶ 35.)  Thus, of the few spots remaining for candidates

without any statutory preference, not all of them (and perhaps few or none of them) would have

gone to non-minorities.  Further, no Plaintiff has adduced evidence that he would have been

hired in the absence of the 1975 Castro Decree and, therefore, that his claimed injury is

redressable by a decision that the 1975 Castro Decree has "expired."  Plaintiffs have thus failed

to meet their burden to establish that they have standing to challenge the October 2003 hiring

class.  At the very least, therefore, a genuine issue of material fact exists as to whether each or

any Plaintiff has standing to pursue this matter, and summary judgment is therefore

inappropriate.

---

[7]    Though Ed Callahan suggested the attrition rate was 50%, this was an estimate; the estimate itself was speculative; and Mr. Callahan made no attempt to determine whether minorities and non-minorities have differing attrition rates.  See Ints' SOF ¶ 25.  Thus, Plaintiffs have not established that they would have been reached.  Indeed, even assuming arguendo the 50% attrition rate, seven of the 14 non-minorities with statutory preferences would have been selected, leaving only five open slots.  Id. ¶ 35.  Given the immediate decrease in diversity that would result in such a result, it is likely that the City would have considered alternative means for hiring, and therefore a genuine issue of material fact exists as to whether any Plaintiff would have been reached or appointed.  (Ints' SOF ¶ 35 n. 5.)

3.    Plaintiffs Lack Standing to Challenge the November 2004 Class

Plaintiffs also lack standing to seek a preliminary injunction with respect to the BPD's

November 2004 hiring class.  In particular, every non-minority who even appears on the April

Certification has a statutory preference and therefore would be reached before Plaintiffs.  (See

Ints' SOF ¶¶ 67-68.)  In addition, 88 applicants have scores higher than all but two of the

Plaintiffs (and 17 applicants are tied with those two Plaintiffs).  (See Ints' SOF ¶ 37.)  Thus,

there is no circumstance under which Plaintiffs will be hired in the absence of the 1975 Castro

Decree, and, accordingly, no causal connection between any failure to be reached or hired and

the claimed injury from the use of the 1975 Castro Decree.  Enjoining the use of the consent

decree, therefore, would not remedy plaintiffs' claimed injury – being neither considered nor

hired for the position of police officer in the November 2004 class.  Plaintiffs' claims must

therefore be dismissed for lack of standing.

III.    **THE 1975 CASTRO DECREE IS A JUDICIALLY-APPROVED AND CONSTITUTIONAL RESPONSE TO RACIAL DISCRIMINATION**

A.    **The 1975 Castro Decree Survives Strict Scrutiny**

"It is well-settled that the Fourteenth Amendment requires strict scrutiny of *all* race-based

action by state and local governments."  Boston Police Superior Officers Federation v. City of

Boston, 147 F.3d 13, 19 (1st Cir. 1998) (citing Adarand Constructors, 515 U.S. at 222).  To

survive strict scrutiny, government actions based on racial classifications must (1) be justified by

a compelling government interest; and (2) be narrowly tailored to achieve the compelling

interest.  See City of Richmond v. J.A. Croson Co., 488 U.S. 469, 505 (1989).

"When race-based action is necessary to further a compelling governmental interest,

such action does not violate the constitutional guarantee of equal protection so long as the

narrow-tailoring requirement is also satisfied."  Grutter v. Bollinger, 539 U.S. 306, 327 (2003).

The Supreme Court of the United States has consistently recognized that use of racial

- 18 -

classifications for the purpose of remedying the effects of past discrimination is a compelling

government interest permissible under the Equal Protection Clause of the United States

Constitution and under Title VII.[8]  See Croson, 488 U.S. at 493; Wygant v. Jackson Bd. of

Educ., 476 U.S. 267, 274 (1986).  Here, it is undisputed that the purpose of the 1975 Castro

Decree is to remedy the effects of past discrimination against Blacks and Hispanics and therefore

the Decree serves a compelling state interest.  See SJ Br. at 9; Castro I, 334 F. Supp. at 935-936;

Castro II, 459 F.2d at 738.  See also Stuart v. Roache, 951 F.2d 446, 449 (1st Cir. 1991)

(affirming promotions consent decree as narrowly tailored to remedy past police department

discrimination); Mackin v. City of Boston, 969 F.2d 1273, 1275 (1st Cir. 1992). The only issue is

whether the 1975 Castro Decree is narrowly tailored to achieve that goal.  Plaintiffs themselves

admit that the decree, "when entered," was narrowly tailored.  (See SJ Br. at 10.)

By admitting that the 1975 Castro Decree "was constitutionally permissible when

entered" (SJ Br. at 10), Plaintiffs acknowledge – as they must – that the purpose of Defendants'

use of race conscious measures is to remedy the effects of past discrimination (see id. at 9)

(admitting that the 1975 Castro Decree was entered "to remedy the racially discriminatory results

of the written entrance examination for police officers"), and that the 1975 Castro Decree was

narrowly tailored to achieve its goal.  (Id. at 10.)  Because they do not and cannot dispute that all

parties to the 1975 Castro Decree have calculated parity in precisely the same way since the

Decree was entered (Ints' SOF ¶¶ 54-57), Plaintiffs contend that the definition of parity set forth

---

[8]    In Grutter v. Bollinger, the Supreme Court last year reaffirmed the use of race-based classifications to promote diversity and concluded that a diverse student body can be a compelling government interest.  539 U.S. at 345. Similarly, courts have recognized the importance of a diverse police force to effective police enforcement.  See, e.g., Petit v. City of Chicago, 352 F.3d 1111, 1115 (7th Cir. 2003) (finding compelling need for diversity in metropolitan police force because, inter alia, "[e]ffective police work…requires that the police have the trust of the community and they are more likely to have it if they have 'ambassadors' to the community of the same [race or] ethnicity"); Reynolds v. City of Chicago, 296 F.3d 524, 529-30 (7th Cir. 2002) (same); Barhold v. Rodriguez, 863 F.2d 233, 238 (2d Cir. 1988) (in challenge to a transfer and reassignment policy which was based in part on race and gender, the Court found that a compelling state interest is the "operational need" of the Correctional Division for a balanced workforce).

unambiguously in the Decree is (1) other than those plain terms indicate and (2) unconstitutionally overbroad.  (See SJ Br. at 9-16.)  Plaintiffs' first argument fails as a matter of law and fact, and their second argument cannot by squared with the very Quinn decision that they claim should otherwise control the outcome of this case.

        1.     The Proper Calculation of Parity

        a.)    The numerator:  meaning of "complement of Black and Spanish surnamed post-probationary police officers"

Plaintiffs' contention that the Quinn decision requires the conclusion that parity in the BPD must be calculated based on the percentage of minority patrolmen is without foundation. Plaintiffs offer no basis for this conclusion other than their unsupported contention that the consent decree in the Quinn case, involving the Boston Fire Department, was "similar" to the consent decree here.  In fact, although both decrees use the same "complement" and "commensurate with" language, the Quinn court concluded that term firefighter used in the consent decree was limited to entry-level positions because within the fire department, "the term 'firefighter' carries with it specific duties, responsibilities and privileges," as distinguished from the titles fire lieutenant, fire captain, and district fire chief.  See Quinn, 325 F.3d at 31.

Here, by contrast, the term "police officers" in the consent decree is not so limited. Consistent with common practice, the BPD does not use the term "police officers" to apply only to entry-level police officers.  To the contrary, the BPD has a specific term – "patrolman" – to apply to entry-level police officers, and uses the term "police officer" to refer to all uniformed police personnel.  See, e.g., Ints' SOF ¶ 59.  The "common-sense reading of the verbiage chosen by the parties and approved by the district court" is the meaning that the BPD has always ascribed to the term – *all* police officers.  See Quinn, 325 F.3d at 35.  Further, since the 1975 Castro Decree was entered, the parties to it have *always* interpreted "post-probationary police

officers" as meaning *all* tenured police officers, not merely tenured entry-level police officers or patrolmen.  See Mackin, 969 F.2d at 1276 ("Few things evidence a decree's meaning more persuasively that an immutable, decade-old pattern of past practice under the decree, consensually engaged in by all sides in the underlying litigation that produced the decree.").

This situation here is therefore starkly different from Quinn, where the court found that the defendants' interpretation of "firefighter" to include all fire department personnel was "first inaugurated … thirteen years after the entry of the [consent] decree …, and never directly challenged, [in order] to change the meaning of plain language and thus to validate an implausible interpretation."  Quinn, 325 F.3d at 35.  Here, as in Mackin, the "common sense reading" of the term "police officer" does not change the meaning of plain language but rather confirms it, and, moreover, such interpretation has not been "first inaugurated" years after the decree but, instead, has always been used in connection with the decree.  Compare id. with Ints' SOF ¶¶ 54-57.  Therefore, the BPD's customary usage of the term "police officer," the plain meaning of the term itself, and the parties' course of performance over the life of the 1975 Castro Decree indicate that the meaning of this term is not limited to patrolmen.  Compare Quinn, 325 F.3d at 34-35.  Indeed, the Castro court's use of the term "patrolmen" in the same opinion in which it entered the consent decree that *does not use that term* further supports the conclusion that the parties to the 1975 Castro Decree intended for "police officer" not to be limited to "patrolman."  Compare Quinn (where court noted consistent use of term "firefighter" by court in both opinion and in consent decree).

> b.)    The denominator:  meaning of "within the community"

After insisting that Quinn must dictate the results in this case, Plaintiffs do an about-face when it comes to how the "denominator" of the parity calculus is measured.  Plaintiffs contend that Quinn's conclusion – that the plain and unambiguous terms of a consent decree requiring

that the complement of minorities be "commensurate with the percentage of minorities within the community" preclude use of a "qualified labor pool" analysis – does not control here.  (SJ Br. at 13-16.)  If that language is unambiguous in <u>Quinn</u>, it is unambiguous here; the language is exactly the same.  <u>Compare</u> <u>Quinn</u> <u>with</u> Ps' SOF Ex. 2 (1975 Castro Decree) ¶ 18.

Plaintiffs' suggestion that the word "community" cannot "be taken to mean anything more specific" does not withstand scrutiny.  Had the parties to the 1975 Castro Decree meant the phrase to refer to "the community of individuals from whom police officer candidates may be drawn," as Plaintiffs suggest (SJ Br. at 14), they would and could have said so.  Importing such language would effectively rewrite the terms of the 1975 Castro Decree.  The findings of fact regarding discrimination in <u>Castro I</u> were based on a comparison of the number of police officers in the BPD to the number of minorities in the Boston community.  <u>See</u> <u>Castro I</u>, 334 F. Supp. at 935-36.  These findings and the legal conclusion of discrimination were affirmed on appeal by the First Circuit.  <u>See</u> <u>Castro II</u>, 459 F.2d at 738; <u>see also</u> <u>Castro III</u>, 365 F. Supp. at 655.  That was the injury that the 1975 Castro Decree addressed, and that was the context of the term "community."  Further, even if the consent decree is ambiguous, then the most relevant evidence of the meaning of the terms of the decree is the course of performance of the parties to that agreement.  <u>See</u> <u>Quinn</u>; <u>Mackin</u>.  The evidence is uncontroverted that the parties viewed the community as being the relevant city or town.  (Ints' SOF ¶¶ 54-57.)  Just as the court found in <u>Quinn</u>, the appropriate basis for comparing the number of minorities in the BPD (whether to all police officers or patrolmen only) is the percentage of minorities in the City of Boston.  <u>Quinn</u>, 325 F.3d at 35-36.

2.    <u>Calculating Parity Based on the Minority Population of Boston is Not Overbroad</u>

Contrary to Plaintiffs' claims, calculating parity based on the minority population of Boston satisfies the narrow tailoring requirement described in <u>City of Richmond v. J.A. Croson Co.</u>  Indeed, the First Circuit has already explained, in evaluating the same "within the community" language under the <u>Beecher</u> firefighter consent decree, that that calculation is narrowly tailored.  <u>See</u> <u>Mackin</u>, 969 F.2d at 1278-79.  In <u>Mackin</u>, the Court emphasized that in determining whether a remedial order is narrowly tailored, a significant measure of deference is owed to the trial court's conclusion that a particular kind of relief is essential to heal a constitutional wound.  <u>Id.</u> at 1277 (citing <u>United States v. Paradise</u>, 480 U.S. 149, 138 (1982) (plurality opinion)).  The court explained that in assessing an overbreadth challenge to an order directing race-conscious relief in the context of public employment, courts should consider the extent to which (i) the beneficiaries of the order are specially advantaged; (ii) the legitimate expectancies of others are frustrated or encumbered; (iii) the order interferences with other valid state or local policies; and (iv) the order contains (or fails to contain) built-in mechanisms which will, if time and events warrant, shrink its scope and limit its duration.  <u>Id.</u> at 1278.

Applying these factors, the <u>Mackin</u> court concluded that a consent decree calling for parity to be measured based on a comparison of the percentage of minority firefighters to the percentage of minorities in the population of Boston as a whole was narrowly tailored.  <u>Id.</u> at 1277-79.  The same analysis applies here and dictates the same result.  In particular, here, as in <u>Mackin</u>, only *qualified* minority applicants are "specially advantaged" under the 1975 Castro Decree;[9] no minority candidate for entry-level police officer is placed on an eligibility list unless

---

[9]    Given the ongoing disparate impact to minorities with respect to the highest test scores, it can hardly be considered that the very mechanism for addressing this disparity "specially advantages" minorities; to the contrary, it simply removes the special advantage enjoyed by non-minorities.  (<u>See</u> Ints' SOF ¶ 60.)

he or she has attained a passing score on the entrance examination.  See Mackin, 969 F.2d at 1278; compare Ps' SOF Ex. 2.  This is an important indicium of narrow tailoring.  Mackin, 969 F.2d at 1278.  Also as in Mackin, the 1975 Castro Decree does not require that minority aspirants be appointed, nor does it dispense with the statutory preferences mandated by state law.  Id.; compare Ps' SOF Ex. 2 .  Thus, the decree gives only a limited advantage, not a guarantee of employment, to minority applicants.  "This, too, is a significant factor."  Mackin, 969 F.2d at 1278.  Moreover, "as a result of these features it can appropriately be said that the [Castro] decree 'is not being used simply to achieve and maintain racial balance, but rather as a benchmark against which the court could gauge…efforts to remedy past discrimination.'"  Id.  Indeed, the 1975 Castro Decree does not call for maintaining racial balance.  (See Ps' SOF Ex. 2.)

In addition, here, as in Mackin, any failure to appoint high-scoring non-minority applicants under the 1975 Castro Decree "disturbs no legitimate, firmly rooted expectations on the part of those applicants."  Id.  The record here (as there) shows that, when Plaintiffs sought appointment to the BPD, there were few, if any, vacancies for candidates without statutory preferences in either March 2002 or October 2003, and there were 324 candidates with perfect test scores, of whom 289 were non-minorities.  See Ints' SOF ¶ 35 and Exs. C and E.  "Hence, irrespective of the decree, [plaintiffs] could not reasonably have felt assured they would be appointed.  This factor, too, counsels in favor of upholding the decree."  Mackin, 929 F.2d at 1278 (citing Stuart, 951 F.2d at 449 (affirming consent decree in police promotion case as narrowly tailored)).  Finally, the 1975 Castro Decree's life is limited, remaining in force only until its requirements have been met.  Id.; see also Castro III, 365 F. Supp. at 660-62 (providing for release from appointment process mandated by decree "[a]s a city or town achieves a

complement of minorities commensurate with the percentage of minorities within the community").

Moreover, Plaintiffs' "eligible labor pool" argument fails for the additional reason that the First Circuit revisited the narrow tailoring issue in Quinn and concluded that "within the community" – interpreted as the population of Boston as a whole – satisfies Croson.[10]  Though Plaintiffs suggest that Croson itself requires adoption of the "eligible labor pool" in the parity calculus, Quinn – as well as Croson itself – makes clear that Plaintiffs are wrong.  The Quinn court noted that the firefighter decree (like the 1975 Castro Decree) "unambiguously requires the use of the percentage of minorities in the general population as the second variable for gauging discriminatory patterns in entry-level hiring" and that that requirement "is fully consistent with … Croson."  Quinn, 325 F.3d at 36.  The Court determined that the firefighter position is "of the type contemplated by the Croson court," i.e., the position falls within the category of "certain entry level positions requiring minimal training, [and thus] statistical comparisons of the racial compositions of the relevant population may be probative of a pattern of discrimination."  Id.  The same result should obtain here:  the language of the 1975 Castro Decree unambiguously requires the use of the percentage of minorities in the general population, and the minimal qualifications necessary to be considered for the position of police officer permit the sort of statistical comparison with the population as a whole in order to gauge the efforts to remedy past discrimination, just as Croson contemplates.

---

[10]     Contrary to Plaintiffs' claims, *stare decisis* is not the sole basis on which the Quinn court upheld the decree as narrowly tailored.  The court found that even in the absence of *stare decisis*, the decree would be constitutional because it was narrowly tailored consistent with Croson.  See Quinn, 325 F.3d at 36.

## IV.     THE 1975 CASTRO DECREE HAS NOT EXPIRED, AND CANNOT EXPIRE, "BY ITS OWN TERMS"

### A.     Parity Has Not Been Achieved

Parity has not been achieved whether the "numerator" of the algorithm is calculated as the parties to the 1975 Castro Decree always have done (based on the percentage of minority tenured police officers) or whether it is calculated based on minority patrolmen.  (See Ints' SOF ¶¶ 43-44.)  Under any measure, parity had not been reached as of April 2000, April 2001, March 2002, or October 2003, and still has not been reached today, because the percentage of minorities in either the entire BPD or at the patrolman rank is well below 40.12%.  Id. ¶¶ 43-44.

In Quinn, the First Circuit described the calculus for release under the consent decree governing the hiring of firefighters as "rough parity".  325 F.3d at 37.  Plaintiffs latch on to this phrase to suggest that parity has been achieved if there is a "less than four (4) percent difference in minority composition of the entry-level police officers and the general population."  (SJ Br. at 12.)  Nothing in the Quinn decision suggests that parity, or even "rough parity" is defined based on a "4% or less" rule.  See generally Quinn, 325 F.3d at 37 (determining parity had been reached because percentage of minorities in firefighter ranks exceeded the percentage of minorities in the Boston population).  Plaintiffs appear to have settled upon this number because it happens to be the differential between the percent of minority entry-level police officers and their incorrect calculation of the total number of minorities in the City of Boston based on the census data.  (See SJ Br. at 12.)  But there is no basis under the 1975 Castro Decree itself, under Quinn, or under any case law for this Court to adopt Plaintiffs' self-serving and arbitrary measure.  To the contrary, the 1975 Castro Decree's use of the phrase "commensurate with" precludes the adoption of such a rule, as a 4% differential cannot be considered "equal in measure or extent."  See Merriam-Webster Online Dictionary, at http://www.m-w.com; see also

Modern Office Dictionary (Random House Webster 1999) at 76-77 (defining commensurate as "1. having the same measure. 2. corresponding in amount, magnitude, or degree."). In the absence of parity, of course, the 1975 Castro Decree cannot "expire," as it still has not fulfilled its purpose with respect to the City of Boston. Plaintiffs' claims therefore fail as matter of law, and summary judgment should be denied to Plaintiffs and awarded in favor of Defendants and the Intervenors.

### B.    The 1975 Castro Decree's Age Does Not "Dictate its Demise"

Plaintiffs offer no legal authority in support of their novel alternative argument that the 1975 Castro Decree has "expired due to the passage of time." (See SJ Br. at 16-17.) This is not surprising, since the case law is to the contrary. See, e.g., Brown v. Philadelphia Housing Authority, 237 F. Supp. 2d 567, 576 (E.D. Pa. 2002), rev'd on other grounds, 350 F.3d 388 (in considering 30 year-old consent decree, the court held that "the mere passage of time, however, does not warrant vacating a consent decree if its prospective application is still equitable"); Greene v. Amer. Cast Iron Pipe Co., 871 F. Supp. 1427, 1432 (N.D. Ala. 1994) (determining that consent decree the parties entered into 14 years previously was still binding, and stating that the mere passage of time does not render an injunctive order or consent decree void).

The logical (indeed, required) endpoint of a consent decree is when its purpose has been achieved. See Mackin, 969 F.2d at 1278 ("[T]he [Consent] decree's life is limited, remaining in force until its requirements have been met . . . ."). Any other result would enable parties to a consent decree to avoid compliance through delay, and then to be released from its requirements based on the passage of time.

The undisputed facts demonstrate that the BPD has not, in fact, achieved parity. (Ints' SOF ¶¶ 43-44.) It is likewise undisputed that the eleven other communities still subject to the

1975 Castro Decree have not achieved parity.  (Id. ¶ 58.)  Accordingly, the 1975 Castro Decree

has not yet achieved its purpose, and must remain in effect.  See Mackin, 969 F.2d at 1278.

      C.     **The 1975 Castro Decree Cannot "Expire By Its Own Terms"**

Plaintiffs' argument that the 1975 Castro Decree could "expire by its own terms" ignores

the terms of the Decree itself.  The 1975 Castro Decree is clear that expiration of the Decree or

exemption from its constraints is not automatic and that regardless of the BPD's composition, the

1975 Castro Decree must stay in effect until all the remaining communities still subject to it have

achieved parity.  (Ints' SOF ¶ 53.)  Thus, even if Plaintiffs could establish that the BPD has

achieved parity – which the Plaintiffs cannot do because the evidence is to the contrary – the

1975 Castro Decree could not be deemed to have "expired," as Plaintiffs have presented no

evidence regarding whether the other communities still subject to it have achieved parity.

**V.**     **PLAINTIFFS ARE NOT ENTITLED TO A PRELIMINARY INJUNCTION**

As a threshold matter, Plaintiffs lack standing to seek a preliminary injunction and their

motion must be denied on that ground alone.  (See discussion supra Section II.)  Even if they

could show standing, however, their motion would still fail because Plaintiffs meet none of the

requirements for granting a motion for preliminary injunction.

      A.     **Plaintiffs Will Not Succeed on the Merits of Their Claims**

For the reasons set forth in Section II above, Plaintiffs will not succeed on the merits of

their claims.  The Intervenors here have done more than raise a genuine issue of material fact

regarding whether parity has been achieved.  They have demonstrated – with Plaintiffs' own

evidence – that parity has not been reached.  As Plaintiffs' argument centers on the assumption

that the 1975 Castro Decree has expired because parity has been achieved, and their alternative

argument that the 1975 Castro Decree must "expire" because it is old regardless of whether its

purpose has been achieved is without legal foundation, Plaintiffs are not likely to prevail on the merits.

**B.     Plaintiffs Will Not Suffer Irreparable Harm Without a Preliminary Injunction**

Plaintiffs have not met their burden of showing that they will suffer irreparable harm absent a preliminary injunction. Their considerable delay in seeking injunctive relief proves that their alleged injuries are not "irreparable" in nature. Furthermore, the only specific harms Plaintiffs do identify – loss of pay, benefits, and opportunities for advancement – are monetary in nature, boiling down to temporary loss of pay and benefits, and do not meet the heightened requirement that irreparable harm be "genuinely extraordinary." Finally, Plaintiffs' attempt to create a presumption of irreparable harm by expanding the First Circuit's application of Elrod v. Burns is unprecedented and has no application here.

> **1.     Plaintiffs' Delay in Seeking Injunctive Relief Demonstrates Lack of Irreparable Harm**

Despite Plaintiffs' claim that "delays of any kind reflect an undeniable an irremediable harm," they waited almost two years after being denied appointment to the BPD in March 2002 to file their complaint. Indeed, Plaintiffs did not file their complaint until after they were not selected a *second* time in October 2003, and even then, waited another six months after filing their complaint before they moved for a preliminary injunction. Certainly, if Defendants' continued use of the 1975 Castro Decree were causing "irreparable harm" to Plaintiffs, they would have initiated this action before the October 2003 hiring cycle and, in any event, would not have waited two years to file this motion for preliminary injunction. See Morales-Narvaez v. Rossello, 1995 U.S. App. LEXIS 26064, *5 (1st Cir. Sept. 13, 1995) (overturning a preliminary injunction for lack of irreparable harm because, where plaintiffs waited to file their complaint

until three months after the allegedly unconstitutional employment decision took effect, the delay

"undercut[] the claimed irreparable nature of their injury").

        2.    <u>The Harms Identified By Plaintiffs Are Monetary in Nature and Do Not Merit Injunctive Relief</u>

The First Circuit held in <u>Gately v. Commonwealth of Massachusetts</u>, 2 F.3d 1221 (1st

Cir. 1993), that "irreparable harm is a critical element of injunctive relief in federal court;" and

that "temporary loss of income… [does] not amount to a sufficient showing of irreparable harm."

<u>Id.</u> at 1230-32 (citing <u>Sampson v. Murray</u>, 415 U.S. 61 (1974), and cases interpreting <u>Sampson</u>).

<u>See</u> <u>also</u> <u>DeNovellis v. Shalala</u>, 1996 U.S. Dist. LEXIS 21973, *5-*8, *19-*21 (D. Mass. Sept.

30, 1996) (Saris, J.) (denying a preliminary injunction based on <u>Gately</u> and holding that,

although <u>Gately</u> affirmed a preliminary injunction, it nonetheless imposes on district courts a

heightened requirement that the harm alleged must be "genuinely extraordinary" and "more than

a mere temporary loss in pay") (internal citations omitted), <u>aff'd</u>, 135 F.3d 58 (1st Cir. 1998).

Plaintiffs insist that a preliminary injunction is necessary to prevent loss of "pay, union

seniority rights and benefits, and even their ability to accrue years of service to collect retirement

benefits." SJ Br. at 21. These requests for pay and enhanced benefits are purely monetary in

nature, and are fully compensable with money damages. Even those aspects of employment for

which plaintiffs claim there is no financial compensation – such as "being able… to sit for an

exam to advance into a detective or sergeant position" – can be easily reduced to a monetary

value based on differentials in pay over the course of a career.[11] Plaintiffs' mere dreams of

---

[11]    The First Circuit has upheld a trial court's denial of a preliminary injunction where plaintiffs did not provide sufficient evidence from which it could determine the magnitude or irremediable nature of their alleged injury. <u>Morales-Nervaez</u>, 1995 U.S. App. LEXIS 26064 at *5-6 (affirming trial court's denial of preliminary injunction where plaintiffs' failure to provide details of comparative employment precluded the court from "determine[ing] the magnitude of harm they claim to have suffered"). Plaintiffs have not provided detailed information about their current positions and salaries. Further, while several Plaintiffs have submitted affidavits indicating that they are currently employed as police officers in other municipalities or work for the BPD or District Attorney's Office in another capacity, none of these Plaintiffs has addressed the degree to which seniority or pension eligibility in their current jobs might be transferable in the event that they were selected for the Boston police force.

becoming Boston police officers and climbing through the ranks do not present a cognizable legal right sufficient to trigger the extraordinary relief of a preliminary injunction.[12] In sum, Plaintiffs' allegations boil down to a claim for temporary, recoverable loss of pay, which does not merit injunctive relief under <u>Gately</u>.

<div style="text-align: center;">3.     <u>Plaintiffs' Constitutional Allegations Do Not Create a Presumption of Irreparable Harm</u></div>

Plaintiffs cite <u>Elrod v. Burns</u>, 427 U.S. 347, 373 (1976), and <u>American Civil Liberties Union of Kentucky v. McCreary Cty.</u>, 354 F.3d 438, 445 (6th Cir. 2003), for the proposition that "irreparable harm is presumed if a constitutional right is being threatened or impaired." In fact, the holding in <u>Elrod</u> – which protected public employees not involved in policy-making from adverse employment action based on political affiliation or expression – was explicitly limited to employees whose *First Amendment* rights were threatened. Indeed, the hundreds of District of Massachusetts and First Circuit cases citing <u>Elrod</u> reflect this limitation. See, <u>e.g.</u>, <u>Bl(a)ck Tea Society v. City of Boston</u>, 2004 U.S. App. LEXIS 15778 (D. Mass. July 30, 2004); courts in this jurisdiction have not applied <u>Elrod</u> in cases involving racial discrimination. Even <u>ACLU v. McCreary</u> – decided by the Sixth Circuit – is, itself, a First Amendment case involving religious displays in public schools and courthouses, and therefore has no application here.

Nothing in <u>Elrod</u> suggests that it may be extended to create a presumption of irreparable harm in *any* case alleging a constitutional violation, and this Court should not expand the well-settled reading of <u>Elrod</u> to apply such a presumption here.

---

[12]     In denying a college professor's motion for preliminary injunction reinstating her to the position of chairperson of her department, the First Circuit noted that: "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." <u>Kruger v. Cressy</u>, 2000 U.S. App. LEXIS 67 (1st Cir. Jan. 4, 2000) (quoting <u>Board of Regents v. Roth</u>, 408 U.S. 564, 577 (1972) (holding that non-tenured public employees have no property right to their positions).

C.    **The Balance of the Equities Tips Against Plaintiffs and in Favor of Defendants and Intervenors**

The balance of the equities weighs heavily against granting Plaintiffs' request for preliminary injunctive relief.  The harms to the Intervenors and to Defendants if the Court grants the requested injunction easily override any potential harm to Plaintiffs in the absence of such relief.

As Plaintiffs themselves concede, the only potential harms they might suffer consist of money damages, lost time, and resulting limitations in their careers.  (See SJ Br. at 21.)  To the extent they exist, such harms are quantifiable and can be easily redressed after a decision on the merits by awarding damages and/or seniority credit.  However, the police exam upon which Plaintiffs base their claims of job entitlement actually *discriminates in their favor*.  See Ints' SOF ¶ 60.  As the 1975 Castro Decree serves to correct this discriminatory impact, any "harm" that Plaintiffs might sustain absent an injunction is not discriminatory treatment, as they suggest, but rather the loss of unfair advantage conferred on them by the police entrance exam.[13]  The police exams taken by the Plaintiffs have not been validated as complying with statutory and EEOC guidelines with respect to scoring.  In practice, the only applicants without a statutory preference who have any chance of being considered for police officer based on the entrance examinations are those who achieve the very highest test scores.[14]  Because the adverse impact on minority

---

[13]    Thus, though the non-minority Plaintiff candidates would have the Court believe that they are being denied employment as Boston police officers because of their race, they are the ones who have benefited from obtaining high scores on a test that discriminates *in their favor.*  Any harm to these candidates from the operation of the 1975 Castro Decree must be balanced against the harm to Black and Hispanic officers resulting from the adverse impact of the civil service exam.

[14]    The 1975 Castro Decree precludes HRD from administering entry-level civil service exams for police officers unless they have determined that such exams have no adverse impact on minority applicants or have been validated in accordance with the Testing Guidelines of the Equal Employment Opportunity Commission ("EEOC"), 29 C.F.R. §1607.4.  The EEOC Testing Guidelines approve the use of a "four-fifths test" for measuring adverse impact.  If the passing rate of African-American and Hispanic applicants is less than 80% of the passing rate of white applicants, the test is presumptively discriminatory and must be validated.  For purposes of considering applicants without a statutory preference, however, the adverse impact at the passing rate is irrelevant.  The only candidates who are considered are those with perfect or near perfect scores.  (See Ints' SOF ¶¶ 64-65.)  At those scores, the adverse impact is considerable, and cannot pass the "four-fifths test."  (See id.)

applicants increases as the scores get higher (those with the highest scores are predominantly non-minority), the disparate impact of the test at the relevant level of performance is so significant as to create a virtual barrier to entry for minority applicants.  See Ints' SOF ¶¶ 64-66. That barrier has not been shown to be job related or valid so as to justify its application.  Thus, the only potential harm to Plaintiffs from enjoining the 1975 Castro Decree is the loss of an unfair advantage.

By contrast, the corresponding harm to the Intervenors – minority applicants for positions in the BPD and minority law enforcement officers in Boston – is severe.  The relief Plaintiffs seek is not merely that they be considered for and hired into positions within the BPD themselves; rather, Plaintiffs ask this Court to enjoin the City of Boston from using its current method of hiring police candidates.  The balance of harms must thus consider the impact on those whom such a far-reaching injunction would affect.

With respect to minority applicants for the police force, if Plaintiffs' requested injunction is granted, police candidates would be hired in strict order of test score unless Defendants adopt other constitutionally permissible means of achieving diversity.  (See Ints' SOF ¶ 35; Ps' SOF ¶ 35.)  As described above, in the absence of such adoption, the discriminatory impact of the police entrance exam on minorities would effectively bar significant numbers of minority candidates from admission to the police force.  (See Ints' SOF ¶ 64-66 (citing Moore Aff. ¶ 19 (describing the negative effect on the population of the Boston police force if the 1975 Castro Decree were to be invalidated).).

Minority law enforcement officers within the BPD will also be harmed if the requested injunction is granted.  Absent the 1975 Castro Decree, the percentage of minorities in the BPD will decrease.  (See e.g., Ints' SOF ¶¶ 65-66.)  As the minority population on the police force

decreases, minority police officers may suffer the well-known harms that have long been associated with such racial imbalance – unfavorable working conditions, a tense racial climate, unwarranted or disproportionate disciplinary action, and limitations on advancement.  See id. ¶ 70 and Exs. G, H.

The harms of an injunction to Defendants, the City of Boston and the Commonwealth of Massachusetts, are equally severe.  First, it is well-documented that police forces can more effectively police minority communities with a diverse police force.  (See infra Section V.D.)  Without the 1975 Castro Decree, the percentage of minority officers will decrease and the City and the Commonwealth will experience limitations in the effectiveness of their policing, which may have widespread consequences on crime rates and community harmony.  Furthermore, if Plaintiffs' request is granted, the City and Commonwealth will face the burden of adopting a new system of hiring for Boston police officers.  If selection were made on the basis of strict rank order of scores on a discriminatory test, the City and the Commonwealth may very likely be faced with a constitutional challenge by minority candidates based on the adverse impact of their police exam, and the constitutionality of the appointment process would once again be at issue. The City and Commonwealth could avoid such a legal challenge by establishing a new selection process that does not adversely impact minority applicants, but developing such a selection process would require allocation of time and money – an unnecessary expenditure if the Plaintiffs do not ultimately prevail on the merits.  These harms to the City and the Commonwealth weigh heavily against injunctive relief.

Clearly, the significant harms to Intervenors and Defendants would outweigh the minimal potential harms that Plaintiffs could theoretically sustain in the absence of injunctive relief.

**D.** **Denial of Plaintiffs' Motion for a Preliminary Injunction is in the Public Interest**

      1.    A Diverse Police Force Reflective of the Community is in the Public Interest

A preliminary injunction would also adversely affect the public interest, and should be denied on that ground as well. Without the 1975 Castro Decree, the public will be deprived of hiring practices that have served to promote necessary diversity on the police force. As the Castro court itself recognized, the existence of a diverse police force reflective of the community as a whole is in the public interest. See Castro III, 365 F. Supp. at 659 ("A policeman of one background communicates more easily with persons who share his background, or whose background is familiar to the policeman … *considerations of that nature make it desirable in the public interest that, in their important role in the governance of society, policemen should be drawn from all groups*.") (emphasis added); see also Petit v. City of Chicago, 352 F.3d 1111, 1115 (7th Cir. 2003) ("Effective police work…requires that the police have the trust of the community and they are more likely to have it if they have 'ambassadors' to the community of the same [race or] ethnicity."). With the minority population growing in the City of Boston, the importance of and need for a diverse police force has only increased since entry of the 1975 Castro Decree, and in there exists a "compelling need for diversity a large metropolitan police force charged with protecting a racially and ethnically divided major American City." Petit, 352 F.3d at 1114; cf. Grutter, 539 U.S. at 332 ("Effective participation by members of all racial and ethnic groups in the civic life of our Nation is essential if the dream of one nation, indivisible, is to be realized.") The injunction Plaintiffs seek will adversely affect this compelling public need by prohibiting hiring practices that promote diversity on the police force, and therefore must, as a matter of equity, be denied.

2.     <u>Remedying Past Discrimination is in the Public Interest</u>

Without question, remedying past discrimination is in the public interest, as it is "one goal sufficiently important to justify the use of affirmative action in public employment." <u>Boston Police Superior Officers Federation v. City of Boston</u>, 147 F.3d 13, 19 (1st Cir. 1998) (collecting cases); <u>see</u> <u>e.g.</u>, <u>Croson</u>, 488 U.S. at 493 (compelling state interest in remedying past discrimination). As discussed <u>supra</u>, the 1975 Castro Decree has not achieved its narrowly tailored and constitutionally permissible goal of remedying "present effects of past discrimination." <u>NAACP v. Beecher</u>, 371 F. Supp. 507, 520 (D. Mass. 1974). Therefore, granting the preliminary injunction Plaintiffs seek will deprive the public of the benefits of a consent decree designed to remedy historical discrimination in the hiring practices of the BPD before the Decree has achieved its purpose.

## CONCLUSION

For the foregoing reasons, Intervenors respectfully request the Court to issue an order (1) denying Plaintiffs' motion for summary judgment in its entirety; (2) denying Plaintiffs' motion for preliminary injunction; (3) granting summary judgment in favor of Defendants and Intervenors; and/or (4) dismissing this case in its entirety for lack of standing.

<div style="margin-left:40%;">

BOSTON BRANCH OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE and MASSACHUSETTS ASSOCIATION OF MINORITY LAW ENFORCEMENT OFFICERS,

By their attorneys,

/s/ Christopher R. Noyes

_____

Harry T. Daniels (BBO #113800)
Mark D. Selwyn (BBO #565595)
Jennifer L. Carpenter (BBO #647214)
Christopher R. Noyes (BBO #654324)
christopher.noyes@wilmerhale.com
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, Massachusetts 02109
(617) 526-6000

Robin L. Alperstein (*pro hac vice*)
Wilmer Cutler Pickering Hale and Dorr LLP
300 Park Avenue
New York, New York  10022
(212) 937-7200

Nadine Cohen (BBO #090040)
Lawyers' Committee For Civil Rights
  Under Law of the Boston Bar Association
294 Washington Street, Suite 443
Boston, Massachusetts  02108
(617) 482-1145

</div>

Dated:  September 3, 2004

## <u>CERTIFICATE OF SERVICE</u>

I, Christopher R. Noyes, hereby certify that a copy of the foregoing has been served via

e-mail and by hand this 3rd day of September, 2004 to the following attorneys of record:

Harold L. Lichten, Esq.
Pyle, Rome Lichten & Ehrenberg, P.C.
18 Tremont Street, Suite 500
Boston, MA  02108

Stephen G. Cox, Esq.
City of Boston
Boston City Hall, Room 615
Boston, MA  02201

Betsy Facher, Esq.
Office of the Legal Advisor
Boston Police Department
One Schroeder Plaza
Boston, MA  02120

Robert L. Quinan, Jr., Esq.
Attorney General's Office
One Ashburton Place, Room 2019
Boston, MA  02108-1698

<u>/s/ Christopher R. Noyes</u>

Christopher R. Noyes

- 38 -
BOSTON 1980226v5