UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

PAUL DELEO, JR., *et al.*,

Plaintiffs,

v.

CITY OF BOSTON, *et al.*,

Defendants.

CIVIL ACTION
NO. 03-12538-PBS

**THE COMMONWEALTH DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT AND/OR FOR PRELIMINARY INJUNCTION**

I.    INTRODUCTION

       The Commonwealth defendants (hereinafter, "Human Resources Division" or "HRD")

oppose Plaintiffs' Motion for Summary Judgment and/or for Preliminary Injunction ("Pl.

Motion").  This is a "reverse discrimination" lawsuit in which Caucasian males allege that they

were illegally denied employment as entry-level police officers with the Boston Police

Department ("BPD") on account of their race and gender.  Specifically, plaintiffs challenge

defendants' adherence to a federal-court consent decree ("Castro decree") designed to remedy

past discrimination against blacks and Hispanics (together, "minorities") by facilitating the

hiring of minority police recruits.  Plaintiffs further challenge Boston's hiring of female police

officers from an all-women list of candidates.  Plaintiffs allege they are entitled to summary

judgment, or, in the alternative, to a preliminary injunction "requiring the Commonwealth and

the City to cease and desist from using race and/or gender in its hiring process for the City of

Boston Police Department and requiring the City of Boston to immediately consider the

Plaintiffs for positions as police officers."  Pl. Motion at 3.

Plaintiffs' motion should be denied. Plaintiffs have no likelihood of success on the merits. Contrary to plaintiffs' contention, the Castro decree has not expired under its own terms, nor is it constitutionally defective. The special hiring of female police officers also passes constitutional muster. Furthermore, an injunction is unwarranted because the balance of harms tips sharply in favor of the defendants. An injunction, moreover, would harm the public interest if it left vital public-safety positions unfilled for any length of time. Finally, numerous factual issues remain unresolved. In particular, even if the Castro decree were set aside, it is not at all clear that plaintiffs would be entitled to police-officer appointments. In sum, plaintiffs are not entitled to summary judgment or to a preliminary injunction.

## II.     BACKGROUND

The hiring of entry-level police officers in the City of Boston takes place pursuant to a federal court consent decree that remedies the effects of past discrimination against blacks and Hispanics. See Exhibit A-1, attached hereto.[1] Both the City of Boston and the Commonwealth were parties to the original litigation that produced the Castro decree because under Massachusetts law both are involved in police-officer hiring: the Commonwealth's Human Resources Division administers a civil service examination for police recruits and then certifies qualified candidates to the city, which makes the final hiring decisions. The Castro decree does not require the Boston Police Department to hire any particular candidates. See Exhibit A-1 (1975 Decree). Rather, the decree facilitates the hiring of minority recruits by, among other

---

[1] Exhibit A hereto is The Commonwealth Defendants' Response to the City of Boston's Motion for Clarification of the Castro v. Beecher Consent Decree ("HRD's Decree-Clarification Memo"), which was filed with the Court on July 15, 2004. Exhibit A-1 hereto is the Castro litigation Consent Decree dated June 27, 1975 ("1975 Decree"). For a complete list of all exhibits to this memorandum, see the Addendum hereto.

things, directing HRD to assemble its list of qualified candidates by alternating minority and non-minority candidates. Id.[2]

The Castro decree's hiring protocol applies to all Massachusetts communities with minority populations of at least one percent. Id. The decree remains in place until a community's police force achieves a complement of minorities commensurate with the percentage of minorities in the community. Id. In other words, the decree ends when parity is reached. Id. The parties to the original Castro litigation have long understood that parity is calculated by comparing the percentage of the authorized uniformed force made up of tenured black and Hispanic officers, of any rank, to the percentage of minorities in the community's general population. See Exhibit A (HRD's Decree-Clarification Memo).

Scores of Massachusetts communities originally subject to the Castro decree have attained parity.[3] Boston, however, hires pursuant to the Castro decree, and did so most recently in March, 2002, and October, 2003, from a 2001 certification list that has since expired. Pl. SOF ¶¶ 31, 33. During those two periods, the percentage of the BPD's authorized uniformed force

---

[2] Candidates are ranked in two groups, one consisting of qualified minority candidates and the other consisting of qualified non-minority candidates. See Plaintiffs' Rule 56.1 Statement of Facts Not in Material Dispute ("Pl. SOF") at ¶ 8. Within each group, the candidates are ranked in order of Massachusetts statutory preferences such as veteran status and familial relation to public safety officers killed or injured in the line of duty. Pl. SOF ¶¶ 6, 8. HRD compiles the certification list so that the first name is the highest-ranking minority candidate and the second name is the highest ranking non-minority candidate and so on, alternating minority and non-minority candidates. Pl. SOF ¶¶ 9, 17, 18; but see Intervenors' and Commonwealth Defendants' Rule 56.1 Statement of Disputed Material Facts and Statement of Additional Material Facts ("Int./Def. SOF") at ¶¶ 17, 18.

[3] Since 1980, 80 communities have been exempted from the decree; as of July, 2004, twelve communities, including Boston, remain subject to the decree. See Exhibit A-2, attached hereto (Affidavit of Toni G. Wolfman, hereinafter "Wolfman Affidavit") at ¶ 9 and Exhibit A thereto.

made up of tenured black or Hispanic officers, of any rank, ranged from 32.10 percent to 33.98 percent; while the percentage of Boston's total population that is black or Hispanic, as determined by the most recent federal census was 40.12 percent.  See Exhibit A-4, attached hereto (federal census data); Exhibit B, attached hereto (BPD Strength Reports prepared on 2/22/2002 and 9/25/2003); Int./Def SOF ¶ 39.[4]

The DeLeo plaintiffs are Caucasian males who took the 2001 police-recruit examination and scored 100 or 101 points. Pl. SOF ¶¶ 30, 31.  (While the examination is scored on a 100-point scale, DeLeo got an extra point for prior police experience.)  None of the plaintiffs enjoys a statutory preference. Pl. SOF, Ex. 25, at 3-4.  Massachusetts statutory preferences are "absolute" in that candidates with such preferences who pass the police-recruit examination are placed at the top of the certification list.  Pl. SOF ¶ 17; see Int./Def. SOF ¶ 17.  Thus, minority candidates with statutory preferences who were considered and/or hired in March, 2002, and October, 2003, would have been ranked above plaintiffs even without the operation of the Castro decree.  Id.

The BPD did not reach plaintiffs for consideration in either the March, 2002, or October, 2003, hiring rounds.  Pl. SOF ¶¶ 32, 34; see Int./Def. SOF ¶ 34.  The BPD considered 44 minority candidates who, like plaintiffs, had no statutory preferences.  Id.  The BPD hired 24 of those minority candidates.  Id.  The examination scores of those minority candidates without statutory preferences hired from the certification list by the BPD as entry-level officers for the March, 2002, and October, 2003, classes ranged from 98 to 100 points.  Int./Def. SOF ¶ 62; Pl.

---

[4]  A community's minority population includes persons who check on their federal census form "black" and some other race.  See Exhibit A (HRD's Decree-Clarification Memo) at 13-14. Thus, it is not the case, as plaintiffs' expert contends, that Boston's minority population is only 38.26 percent.  Pl. SOF ¶ 39.  See instead Int./Def. SOF ¶ 39.

SOF, Ex. 24; Exhibit C, attached hereto (Affidavit of Regina Caggiano, hereinafter "Caggiano Affidavit") at ¶ 9.  In other words, no more than 3 points separated the DeLeo plaintiffs from the minority candidates who were hired.  Id.

The DeLeo plaintiffs also sat for and passed the 2003 police-recruit examination.  Pl. SOF ¶ 37; see Int./Def. SOF ¶ 37.  The City has requested a certification list from HRD to begin the hiring process and expects to hire a new class for entry into the Boston Police Academy in November, 2004.  Pl. SOF ¶ 38.  HRD assembled the list according to the Castro decree hiring protocol.  Pl. SOF ¶ 38.

Separately, the DeLeo plaintiffs challenge Boston's hiring in October, 2003, of 11 female officers from an all-women certification list.  As of July, 2002, the BPD had only 281 female police officers, representing 12.7 percent of the total force.  Pl. SOF, Ex. 23 at 1-6.  Boston requested the all-women list in order to meet its operational needs for female police officers to perform such duties as searching and transporting female prisoners and interviewing female rape victims.  Pl. SOF, Ex. 23 at 1-8.

III.    THE LEGAL STANDARDS APPLICABLE TO PLAINTIFFS' MOTION

The party seeking a preliminary injunction must prove entitlement to that extraordinary relief.  See EEOC v. Astra U.S.A., Inc., 94 F.3d 738, 742 (1st Cir. 1996).  These plaintiffs must demonstrate:  "(1) a substantial likelihood of success on the merits; (2) a significant risk of irreparable harm if the injunction is withheld; (3) a favorable balance of hardships; and (4) a fit (or, at least, a lack of friction) between the injunction and the public interest."  Id.  Failure to demonstrate all of the requirements proves fatal for a request for relief.  See Massachusetts Coalition of Citizens with Disabilities v. Civil Defense Agency and Office of Emergency

Preparedness of Commonwealth of Mass., 649 F.2d 71, 74 (1st Cir. 1981). The "sine qua non" of the four requirements, however, is likelihood of success on the merits. See New Comm Wireless Svcs. v. Sprintcom, 287 F.3d 1, 9 (1st Cir. 2002).

Plaintiffs in a reverse discrimination suit challenging a remedial consent decree under either the Fourteenth Amendment or Title VII bear the burden of proving that their rights have been violated. See Stuart v. Roache, 951 F.2d 446, 451 (1st Cir. 1991) (quoting Wygant v. Jackson Bd. of Educ., 476 U.S. 267, 292-93 (1986) (O'Connor, J., concurring)); Wygant at 277-78 (plurality). On a motion for summary judgment, they must demonstrate the absence of a genuine issue of material fact. Fed. R. Civ. P. 56(c). See Celotex Corp. v. Gatrett, 477 U.S. 317, 323 (1986). Once the defendants show that implementing the Castro decree's terms furthers a compelling governmental interest in eradicating the vestiges of discrimination affecting the complexion of the BPD (or some other permissible justification for race-conscious hiring methods), and that the decree protocol remains a narrowly tailored means of effectuating that compelling interest, the burden then falls on the plaintiffs to prove the unconstitutionality of the defendants' actions. Cotter v. City of Boston, 323 F.3d 160, 168 (1st Cir. 2003). Hence, in order to prevail on their summary judgment motion, these plaintiffs must establish that (1) the race-conscious measures employed by HRD and the City of Boston have unreasonably exceeded the remedial purposes underlying the hiring protocol set forth in the Castro decree, and (2) there is no longer any constitutionally-acceptable justification for race-conscious measures in the BPD hiring process. See Donaghy v. City of Omaha, 933 F.2d 1448, 1458-59 (8th Cir. 1991).

IV.    PLAINTIFFS ARE NOT ENTITLED TO A PRELIMINARY INJUNCTION OR TO
       SUMMARY JUDGMENT BECAUSE THEY CANNOT SHOW THAT
       DEFENDANTS' ADHERENCE TO THE CASTRO DECREE HIRING PROTOCOL IS
       UNLAWFUL.

       Plaintiffs' motion should be denied because they have demonstrated no likelihood of

success on the merits, the "sine qua non" of the four-part preliminary-injunction inquiry.  Nor

have plaintiffs successfully shouldered their burden on summary judgment, as the defendants can

demonstrate that the Castro decree has neither expired nor been rendered unconstitutional.[5]

       Contrary to plaintiffs' contention, Boston has not yet achieved parity under the Castro

decree.  Furthermore, for Boston and the 11 other Massachusetts communities where racial

disparity still exists, the decree remains a vital, constitutional means of eradicating the last

vestiges of racial discrimination surrounding police-officer hiring.  Separately, Boston's hiring

of 11 police officers from an all-women list is substantially related to the important

governmental objective of ensuring sufficient numbers of female officers to perform such duties

as searching female prisoners and questioning female rape victims (see Argument, Part VI,

infra).  In sum, the defendants' certification and hiring of Boston police officers did not violate

plaintiffs' rights under Title VII or the Equal Protection Clause.[6]  Accordingly, plaintiffs have no

likelihood of success on the merits, and their motion should be denied.

---

[5]  Plaintiffs' summary judgment motion is, at best, premature.  See Docket No. 27 (establishing
December 1, 2004, as the deadline for completing discovery on liability issues and January 15,
2005, as the deadline for filing dispositive motions).

[6]  Plaintiffs also allege that the police-officer hiring system violates Mass. Gen. Laws c. 151B, §
4(1).  See Pl. Memo at 2.  The Commonwealth defendants intend to move to dismiss this claim
against them as barred by the Eleventh Amendment to the United States Constitution.  See
Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 117 (1984).

A.    The Castro Decree Still Applies Because Parity, Correctly Calculated, Has Not
      Been Achieved.

Plaintiffs first contend that the Castro decree has expired under its own terms because Boston has achieved parity.  Plaintiffs' Memorandum of Law in Support of Their Motion for Summary Judgment and/or for Preliminary Injunction ("Pl. Memo") at 9-16.  Plaintiffs reach this result by comparing the percentage of entry-level minority police officers in the BPD to the percentage of minorities in Boston's "qualified" labor pool.  Plaintiffs misinterpret the decree.  The correct measurement of parity -- comparing the percentage of the authorized uniformed police force which is made up of tenured black or Hispanic officers of any rank, to the percentage of Boston's total black and Hispanic population -- reveals that Boston's police force is 33.40 percent minority, while Boston's minority population is 40.12 percent.  See Exhibit A-3, Exhibit A-4.  Thus, Boston has not achieved parity and the Castro decree still applies.  This method of calculating parity is supported by precedent; adheres to the decree's language and purpose; and follows past practice under the decree consensually engaged in by parties to the original litigation.  In further support of this method of calculating parity, HRD relies on its discussion of the issue in HRD's Decree-Clarification Memo at 6-14.  See Exhibit A.

B.    The Certification and Hiring of Boston Police Officers Under the Castro
      Decree Is Constitutional.

Plaintiffs also advance two constitutional arguments relating to the Castro decree.  First, plaintiffs insist that their interpretation of parity must be correct because otherwise the decree, as entered, would not have met the narrow-tailoring prong of the strict-scrutiny analysis that applies under the Equal Protection Clause to race-based classifications.  Pl. Memo at 11-12, 14-15.  Second, plaintiffs claim that, even if the Court were to determine that Boston has not yet

achieved parity, the decree must nonetheless be set aside because it has "exceeded its constitutional lifespan." Pl. Memo at 16-18. Neither of plaintiffs' arguments has merit.

        1.      Calculating Parity Under the Castro Decree by Comparing the Percentage of Minorities on the Police Force to the Percentage of Minorities in the General Population Is Constitutionally Sound.

Federal-court precedent, past practice under the decree, and the decree's language and purpose all compel the conclusion that the parties and district court judges involved in the original Castro litigation understood parity to mean comparing the percentage of the authorized uniformed force which is made up of tenured Black or Hispanic officers, of any rank, to the percentage of the community's total population which is Black or Hispanic. See Exhibit A (HRD's Decree-Clarification Memo). Contrary to plaintiffs' contention, the Equal Protection Clause does not require that the intent of the parties and the court be set aside. Rather, the parties and the court crafted a decree that was, and remains, a narrowly tailored means of furthering the compelling governmental interest of eradicating the vestiges of past racial discrimination surrounding the certification and hiring of police officers in the Commonwealth. See Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 237 (1995) ("The unhappy persistence of both the practice and the lingering effects of racial discrimination against minority groups in this country is an unfortunate reality, and government is not disqualified from acting in response to it.").

As for the first prong of the strict-scrutiny analysis, plaintiffs apparently agree that there was a "'strong basis in evidence'" to conclude that past discrimination surrounding the certification and hiring of police officers by HRD and the BPD justified the race-conscious hiring protocol of the Castro decree. See Cotter, 323 F.3d at 169 (quoting Stuart, 951 F.2d at

450); Pl. Memo at 9 (stating that Castro decree was "constitutionally permissible when

entered"). Indeed, as the original Castro court found, in 1970 blacks represented 16.3 percent of

Boston's general population and but 3.6 percent of its police force. See Castro v. Beecher, 334

F. Supp. 930, 935 (D. Mass. 1971). Just last year, the First Circuit found that the BPD's history

of discrimination in hiring and promotion was "well-documented by past litigation and records,"

and thus justified the race-conscious government action at issue there. See Cotter, 323 F.3d at

169.

Plaintiffs' constitutional arguments regarding the meaning of parity focus on strict

scrutiny's second prong. In conducting a narrow-tailoring analysis, the Court must consider:

> the extent to which (i) the beneficiaries of the order are specially advantaged;
> (ii) the legitimate expectancies of others are frustrated or encumbered; (iii) the
> order interferes with other valid state or local policies; and (iv) the order contains
> (or fails to contain) built-in mechanisms which will, if time and events warrant,
> shrink its scope and limit its duration.

Cotter, 323 F.3d at 171 (quoting Mackin v. City of Boston, 969 F.2d 1273, 1278 (1st Cir. 1992)).

In 1992, the First Circuit upheld the constitutionality of the Beecher fire-fighter degree against a

charge of overbreadth for reasons that also apply to the Castro police-officer decree: among

them, that only qualified minority candidates are specially advantaged; that the decree does not

require that minority aspirants be appointed; and that "the decree's life is limited, remaining in

force only until its requirements have been met," Mackin, 969 F.2d at 1278, namely, until a city

or town "achieves a complement of minorities commensurate with the percentage of minorities

within the community," id. (quoting Beecher decree).

          a.    It Is Not Unconstitutional to Calculate Minority Penetration on a
               Police Force with Reference to All Minority Officers of Any Rank.

The DeLeo plaintiffs claim that minority penetration on a police force must be measured

with reference to entry-level minority police officers only because to include all minority officers on the force would mean that the decree was not narrowly tailored to serve its purpose of eliminating discrimination in recruitment and hiring.  <u>Pl. Memo</u> at 11-12.  That is incorrect.  A parity measurement that takes into account all minority officers on the force is a constitutionally permissible way to measure a given community's progress in overcoming the effects of past discrimination.  <u>See</u> <u>Exhibit A-2</u> (Wolfman Affidavit) at ¶¶ 11-12; <u>Navarro-Ayala v. Hernandez-Colon</u>, 951 F.2d 1325, 1338 (1st Cir. 1991) ("broad judicial discretion [is often] crucial for the district judge to secure complex legal goals") (citations and internal quotation marks omitted).  The parity measurement (1) is clear and relatively simple to apply to the multiple municipalities subject to the decree; (2) permits the progressive narrowing of the reach of the <u>Castro</u> Court's orders as each community achieves parity, without regard to statewide demographics or the progress (or lack thereof) of any other municipality; and (3) perhaps most significantly, corrects for the impact of continuing discrimination within police departments.  <u>See</u> <u>Exhibit A-2</u> (Wolfman Affidavit) at ¶¶ 11 -12 (describing how "for many years the Boston Police Department limited its cadet program (the source of as many as one-third of its recruits each year) to well-connected white candidates, thereby significantly slowing its progress towards parity"); Pl. SOF ¶ 28 (same).

Indeed, to exclude higher ranks from an evaluation of a police force's complement of minorities could <u>foster</u> racial discrimination, the very behavior the Castro decree was intended to eliminate.  That is, counting only patrol officers towards a force's parity goal would create an incentive for a force to keep all of its minority patrol officers at the entry level, and thereby achieve release from the decree more readily.  <u>See</u> <u>Quinn v. City of Boston</u>, 325 F.3d 18, 43 (1st

Cir. 2003) (Lipez, J., dissenting); but see id. at 34 (majority opinion). Thus, while the Castro litigation and decree focused on discrimination in entry-level recruitment and hiring, the parity measurement was necessarily broader. See Local 28, Sheet Metal Workers' Int'l Assoc. v. EEOC, 478 U.S. 421, 486 (1986) (Powell, J., concurring in part and concurring in judgment) (noting that the district court that entered an affirmative action plan was "in the best position to judge whether an alternative remedy . . . would have been effective in ending [the challenged] discriminatory practices").

Because the BPD is a "closed system," with the only entry point at the police-recruit level,[7] entry-level discrimination not only unlawfully limited the number of minority patrol officers, it necessarily precluded minorities from serving in the upper ranks. See United States v. Paradise, 480 U.S. 149, 168 (1987) ("Discrimination at the entry level necessarily precluded blacks from competing for promotions, and resulted in a departmental hierarchy dominated exclusively by nonminorities."); Cotter, 323 F.3d at 170. Thus, to fully measure whether the effects of entry-level discrimination have been remedied, the decree may lawfully measure minority penetration in the upper ranks. See id.

Plaintiffs cite Quinn v. City of Boston, where a divided panel of the First Circuit stated, without citing any case law, that including higher ranks to calculate parity under the Beecher fire-fighter decree would impermissibly benefit minority fire fighters by somehow giving them preferences for promotions. Quinn, 325 F.3d at 32. Regardless of whether this conclusion was correct as to the Beecher decree, including higher ranks in the parity measurement does not in

---

[7] See Pl. SOF, Ex. A (transcript "tr." of deposition of Edward Callahan, the BPD's Director of Human Resources) at 29-30.

fact grant minorities promotional preferences under the Castro police-officer decree.  See id. at 43-44 (Lipez, J., dissenting); Exhibit A-1 (1975 Decree).  Nothing in the Castro decree mandates, or even encourages, changes in the BPD's promotional criteria.  Exhibit A-1 (1975 Decree).  Moreover, unlike in Quinn, a separate consent decree was entered against the BPD in 1978 to provide for race-conscious promotions from patrol officer to sergeant.  See Stuart, 951 F.2d at 447-49.  After that promotional consent decree expired, the BPD continued to make race-conscious promotions, and the First Circuit has upheld such promotions as a constitutional means to remedy racial discrimination in the department's promotional practices.  See Cotter, 323 F.3d at 168-72; Boston Police Superior Officers Federation v. City of Boston, 147 F.3d 13, 19-25 (1st Cir. 1998).  In sum, the BPD's race-conscious promotions have occurred independently of the Castro decree.[8]

Plaintiffs' reliance on Wards Cove Packing Co. v. Atonio, 490 U.S. 642 (1989), is misplaced.  In Wards Cove, the Supreme Court addressed a question that has never been an issue in the Castro litigation:  whether employment discrimination in violation of Title VII could be shown by comparing the racial composition of two classes of jobs within the same company.  See Wards Cove, 490 U.S. at 655.  The Court answered in the negative, stating that the proper comparison was between the racial composition of the class of jobs for which minorities had allegedly been denied employment, and the racial composition of either the relevant labor market or the general population.  See id. at 650-51 & n.6.  The Title VII issue in Wards Cove

---

[8]  It is also worth noting that the Quinn majority had already decided that the plain language of the fire-fighter decree mandated that parity be measured with reference to entry-level fire fighters only.  See Quinn, 325 F.3d at 29-32.  Here, in contrast, the Castro decree's plain language -- as well as the past practice of the parties and federal-court precedent -- compel a different result.  See Exhibit A (HRD's Decree-Clarification Memo).

essentially went to the first prong of the strict-scrutiny equal protection analysis: whether there was any racial discrimination that needed to be remedied. See id. Here, in contrast, the parity measurement is part of the remedy. See Quinn, 325 F.3d at 37. The issue here is whether that remedy goes only as far as is needed to "secure [the] complex legal goal[]" of eliminating discrimination in police-officer certification and hiring. See Navarro-Ayala, 951 F.2d at 1338. As explained above, the remedy is narrowly tailored to serve its purpose.

Finally, even assuming arguendo that including higher ranks within the parity measurement provides some small incidental advantage to minorities in promotions, litigated court findings of entry-level discrimination are "sufficient to justify race-conscious remedies at both entry and promotional levels" in this context. See Stuart, 951 F.2d at 452. This is so because an employer like a police department that promotes from within cannot "'segregate the results achieved by its hiring practices and those achieved by its promotional practices.'" See id. (quoting Paradise, 480 U.S. at 168-69).

Elimination of all vestiges of the discrimination that occurred at the entry point years ago requires consideration of the complexion of the BPD at all levels of the force today, given the strong "promote from within" culture of this organization. Minority representation in the BPD's highest ranks presumably would have been higher today than it is in fact were it not for the discrimination associated with the entry-level selection procedures utilized 30 years ago (or even 10 years ago, insofar as the cadet program is concerned). See Int./Def. SOF ¶ 28; Exhibit A-2 (Wolfman Affidavit) at ¶ 12. The problems identified in the Castro litigation will not have been sufficiently cured once the entry-level complement alone is commensurate with the general minority population of the City. In sum, calculating parity under the Castro decree with

reference to all minority members of the police force is constitutionally sound.

> b.    It Is Not Unconstitutional to Compare the Percentage of Minorities
> On a Police Force to the Community's General Minority
> Population.

Plaintiffs also contend that the Constitution requires that a police force's complement of minorities be compared to the specific adult population that comprises the qualified labor pool for the police officer position.  Pl. Memo at 13-16.  Plaintiffs' reasoning has been rejected by the First Circuit, and moreover is at odds with Supreme Court precedent.  See Quinn, 325 F.3d at 36 (holding that, under the Beecher fire-fighter decree, comparing a fire department's complement of minorities to the community's general minority population was constitutionally permissible) (citing City of Richmond v. J.A. Croson Co., 488 U.S. 469, 501 (1989)).

As an initial matter, contrary to plaintiffs' contention, the Castro decree unambiguously requires the use of the percentage of minorities in a community's general population in the second part of the parity algorithm.  Exhibit A-1 (1975 Decree) at ¶¶ 18, 24 (parity is "a complement of Black and Spanish-surnamed post-probationary police officers commensurate with the percentage of minorities within the community" or "a complement of minorities commensurate with the percentage of minorities within the community") (emphasis added); Quinn, 325 F.3d at 35-36 & n.9 (holding that identical language in fire fighters decree referred to a community's general population).  Moreover, the Castro parties and the federal courts have long understood general population figures to be the correct measurement.  Boston Chapter, NAACP v. Beecher, 679 F.2d 965, 973 (1st Cir. 1982), vacated on other grounds, 461 U.S. 477 (1983) (interpreting Castro decree to require race-conscious hiring until the percentage of minorities on a police force "approximates that of the general population") (emphasis added);

Castro v. Beecher, 522 F. Supp. 873, 875-76 (D. Mass. 1981); Exhibit A-2 (Wolfman Affidavit) at ¶¶ 5-10; Exhibit A-6, attached hereto (HRD memoranda to appointing authorities). This plain language, longstanding past practice, and judicial understanding are in no way undermined by a remark in a district court opinion entered before the parity target was even part of the Castro decree. See Pl. Memo at 14.[9]

Thus the question becomes whether the parties' original bargain for a community-wide pool, and the district court's adoption of that agreement, comport with constitutional requirements. In this regard, it bears reiterating that the issue here is not what measurement would be the most exact but whether the measurement that the Castro parties and court chose is within constitutional limits. As the First Circuit observed when it upheld the use of general population statistics under the fire-fighter decree, "[w]hether or not some other standard might be more precise, the fact remains that" using general population statistics is constitutional. See Quinn, 325 F.3d at 36.[10] The Quinn Court's holding on this issue also applies to the police officer position, which has similar age, citizenship, and educational requirements. See M.G.L. c. 31, § 58; Pl. SOF, Ex. 5.

The Quinn Court's endorsement of general population statistics hews closely to Supreme

---

[9] Indeed, the district court judge who entered the Beecher fire-fighter decree made specific mention of the age requirement for the fire-fighter position, but recognized that it would be imprudent to measure parity with reference to a labor pool that could be "manipulat[ed]" by the enjoined public employer in order to circumvent the decree's purpose. See Quinn 325 F.3d at 36 n.9; see also Exhibit A (HRD's Decree Clarification Memo) at 13 n.6.

[10] The general population measurement can fairly be viewed as a response to the complexities presented in Boston, including not only the Department's past history of entry-level discrimination, but also its more modern practice of filling up to one third of entry-level positions with predominantly white candidates from the cadet program. See Int./Def. SOF ¶ 28; Exhibit A-2 (Wolfman Affidavit) at ¶¶ 11-12.

Court case law.  The Supreme Court has consistently held that "for certain entry level positions

or positions requiring minimal training, statistical comparisons of the racial composition of an

employer's work force to the racial composition of the relevant population may be probative of a

pattern of discrimination."  See Croson, 488 U.S. at 501; see also Wards Cove Packing, 490 U.S.

at 650-51 & n.6; Johnson v. Transportation Agency, Santa Clara County, 480 U.S. 616, 632

(1987); Steelworkers v. Weber, 443 U.S. 193 (1979); Hazelwood School Dist. v. United States,

433 U.S. 299, 308 & n.13 (1977); International Bhd. of Teamsters v. United States, 431 U.S.

324, 337-40 & n.20 (1977).  In contrast, for positions requiring "special qualifications," the

relevant comparison must be narrowed to the qualified labor pool, in order to screen for the

effects of societal discrimination.  See Croson, 488 U.S. at 501-02.  The relevant distinction

between the two groups involves education and training.  A position is "entry level" within the

meaning of Croson when, for example, any skill required for the job "is one that many persons

possess or can fairly readily acquire," see Hazelwood, 433 U.S. at 308 n.13, or where the

position itself is "designed to provide expertise," see Johnson, 480 U.S. at 632.

      The patrol officer position is "entry level."  Age and citizenship status have nothing to do

with education and training, and a high school diploma or its equivalent is a credential that

"many persons possess or can fairly readily acquire."  Compare Teamsters, 431 U.S. at 337-40 &

n.20 (statistical comparison between minority truck drivers and general population probative of

discriminatory exclusion notwithstanding fact that truck-driver position requires ability to drive a

truck), with Hazelwood, 433 U.S. at 308 & n.13 (comparison must be to qualified labor pool for

teaching position requiring college degree or its equivalent).  Moreover, entry-level police

officers obtain most of their basic expertise from the position itself, during the six-month police

academy and the one-year probationary period.  See Johnson, 480 U.S. at 632; Pl. SOF, Ex. A at

3, 7, 11.  In sum, the Castro decree, established to combat racial discrimination in the

certification and hiring of police officers, is tailored with sufficient precision to withstand

constitutional challenge.

        2.      The Castro Decree Continues to Operate Effectively and Constitutionally
                      To Eradicate the Last Vestiges of Discrimination Surrounding the Hiring
                      Of Police Officers.

       Plaintiffs contend in the alternative that, even if parity has not been achieved, the decree

must nonetheless be set aside because it has "exceeded its constitutional lifespan."  Pl. Memo at

16-18.  Given that plaintiffs agree that the decree was "constitutional when entered," Pl. Memo

at 10, plaintiffs' temporal argument is predicated on the notion that the passage of time alone is a

changed circumstance that requires the decree's hiring protocol to be modified or discontinued

entirely.  While modification of a consent decree is warranted if there is "a significant change

either in factual conditions or in law," Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 384

(1992), "a party seeking modification of a consent decree bears the burden of establishing that a

significant change in circumstances warrants revision of the decree."  Id. at 383; see Quinn, 325

F.3d at 45 (Lipez, J., dissenting).  Plaintiffs have failed to carry this burden.

       Plaintiffs complain that 31 years is simply "too long" for a remedial affirmative-action

program to remain in place.  Pl. Memo at 16.  The Constitution, however, does not demand that

race-conscious hiring protocols be measured by a term of years.  Rather, the standard is whether

the remedy is a narrowly tailored means of eradicating discrimination.  Time is an element of the

narrow-tailoring analysis in that the court should consider the extent to which the remedial

program "contains (or fails to contain) built-in mechanisms which will, if time and events

warrant, shrink its scope and limit its duration." See Mackin, 969 F.2d at 1278.  In 1992, the

First Circuit concluded that the Beecher fire-fighter decree, which contains a parity target similar

to that of the Castro decree, "passe[d] this test with flying colors." Id.  Then the Court wrote:

> [T]he decree's life is limited, remaining in force only until its requirements have
> been met . . . .  Indeed, the proof of the present pudding is that, since 1974, more
> than fifty percent of the communities originally affected by the decree have
> already been freed from further oversight.

Id. (citations omitted).[11]

Likewise, the Castro police-officer decree is appropriately limited in duration because it

ends upon a community's achievement of parity.  The parity goal is demonstrably attainable:

since 1980, 80 communities have been exempted from the decree, and as of July, 2004, only 12

communities, including Boston, remain subject to the decree.  See Exhibit A-2 (Wolfman

Affidavit) at ¶ 9 and Exhibit A thereto.  Boston itself has made much progress towards parity.

Furthermore, courts in this circuit have repeatedly recognized that the elimination of racial

discrimination surrounding police and fire departments "takes time" because "discrimination

may linger for many years in an organization that had excluded [minorities] from its ranks." See

Stuart, 951 F.2d at 452.[12]  In view of these circumstances, the mere passage of time does not

---

[11]  In the 2003 Quinn decision, the majority opinion did not address plaintiffs' "constitutional
lifespan" argument because the majority concluded that the Beecher fire-fighter decree had
expired under its own terms.  See Quinn, 325 F.3d at 37.  Judge Lipez, who disagreed with the
majority's conclusion, did reach plaintiffs' argument and found it "as unpersuasive now as it was
when we decided Mackin." Id. at 49 (dissenting opinion).

[12]  See also Cotter, 323 F.3d at 169-70 ("The [Boston Police] Department has been working for
many years to address racial disparity and bias within its ranks.  In 1965, only two percent of
police officers in the City were not Caucasian, and only one minority held a position of sergeant
or above.  In 1978, only five-and-a-half percent of officers were African-American, and only
three officers held a position of sergeant or above.  While the numbers are more representative

(continued...)

make the Castro decree constitutionally defective.

Plaintiffs also insist that the passage of time is proof that the decree has impermissibly "become a crutch for keeping racial balance as opposed to a tool to achieve racial balance." Pl. Memo at 18.  Factually, it is difficult to understand plaintiffs' argument, given that "racial balance" has not, in fact, been achieved in the BPD.  Furthermore, the Supreme Court has endorsed the use of parity targets specifically because they provide a "benchmark against which the court [can] gauge . . . efforts to remedy past discrimination," thus ensuring that affirmative action programs "operate as a temporary tool for remedying past discrimination without attempting to maintain a previously achieved balance." See Local 28, 478 U.S. at 477-79 (internal quotation marks omitted) (in upholding affirmative action plan against constitutional and Title VII challenges, Court approvingly notes that the plan is "temporary" in that preferential selection of minority union members will end as soon as parity is reached); Weber, 443 U.S. at 208-09 (rejecting Title VII challenge for same reason).  In sum, for communities like Boston that have not yet achieved parity, the Castro decree continues to operate effectively and constitutionally to eradicate the last vestiges of racial discrimination surrounding the hiring of police officers.

---

[12](...continued)
today, we are not prepared to rule that all effects of past discrimination have been eliminated."); Boston Superior Officers, 147 F.3d at 23 ("Given the BPD's halting and, at times, quite modest progress in remedying its earlier discrimination, we are reluctant to infer that the vestiges of that discrimination had substantially disappeared when the BPD [made the affirmative action promotion at issue.]"); id. at 20 ("Nineteen years after Castro, this court in Stuart . . . saw little evidence of progress toward remedying the discrimination cited in Castro."); Mackin, 969 F.2d at 1277-78 (rejecting constitutional challenge to fire-fighter decree then in effect for almost 20 years).

20

V.    EVEN IF THE COURT WERE TO RULE AGAINST THE DEFENDANTS ON THE
      'CONTINUING APPLICATION OF THE DECREE' ISSUE, THE PLAINTIFFS
      WOULD NOT BE ENTITLED TO SUMMARY JUDGMENT.

Plaintiffs' argument for summary judgment in their favor hinges on the flawed

assumption that if the Castro consent-decree hiring protocol were to be struck down (or to expire

of its own accord), they would automatically be entitled to a position in the Boston Police

Academy.  See Pl. Memo at 21 (stating claim that because their applications for police officer

positions were "unlawfully rejected," plaintiffs are "losing pay, union seniority rights and

benefits," etc.); Pl. Amended Complaint at 8 (seeking court order requiring "[d]efendants to hire

[p]laintiffs forthwith with retroactive seniority").  The hiring process that would replace the

Castro protocol must, of course, pass legal muster.  In particular, if there is a demonstrated

adverse impact upon minorities under a policy of making appointments of BPD candidates only

in strict rank order based upon a 100-point examination score, HRD may find it necessary to

implement appropriate measures to lessen the adverse impact.

In determining whether a particular hiring process would have an adverse impact on

minorities, federal courts routinely turn to the *Uniform Guidelines on Employee Selection

Procedures*, 29 C.F.R. § 1607 (1978 & 2003 ed.).[13]  The *Guidelines* provide that "[a] selection

rate for any race, sex, or ethnic group which is less than four-fifths (4/5) (or eighty percent) of

the rate for the group with the highest rate will generally be regarded by the Federal enforcement

agencies [i.e., the EEOC and Department of Justice, which enforce Title VII of the Civil Rights

---

[13] E.g., Albemarle Paper Co. v. Moody, 422 U.S. 405, 430-431 (1975) (the *Guidelines* constitute
the administrative interpretation of Title VII by federal enforcement agencies and, consequently,
are entitled to "great deference"); Allen v. Entergy Corp., 181 F.3d 902, 905 (8th Cir. 1999)
(same); Cotter v. City of Boston, 323 F.3d at 170.

Act of 1964] as evidence of adverse impact[.]" Id. at § 1607.4(D).  Selection procedures that

have an adverse impact on the hiring of members of any racial or ethnic group raise the possible

inference of discrimination.  Id. at § 1607.3(A).  See Cotter, 323 F.3d at 170 ("[w]hile not

conclusive evidence of discrimination, [a] discrepancy in [the] selection rate [may] serve as a

benchmark against which to gauge [a municipality's] efforts to remedy past discrimination.")

(internal punctuation and citations omitted).

        Once the pool of eligible candidates enjoying an absolute statutory preference is

exhausted, the BPD traditionally has appointed candidates in strict rank order based only on their

examination score, which is calculated on a 100-point scale.  Pl. SOF, Ex. A (Callahan tr.) at 68-

69; Pl. SOF, Ex. B (McNeely tr.) at 27.  The existence of the Castro decree has eliminated any

adverse impact associated with this process because of the decree's mandate that one minority be

considered for every non-minority candidate, which virtually ensures a selection rate that

satisfies the "four-fifths rule."  However, if the Castro protocol were to be abandoned in favor of

a selection method that ranks candidates on a 100-point scale, the latter process may well

produce an adverse impact upon minorities.  For example, in the October 2003 round of

appointments, when the BPD sought to hire 38 new recruits from the certification list, if the

hiring of all candidates (without a statutory preference) had to proceed in strict rank order, no

one with a score of less than 100 points could be selected.  See Pl. SOF, Ex. 9 and 26.  An

adverse impact analysis prepared by HRD in 2001 shows that this would result in the

appointment of only two minorities.  See Pl. SOF, Ex. 24 and 27; Exhibit D, attached hereto.  A

similar analysis of each of the past four entry-level police officer civil service examinations

would likely show that the four-fifths benchmark would not be met if a strict rank-order hiring

process were followed in the absence of the Castro protocol.  See Exhibits E - G, attached hereto

(showing adverse impact quotients at the selection points of far less than 0.8 or 80 percent).[14]

     If faced with such evidence, the defendants could appropriately implement an alternative

hiring procedure to lessen the adverse impact.  See 42 U.S.C. §§ 2000e-2(h) and  2000e-2(k).[15]

See Officers for Justice v. Civil Serv. Comm'n, 979 F.2d 721, 728 (9th Cir. 1992) ("[B]efore

utilizing a procedure that has an adverse impact on minorities, [a hiring authority] has an

obligation pursuant to the *Uniform Guidelines* to explore alternative procedures and to

implement them if they have less adverse impact and are substantially equally valid to [strict]

rank ordering.") (citing 29 C.F.R. § 1607.3B) (emphasis in original).  Accord Brunet v. City of

Columbus, 1 F.3d 390, 412 (6th Cir. 1993) (declaring it "error" for district court not to have

ascertained that City explored alternatives to strict rank ordering).

---

[14]  It is important to note that each "adverse impact analysis" report prepared by HRD in
connection with the four most recent police officer examinations concludes that there is no
adverse impact associated with the examination in question at the passing score of 70 points (the
"passing point").  See Pl. SOF, Ex. 27; Exhibits E - G.  This is not at all the same thing as
concluding that there is no adverse impact at the selection point (the point associated with the
exam score achieved by the last-hired candidate), which will vary depending upon the
municipality, its hiring plans, and the pattern of scores associated with those whose names
appear on the certification list.  In Boston, the selection point historically has been very close to
100 for entry-level officer candidates who do not enjoy a statutory preference.  See Donahue v.
City of Boston, 264 F. Supp. 2d 74, 79 n.32, 81 n.48 (D. Mass. 2003).

[15]  Section 703(h) of Title VII [42 U.S.C. § 2000e-2(h)] prohibits an employer from
administering a test that discriminates on the basis of race, color, or sex.  Section 703(k) requires
that if a selection procedure adversely impacts minorities, and if an alternative selection method
exists having substantial validity and less adverse impact, the employer must choose the less
discriminatory method.  42 U.S.C. § 2000e-2(k).  Cf. Cotter v. City of Boston, 193 F. Supp. 2d
323, 348-49 & n.12 (D. Mass. 2002), aff'd in relevant part, 323 F.3d 160 (1st Cir. 2003) (if
adverse impact associated with strict rank-order hiring is established through statistical analysis,
appointing authority may need to show under Title VII that the test is predictive of who amongst
the highest-scoring candidates (e.g., those in the 98 to 100 point range) is best qualified, if those
test results are to serve as the basis for strict rank-order selection of recruits).

An alternative procedure that may better reflect the relative abilities of candidates for entry-level police officer, while simultaneously decreasing the adverse impact of the civil service examination upon minorities, is a process known as "banding."  "[B]anding, a technique that combines candidates with close test scores into one unit from which the hiring authority may appoint any member[,] . . . remove[s] statistically inappropriate barriers to appointing candidates who are best able to succeed and enable[s] government hiring officials to include modern workplace competencies in [the] selection analysis."  John W. Lasky, Loosen the Shackles on Pennsylvania Local Government's Hiring Authority:  An Argument for Banding, 37 Duq. L. Rev. 445, 458 (1999).[16]  See also Officers for Justice, 979 F.2d at 727-28 (Since "test scores themselves are imprecise measurements of future job performance[, ] by banding the scores and considering secondary criteria in making [hiring] decisions, the City may increase the probability

---

[16]  The Ninth Circuit has offered a more technical explanation of how banding works:  "The 'band' is a statistically derived confidence range that is applied to the examination results. Differences between scores within the band are considered to be statistically insignificant due to measurement error inherent in scoring the examination."  Officers for Justice, 979 F.2d at 723. There are two recognized versions of banding – "fixed bands" and "sliding bands."  "The fixed bands method classifies all test scores within a given range as equal.  The employer determines the ranges according to accepted testing principles, such as standard error of measurement.  Each band member is qualified for the vacant job because she has passed the examination.  The hiring authority may appoint any member of the highest available band and may not appoint from the next highest band until the pool from the highest available band is depleted.  The sliding bands method mirrors the fixed band technique in all respects but one.  When the hiring authority appoints a member of the highest available band, the highest scoring member of the next highest band moves into the highest band.  Using this technique, the hiring authority need not exhaust the highest available band before appointing other candidates."  Lasky, supra, at 459, citing Sheldon Wollack, Confronting Adverse Impact in Cognitive Examinations, 23 Public Personnel Management 217, 222 (Summer 1994), and Sheldon Zedeck, Use of Sliding Bands Offers a Way to Select a Diverse Workforce, Employment Testing (March 1996).

that the most qualified candidates will be [appointed].").[17]

Proponents of banding contend that it "offers a methodology geared to employer and candidate fairness and selection reliability." Lasky, ibid., at 458. Recognizing that small test-score differentials are insignificant predictors of job candidates' success, banding allows the hiring authority to focus on candidates' superior qualifications as opposed to minuscule test-result differences. See Sims v. Montgomery County Comm'n, 887 F. Supp. 1479, 1486 (M.D. Ala. 1995), aff'd, 119 F.3d 9 (11th Cir. 1997). In Officers for Justice, Chief Judge J. Clifford Wallace of the Ninth Circuit addressed banding's effectiveness:

> Banding is premised on the belief that minor differences in test scores do not reliably predict differences in job performance. It also recognizes that an individual is unlikely to achieve an identical score on consecutive administrations of the same examination. Because some measurement error is inevitable, strict rank order [appointments] will not necessarily reflect the correct comparative abilities of the candidates. The smaller the difference between observed scores, the more likely it is a result of measurement error, and not a variance in job-related skills and abilities.

Id. at 723-24. After considering evidence that banding "is more valid, or at least 'substantially equally valid' to rank order promotions," and mindful of the Guidelines' directive to implement the procedure bearing the least adverse impact on minorities, the Ninth Circuit held in Officers for Justice that the banding process employed by the San Francisco Police Department "is valid as a matter of constitutional and federal law." 979 F.2d at 728.

The Second and Seventh Circuit Courts of Appeal have also supported the concept of

---

[17] Officers for Justice involved the banding of scores from a police sergeant promotional examination and thus in the decision's original text (quoted in parentheses above) the Ninth Circuit wrote of "promotion" rather than "hiring" decisions and candidates being "promoted" rather than "appointed." 979 F.2d at 727-28. However, banding is as equally appropriate a methodology at the entry level as it is at the promotional level when it comes to selecting police officers. See Lasky, supra, at 459-61.

banding as an appropriate alternative to strict rank order selection of police or firefighter candidates.  In <u>Chicago Firefighters Local 2 v. City of Chicago</u>, 249 F.3d 649 (7th Cir. 2001), the Seventh Circuit concluded that the use of banding is not a form of "race norming" (which is prohibited by Title VII), even when banding in practice may favor a particular racial or ethnic group.  <u>Id.</u> at 656.  The court upheld Chicago's use of banding because banding is a "universal and normally an unquestioned method of simplifying scoring by eliminating meaningless gradations," which differs from adjusting lower scores so that they appear higher.  <u>Id.</u>  Writing for the court, Judge Posner also noted that banding does not favor one racial group over another.  To illustrate this point, he gave as an example the practice of many teachers to convert number scores to banded letter grades:  a student who scores a 90 gets the same grade (an "A") as one who scores 100, but a student who scores 89 is grouped with students at the bottom of the "B" band, regardless of that student's race.  <u>Id.</u>

The Second Circuit found banding to be an appropriate remedy upon a determination that a police department's promotional examination had an adverse impact on minorities.  <u>Bridgeport Guardians v. City of Bridgeport</u>, 933 F.2d 1140, 1145 (2nd Cir. 1991).  After finding that plaintiff had established a prima facie case of disparate impact discrimination if the test results were used to make strict rank order promotions, the Second Circuit held that, because the City could have used banding to mitigate this disparate impact without disserving its legitimate interests, such an alternative selection procedure was required under Title VII.  <u>Id.</u> at 1146-48.

In <u>Boston Superior Officers</u>, the First Circuit cited expert testimony endorsing the banding approach utilized by the BPD to select new Boston police lieutenants in affirming the

out-of-rank promotion of a minority officer.  147 F.3d at 24.[18]  In conducting its "narrow

tailoring" analysis, the Court concluded, based on this evidence, that the minority candidate was

not "specially" benefitted by his promotion because the "unanswered evidence" demonstrated

that "the one-point difference between [the minority candidate's] score and that of the white

Plaintiffs was, as a matter of testing accuracy, negligible."  Id.  The Court also concluded that

promoting the minority candidate did not "unduly interfere with any valid policies" – including

those served by rank-order selection, which "is presumably designed to ensure that candidates

are chosen on the basis of their ability to do the job."  Id.  This goal was advanced, the Court

reasoned, since the banding evidence demonstrated that the minority candidate and plaintiffs

"shared virtually identical qualifications."  Id.

        Had a banding selection process been used instead of the Castro protocol in 2003,[19] the

_____

[18]  The First Circuit noted HRD's expert's testimony that "candidates who scored within a three-
point band [on a police promotional exam] should be considered functionally equivalent . . . and
equally qualified to successfully perform the job as any other person in that score band."  Boston
Superior Officers, 147 F.3d at 24.

[19]  Plaintiffs may argue that utilization of a banding process would violate Mass. Gen. Laws c.
31, the state civil service law, but in this they would be entirely mistaken.  In Ash v. Police
Com'r of Boston, 11 Mass. App. Ct. 650 (1981), the Massachusetts Appeals Court held that the
state Personnel Administrator did not exceed his authority in banding test scores, a method
which increased the pool of certified applicants from which appointments could be made, since
the Administrator had discretion and expertise in determining proper methods of numerically
grading civil service examinations.   The Appeals Court declared that it "fully agree[d] with the
conclusions of the Superior Court judge," who stated:

        [T]he statutory scheme contemplates that the Administrator have discretion in
        determining the method of numerically grading a promotional examination . . . .
        In exercising this discretion with respect to the evaluation and marking of
        examinations, the Administrator is not precluded from availing himself of modern
        testing techniques consistent with the underlying objective of competitive merit
        selection, and his determination will be upheld unless clearly shown to be

                                                                        (continued...)

same or a substantially similar roster of appointments might have been made.  That is to say,

even without taking race into account, a number of minority candidates – approaching or even

equalling the number of plaintiffs in this case – might have been selected instead of the

plaintiffs, and their appointment under such a protocol could be deemed perfectly valid and

constitutional given the fact that these minorities scored within a three-point band of plaintiffs'

scores.[20]  See Boston Superior Officers, 147 F.3d at 23-24.[21]  Because there is, at a minimum, a

material issue of fact as to what the results of the City's hiring efforts would be were a non-

---

[19](...continued)
        arbitrary or unreasonable.

Ash, 11 Mass. App. Ct. at 652-53 (internal citations and quotation marks omitted).  See also
Chmill v. City of Pittsburgh, 412 A.2d 860, 874 (Penn. 1980) (banding "does not conflict with
the statutory requirement of merit selection").

[20]  The fact that all of the minorities who lacked statutory preferences and yet were appointed to
the BPD in 2002 and 2003 had achieved scores of 98 or better on the civil service exam is
established through the affidavit of Regina Caggiano (at ¶ 9), attached as Exhibit C hereto, and
Pl. SOF, Ex. 24.

[21]  Moreover, in the wake of the United States Supreme Court's latest opinion on affirmative
action [Grutter v. Bollinger, 539 U.S. 306 (2003)], the Seventh Circuit has held that race may be
used as a "plus factor" in selecting police officers for promotion.  Petit v. City of Chicago, 352
F.3d 1111 (7th Cir. 2003),  reh'g en banc denied (2004),  cert. denied, 124 S. Ct. 2426 (June 1,
2004).  In Petit, the Seventh Circuit found that the Chicago Police Department had established a
compelling operational need for diversity at the rank of sergeant.  Id. at 1114.  Relying on
Grutter, the court agreed that fostering diversity in a major urban police department so as to "set
the proper tone" within the department and "earn the trust of the community" could constitute a
constitutionally adequate "compelling governmental interest" for strict scrutiny purposes.  Id. at
1115.  Because Chicago operates a large metropolitan police force in "a racially and ethnically
divided" city, affirmative action was warranted to enhance the department's effectiveness.  Id. at
1114.  Thus, the fact that certain Caucasian police officers had achieved higher raw scores on a
promotional examination did not establish that they had a viable Equal Protection Clause claim
against the Chicago Police Department, which had promoted slightly lower-scoring minorities in
order to satisfy its operational need for a diverse police department.  Id. at 1112, 1117.  The
affirmative action approved in Petit, however, was not banding, but rather certain sophisticated
procedures the city used to "standardize" the test scores so as to minimize adverse impact on
minorities.  Id. at 1117.

discriminatory alternative selection method employed instead of the Castro protocol, these

plaintiffs are not entitled to summary judgment in their favor.

VI.    THE HIRING OF 11 FEMALE POLICE OFFICERS FROM AN ALL-WOMEN
       CERTIFICATION LIST DID NOT VIOLATE PLAINTIFFS' CONSTITUTIONAL OR
       STATUTORY RIGHTS.

       Plaintiffs allege that Boston's recent hiring of 11 female police officers from an all-

women certification list was based on nothing more than "generalizations about the talents and

capacities of females or males," and thus was impermissible under the Equal Protection Clause

and Title VII.  Pl. Memo at 18-19.  Plaintiffs' argument is without merit.  Gender-conscious

hiring of female police officers is permissible where, as here, such hiring is necessary to ensure

sufficient numbers of female officers to care for female prisoners and to participate in rape

investigations.  Accordingly, plaintiffs' motion should be denied as to this issue.

       Massachusetts civil service law allows appointing authorities to request that eligibility for

certain positions be limited to either male or female persons.  M.G.L. c. 31, § 21.  HRD, after

soliciting the recommendation of the Massachusetts Commission Against Discrimination, may

approve such a request by certifying an eligibility list with persons of only one gender.  Id.  The

statute specifically provides that such limitation is appropriate, for example, "if the duties and

responsibilities of such position require special physical or medical standards or require custody

or care of a person of a particular sex."  See id.  Separately, Massachusetts law mandates that

police departments "shall make efforts to employ women police officers to serve in [rape

reporting and prosecution] units" and that "a victim of rape who is female shall, whenever

possible, be interviewed initially by a woman police officer."  M.G.L. c. 41, § 97B.[22]

These two statutes show that the Massachusetts Legislature has recognized that the gender-conscious hiring of female police officers serves important governmental objectives.  See Boston Police Department v. James C. Choukas, et al., Suffolk County Superior Court, C.A. No. 96-6895-A (opinion of van Gestel, J.), aff'd (reproduced in Pl. SOF, Ex. 23 at 10-19). Furthermore, the important governmental objectives – relating to female arrestees and rape victims – do not depend on any finding of employment discrimination against women.  See id. Police departments like the BPD have from time to time requisitioned all-women lists in order to meet their operational needs for female police officers.  Pl. SOF ¶ 27 and Ex. 13, 23; see Int./Def. SOF ¶ 27; see also Costa v. Markey, 706 F.2d 1, 11 (1st Cir. 1982) (opinion en banc) ("Because the city needed female officers to perform certain duties, related, for example, to female prisoners, and because there were no women high enough on the integrated list to be hired, the city sought and received approval . . . to hire from a list of exclusively female applicants.").

As of July, 2002, the BPD had only 281 female police officers, representing 12.7 percent of the total force.  Pl. SOF, Ex. 23 at 1-6.  Yet, in 2000 and 2001, women represented approximately 19 percent of all persons arrested by the BPD.  Pl. SOF, Ex. 23 at 7.  In July, 2002, the BPD requested from HRD an all-women police-candidate list for the purpose of hiring 15 female police officers.  Pl. SOF ¶ 27 and Ex. 23 at 1-8.  The BPD explained that it was requesting the all-women list to ensure sufficient numbers of female officers to assist with the

---

[22]  Caring for female prisoners and investigating rape are not necessarily the only police duties that justify gender-based hiring, but HRD has focused on these justifications because they are expressly provided for by state statute.

30

care and custody, including transport and searching, of female prisoners,[23] and to meet its
obligations under M.G.L. c. 41, § 97B, vis-à-vis rape victims and rape investigations. Pl. SOF,
Ex. 23 at 1-8. HRD approved the request and certified a list of eligible female candidates,
ranked as appropriate by taking into account examination scores, Massachusetts statutory
preferences, and the Castro decree. Pl. SOF ¶¶ 17-19, 27; see Int./Def. SOF ¶¶ 17-19, 27; Pl.
SOF, Ex. 23 at 20-47. In October, 2003, the BPD hired 11 police recruits from the all-women
list. Pl. SOF, ¶ 27 and Ex. 23, at 45-47. Some of the women considered and/or hired from the
female list ranked above plaintiffs on the mixed-gender list, while some ranked below. Pl. SOF,
Ex. 23 at 45-57, and Ex. 26. Also in October, 2003, the BPD hired 24 police recruits from the
mixed-gender list. Pl. SOF, Ex. 26. Following the October, 2003, hiring round, female police
officers still represented only 13.7 percent of the overall BPD force. See Exhibit B (BPD
Strength Report prepared on 11/5/2003).

　　　　Gender-based state action is constitutionally permissible where the action serves
"important governmental objectives" and the means employed are "substantially related to the
achievement of those objectives." See United States v. Virginia, 518 U.S. 515, 533 (1996)
(internal quotation marks omitted). Unlike classifications based on race, which are inherently
suspect and thus strictly scrutinized, gender classifications are subject to a less-searching
inquiry, in recognition of the fact that there exist "[i]nherent differences between men and
women." See id. (internal quotation marks omitted); see also Michael M. v. Superior Court of

---

[23] In its request, the BPD noted that it had recently taken responsibility for housing female
prisoners at district police stations. Pl. SOF, Ex. 23 at 6. Previously, female arrestees awaiting
arraignment were housed by the Suffolk County Sheriff, while male arrestees remained in police
custody. The shift in responsibility occurred as the result of a civil rights lawsuit brought by
female arrestees. See Ford v. City of Boston, 154 F. Supp. 2d 131 (D. Mass. 2001).

Sonoma County, 450 U.S. 464, 468-69 (1981); Cohen v. Brown University, 101 F.3d 155, 183 &

n.22 (1st Cir. 1996) (recognizing that United States v. Virginia, supra, retained "intermediate

scrutiny" level of review of gender classifications).  While gender classifications must not rest

on overbroad generalizations or stereotypes, the Supreme Court has consistently upheld state

action where the "gender classification is not invidious, but rather realistically reflects the fact

that the sexes are not similarly situated in certain circumstances."  See Michael M., 450 U.S. at

469; see also Nguyen v. INS, 533 U.S. 53, 73 (2001) ("To fail to acknowledge even our most

basic biological differences . . . risks making the guarantee of equal protection superficial, and so

disserving it."); cf. Dothard v. Rawlinson, 433 U.S. 321 (1977) (upholding gender-based hiring

practices under Title VII).  In particular, the Court has recognized that "a legislature may provide

for the special problems of women."  See Michael M., 450 U.S. at 469 (internal quotation marks

omitted).

 The type of gender-based hiring at issue in the DeLeo action has been addressed in the

case law most frequently in the context of the Title VII provision allowing for facially

discriminatory hiring where gender is a "bona fide occupational qualification" ("bfoq").  See 42

U.S.C. § 2000e-2(e)(1); 3 Larson, Employment Discrimination § 43.01-04 (2001) (collecting

cases).  The weight of authority supports the legality of HRD's and the BPD's actions under

Title VII and, by analogy, under the Equal Protection Clause.

 As of July, 2002, the Boston police force was only 12.7 percent female.  Pl. SOF, Ex. 23

at 1-6.  The hiring of 11 female officers as part of the October, 2003, hiring round was essential

to ensure that the BPD could effectively perform its public safety functions.  First, female police

officers are needed to protect the privacy and bodily integrity of female arrestees and rape

victims.  See 3 Larson, Employment Discrimination § 43.02[3] (courts have upheld gender-based

hiring where the "necessity of employing a person of a particular sex stems from prevalent

standards of morality, decency, and privacy"); Robino v. Iranon, 145 F.3d 1109, 1111 (9th Cir.

1998) (for prison-guard position, gender was bfoq necessary to accommodate privacy interests of

female inmates and to reduce risk of sexual contact between guards and inmates); Button v.

Rockefeller, 76 Misc.2d 701, 351 N.Y.S.2d 488 (Sup. Ct. Albany County, 1973) (gender-based

hiring of female police officers upheld on basis of need for female officers to search female

prisoners and to participate in certain undercover operations); cf. Jordan v. Gardner, 986 F.2d

1521, 1530-31 (9th Cir. 1993) (en banc) (affirming district court's holding that the psychological

harm inflicted by cross-gender clothed body searches of inmates at women's prison constituted

cruel and unusual punishment); Kane v. Winn, 319 F. Supp. 2d 162, 185 n.34 (D. Mass. 2004)

(Young, C.J.) (criticizing gender-blind hiring of male prison guards for female penal institutions

as a "formalistic" approach to civil rights provisions in the federal constitution and in federal

statutes "that studiously ignores the purposes behind the provisions and the context of gender-

based power relations in society").[24]

---

[24]  See also Tharp v. Iowa Dep't of Corrections, 68 F.3d 223, 226 (8th Cir. 1995) (deciding,
without reaching bfoq issue, that female inmate privacy concerns and prison's goal of
rehabilitation justified assignment of female guards to female prison units); Local 567, AFSCME
v. Michigan Council 25, 635 F. Supp. 1010, 1013-14 (E.D. Mich. 1986) (finding that gender was
bfoq for providers of personal-hygiene care to mental health patients); Fesel v. Masonic Home of
Delaware, 447 F. Supp. 1346, 1353 (D. Del. 1978) (retirement home patients), aff'd, 591 F.2d
1334 (3rd Cir. 1979); Backus v. Baptist Medical Center, 510 F. Supp. 1191, 1193 (E.D. Ark.
1981) (recognizing the need to have female registered nurses care for obstetrical patients),
vacated as moot, 671 F.2d 1100 (8th Cir. 1982); EEOC v. Mercy Health Center, 29 Fair Empl.
Prac. Cas. (BNA) 159, 163 (W.D. Okla. 1982) (same as Backus); Norwood v. Dale Maintenance
Sys., Inc., 590 F. Supp. 1410, 1422-23 (N.D. Ill. 1984) (finding that gender is bfoq for washroom
attendant); Torres v. Wisconsin Dep't of Health & Social Svcs., 859 F.2d 1523, 1531 (7th Cir.

(continued...)

Second, employing female police officers to participate in rape investigations not only protects the privacy interests of the victims but also facilitates the investigation and successful prosecution of such crimes.  See Moteles v. University of Penn., 730 F.2d 913, 920-21 (3rd Cir. 1984) (remanding for consideration of whether "the special needs of rape victims, as well as the necessity to have a female officer quickly available to assist the victim and participate in the investigation" provided a bfoq justification to university's practice of ensuring that at least one female security officer was on duty for every shift); Torres v. Wisconsin Dep't of Health & Social Svcs., 859 F.2d 1523, 1530-31 (7th Cir. 1988) (en banc) (finding that rehabilitative mission of women's prison justified hiring only female guards, particularly where 60 percent of inmates had been physically and sexually abused by men); Healey v. Southwood Psychiatric Hosp., 78 F.3d 128, 133 (3rd Cir. 1996) (finding that psychiatric hospital's therapeutic mission and patients' privacy concerns justified discriminatory staffing policy where "children who have been sexually abused will disclose their problems more easily to a member of a certain sex, depending on their sex and the sex of the abuser" and where female patients "have hygiene, menstrual, and sexuality concerns which are discussed more freely with a staff member of the same sex"); City of Philadelphia v. Pennsylvania Human Relations Comm'n, 7 Pa.Cmwlth. 500, 300 A.2d 97 (1973) (similar to Healey).[25]

---

[24](...continued)
1988) (en banc) (recognizing that "the presence of unrelated males in living spaces where intimate bodily functions take place is a cause of stress to females").

[25]   The cases from other jurisdictions holding or suggesting that gender-conscious hiring is impermissible are readily distinguishable from the instant case.  See, e.g., Everson v. Michigan Dep't of Corrections, 222 F. Supp. 2d 864 (E.D. Mich. 2002); Carl v. Angelone, 883 F. Supp.
(continued...)

Assigning female police officers to handle female prisoners and rape victims "realistically reflects the fact that the sexes are not similarly situated" when comes to certain job duties. See Michael M., 450 U.S. at 469. Common sense, and Massachusetts law, indicate that a police force must be allowed to make gender-based hiring decisions when necessary to ensure sufficient numbers of female police officers to perform job duties that implicate sensitive issues of female privacy, bodily integrity and sexual abuse. See M.G.L. c. 31, § 21; M.G.L. c. 41, § 97B; Dothard, 433 U.S. at 335 (relying on common sense and expert testimony, not statistical evidence, to determine bfoq defense); Michael M., 450 U.S. at 471 (rejecting equal protection challenge to facially discriminatory statutory rape law in part because "[w]e need not be medical doctors to discern that young men and young women are not similarly situated with respect to the problems and the risks of sexual intercourse"); Healey, 78 F.3d at 132 ("appraisals [of the bfoq defense] need not be based on objective, empirical evidence, and common sense and deference to experts in the field may be used"); Torres, 859 F.2d at 1531-32 (in establishing a bfoq defense, defendants need not produce objective evidence, but rather employer's action should be evaluated on basis of totality of circumstances contained in the record).

Furthermore, the gender-based hiring at issue in this case served these important governmental objectives with minimal intrusion on the rights of others. The October, 2003, hiring round, which included the all-women list, increased female representation on the Boston police force to just 13.7 percent, far lower than the percentage of female arrestees. Exhibit B; Pl.

---

[25](...continued)
1433 (D. Nev. 1995); Quirin v. City of Pittsburgh, 801 F. Supp. 1486 (W.D. Pa. 1992); Little Forest Medical Ctr. of Akron v. Ohio Civil Rights Comm'n, 61 Ohio St. 3d 607, 575 N.E.2d 1164 (1991).

SOF, Ex. 23 at 7.  Since 1996, the BPD has hired a mere 31 officers from women-only lists.  Pl.

SOF ¶ 27.  In October, 2003, some of the 11 women hired from the all-women list were ranked

higher on the mixed-gender list than plaintiffs and than men who were considered and/or hired in

that round.  Pl. SOF, Ex. 23 at 45-47, and Ex. 26.  In sum, hiring 11 female police officers from

an all-women list did not violate plaintiffs' constitutional and statutory rights.

VII.   IN ADDITION TO SHOWING NO LIKELIHOOD OF SUCCESS ON THE MERITS,
       PLAINTIFFS FAIL TO ESTABLISH THE OTHER NECESSARY ELEMENTS FOR A
       PRELIMINARY INJUNCTION.

       Plaintiffs' motion for preliminary injunction should be denied because, besides having no

likelihood of success on the merits, they have failed to demonstrate the remaining three

prerequisites for a preliminary injunction: (1) "a significant risk of irreparable harm if the

injunction is withheld; ([2]) a favorable balance of hardships; and ([3]) a fit (or, at least, a lack of

friction) between the injunction and the public interest."  See Astra U.S.A., 94 F.3d at 742.  The

vagueness of plaintiffs' request for relief, see Pl. Motion at 3, cannot obscure the fact that any

meaningful injunctive relief would likely result in, at the very least, a significant delay in the

appointment of vital public-safety officers.  Furthermore, any harm to plaintiffs from the Castro-

decree hiring protocol must be balanced against HRD's need to ensure that its certification

method, in the absence of the Castro decree, is legally permissible.  See Argument, Part V, supra.

In further support of this section of its argument against a preliminary injunction, HRD relies on

the City of Boston's discussion of these issues, with which HRD is in substantial agreement.  See

Defendant City of Boston's Opposition to Plaintiffs' Motion for Summary Judgment and/or

Preliminary Injunction, at 18-24.

VIII.   SUMMARY JUDGMENT IS INAPPROPRIATE BECAUSE FACTUAL DISPUTES
        REMAIN.

        Plaintiffs have failed to demonstrate the absence of a genuine issue of material fact.  See

Celotex, 477 U.S. at 323.  As the Commonwealth defendants and the intervenors have shown,

numerous factual disputes simply cannot be resolved at this stage of the litigation.  See Anderson

v. Liberty Lobby, Inc., 477 U.S. 242, 256-57 (1986); Intervenors' and Commonwealth

Defendants' Rule 56.1 Statement of Disputed Material Facts and Statement of Additional

Material Facts.  Thus, plaintiffs are not entitled to summary judgment.

## CONCLUSION

For the reasons stated herein, Plaintiffs' Motion for Summary Judgment and/or for

Preliminary Injunction should be denied.

Respectfully submitted,

THE COMMONWEALTH OF MASSACHUSETTS
and RUTH BRAMSON, in her official capacity as
Chief Human Resources Officer for the
Commonwealth of Massachusetts

By their attorneys:

THOMAS F. REILLY
ATTORNEY GENERAL


[ /s/ Robert L. Quinan, Jr. ]

_____
Robert L. Quinan, Jr.
BBO # 553010; (617) 727-2200, ext. 2554


_____
Victoria S. Cole
BBO # 654996; (617) 727-2200, ext. 2083

Assistant Attorneys General
Government Bureau
One Ashburton Place, Room 2019
Boston, MA  02108


Dated:  September 3, 2004

**ADDENDUM**

# List of Exhibits Attached to the Commonwealth Defendants' Opposition to Plaintiffs' Motion for Summary Judgment &/or P. I.

Exhibit A:      The Commonwealth Defendants' Response To The City Of Boston's Motion For Clarification Of The *Castro v. Beecher* Consent Decree (dated July 15, 2004) (the original exhibits 1-7 are reproduced here as exhibits A-1 to A-7 (*see infra*))

Exhibit A-1:    Consent Decree entered in *Castro v. Beecher* (dated June 27, 1975)

Exhibit A-2:    Affidavit of Toni G. Wolfman (with exhibits A - D) (dated July 15, 2004)

Exhibit A-3:    BPD Strength Report (dated 6/9/04)

Exhibit A-4:    Census 2000 data – numbers of minorities in Boston

Exhibit A-5:    Affidavit of David A. Haley (dated November 28, 1990)

Exhibit A-6:    Memoranda to Appointing Authorities from state Personnel Administrator (dated 3/19/86 and 9/1/87)

Exhibit A-7:    Excerpt from deposition of Edward Callahan (June 22, 2004)

Exhibit B:      BPD Strength Reports (dated 2/22/02, 9/25/03, and 11/5/03)

Exhibit C:      Affidavit of Regina Caggiano (dated September 2, 2004)

Exhibit D:      Letter/adverse impact analysis report from HRD to T. Wolfman (dated July 1, 2003)

Exhibit E:      Letter/adverse impact analysis report from HRD to T. Wolfman (dated July 13, 2001)

Exhibit F:      Letter/adverse impact analysis report from HRD to T. Wolfman (dated June 30, 1999)

Exhibit G:      Letter/adverse impact analysis report from HRD to T. Wolfman (dated July 8, 1997)

## CERTIFICATE OF SERVICE

I, Robert L. Quinan, Jr., hereby certify that I have today, September 3, 2004, served a copy of The Commonwealth Defendants' Opposition to Plaintiffs' Motion for Summary Judgment and/or for Preliminary Injunction and attendant exhibits on all other parties as listed below, by first-class mail, postage prepaid.  I also served a courtesy copy of the above document (without exhibits) on counsel listed below via e-mail.

[  /s/ Robert L. Quinan, Jr. ]

_____

Robert L. Quinan, Jr., BBO # 553010
Assistant Attorney General
One Ashburton Place, Room 2019
Boston, MA 02108
(617) 727-2200, ext. 2083

Harold L. Lichten
Alfred Gordon
Pyle, Rome, Lichten & Ehrenberg
18 Tremont Street, Suite 500
Boston, MA  02108
(617) 367-7200

Stephen G. Cox
City of Boston Law Department
City Hall Plaza, Room 615
Boston, MA  02201
(617) 635-4064

Betsy Facher
Office of the Legal Advisor
Boston Police Department
One Schroeder Plaza
Boston, MA  02120
(617) 343-4550

Mark D. Selwyn
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA  02109
(617) 526-6000

Nadine Cohen
Lawyers Committee for Civil Rights Under Law
294 Washington Street, Suite 443
Boston, MA  02108
(617) 482-1145