UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
PAUL DELEO, JR., THOMAS BARRETT,           )
MICHAEL CONNEELY, MATTHEW                  )
HOGARDT, BRENDAN DEVER,                     )
PATRICK ROGERS, CHRISTOPHER                 )
CARR, and BRIAN DUNFORD,                    )
                           Plaintiffs        )
                                             )
v.                                           )
                                             )
CITY OF BOSTON, Massachusetts;               )
MITT ROMNEY, in his capacity as Governor    )      Docket No. 03-12538-PBS
of the Commonwealth of Massachusetts; and   )
COMMONWEALTH OF MASSACHUSETTS,              )
                                             )
                           Defendants        )
                                             )
BOSTON BRANCH OF THE NATIONAL               )
ASSOCIATION FOR THE ADVANCEMENT            )
OF COLORED PEOPLE and                        )
MASSACHUSETTS ASSOCIATION OF                )
MINORITY LAW ENFORCEMENT                     )
OFFICERS,                                    )
                                             )
                           Intervenors       )
_____  )

PLAINTIFFS' REPLY TO THE OPPOSITIONS OF THE
DEFENDANTS AND INTERVENORS TO THEIR MOTION FOR
SUMMARY JUDGMENT AND/OR FOR PRELIMINARY INJUNCTION

Per the original scheduling order of the Court on June 2, 2004, as extended by the Court's

order of August 4, 2004, granting Defendants' and Intervenors' motion for a four-week

extension, the Plaintiffs' hereby submit their reply to the oppositions of the Defendants and

Intervenors to their motion for summary judgment and/or for preliminary injunction.[1]

_____

[1] Though the four-week extension would have brought the due date to September 9, 2004, the Plaintiffs assented to receipt of the Commonwealth's and Intervenors' filings one day later than their due date and have thus calculated the due date for this reply brief as one week following receipt of the other parties' oppositions as originally intended.

I.    PLAINTIFFS HAVE STANDING TO BRING THESE CLAIMS AND ARE
      ENTITLED TO JUDGMENT IN THEIR FAVOR BECAUSE THEY WOULD HAVE
      BEEN REACHED UNDER THE CIVIL SERVICE SYSTEM HAD THE
      DEFENDANTS NOT USED RACE AS A FACTOR IN THEIR HIRING PROCESS.

The Intervenors' contention that the Plaintiffs do not have standing to challenge the

hiring process in March 2002, October 2003, or November 2004 lacks merit. [Int. Opp. at 14-

18.][2]  As explained in the Plaintiffs' original memorandum, [Pl. Memo. at 12-13], Plaintiffs have

demonstrated that they may have been reachable in the March 2002 hiring cycle and that they

definitely were reachable in the October 2003 hiring cycle but for the Defendants' improper use

of race in the hiring process in reliance on the expired and outdated consent decree.  The

Intervenors' argument that Plaintiffs do not have standing is premised on an incorrect calculation

of the number of non-minority individuals who have standing ahead of them.  In fact, there were

only 11 individuals with statutory preferences ahead of the Plaintiffs for 12 spots that would not

have been taken by minority candidates with lower scores.  [See Pl. Revised SOF ¶ 34.]  By

establishing that the consent decree has expired and that their scores on the civil service exam

place them within reach of the hiring process, the Plaintiffs have demonstrated standing to

challenge any race-based hiring that took place after the consent decree expired.  See, e.g.,

Donahue v. City of Boston, 304 F.3d 110, 115-121 (1st Cir. 2002).  Moreover, the Plaintiffs have

a high expectation of being considered under the new exam results because many individuals

with veterans preferences may be deployed overseas and because there will likely be more than

one round of hiring using these exam scores.  [Callahan Depo. 17-18, 55-56.]

---

[2] References to previous filings will be referred to as follows:  "Pl. Memo." will refer to the Plaintiffs' Memorandum
in support of their motion; "City Opp." will refer to the City Defendants' Opposition to the Plaintiffs' motion;
"Comm. Opp." will refer to the Commonwealth Defendants' Opposition to the motion; "Int. Opp." will refer to the
Intervenors' Opposition to the motion; "Pl. SOF" will refer to Plaintiffs' original Statement of Facts; "Comm./Int.
SOF" will refer to the Commonwealth and Intervenors' Statement of Facts; "City SOF" will refer to the City's
Statement of Facts; and "Pl. Response to SOF" will refer to the Plaintiffs' Response to the other parties' Statements
of Facts.

In addition, the Defendants and Intervenors attempt to thwart this action by arguing that the Plaintiffs may not have been hired even without the consent decree because the Commonwealth and/or the City may have taken other steps to hire a racially diverse class of officers. [E.g., Comm. Opp. at 21-29.]  However, it is inappropriate to apply to this analysis any speculation about what the Defendants might have done if the decree had expired; and, in any event, the Defendants would be required to follow the Civil Service Law in the absence of the decree.  The only question before the Court is whether the Defendants acted inappropriately in continuing to follow the race-based hiring dictates of the decree.  The fact that the Plaintiffs would have been reached for consideration under the Civil Service System, which the Defendants are required to use in the absence of the decree, necessitates a finding that the Plaintiffs have standing and that they are entitled to judgment in this matter.

II.     IN ADMITTING THAT THE CONSENT DECREE WAS CONSTITUTIONAL WHEN IMPLEMENTED, THE PLAINTIFFS DO NOT ADMIT THAT APPLICATION OF THE DECREE IS CONSTITUTIONAL FOREVER.

Contrary to the Intervenors' arguments, [Int. Opp. at 19-20], in admitting the constitutionality of the decree at time it was issued, Plaintiffs in no way admit that it is constitutional now.  As an initial matter, the Plaintiffs do not admit that it was ever constitutional for the Defendants to measure parity using *all* uniformed members of the police force because such a comparison has never been narrowly tailored and is thus unconstitutional. See infra part IV.  As for the other variable, the population comparison, because of the huge disparity in 1971 in the numbers of minority police officers vis-à-vis the percentage of minorities in the area labor force, it would not have mattered how the parity variables were measured, because the city had a long way to go to correct the discrimination found by the court.  See Castro v. Beecher, 334 F. Supp. 930, 935 (D. Mass. 1971) (finding a 3.6% minority complement in the department as

compared to a 16.3 % minority population).   In the intervening years, while the percentage of

minorities within the department came within parity range, the "tests for determining whether

remedial race-conscious relief is, in fact, narrowly tailored have been refined and clarified."

Mackin v. City of Boston, 969 F.2d 1273, 1277 (1st Cir. 1992) (finding that the District Court

was in the proper position to exercise the equitable power to determine whether a decree should

be modified or dissolved).  As demonstrated in the Plaintiffs' original Memorandum in support

of their motion, applying today's refined constitutional principles to this decades-old consent

decree leads to a finding that the decree is no longer constitutionally sound and must be

dissolved.

III.    THE DEFENDANTS AND INTERVENORS CANNOT ADOPT NEW RATIONALES
        TO DEFEND THE CONSTITUTIONALITY OF THE CONSENT DECREE, WHICH
        WAS IMPLEMENTED AS A REMEDY FOR PAST RACIAL DISCRIMINATION.

        The Defendants and Intervenors cannot now adopt and rely on new rationales for the

alleged constitutionality of the consent decree, nor would the new rationales they adopt pass

constitutional muster in this case.  [City Opp. at 9; Comm. Opp. at 6, 21-29; Int. Opp. at 35.]

The consent decree was implemented as a remedy for past racial discrimination, and it must

stand or fall on that basis.

        Neither Cotter v. City of Boston, 323 F.3d 160 (1st Cir. 2003), nor Donaghy v. City of

Omaha, 933 F.2d 1448 (8th Cir. 1991), cited by the Commonwealth, [Comm. Opp. at 6], stands

for the proposition that *any* justification, even a newly created one, will support a finding of

constitutionality in the government's use of race-based criteria.  Rather, "[i]n order to be a

"compelling interest," the government must show that the alleged objective was its *actual*

*purpose* for the discriminatory classification . . . ."  Cotter, 323 F.3d at 168 (emphasis added).

The fact that the District Court in Castro v. Beecher, 365 F. Supp. 655, 659 (D. Mass. 1973) (Castro III), recognized the benefits of a diverse police force does not change the actual purpose of the consent decree. The consent decree was prompted by decisions of the District Court and the First Circuit in which neither court discussed the benefits of a diverse police force but rather made specific findings about the discriminatory nature and effects of the civil service exam. See Castro I, 334 F. Supp. 930; Castro v. Beecher, 459 F.2d 725 (1st Cir. 1972) (Castro II). Indeed, the Court specifically stated that its discussion of the desirability of having police officers drawn from all segments of society "does *not* imply that any group is entitled to a quota, nor to a fraction roughly corresponding to the fraction of the total population which belong to that group." Castro III, 365 F. Supp. at 659 (emphasis in original).

The Plaintiffs do not dispute that the Defendants may have a laudable goal in seeking a diverse police force, but such a goal is not the underlying reason for the consent decree and cannot therefore support the constitutionality of the current hiring system. A goal of racial diversity cannot support the system that is in place now because that system is akin to the admissions system found by the Supreme Court to be unconstitutional in Gratz v. Bollinger, 539 U.S. 244 (2003), since it has the effect of making race a decisive factor in the consideration. To be constitutional, a diversity-based approach must not "insulat[e] the individual[s] from comparison with all other candidates," but rather must be "flexible enough to consider all pertinent elements of diversity in light of the particular qualifications of each applicant." Grutter v. Bollinger, 539 U.S. 306, 334 (2003) (citing Regents of Univ. of Cal. v. Bakke, 438 U.S. 265 (1978)).[3]

---

[3] Plaintiffs would welcome the Defendants implementing a merit-based selection system that considers an entire group of *best* qualified candidates and selects from among them with an eye toward diversity, as the Plaintiffs believe that they would benefit from such an approach due to their exceptional levels of education and experience. [See Pl. SOF ¶¶ 45-52.]

Finally, the fact that the City has not taken any steps to get out from under the decree, [See Int. Opp. at 6], has no bearing on whether the decree should no longer be applied to the City. Following this theory to its logical end, the Defendants could agree with the Intervenors that the City will never ask to be excused from the requirements of the decree and could thus keep the decree in place forever. The possibility of this type of collusion, whether spoken or unspoken, is exactly why this legal challenge is necessary.

IV.    THE COURT MUST USE ONLY ENTRY-LEVEL POLICE OFFICERS IN ITS PARITY CALCULATION, NOT THE ENTIRE UNIFORMED POLICE FORCE, BECAUSE TO DO OTHERWISE WOULD NOT BE NARROWLY TAILORED.[4]

       A.    If there are disparities in the promotional ranks, those disparities have been and continue to be addressed in a variety of ways, and it is not permissible to address disparities in the promotional ranks by simply flooding minorities into entry-level positions hoping for some trickle-up effect.

The Defendants and Intervenors argue that it is constitutionally permissible, not withstanding the First Circuit decision in Quinn, to compare the number of minorities in the general population with the total number of minorities in the Boston Police force as a whole to determine whether parity has been achieved. [Comm. Opp. at 10-15; Int. Opp. at 20-21]. As described below, not only does this analysis ignore the holding by the First Circuit in Quinn, but it is otherwise wrong as a matter of law and common sense.

First, the Defendants try to get some mileage out of the fact that the department hires some percentage of its entry-level officers through the cadet program, which is not based upon rank and exam score. [See Wolfman Aff. ¶ 13.][5] Yet the problem with this suggestion is that the head of personnel for the Boston Police Department has testified that since the 1990s, even the

---

[4] Plaintiffs use the term "police officers" to refer to individuals who have not become detectives or been promoted to superior officer positions. The term refers to the category of individuals referred to as "patrolman" on the BPD strength reports.

[5] The Affidavit of Toni Wolfman is attached as Exhibit B to the City's SOF.

cadet program has been based upon a rough quota system in which the Commissioner attempted

to achieve the hiring of 40 percent minorities in each cadet class.  [See Callahan Depo. at 62-65,

115-116.][6]

Curiously, the Commonwealth also suggests that measuring whether parity is achieved by

looking at the total police force, including all ranks, "perhaps most significantly, corrects for the

impact of continuing discrimination within police departments."  [Comm. Opp. at 11 (emphasis

added).]  The suggestion that there is continuing discrimination within the department – i.e., in

terms of internal promotions – is an absolutely slanderous allegation against the Boston Police

Department.  Rather than there being evidence that the Boston Police Department has engaged in

a pattern of "continuing discrimination," the evidence shows just the opposite – that the Boston

Police Department has taken extraordinary steps, within the confines of the law, to have a

diverse group of superior officers.  Since 1985 and thereafter, the City of Boston has spent

millions of dollars to come up with a valid, EEOC approved, promotional exam that relies little

on pen-and-paper test-taking and instead tests real superior-officer decision-making ability

through in-baskets, video simulations, and other such methods.  See Boston Police Superior

Officers Fed'n v. Civil Serv. Comm'n, 624 N.E.2d 617 (Mass App. Ct. 1993) (BPSOF).

Moreover, the City of Boston, a defendant itself, has demonstrated that when it has been faced

with tie scores or scores within the Civil Service 2-plus-1 rule, it has promoted minority

candidates based upon ability.  See Cotter v. City of Boston, 323 F.3d 160 (1st Cir. 2003).

Because in order to become a superior officer, or a detective, one has to go through a

professionally validated, non-discriminatory examination process, maintaining this quota system

---

[6] The Court should strike the self serving Affidavit of Attorney Wolfman, an attorney for the Intervenors, who tries
to suggest a history of discrimination in the cadet program.  Even if this were true, it has no relevance to this case,
and in any event, is subject to the same quota based hiring system since the early 90's as it is at issue in the rest of
the case.

at the entry level will do very little to obtain diversity in the higher ranks. The Commonwealth's position is akin to arguing that in order to get more minority medical students, universities' undergraduate programs should admit more minorities in the hopes that there will be some trickle-up effect. The plain fact is that if the Intervenors and Defendants are concerned about more minority representation in the upper ranks, they have adequate means available to them under the Civil Service Law, through the use of paragraph 10 lists, and through the further refining of the non-discriminatory promotional exam. Simply overfilling the entry level ranks with minority candidates who were not otherwise chosen based on merit does not accomplish that goal. Further, and most importantly, because strict scrutiny must be applied to governmental race-based decisions, any race-based remedy must be narrowly tailored to achieve its stated purpose. See Grutter, 539 U.S. at 326. Using an entry-level quota system to achieve more diversity in superior officer ranks is not a narrowly tailored approach and therefore cannot withstand constitutional scrutiny. Quinn, 325 F.3d at 32.

In addition, as stated by the First Circuit in Quinn, a raced-based hiring scheme can never be used to *maintain* racial parity, but only to *achieve* it. Id. at 37. It is clear from the Defendants' and Intervenors' briefs that they wish to use race-based hiring to maintain racial parity, yet this is clearly an unconstitutional use of such a scheme. Indeed, continuing race-based entry-level hiring to achieve more diversity in superior officer ranks could easily result in minorities being hired in numbers greater than the number of minorities in the relevant labor pool. Without specifically addressing any diversity problems in the superior officer ranks, such entry-level race-based hiring will not resolve any issues of diversity in the superior ranks.[7]

---

[7] Indeed, it is not clear from the parties' briefs that there is *any* discrimination in the superior officer ranks, and there are many well-known and well-qualified minority superior officers. Indeed, the number two in command of the whole Boston Police Department, James Claiborne, is African-American, and at least four other individuals holding the rank of Superintendent or Deputy Superintendent, among the highest positions in the BPD, are minorities.

B.     Even a focused review of the language of the consent decree necessarily leads to a finding that entry-level police officers is the appropriate variable to consider.

A central contention in the Quinn decision was that the consent decree underlying that case used the word "firefighter," which the Court determined referred to entry-level firefighters. Quinn, 325 F.3d at 30-32. However, there is no evidence to suggest that the use of the term "police officer" in the nearly identical consent decree underlying this case refers to anything other than entry-level police officers. [Int. Opp. at 20-21.] As an initial matter, the Intervenors are plain wrong when they assert that the evidence shows the City uses the term "police officer" to apply to all uniformed officers; the evidence fails to even show that Callahan uses that term in that way. [See Pl. Response to SOF ¶ 59.] Furthermore, in Quinn, the First Circuit noted that it had held the term "police officers" in a consent decree governing promotions in the Boston Police Department referred not to all uniformed individuals but rather only to "patrolmen." Id. at 32.

More importantly, the Quinn court held that to use the term firefighter to refer to anything broader than entry-level employees would not be narrowly tailored and would therefore be unconstitutional. Id. The same is true of "police officers" in this case, as the entire purpose behind the consent decree was to address discrimination in "recruiting and hiring" of entry-level officers. Castro II, 459 F.2d at 728. Applying the comparison to include all uniformed individuals would "effectively transform an instrument carefully crafted to eliminate discrimination in recruitment and hiring into general leverage favoring minorities in a much

---

Promotional selections are made from outside experts who assess people's abilities through in-basket and video simulation exercises. See BPSOF, 624 N.E.2d 617. Many of the assessors are minorities. While there may be some difference between the percentage of minorities in the general labor pool and the percentage of minority superior officers in the Boston Police Department, there is simply no proof that this is a result of any discrimination, intentional or unintentional.

wider variety of matters." Quinn, 325 F.3d at 32. The proper variable must therefore be only

entry-level police officers.

V.    A NARROWLY TAILORED APPROACH TO PARITY CALCULATIONS
      REQUIRES THE USE OF LABOR POOL FIGURES AS OPPOSED TO GENERAL
      POPULATION FIGURES.

The Defendants' and Intervenors' reliance on their practice with regard to parity

calculations ignores whether the approach is narrowly tailored to achieve a compelling state

interest. [City Opp. at 8-9; Comm. Opp. at 15-16; Int. Opp at 22.] As explained above, the test

for determining whether race-conscious relief is appropriately narrowly tailored has been refined

over the years, so such race-based actions must be subjected to continuing oversight to assure

that they do not "unduly harm members of any racial group." Grutter, 539 U.S. at 341; see also

Mackin, 969 F.2d at 1277.

As clearly explained in the Plaintiffs' original memorandum, the Supreme Court's

decision in City of Richmond v. J.A. Croson Co., 488 U.S. 469, 501-502 (1989), requires the use

of qualified labor pool analysis where special qualifications are necessary to hold a particular

position and where such information is available. [See Pl. Memo. at 14-16.] Age, citizenship,

and high school degrees are qualifications to become Boston Police Officers that cannot be

ignored and are thus "special qualifications" within the meaning of Croson.[8]

The Commonwealth pulled the artificial category of education and training qualifications

out of thin air; there is absolutely no support in any case law for such a categorization. [See

Comm. Opp. at 17.] Rather, the cases set forth in the Commonwealth's Opposition reflect that

the Supreme Court allows and even encourages the use of more restrictive analyses. See

Steelworkers v. Weber, 443 U.S. 193 (1979) (accepting the use of area labor force figures);

---

[8] The Commonwealth's suggestion that these qualifications are all easily attainable flies in the face of the well-
known hurdles to obtaining U.S. citizenship, which have been amplified since September 11, 2001.

<u>Hazelwood School Dist. v. U.S.</u>, 433 U.S. 299 (1977) (requiring the use of qualified labor pools where a job has special requirements).

Because age, citizenship, and education level are specifically identified qualifications to attain a position as a Boston Police Officer, the Court must base its comparison on the qualified labor pool. Since the evidence indicates that application of *any one* of these qualifications leads to a clear finding of parity (even taking all other factors in a light most favorable to the Defendants), it would constitute a manifest injustice to ignore the figures that are available to the Court.

Finally, and importantly, the Defendants' and Intervenors' reliance on the four factors regarding narrow tailoring set forth in <u>Mackin</u> does not resolve the issue of overbreadth. [E.g., Int. Opp. at 23-24.] Though the First Circuit recognized as one factor the extent to which "the legitimate expectancies of others are frustrated or encumbered," <u>Mackin</u>, 969 F.2d at 1278, the Supreme Court has since held that the appropriate inquiry is one that ensures that race-based government actions "work the *least harm possible* to other innocent persons . . . ." <u>Grutter</u>, 539 U.S. at 341. Such an exacting standard requires the strictest scrutiny and narrowest tailoring possible, which the Court can only achieve through a comparison with the qualified labor pool based on the data that is readily available.

<u>VI.</u>     <u>THE PLAINTIFFS' EXPERT WITNESS CORRECTLY CALCULATED THE MINORITY POPULATION OF THE CITY OF BOSTON, SO PARITY HAS BEEN ACHIEVED EVEN USING A COMPARISON TO THE ENTIRE MINORITY POPULATION.</u>

As the supplemental affidavit of Dr. Aitken makes clear, he correctly calculated the percentage of minority residents of the City of Boston. [See Ex. A attached hereto.] Because the census uses separate questions for race and Hispanic/Latino ethnicity, any time you add together populations of black residents with Hispanic residents you must first ensure that the population

of black residents you are using doesn't already include those black residents who also consider themselves to be of Hispanic/Latino ethnicity.  Otherwise, these individuals get counted twice. Id. ¶ 2.  Using the figure that the Defendants' expert suggests would double count those individuals who identify as black who also identify as Hispanic or Latino.  Id.  ¶ 13.  The correct percentage of the minority population of the City of Boston, which was also recognized as the correct measure in the Quinn case, 325 F.3d at 37, is **38.26 percent**.  Id.

As they did in the Quinn case, the Defendants and Intervenors again attempt to muddy the statistical waters by asking that the Court add into the minority population those who identified themselves on the census as multi-racial.  See Quinn v. City of Boston, 204 F. Supp.2d 156, 162 n. 15 (D. Mass. 2002), rev'd 325 F.3d 18 (2003).  As explained by Dr. Aitken, adding these individuals to the number of minority residents is not appropriate in this calculus because neither the Commonwealth nor the City allows individuals to self-identify in such a manner when applying for police officer positions.  [Aitken Aff. ¶ 11.]  Therefore, it is impossible to know how these individuals would have self-identified, [Aitken Aff. ¶ 19], and the numbers cannot be used to justify continued reliance on the consent decree.

Moreover, the Defendants' and Intervenors' expert witness, Dr. Moore, made a significant miscalculation in his multi-race analysis when he used the figures for residents who consider themselves black and any other race, including Hispanic or Latino.  [Moore Aff. ¶¶ 26, 27.]  Since the question regarding Hispanic or Latino identity is separate from the race question, Dr. Moore has double counted all individuals who identify as both black and Hispanic or Latino by counting them in the multiracial black population *and* the Hispanic population and by then adding those figures together.  [Aitken Aff. ¶ 16.]

Moreover, if the Court were to use the more sophisticated data regarding multi-racial individuals that is now available, it would smack of unfairness to at the same time exclude the more sophisticated data now available regarding the qualified labor pool.[9] See supra part V.

These questions regarding how the variables should be computed merely raise questions of how closely the Court should scrutinize the race-based hiring practices here and do not raise any significant questions of material fact. [City Opp. at 6-7.] As explained herein, a strictly scrutinized viewing of the variables in this case leads to a finding that parity has been achieved and that the Plaintiffs are entitled to judgment as a matter of law.

VII.  THE SUPPOSITION THAT REMOVING THE CASTRO DECREE WILL LEAD TO FURTHER DISCRIMINATION BECAUSE OF THE DISCRIMINATORY IMPACT OF THE CURRENT EXAM CANNOT SUPPORT CONTINUED ADHERENCE TO THE CONSENT DECREE.

Given that the Commonwealth was ordered to devise a non-discriminatory entrance examination more than 30 years ago, it is disingenuous for the Commonwealth to use its utter failure to do so as an excuse to perpetuate a quota-based hiring system. [Comm. Opp. at 22; Int. Opp. at 32-34.] The original Castro decisions make clear that the root cause of the problem was the discriminatory nature of the examination, Castro I, 334 F. Supp. at 941-43, Castro II, 459 F.2d at 735-36, and the consent decree had as a central purpose the establishment of an examination that is non-discriminatory. [See Pl. SOF, Ex. 1 ¶¶ 3, 7.] It is unconstitutional for the Defendants to continue to rely on the racially motivated hiring aspect of the decree when it has failed to correct the original problem – an exam with disparate racial impact that does not pass muster under the EEOC guidelines – for which the decree was created. See 29 C.F.R. Part 1607; see also Aiken v. City of Memphis, 37 F.3d 1155, 1164 (6th Cir. 1994) ("[I]ncredibly, the

---

[9] The Defendants/Intervenors also argue that the Court should take into account the assumption that the census undercounts minorities. [E.g., Int. Opp. at 7-8.] This contention is unsupportable, as the census data is the only benchmark available to us. If allowed to do so, the Defendants and Intervenors could use this excuse to forever justify use of the consent decree.

City continues to make police and fire department promotions according to procedures that have not been validated as racially neutral.  This dereliction cuts against a finding that the race-based remedies at issue are narrowly tailored . . . .").

What is truly remarkable about the Intervenors' and Defendants' briefs is that they utterly fail to mention or discuss the main holding in the underlying case.  Castro v. Beecher stemmed from an attack on a pen-and-paper written examination that truly did have adverse impact on minorities and which could not be demonstrated to be job-related under EEOC guidelines.  See Castro I, 334 F. Supp. at 941-43.  The remedial hiring set forth in the consent decree was only an interim measure designed to remedy the effects of past discrimination while a valid examination was devised.  Castro III, 365 F. Supp. at 659-660, 662.

Since the consent decree was premised upon the Court's finding that the exam was discriminatory, the most important result of the litigation was the court order requiring the Commonwealth and the City of Boston to construct a non-discriminatory examination designed to pick the best police officers without improper discriminatory effect.  Remarkably, the Intervening NAACP and MAMLEO have apparently entered into an agreement, spoken or unspoken, with the Defendants in which they have chosen not to pursue the creation of a non-discriminatory exam, and in return, they have accepted the Defendants' cutting off the passing score for the discriminatory written examination at 70 and continuing to hire on a one-for-one basis.  This race-based hiring scheme made it unnecessary for the Intervenors to pursue the real remedy in the underlying case, a non-discriminatory examination.  The current hiring system continues to serve as a crutch for maintaining racial diversity, making it unattractive for the Intervenors to pursue changes in the examination process.

14

Indeed, the Commonwealth has failed to ensure that the exam is non-discriminatory and essentially now concedes that it is a discriminatory exam. [Comm. Opp. at 22-23.] Thus, despite being admonished to come up with a non-discriminatory exam because it was guilty of unlawful race discrimination in 1971, the Commonwealth has failed to achieve this goal and now seek further delay by arguing that if the Court ends the decree, the exam will produce discriminatory results. If ever the old aphorism regarding an individual killing his parents and then throwing himself on the mercy of the Court because he is an orphan applied, it would apply to this case and to this argument made so callously by the Defendants and Intervenors.

Furthermore, the Commonwealth's eleventh-hour suggestions of new approaches, such as banding, to resolve the discriminatory hiring dilemma have no place in this litigation and would cause their own problems.[10] [Comm. Opp. 23-29.] The question presented in this litigation is whether the *current* system applied by the Defendants is constitutional. It is of no help for the Commonwealth to offer new approaches at this hour. As noted above, <u>supra</u> part III, the Defendants should have been seeking alternative approaches to their discriminatory practices for the past 30 years. Only now, when the Plaintiffs are asking the Court to set aside the current approach as unconstitutional, does the Commonwealth even attempt to find another approach that it asserts would pass constitutional muster.

---

[10] Though the Commonwealth takes pains to suggest that banding would comport with Massachusetts Civil Service laws, [Comm. Opp. at 27-28, n .19], the case it cites, <u>Ash v. Police Comm'r of Boston</u>, 418 N.E.2d 622 (Mass. App. Ct. 1981), relates to rounding off of exam scores, which is not exactly the same as banding. Moreover, that case dealt with promotional appointments, which fall under a different statutory scheme and follow different rules than initial appointments. And interestingly, the Plaintiffs might have actually done better under a banding approach, considering their relevant law enforcement education and experience. [<u>See</u> Pl. SOF ¶¶ 45-52.]

VIII.  THE DEFENDANTS' AND INTERVENORS' ARGUMENTS ABOUT OTHER
       CITIES AND TOWNS THAT HAVE OR HAVE NOT BEEN RELEASED FROM THE
       DECREE ARE IRRELEVANT AND MISLEADING.

       The Defendants make much of the fact that other cities and towns have gotten out from

under the consent decree.  [E.g., Comm. Opp. at 3; Wolfman Aff. ¶¶ 4, 5, 9, 11.]  No evidence

was provided as to what the statistics were in those cities and towns that allowed those

municipalities to get out from under the decree.  The Court is simply asked to rely on the bald

assertions of the Defendants.

       In any event, Boston is clearly unique in the Commonwealth.  It is by far the state's

largest city, and it is clearly a major point of entry and destination for many immigrants –

including those who would meet the definition of "minority" in this case.   It is undeniable that

the minority population is growing.  But much of this growth is not by people who meet the

basic qualifications to be a Police Officer, but by legal and illegal immigrants who have moved

to Boston from their native lands.  See, e.g., Black Political Task Force v. Galvin, 300 F. Supp.

2d 291, 300 (D. Mass. 2004) (noting that there are a great number of recent immigrants among

the city's growing Hispanic population).

       If the Court accepts the Defendants' arguments, there is a very real possibility that the

decree will go on forever, a result which apparently is to the liking of the Defendants and

Intervenors.  For example, given current population trends, it is certainly possible that the total

minority population in the city of Boston will one day be above 50 percent.  As this growth in

minority population increases, the City of Boston would have to hire more and more minorities

in an attempt to catch up to these general population statistics in a never ending game of chase.

Indeed, it is not clear that parity would ever be achieved using the Defendants' calculations even

should the Department become a majority of minority officers.  And more importantly, at this

stage, the Defendants' use of a race-based hiring system can no longer be said to relate to addressing the vestiges of race discrimination.

IX.    THE AGE OF THE CONSENT DECREE MILITATES AGAINST A FINDING THAT IT IS STILL CONSTITUTIONAL.

The Intervenors' contention that the decree cannot be considered to have expired because other communities are still operating under it misses the point of the Plaintiffs' arguments regarding the duration of the decree. [Int. Opp. at 28.] If the decree has outlived its constitutional reliability, the Court has not only the power, but the obligation to dissolve it, no matter how many communities might still be operating under it.

More to the point, as regards the City of Boston's use of the consent decree, the extremely long duration of this particular decree certainly militates against a finding that it still passes constitutional muster. "Limiting the duration of a race-conscious remedy which clearly impacts adversely upon the plaintiffs is a keystone of a narrowly tailored plan . . . ." Detroit Police Officers Ass'n v. Young, 989 F.2d 225, 228 (6th Cir. 1993). As explained herein, supra part VIII, though the Defendants and Intervenors contend that the decree will expire when parity is achieved, it is becoming increasingly clear that parity – as they define it – may never be achieved. Such a result cannot be sanctioned. The Court should take this opportunity to put an end to a decree that has outlived its strictly scrutinized usefulness.

X.    THE DEFENDANTS HAVE STILL NOT PROVIDED ANY EVIDENCE OF DISCRIMINATION TO JUSTIFY GENDER-BASED HIRING, AND THEIR ARGUMENTS REGARDING BONA FIDE OCCUPATIONAL QUALIFICATIONS RAISE POTENTIAL ISSUES OF MATERIAL FACT THAT WOULD MAKE SUMMARY JUDGMENT INAPPROPRIATE ON THIS DISCRETE ISSUE.

The City and the Commonwealth both present much information as to the rationale behind the City's use of gender in the hiring process for police officers. [City Opp. at 14-18; Comm. Opp. at 29-36.] However, nowhere in those lengthy arguments does either Defendant

show any evidence of a history of gender discrimination by the Boston Police Department that might justify gender-based hiring. To the extent that the Defendants contend that gender is a bona fide occupational qualification for police officers in the City, such a claim necessarily invites an extremely fact-intensive inquiry that may not be resolvable on a motion for summary judgment at this time without recourse to further discovery. See Fed. R. Civ. P. 56(f).

XI.    THE PLAINTIFFS HAVE DEMONSTRATED THAT THEY SATISFY THE
       REQUIREMENTS FOR A PRELIMINARY INJUNCTION.

The general attacks launched by the Defendants and the Intervenors regarding the Plaintiffs' entitlement to preliminary injunctive relief fall well short of their goal. As a prime example, the Defendants' argument that holding open eight police officer spots for the Plaintiffs in the next hiring class would somehow endanger the city, [City Opp. at 22-23; Comm. Opp. at 36], are specious, self-serving, and completely unsupported. The Intervenors' contention that the timing of the complaint and the filing of the injunction motion evince a lack of concern by the Plaintiffs is similarly disingenuous. [Int. Opp. at 29.] The Plaintiffs filed their complaint soon after being passed over in the October 2003 hiring cycle and filed their injunction motion well before the next class was hired. There can and should be no room in these proceedings for these types of hollow contentions.

As to the merits of the injunction request, the Plaintiffs have demonstrated herein and in their original memorandum that they are likely to succeed on the merits of the claims. The balance of the equities argument regarding the Defendants' need to have a constitutional hiring process in place in the absence of the decree is outrageous. [Int. Opp. at 32-34.] As explained above, supra parts III & VII, if the Defendants and Intervenors were so concerned about this problem, they should have done *something* over the last 30 years to create a non-discriminatory

hiring process.  Moreover, nothing stops the parties from creating such a non-discriminatory

process with or without the decree.

As to the issue of irreparable harm, the Plaintiffs demonstrated such harm in their original

filing both through presumption and evidence.  [Pl. Memo. at 20-21.]  As to the presumption of

irreparable harm, though the Intervenors point out that the First Circuit has never used the Elrod

presumption outside of First Amendment cases, [Int. Opp. at 31], they failed to explain that no

Court of Appeals has ever expressly ruled out such use of the Elrod exception and that several

other circuits have indeed presumed irreparable harm based on constitutional violations of other

than the First Amendment.  E.g., Mitchell v. Cuomo, 784 F.2d 804 (2nd Cir. 1984) (eighth

amendment), Conn. Dept. of Environmental Protection v. OSHA, 356 F.2d 226 (2nd Cir. 2004)

(sovereign immunity); Preston v. Thompson, 587 F.2d 300 (7th Cir. 1978) (due process),

abrogated on other grounds, City of Boerne v. Flores, 521 U.S. 507 (1997).  Moreover, even

without this presumption, the Plaintiffs have demonstrated that although their promotional

opportunities within the department may be speculative, they are currently foreclosed and would

become increasingly more difficult as time goes by.

Finally, as already addressed, the public interest in a diverse police force asserted by the

parties, [City Opp. at 5-6; Int. Opp. at 35], cannot outweigh the constitutional violations against

those who wish to become police officers but are prevented from becoming officers because of a

racially discriminatory hiring process.  Though the Intervenors correctly point out that the Court

in Castro III discussed the importance of a diverse police force, [Int. Opp. at 35], in the very next

paragraph, the Court stated that such a laudable goal does not imply that any group is entitled to

a quota or fraction corresponding to their representation in the population.  365 F. Supp. at 659.

Though diversity may be a laudable goal, that goal cannot counterbalance the clear constitutional violation proved by the Plaintiffs in this case.

For these reasons, the Plaintiffs are entitled to a preliminary injunction as they have requested.

XII.    CONCLUSION

For the foregoing reasons, the Plaintiffs respectfully request that this Court enter summary judgment in their favor on liability and enter a preliminary injunction requiring the Defendants to immediately cease using their discriminatory hiring practices and to immediately consider Plaintiffs for police office positions.

Respectfully submitted,

PAUL DELEO, JR., THOMAS BARRETT, MICHAEL CONNEELY, MATTHEW HOGARDT, BRENDAN DEVER, PATRICK ROGERS, CHRISTOPHER CARR, and BRIAN DUNFORD,

By their attorneys,

/s/  Alfred Gordon
Harold L. Lichten, BBO #549689
Alfred Gordon, BBO #630456
Pyle, Rome, Lichten & Ehrenberg, P.C.
18 Tremont Street, Suite 500
Boston, MA 02108
Date:    September 10, 2004        (617) 367-7200

**CERTIFICATE OF SERVICE**

I hereby certify that, in addition to being electronically filed, a true copy of the above document was served on the attorneys of record for each party by U.S. Mail on September 10, 2004.

/s/  Alfred Gordon
Alfred Gordon

20