UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 03-12538-PBS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Paul DeLeo, Jr., et al.
                    Plaintifs

v.

City of Boston, Massachusetts, et. Al.
                    Defendants
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### SUPPLEMENTAL AFFIDAVIT OF EXPERT WITNESS DR. NORMAN D. AITKEN

I, Norman D. Aitken, Ph.D., being duly sworn, depose and state as follows:

### INTRODUCTION

1) As a supplement to my original Affidavit of July13, 2004, I will describe the methodological principles that have determined my statistical approach to this case. I believe this will address and resolve the objections that Dr. Craig Moore has raised about my statistical analysis in his affidavit of September 2, 2004. I will also show that Dr. Moore has used the wrong Census data in making his calculations and therefore, his analysis and conclusions are incorrect. This means that my original conclusions still stand: The percentage of Black/African-American and Hispanic/Latino minorities in the total population of Boston was 38.26% on April 1, 2000 and the percentage of the minorities in the entry level patrolman-position of the BPD was 38.79% on June 30, 2003 and remained at this level or higher, through October 27, 2003. Therefore, it can be concluded that during this time, parity was attained between the percentage of minorities in the patrolman position and the percentage of minorities in the general population of Boston. I will also address the issue of how to statistically treat "Individuals of More Than One Race" as reported by the Bureau of the Census for the City of Boston from the 2000 Census. Finally, I will respond to statements made in the "THE COMMONWEALTH DEFENDANTS' RESPONSE TO THE CITY OF BOSTON'S MOTION FOR CLARIFICATION OF THE CASTRO V. BEECHER CONSENT DECREE," which are also reflected in the Commonwealth's Opposition to the Plaintiffs' motion for summary judgment. I will provide a comprehensive response to the issues that have been raised and identify sources in parentheses.

### MEASUREMENT OF RACE: METHODOLOGY

2) One of the issues in this case, is the effect of the U.S. Census Bureau's decision to allow respondents to identify themselves as being of more than one race (up to six) in the 2000 Census. Included as **Exhibit A**, is the first page of the 2000 U.S. Census Form, which contains Question 8, "the Race Question". The question asks respondents to "mark one or more races to indicate what this person considers himself/herself to be". In prior census years, respondents were asked to identify themselves as being of a particular (single) Race. Question 7 asks whether the Person is "Spanish/Hispanic/Latino". Persons who answer yes to this question are also asked to identify their race in Question 8. Consequently, there can be Spanish/Hispanic/Latinos of any race. This is important for this case, because in order to obtain an accurate count of "minorities" compatible with the Castro Decree it is necessary to add to the Spanish/Hispanic/Latino Population only those Black/African minorities, who are not Spanish/Hispanic/Latino. Otherwise, they will be counted twice. Associated with the new Race question, is a March 9, 2000 Bulletin (NO. 00-02) issued by the Office of Management and Budget (OMB) to provide "guidance on aggregation and allocation of data on Race for use in civil rights monitoring and enforcement (see **Exhibit B**). Section II of the Bulletin, "Allocation Guidance", provides some rules for "Federal agencies," but not state or city governments. No evidence has been provided that either the Commonwealth of Massachusetts or the City of Boston has adopted these guidelines. In fact, along with other issues, the OMB guidelines require that agencies offer individuals the opportunity to select one or more races when reporting information on race in Federal data collections. I am not aware of any evidence in this case that the BPD is collecting multiracial information for its applicants or its appointees.

3) In analyzing major decisions made by large organizations such as the Boston Police Department (BPD), it is important to identify the policies, procedures and practices used by the organization to make its decisions. This information is useful in determining the appropriate data for both understanding and analyzing the organization's decisions as well as the results of those decisions. The following paragraphs provide my understanding and analysis of the current identification and reporting practices for race in the hiring of Patrolmen for the BPD.

4) The major policies were written in the Castro v. Beecher Consent Decree (hereinafter "Castro Decree,") attached as **Exhibit C**. Especially important are the policies for "Future Certifications" (Id. pgs. 9-10), which requires that the Director establish two groups: "i. Group A shall consists of all Black and Spanish-surnamed applicants who pass a future police examination and are otherwise qualified for appointment on the basis of existing requirements. ii. Group B shall consist of all other persons who pass a future police entrance examination and are otherwise qualified for appointment on the basis of existing requirements" ( Id. p.10, par. 21) To be clear, group B was to consist of all qualified individuals who were neither Spanish surname applicants nor Black applicants. The Decree defined Spanish-surnamed candidates as follows: "the candidate was born in a Spanish- speaking country or if the candidate was raised in a home, where the primary language was Spanish" (Id. par. 16, p. 8).   In my original

affidavit, I called Group A "the minority group." and Group B the "non-minority group."

5) The Castro Decree further specifies that for each future police examination, "... the Director shall require all candidates for police officer positions to provide under penalty of perjury the following information: whether the candidate is (a) caucasian (white); (b) black; (c) Spanish-surnamed (i.e. the candidate was born in a Spanish-speaking country or if the candidate was raised in a home where the primary language was Spanish); (d.) other (Id. p. 8, par 16). From these four race/ethnic categories, (b) Black and (c) Spanish-surname candidates were to be combined to form Group A (the minority group) and (a) Caucasian (White) and (d) Other) were to be combined to form Group B (the non-minority group). Under this process, candidates self-identify their race and ethnicity.

6) Compliance with the Castro Decree was to be determined as follows: " As a city or town achieves a complement of minorities commensurate with the percentage of minorities within the community, certification will be made according to existing Massachusetts law, and as the Capitol Police achieves a complement of minorities commensurate with the percentage of minorities within the City of Boston, and the M.B.T.A. Police or the M.D.C. Police achieves a complement of minorities commensurate with the percentage of minorities within the jurisdiction served by the M.B.T.A. Police or the M.D.C. Police, certification will be made in accordance with existing Massachusetts law..." (Id. pg. 11-12, par. 24).

7) The Decree does not specify how the total population or the percentage of minorities within cities or towns (including the city of Boston) were to be calculated. However, in her affidavit (**Exhibit D**), Attorney Toni G. Wolfman states: "Since the early 1980s, I have personally been involved in the process by which a substantial number of Massachusetts communities have been released from the protocol established by the Castro consent decree..." (Affidavit of Toni G. Wolfman, pg. 2, par.5). Referring to "each instance in which my law firm or I have been involved in the exemption process", Wolfman notes "Typically, supporting information would include:... the total population of the city or town as reflected in the most recent federal Census, and the number of African-American and Hispanic residents of the city or town as stated in the same federal census report (Id. pg.2, par.6). Wolfman concludes by saying "I am not aware of any material changes over the years since 1980 in the manner in which the exemption process has been conducted by DPA/HRD, appointing authorities, or my firm" (Id. pg.4, par. 14).

8) Included as **Exhibit E** are copies of memos submitted by the defendants from David Haley, Personnel Administrator to Consent Decree Public Safety Appointing Authorities, dated March 19, 1986 and September 1, 1987. The memos describe the same process for determining the total and percentage of minorities within the community:
"Check the most recent federal Census to determine:
   a. Total population of the municipality

    b. Total Black and Hispanic population of the municipality
    c. The actual percentage of the total population, which is Black or Hispanic as determined by that Census."

9) In his June 22, 2004 deposition (**Exhibit F**), Mr. Edward Callahan, Director of Human Resources for the BPD was asked the following question by Attorney Quinan: "Mr. Callahan, when you are reviewing the U.S. Census data for purposes of determining the percentage of minorities in this general population of the City of Boston, do you count those who identify themselves as biracial, African-American, for example, and some other race, or multiracial on the U.S. Census forms?" Mr. Callahan's answer was "No." (Pg. 126, lines 6-13).

10) Pages 48-50 (**Exhibit F**) of his deposition contain Mr. Callahan's answers to a series of questions about how he determines the race of candidates for BPD positions. His answers identify several sources of information including "self identification", the civil service certification list, "an officer's own characterization of his own race", and a recent use of a "computerized bank of photographs". I conclude from this information that the BPD's primary method of determining the race of candidates is self identification, supplemented by the occasional checking of an individual's designated race against his or her photograph.

11) Based on the above cited evidence, I conclude that at least through June 22, 2004, the BPD has consistently collected and reported data on the racial composition of the Patrolman Position (and the composition of the police force as a whole), using the policies specified in the Castro Decree. The practice by which the BPD collects and reports this data has remained essentially the same over the years since the Decree was issued. The BPD has consistently obtained comparable data from the U.S. Census Bureau using exactly the same definitions and categories for race. The BPD has not included biracial or multiracial individuals in determining the minority composition of the Patrolman Position or the Police Force as a whole. In my analysis, I have followed the exact same policies. The Defendants have argued that Census respondents who have self-identified as multi or biracial and indicated one of their races is Black/African-American should be counted as Black/African-American in calculating the minority composition of the Boston City population. This would be methodologically valid <u>only if</u> the same procedures were also used in determining the racial composition of the patrolman position and the police force. But, this is not the case. Using different definitions of minorities in calculating the race composition of the BPD and the City of Boston create erroneous results.

### DR. MOORE'S AFFIDAVIT

12) In his affidavit, Dr. Craig Moore provides a number of criticisms of the statistical calculations and analysis presented in my first affidavit. His criticisms are either completely wrong or overstated. His errors seem to stem from a misunderstanding of the way the Bureau of the Census organizes and reports its data and a failure to

understand the current policies and procedures of the BPD with respect to race identification and classification, as described in previous paragraphs.

13) In paragraph 16 of his affidavit, Dr. Moore argues that the actual number of African Americans, as reported in the Census data is 149,202 and when added to the total number of Hispanics, yields a minority population which constitutes 39.8% of the total Boston population. While Census Bureau Table DP-1 does report a total of 149,202 Black or African Americans of one Race in the Boston population, this number includes 8,897 Black/African Americans, who are also Hispanic or Latino. Hence, these individuals are counted twice when added to the Hispanic/Latino population. If Dr. Moore had used the correct table (U.S. Census Table P4. HISPANIC OR LATINO, AND NOT HISPANIC OR LATINO BY RACE [73]-see **Exhibit G**), he would have found that the number of Black or African Americans of one race, who are not Hispanic or Latino, was 140,305. This is exactly the number that I reported in my original affidavit and it is correct. When added to the total Hispanic/Latino population of 85,089 it yields a total minority population of **225,394**, which is **38.26%** of the total Boston population. These are precisely the numbers that I reported in Exhibit E of my original affidavit.

14) Consequently, my conclusions still stand as correct: The percentage of Black/African and Hispanic/Latino minorities in the total population of Boston was 38.26% on April 1, 2000 and the percentage of minority patrolmen in the BPD was 38.79% on June 30, 2003 and remained at this level or higher, through October 27, 2003. Therefore, it can be concluded that during this time, parity was attained between the percentage of minorities in the patrolman position and the percentage of minorities in the general population of Boston. It can also be argued that rough parity had been achieved as early as April of 2000, because there is less than a 4% difference in the minority composition of the total Boston population and patrolman in the BPD at this time.

15) As a second criticism, Dr. Moore says that I have understated the number of Black/African-Americans in the population by not counting individuals who report that they are multiracial and that one of their multiple races is Black/African-American. Dr. Moore does not offer any rationale as to why this group should be included as Black/African American, when they have clearly chosen to identify themselves as being multiracial. My response to this criticism has already been answered in Paragraph 11.

16) Dr. Moore's Paragraph 26 brings several numbers together to reach his rather perplexing conclusion. I need to try and trace his logic, but first I need to start with some clear definitions of the U.S. Census data: A) There are Census Tables which report Population (number of people), but also Number of Races (number of races represented in the population, where multi-racial individuals will be counted as in more than one race category). These are not numerically interchangeable categories, except under certain narrowly defined conditions. B) It is my understanding that all parties involved in this case agree that all individuals, who are Hispanic or Latino in the Boston population should be counted as a part of the minority population, but they

should not be counted twice.. Hispanic/Latino is defined as a culture and not a race. Hispanics/Latinos can be of any race, including Black/African American or White. However, if they have identified themselves as Hispanic/Latino, they have been counted as a minority and should not be counted again if they are also Black/African American. It should be noted that this is not recommended in the OMB Bulletin. Let's now examine Dr. Moore's analysis and his data, where the latter is derived from the Census Data shown in his Exhibit C. According to these tables, the total population of Boston is 589,141 and the total number of people who are Black or African American alone or in combination of one or more races, but are not Hispanic or Latino is 151,246. I agree with Dr. Moore's definition and identification of these variables, but because of the reasons stated above, I do not agree with his use of the 151,246 in the calculation, because it includes 10,941 individuals who chose Black/African American as one of two or more races in answering the "race question". The number 10,941 was obtained from Census Table P4 in EXHIBIT G by adding all the numbers under "Population of two or more races" for all the categories which include the Black/African American category, Subtracting the 10,941 multi-race individuals from the 151, 246 yields a Black/African American population of 140,305 and with 85,089 Hispanic Latinos a total minority population of 225,394 and a minority percentage of 38.26, the same results I reported in my original affidavit. Double counting biases and inflates the minority percentage and Dr. Moore does it again in the second part of this paragraph.. Here he starts with 163,006, which is the number of times which Black/African American has been reported as a race, whether alone or in combination with other races. (See Table P9 in **EXHIBIT I**) . If this number is not added to other race counts, it will accurately count the number of individuals who are wholly or partly of this particular race. He then adds this to the total Hispanic/Latino population of 85,089 for a minority population of 248,095 to arrive at his 42.11%. Unfortunately for Dr. Moore's case, the initial 163,006 Black/African Americans he identified include 11,760 who were also Hispanic/Latino (see the Black/African-American numbers under both "Not Hispanic Latino" and "Hispanic Latino".) The 151,246 plus the 11,760 ads to Dr. Moore's 163,006, but the 11,760 are also included in the Hispanic/Latino total so they must be subtracted from Dr. Moore's total to avoid double counting. So instead of Dr. Moore's minority total of 248,095 (163,006 + 85,089) it actually turns out to be only 236,335 (248,095-11,760). If the remaining multiracial individuals (10,941), are also not included in the minority total (as per my prior arguments), then the total number of minorities is 225,394 and the minority population is again the same 38.26% as per my original affidavit.

### Commonwealth Defendants Response

17) The Commonwealth Defendants' Response to the City of Boston's motion for clarification of the consent decree also argues that the calculations of the percentage of minorities in Boston should include "those persons who check off on their federal census form 'African-American/Black' and some other race" (p.3). This statement is

6

also reflected in the Commonwealth's Opposition to the plaintiffs' motion for summary judgment (p. 4, fn. 4). A careful examination of the first page of the United States Census 2000 form (**Exhibit A**) shows that this wording by the Defendants does not appear as an answer on the US Census form. In other words, respondents with multi-race answers are not choosing "African-Americans/Black and some other race", but they are following the instructions in question eight on the form and choosing from two to six specific races that they believe describes their racial composition. There is no way to determine which of the multiple Races selected is the dominant or most important Race in the mind of the respondent.

18) On page 13, the Defendants Response states: "The Federal Office of Management and Budget has ruled that, for purposes of civil rights enforcement, people who identify themselves as members of more than one race should be counted in the minority category." This statement was made based on the Office of Management and Budget (OMB) Bulletin No. 00-02, Guidance on Aggregation and Allocation of Data on Race for The use in Civil Rights Monitoring and Enforcement. (A copy of this bulletin, printed from the OMB web site, is attached as **Exhibit G**.) The "Background" section of this Bulletin states: " The revised standards require, among other things, that agencies offer individuals the opportunity to select one or more races, when reporting information on race in Federal data collections." While these guidelines were issued primarily for federal agencies and are not mandatory for the city of Boston, the defendants have chosen to cite the OMB policy, even though it is not being used by city of Boston or the BPD. Since the defendants have cited this OMB bulletin, it is important to note that no evidence has been provided that multi-race reporting guidelines are being used by the city of Boston or the Boston Police Department. In fact, as noted above in Par. 7 above, H.R. Director, Mr. Edward Callahan states that in doing his own calculations of the minority composition of the city of Boston, he does not include multiracial or biracial individuals. Consequently, while data is available from the Bureau of the Census for individuals of more than one race for the city of Boston, compatible and hence, comparable, data are not available for either the patrolman position or the Boston Police Force as a whole.

19) Furthermore, the strength reports from the Boston Police Department do not contain either a multiracial category or data. Why is this important? Because multiracial individuals who were partially African American but saw themselves as primarily of another race would have identified themselves as being also of the other race during the BPD application process. Perhaps even more important, applicants and potential applicants for the patrolman position may not have realized that they were eligible for the minority affirmative action program because they saw themselves as being primarily of a non-minority Race, even though they were part Black or African American. Having a multi-race question in the BPD application process, by itself could raise minority representation in the dept. because individuals, who see themselves as primarily of another race and only partially or slightly Black/African American could be identified and reclassified into the Black/African-American category.

20) The Implementation Process Section of the bulletin indicates that the guidelines are still a work in progress: "OMB will continue to work closely with the enforcement agencies in the civil rights community to assess these methods as they are implemented over the next few years and to consider the need for future modifications." Therefore, reliance on these guidelines in such an attenuated matter as this litigation is premature and imprudent

21) I have not testified at either a trial or a deposition in the last four years. Attached as EXHIBIT H are tables obtained from the Mass. State Data Center on Citizenship, Age and Educational Attainment' which were used as original information in my Original Affidavit. Originals of all other data sources are provided or cited in either my original or this supplemental affidavit.

I swear that the above is true and accurate to the best of my knowledge.

Signed under the pains and penalties of perjury this 9th day of September, 2004.

*Norman D. Aitken*

Norman D. Aitken

## LIST OF EXHIBITS

A. United States Census 2000 Form, Questions 7 and 8.

B. OMB BULLETIN NO. 00-02, Guidance on Aggregation and Allocation of Data on Race for use in Civil Rights Monitoring and Enforcement.

C. CASTRO CONSENT DECREE.

D. AFFIDAVIT OF TONI G. WOLFMAN

E. MEMOS: DAVID A. HALEY: March 19, 1986 and Sept. 1, 1987.

F. DEPOSITION of EDWARD CALLAHAN: Selected Pages.

G. U.S. Census Bureau: TABLE P4. HISPANIC OR LATINO, AND NOT HISPANIC OR LATINO BY RACE [73] Universe: Total population

H. Tables from Mass. Data Center. Citizenship by Race ...

I. U.S. Census Bureau Tables: P9. RACE and P10. HISPANIC OR LATINO BY RACE