EXHIBIT D

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

PAUL DELEO, JR., et al.,
    Plaintiffs,

v.

CITY OF BOSTON, et al.,
    Defendants.

CIVIL ACTION
NO. 03-12538-PBS

### AFFIDAVIT OF TONI G. WOLFMAN

I, Toni G. Wolfman, on oath depose and state as follows:

1. I am an attorney admitted to practice before this Court. I have been a member of the Massachusetts bar since December 20, 1977. I have been affiliated with the law firm of Foley Hoag LLP since October 1977, first as an associate, then as a partner from November 1984 through December 31, 2003, and currently as of counsel.

2. Since approximately April 1980, I have served as counsel to the plaintiffs in the case of Castro v. Beecher, Civil Action Nos. 70-1220-W and 74-2982-C (D. Mass.). In that capacity, I have been involved over the past 24 years in the implementation of the Castro v. Beecher consent decree entered by this Court in July of 1975 (as well as a supplemental consent decree entered in July of 1976 and subsequent agreements of the parties and orders of the Court). In particular, as contemplated by those orders, I have received from the Commonwealth of Massachusetts (currently its Human Resources Division and previously its Department of Personnel Administration), reviewed and approved or objected to materials relating, among other things, to (a) the recruitment for, administration of, and scoring of all examinations for entry level police officers; (b) requisitions for Civil Service lists by local police departments or other appointing authorities, responsive certifications of eligible candidates, the appointment of police officers from Civil Service lists and cadet programs, and the reasons given by appointing authorities for bypassing or removing eligible candidates; and (c) requests by appointing authorities for exemption from the certification ratios provided in the Court's orders.

3. The July 1975 consent decree sets forth certain methods and ratios to be employed by the Commonwealth of Massachusetts in certifying candidates for appointment as entry-level police officers in the municipal police departments of all cities and towns subject to the Massachusetts civil service law, provided that such cities or towns have a minority

(African-American or Hispanic) population of one percent (1%) or more. The July 1975 consent decree further provides: "As a city or town achieves a complement of minorities commensurate with the percentage of minorities within the community, certification will be made according to existing Massachusetts law[.]" Id. at ¶ 24.

4. Regarding release of communities from the protocol established by the Castro court, the July 1975 consent decree more specifically provides as follows: "The Director [i.e., the Commonwealth's Personnel Administrator and his or her successors] shall notify the plaintiffs and supply evidence to the plaintiffs whenever a particular appointing authority has informed the Director that it has achieved a complement of Black and Spanish-surnamed post-probationary officers commensurate with the percentage of minorities within the community or that the appointing authority is serving a jurisdiction with less than one percent (1%) Black and Spanish-surnamed population. The plaintiffs shall have thirty (30) days to object to the evidence contained in the Director's notification. If such objection is not made within thirty (30) days the particular appointing authority will no longer be subject to Paragraph 23 of this Consent Decree, and certification to that appointing authority will be made according to existing Massachusetts law." Id. at ¶ 18.

5. Since the early 1980's, I have personally been involved in the process by which a substantial number of Massachusetts communities have been released from the protocol established by the Castro consent decree (hereinafter, "the exemption process"). Among the earliest releases that I was personally involved in was that of Peabody, in October of 1982.

6. In each instance in which my law firm or I have been involved in the exemption process, the Department of Personnel Administration (today known as the Human Resources Division; hereinafter referred to as "DPA/HRD") forwarded to my firm the request from the city or town for exemption and the relevant information submitted in support of that request. Typically, the supporting information would include: the identity of all tenured minority officers in the police department and their respective dates of appointment, the number of authorized uniformed positions in that department, the total population of the city or town as reflected in the most recent federal census, and the number of African-American and Hispanic residents of the city or town as stated in the same federal census report.

7. After reviewing the submitted request and supporting information, as well as the materials in my file for the relevant municipality, I would write to DPA/HRD stating whether or not the plaintiffs had any objection to the exemption request being granted. I objected only when the supporting information did not demonstrate that parity had been reached, when there was a pending certification and the hiring process that had not yet been completed, or when some serious problem involving the police department in question raised issues pertaining to their treatment of minorities that had not yet been fully resolved. In some cases, the plaintiffs' objection resulted in a delay of several months; in all cases, DPA/HRD eventually granted the municipality's exemption request.

8. I have always understood the language quoted in paragraphs 3 and 4, *supra*, to require an examination of the number of <u>tenured</u> minority ("Black or Spanish-surnamed") officers within an <u>entire</u> given police department rather than looking only at officers in the entry-level ranks or counting officers who had not completed their probationary period. Similarly, I have always maintained that the July 1975 consent decree requires appointing authorities, in calculating the percentage of post-probationary minority officers within their department, to base that percentage upon the total number of authorized positions – in other words, to include any and all vacant, authorized positions. As longtime counsel for the plaintiffs in the <u>Castro v. Beecher</u> case, I have also always understood the consent decree to permit a determination that parity has been achieved only when the correctly-calculated percentage of minority post-probationary officers within a given department equals or exceeds the percentage of minorities within that entire jurisdiction (and that latter percentage is to be derived from the most current official federal census report).

9. At no time during the 24 years that I have participated in the implementation of the <u>Castro</u> consent decree has any police department requested exemption based on the number of tenured entry-level police officers or the percentage of minorities among the entry-level category of police officers without also taking into account the rest of the uniformed personnel (including minority patrol officers who had been promoted). Approximately eighty (80) communities have been exempted from the certification rations of the <u>Castro</u> consent decree since 1980. As of today, only 12 communities, including Boston, remain subject to those provisions of the <u>Castro</u> orders. See Exhibit A hereto.

10. My understanding of the proper method by which to calculate whether parity has been achieved in a given community or not, as outlined in paragraph 8, *supra*, is fully consistent with two memoranda signed by the Commonwealth's Personnel Administrator that I received from DPA/HRD in 1986 and 1987. Copies of those memoranda are attached hereto as Exhibits B and C. It is my understanding that the process for requesting an exemption from the <u>Castro</u> consent decree that is set forth in those memoranda is fully consistent with the intention of the original parties to the <u>Castro</u> litigation and Judge Caffrey at the time the 1975 decree entered. That process has been consistently followed by DPA/HRD. Indeed, I recall that DPA used those two memoranda in connection with training programs that it ran for appointing authorities that were then subject to the certification provisions of the <u>Castro</u> decree.

11. The consistent statewide application of the terms of the <u>Castro</u> consent decree has been of great importance to the plaintiffs ever since I commenced representing them in 1980. It has provided a clear and relatively simple means of calculating "parity" -- the benchmark for measuring a given appointing authority's progress in overcoming the effects of past discrimination -- which is well known to all persons affected by the <u>Castro</u> orders. By tying exemption to the hiring patterns and progress of each appointing authority, the Court permitted the progressive narrowing of the reach of its orders as each appointing authority achieved parity, without regard to statewide demographics or the progress (or lack thereof) of any other municipality.

-3-

12. The manner in which DPA/HRD calculates parity under the Court's orders also has corrected for the impact of continuing discrimination in other forms. For example, for many years the Boston Police Department limited its cadet program (the source of as many as one-third of its recruits each year) to well-connected white candidates, thereby significantly slowing its progress towards parity. Similarly, the parity calculation process set forth in Exhibits B and C has discouraged manipulation by other appointing authorities that evidenced resistance to the goals of the Castro decree. Indeed, I recall instances in which appointing authorities attempted to delay hiring and count only incumbents without consideration of authorized but vacant slots, or count probationary recruits who could then be terminated without cause, so as to skew the parity calculation results.

13. The manner in which the parties to the Castro decree calculated parity and handled the exemption of appointing authorities from its certification ratios was challenged only once before this current lawsuit. In 1989, a group of white applicants for positions in the Boston Police Department brought a reverse discrimination action against the city of Boston and the Commonwealth of Massachusetts. Among other contentions, plaintiffs in the case of Cecilia Fagan, et al. v. City of Boston, et al., C.A. No. 89-2076-N (D. Mass.) argued that the City of Boston had reached parity under the Castro decree. On behalf of the Castro plaintiffs, I intervened in Fagan for the purpose of defending the consent decree, including the manner in which parity is calculated under its provisions. In that connection, I obtained relevant affidavits from the Personnel Administrator, David Haley, and from his counsel, Margaret Dale. Attached to this affidavit as Exhibit D is the affidavit that David Haley provided in the Fagan case. The Fagan case was subsequently dismissed following the Supreme Court's denial of certiorari in a companion action challenging a similar series of orders affecting the Boston Fire Department. Mackin v. City of Boston, C.A. No. 89-2025-S (D. Mass. 1991), aff'd 969 F.2d 1273 (1st Cir. 1992), cert. denied 506 U.S. 1078 (1993).

14. I am not aware of any material changes over the years since 1980 in the manner in which the exemption process has been conducted by DPA/HRD, appointing authorities, or my firm. In fact, the most recent exemption of an appointing authority from the Castro decree -- that of Cambridge in February of 2004 -- was handled in the identical manner that was followed from the time that we approved the exemption of Peabody in October 1982.

Signed under the pains and penalties of perjury this 15 day of July, 2004.

Toni G. Wolfman

-4-

EXHIBIT E

# dpa commonwealth of massachusetts
# PERSONNEL INFORMATION
### department of personnel administration

March 19, 1986

TO: Consent Decree Public Safety Appointing Authorities

FROM: David A. Haley, Personnel Administrator

SUBJECT: Process For Requesting Exemption From Consent Decrees

Public Safety Appointing Authorities subject to the provisions of the Castro v. Beecher (Police) and NAACP v. Beecher (Fire) federal consent decrees have requested information regarding the process and the criteria for seeking approval for exemption from these decrees.

An Appointing Authority who believes that the Police or Fire Department has met the requirements of the applicable decree should take the following steps:

1. Check the most recent federal census to determine:

   a. Total population of the municipality

   b. Total Black and Hispanic population of the municipality

   c. The actual percentage of the total population which is Black or Hispanic as determined by that census

2. Compare the statistics gained from the census with information specific to the Fire or Police Department under consideration:

   a. Determine the total number of authorized positions in the uniformed force in the Department

   b. Verify the total number of post-probationary (tenured) Black or Hispanic members of the uniformed force

   c. Determine the actual percentage of the authorized uniformed force which is made up of tenured Black or Hispanic officers of any rank

3. If the percentage of tenured Black and Hispanic officers in the municipal force equals or exceeds the percentage of Black and Hispanic members of the municipal population, a request for review of exemption may be filed with the Department of Personnel Administration:

   a. A letter requesting such exemption should be forwarded over the signature of the Appointing Authority and should be forwarded to the Director, Bureau of Local Government Services, Room 307, One Ashburton Place, Boston, MA 02108.

   b. The letter should detail all facts and statistics determined in steps 1 - 3 above.

   c. The Appointing Authority should include with the request a listing (by name, ethnic identity, and permanent appointment date) of all tenured Black and Hispanic officers employed in the municipal Police or Fire Force.

The information will be reviewed by the Department of Personnel Administration and by the Counsel for the Plaintiffs under the NAACP and Castro consent decrees.

Written notice of the decision regarding the exemption request will, in most cases, be forwarded to the community within thirty days of the completed request.

It should be noted that no request for exemption should be filed if the minority members of the police or fire force have not yet completed their probationary periods. Requests for exemption based solely on a change in population figures will not be approved by Counsel for the Plaintiffs and should not be submitted.

Within the past few months, the Police Departments in Salem, Kingston, West Springfield and Northampton and the Fire Department in Lynn have all qualified for exemption from the applicable consent decrees. Each of these departments should be commended on its efforts to meet both the spirit and the letter of the decrees. The Department of Personnel Administration will, working cooperatively with Plaintiff's Counsel, provide support and technical assistance to other communities subject to the NAACP and Castro consent decrees in an effort to increase and improve municipal understanding of and final compliance with the intent of these decrees.

Should you have questions regarding the information contained in this memorandum, please contact Christine Kent, Director, Local Government Services, at (617)-727-4917.

DAH:CK:kea



# commonwealth of massachusetts
# dpa PERSONNEL INFORMATION
### department of personnel administration

September 1, 1987

TO: Consent Decree Public Safety Appointing Authorities

FROM: David A. Haley, Personnel Administrator

SUBJECT: Process For Requesting Exemption From Consent Decree

Public Safety Appointing Authorities subject to the provisions of the <u>Castro v. Beecher</u> (Police) and <u>NAACP v. Beecher</u> (Fire) federal consent decrees have requested information regarding the process and the criteria for seeking approval for exemption from these decrees.

An Appointing Authority who believes that the Police or Fire Department has met the requirements of the applicable decree should take the following steps:

1. Check the most recent federal census to determine:

   a. Total population of the municipality

   b. Total Black and Hispanic population of the municipality

   c. The actual percentage of the total population which is Black or Hispanic as determined by that census

2. Compare the statistics gained from the census with information specific to the Fire or Police Department under consideration:

   a. Determine the total number of authorized positions in the permanent full-time uniformed force in the Department

   b. Verify the total number of post-probationary (tenured) full-time permanent Black or Hispanic members of the uniformed force

   c. Determine the actual percentage of the authorized uniformed permanent full-time force which is made up of tenured Black or Hispanic officers of any rank

in the municipal force equals or exceeds the percentage of Black and Hispanic members of the municipal population, a request for review of exemption may be filed with the Department of Personnel Administration:

   a. A letter requesting such exemption should be forwarded over the signature of the Appointing Authority to the Director, Bureau of Local Government Services, Room 307, One Ashburton Place, Boston, MA 02108.

   b. The letter should detail all facts and statistics determined in steps 1 - 3 above.

   c. The Appointing Authority should include with the request a listing (by name, ethnic identity, and permanent appointment date) of all tenured Black and Hispanic officers employed in the municipal Police or Fire Force.

The information will be reviewed by the Department of Personnel Administration and by the Counsel for the Plaintiffs under the NAACP and Castro consent decrees.

Written notice of the decision regarding the exemption request will, in most cases, be forwarded to the community within thirty days of the completed request.

It should be noted that no request for exemption should be filed if the minority members of the police or fire force have not yet completed their probationary periods or if a certification issued in consent decree format is outstanding. Requests for exemption based solely on a change in population figures will not be approved by Counsel for the Plaintiffs and should not be submitted.

Should you have questions regarding the information contained in this memorandum, please contact Christine Kent, Director, Local Government Services, at (617) 727-4917.

Page 2

```
 1      DEPOSITION of EDWARD CALLAHAN, a
 2   witness called for examination by the
 3   Plaintiffs, taken pursuant to Rule 30 of the
 4   Massachusetts Rules of Civil Procedure, before
 5   Laurie K. Langer, Registered Professional
 6   Reporter and Notary Public in and for the
 7   Commonwealth of Massachusetts, at the offices of
 8   Pyle, Rome, Lichten & Ehrenberg, 18 Tremont
 9   Street, Boston, Massachusetts, on Tuesday, June
10   22, 2004, commencing at 10:10 a.m.
11
12   APPEARANCES
13
14   PYLE, ROME, LICHTEN & EHRENBERG, P.C.
15   By Harold L. Lichten, Esq.
16      Alfred Gordon, Esq.
17   18 Tremont Street, Suite 500
18   Boston, Massachusetts 02108
19   (617) 367-7200
20   For the Plaintiffs
```

Page 3

```
 1   (Appearances continued)
 2
 3   CITY OF BOSTON LAW DEPARTMENT
 4   By Stephen G. Cox, Esq.
 5   City Hall, Room 615
 6   Boston, Massachusetts 02201
 7   (617) 635-4064
 8   For the City of Boston
 9
10   THE COMMONWEALTH OF MASSACHUSETTS
11   OFFICE OF THE ATTORNEY GENERAL
12   By Robert L. Quinan, Esq.
13   One Ashburton Place, Room 2019
14   Boston, Massachusetts 02108
15   (617) 727-2200
16   For the Commonwealth of Massachusetts
17
18   WILMER CUTLER PICKERING HALE and DORR
19   By Robin L. Alperstein, Esq.
20   300 Park Avenue
21   New York, NY 10022
22   (212) 937-7262
23   For the Intervenor Defendants
```

Page 4

```
 1   (Appearances continued)
 2
 3   LAWYERS' COMMITTEE FOR CIVIL RIGHTS
 4   By Nadine Cohen, Esq.
 5      Tzung-bor Wei
 6   294 Washington Street
 7   Boston, Massachusetts 02108
 8   (617) 988-0609
 9   For the NAACP and MAMLEO
10
11              INDEX
12   ATTORNEY      EXAMINATION   CROSS    REDIRECT
13   Mr. Lichten         6              127
14   Ms. Alperstein            109
15   Mr. Quinan                         126
16   EXHIBIT                                PAGE
17   1  City Website Page                     23
18   2  Announcement Regarding the Administration
19      of an Entry Level Police Officer Test  25
20   3  Strength Report                        37
21   4  Strength Reports                       51
22   5  Cadet Appointments                     63
23   6  Personnel Orders                       69
24   7  Personnel Orders                       69
```

Page 5

```
 1   (Index continued)
 2   EXHIBIT                                PAGE
 3   8  Notice From HRD to Commissioner Evans  70
 4   9  List of Tasks                          72
 5   10 Civil Service Certification            73
 6   11 Civil Service Certification            74
 7   12 Eligible List                          79
 8   13 Form 14                                80
 9   14 Standard Civil Service Public Safety
10      Requisition                            80
11   15 Copy of the Requisition                83
12   16 Form 162                               88
13   17 Documents Relating to the Cutoff
14      Score                                  96
15   18 Certification Hiring                   99
16   19 Not Identified                        101
17   20 Test Item Analysis For the 2001
18      Police Exam                           102
19   21 Not Identified                        102
20   22 Form 162                              104
21   23 Series of Documents                   106
22
23   (Exhibits retained by counsel.)
24
```

2 (Pages 2 to 5)

Page 126

1  MR. QUINAN: I have maybe two or three
2  questions.
3       EXAMINATION
4
5  BY MR. QUINAN:
6  Q. Mr. Callahan, when you are reviewing the U.S.
7     census data for purposes of determining the
8     percentage of minorities in this general
9     population of the City of Boston, do you count
10    those who identify themselves as biracial,
11    African American, for example, and some other
12    race, or multi racial on the U.S. census forms?
13 A. No.
14 Q. Different topic. Are cadets compensated and if
15    so how does their compensation compare with new
16    police officer hires who are going through the
17    police academy?
18 A. The cadet program is one step above indentured
19    servitude. They earn $379 a week. So they're
20    significantly undercompensated vis-a-vis the
21    police officers. Vacancies are up, positioning
22    you hope to aspire to gain at some point which
23    is why they go through that process.
24 Q. And they're required to serve for a minimum of

Page 127

1     two years?
2  A. Minimum of two years.
3
4       EXAMINATION
5
6  BY MR. LICHTEN:
7  Q. I have two quick follow ups. If I understood
8     your answers to some recent questions if there's
9     a, if you get to a tie and there are 20 or 30 or
10    40 people in that tie and you have to decide,
11    there the commissioner will use discretion to
12    choose the person whom he or she thinks is the
13    best qualified candidates; did I understand that
14    correct?
15 A. Well, generally the commissioner would not
16    personally be involved. But he would delegate
17    to myself, particularly myself, and in
18    conjunction with other department officials to
19    look at the candidates and pick the best
20    candidate that we can determine.
21 Q. Okay. So you wouldn't go by how people are on
22    the list if they're tied on the list?
23 A. No. Because that would be irrelevant. The same
24    group.

Page 128

1  Q. And you don't go by looking at their fractional
2     score?
3  A. No.
4  Q. So for example, if someone was already a police
5     officer, let's say a Boston municipal police
6     officer, that would be something that would
7     assist them in being selected among the ties?
8  A. That certainly would be helpful.
9  Q. If someone had already gone through the
10    Boston -- I'm sorry, had already gone through
11    another police academy and was working as a
12    police officer in another neighboring community
13    that would be helpful to them --
14 A. Yes.
15 Q. -- if they were tied?
16 A. Yes, indeed.
17 Q. And if they worked for the D.A.'s office as an
18    investigator that would be helpful to them?
19 A. Sure.
20 Q. And finally with respect to the reemployment
21    list, if one agrees to be hired as a Boston
22    police officer off the reemployment list having
23    been a police officer somewhere else, are they
24    subject to the residency requirement?

Page 129

1  A. They're subject to the labor agreement with,
2     with the BPPA and the City's residency ordinance
3     in that they have to live in the city upon date
4     of appointment. And the way the thing is
5     configured now, remain so as a resident during
6     the entire time of their employment.
7  Q. So I take it that's been a drag on police
8     officers from other cities accepting positions
9     for the City of Boston?
10 A. Oh, absolutely it has, yes.
11 Q. That's all I have. Okay.
12      (Whereupon, the deposition concluded at
13    approximately 1:21 p.m.)

Page 46

1  total tenured minority population, uniformed
2  minority population in the Boston Police
3  Department, not to the entry level ranks?
4  A. That's correct.
5  Q. And with respect to this document which is dated
6  October 27, 2003, you have not done that
7  calculation; is that correct?
8  A. With respect to this document?
9  Q. Yes.
10 A. I did not, no.
11 Q. Just so I'm clear on your testimony, do you have
12    any reason to believe that the data contained on
13    this document, which is Deposition Exhibit No.
14    3, is inaccurate in some way?
15 A. Well, shortly after the fall of 2003 I began to
16    be concerned about the accuracy of the
17    spreadsheet, that's why I conducted an audit.
18    Regarding this particular document whether I was
19    concerned about -- I had a general concern that
20    there, that there was a potential that it wasn't
21    completely accurate, but not related to this
22    document itself.
23 Q. And this audit, does this appear in some
24    document form?

Page 47

1  A. I could check whether I had notes. I kept a,
2     the spreadsheet on the computer screen, it was
3     altering it habitually as we went along, but,
4     you know -- I may have notes regarding the
5     thing, but I would have to check. I may have
6     discarded them.
7  Q. Maybe I misunderstand the nature of this audit.
8     Was this audit some study with voluminous number
9     of documents; what was this audit?
10 A. What I did was I went through personnel files of
11    the officers, I reviewed civil service
12    certifications, their race, I checked the City's
13    files, the computerized data files, I looked at
14    photographs of officers as well. So I used any
15    document that I could get my hands on to verify
16    the race and the gender, the rank of all of the
17    candidates.
18 Q. Okay. And does the result of this audit appear
19    on a Strength Report in 2004?
20 A. It would have been the first Strength Report I
21    produced after the audit was completed.
22 Q. Okay. And when was that?
23 A. It was probably in early February.
24 Q. Okay. Now, let me ask you this, how do you

Page 48

1  determine whether someone is a minority or not?
2  A. Well, I'm looking at, of course, one of the
3     documents I do look at to determine the race of
4     a candidate is the civil service certification
5     upon which their names appear. So those lists
6     would indicate whether somebody was Hispanic or
7     black.
8  Q. That is you actually look at whether they were
9     listed as Hispanic or black when they were hired
10    as a result of the civil service list?
11 A. Yes. The civil service lists were among the
12    documents that I check.
13 Q. Do you check anything else?
14 A. As I testified I did look at photographs, I
15    looked at the personnel files, I looked at the
16    officer's own characterization of his own race.
17 Q. Now, what would that appear on?
18 A. That would appear on some entry level documents,
19    particularly the documents that would be used
20    during the screening process. Most importantly
21    our initial application, I believe, would
22    indicate whether the candidate would be required
23    to put his or her race on the application.
24 Q. Okay. Now, if you know, what determines whether

Page 49

1  or not someone is black for the purposes of your
2  calculation in the Boston Police Department,
3  other than self-identification?
4  A. Self-identification would be important, but we
5     do have a computerized bank of photographs of
6     every employee and I did look at an awful lot of
7     photographs as I was going through this
8     particular exercise.
9  Q. Okay. And how do you determine from a
10    photograph whether someone is black or not?
11 A. Not an easy thing to do at times. But there
12    were individuals who were clearly not Caucasian
13    whose photographs I looked at and I would take
14    that photograph and match it up to what the
15    candidate had identified him or herself as and
16    then look at the civil service list as well.
17 Q. Okay. Let's see if I understand it. If you're
18    aware, how black does someone have to be to be
19    considered black for the purposes of the Boston
20    Police Department?
21 A. I do not know how to answer that question.
22 Q. Is it one half, one quarter, do you know?
23 A. I do not know.
24 Q. How about with respect to Hispanic?

13 (Pages 46 to 49)

Page 50

1  A. I think generally the decree, one of the issues
2     of the provisions of the decree is a Spanish
3     surname, Hispanic surnamed individuals is what
4     we look at.
5  Q. Just so --
6  A. And self-identification as well.
7  Q. Okay. If someone is Spanish surnamed but has
8     lived in the United States all of their life and
9     their parents have lived in the United States
10    all of their life, do you consider them Hispanic
11    for the purposes of your calculation?
12 A. Yes.
13 Q. Are you aware as to whether that's what -- are
14    you aware of what the Beecher Decree says with
15    respect to how you count such a person?
16 A. I believe that the, one of the provisions would
17    be whether the individual comes from a Spanish
18    speaking household.
19 Q. So you would agree that there are people with
20    Spanish surnames who don't, who do not come from
21    Spanish speaking households; is that correct?
22 A. Who have been hired?
23 Q. Yes.
24 A. I believe that's a potential, yes.

Page 51

1  Q. My question is when you do your calculation have
2     you, have you made any determination whether
3     people with Spanish surnames come from a Spanish
4     speaking household or not so as to whether they
5     count as Hispanic under the Beecher Decree?
6  A. The detectives who conduct the background
7     investigations physically conduct a home visit
8     for all of the candidates. But I can't say for
9     certain that there are individuals who, who are
10    hired who definitively come from a house where
11    Spanish is spoken or raised in a home where
12    Spanish was spoken.
13        (Deposition Exhibit 4 marked for
14    Identification.)
15 Q. I'm showing you what is labeled as Callahan
16    Deposition Exhibit No. 4, and I'll represent to
17    you that this is simply all of the documents,
18    all of the Strength Reports provided by your
19    counsel to me in response to a request for
20    documents and interrogatories that I made to
21    him. Let me first ask you, I take it from your
22    testimony that this does not nearly constitute
23    all of the Strength Reports during this period?
24 A. That's correct.

Page 52

1  Q. And that you have a file that has all of those
2     Strength Reports?
3  A. Yes, I do.
4  Q. And you have it in an Excel spreadsheet form?
5  A. Well, I have hard copies that I keep in it, --
6  Q. I see.
7  A. -- our file.
8  Q. And you also have a, you have it in some sort of
9     computer file?
10 A. Yes, but it changes, the computer file changes.
11    When there's a need.
12 Q. Do you keep that on a disc?
13 A. On a hard drive on the network.
14 Q. If you look -- let's do it this way. I'm going
15    to keep -- do you still have the October 27th
16    document, Deposition Exhibit No. 3?
17 A. Yes, I do.
18 Q. If you can put those side to side for a second.
19    The first document on Deposition Exhibit No. 4
20    appears to be a Strength Report on May 12, 2004;
21    is that correct?
22 A. That's correct.
23 Q. Okay. Now, let me stop you right now and let me
24    ask you a couple of questions. As I understand

Page 53

1     it now the Boston Police Department entry level
2     exam that the plaintiffs took and are
3     complaining of was a 2001 exam; is that correct?
4  A. I don't know. The Commonwealth gives these
5     exams every two years. It could have been a
6     2003 exam. No, it was probably 2001.
7        MR. COX: Only if you know. Don't guess.
8  Q. Okay. Well, you're aware that they're
9     complaining about their failing to be hired in
10    March of 2002 and October of 2003; is that
11    right?
12 A. Yes.
13 Q. So as you sit here your best understanding is
14    that that was a result of an exam that was given
15    in 2001?
16 A. Yes.
17 Q. Now, that exam expired; is that correct?
18 A. Yes.
19 Q. Okay. When did it expire?
20 A. It would have expired probably in the fall of
21    2003.
22 Q. Okay. So the October 2003 class that was hired
23    was the last class that was hired off of that
24    exam?

EXHIBIT G




P4. HISPANIC OR LATINO, AND NOT HISPANIC OR LATINO BY RACE [73] - Universe: Total population
Data Set: Census 2000 Summary File 1 (SF 1) 100-Percent Data

NOTE: For information on confidentiality protection, nonsampling error, and definitions, see
http://factfinder.census.gov/home/en/datanotes/expsf1u.htm.

| | Boston city, Massachusetts |
|---|---|
| Total: | 589,141 |
| Hispanic or Latino | 85,089 |
| Not Hispanic or Latino: | 504,052 |
| Population of one race: | 485,878 |
| White alone | 291,561 |
| Black or African American alone | 140,305 |
| American Indian and Alaska Native alone | 1,517 |
| Asian alone | 44,009 |
| Native Hawaiian and Other Pacific Islander alone | 271 |
| Some other race alone | 8,215 |
| Population of two or more races: | 18,174 |
| Population of two races: | 17,294 |
| White; Black or African American | 1,719 |
| White; American Indian and Alaska Native | 652 |
| White; Asian | 1,521 |
| White; Native Hawaiian and Other Pacific Islander | 101 |
| White; Some other race | 3,866 |
| Black or African American; American Indian and Alaska Native | 1,064 |
| Black or African American; Asian | 382 |
| Black or African American; Native Hawaiian and Other Pacific Islander | 423 |
| Black or African American; Some other race | 6,615 |
| American Indian and Alaska Native; Asian | 72 |
| American Indian and Alaska Native; Native Hawaiian and Other Pacific Islander | 2 |
| American Indian and Alaska Native; Some other race | 62 |
| Asian; Native Hawaiian and Other Pacific Islander | 143 |
| Asian; Some other race | 561 |
| Native Hawaiian and Other Pacific Islander; Some other race | 111 |
| Population of three races: | 773 |
| White; Black or African American; American Indian and Alaska Native | 287 |
| White; Black or African American; Asian | 42 |
| White; Black or African American; Native Hawaiian and Other Pacific Islander | 5 |
| White; Black or African American; Some other race | 151 |
| White; American Indian and Alaska Native; Asian | 20 |
| White; American Indian and Alaska Native; Native Hawaiian and Other Pacific Islander | 1 |
| White; American Indian and Alaska Native; Some other race | 14 |
| White; Asian; Native Hawaiian and Other Pacific Islander | 22 |
| White; Asian; Some other race | 49 |
| White; Native Hawaiian and Other Pacific Islander; Some other race | 12 |
| Black or African American; American Indian and Alaska Native; Asian | 22 |
| Black or African American; American Indian and Alaska Native; Native Hawaiian and Other Pacific Islander | 0 |
| Black or African American; American Indian and Alaska Native; Some other race | 41 |
| Black or African American; Asian; Native Hawaiian and Other Pacific Islander | 10 |
| Black or African American; Asian; Some other race | 46 |
| Black or African American; Native Hawaiian and Other Pacific Islander; Some other race | 38 |
| American Indian and Alaska Native; Asian; | 1 |

| Race combination | Count |
|---|---|
| Native Hawaiian and Other Pacific Islander | |
| American Indian and Alaska Native; Asian; Some other race | 1 |
| American Indian and Alaska Native; Native Hawaiian and Other Pacific Islander; Some other race | 2 |
| Asian; Native Hawaiian and Other Pacific Islander; Some other race | 11 |
| **Population of four races:** | 96 |
| White; Black or African American; American Indian and Alaska Native; Asian | 41 |
| White; Black or African American; American Indian and Alaska Native; Native Hawaiian and Other Pacific Islander | 2 |
| White; Black or African American; American Indian and Alaska Native; Some other race | 23 |
| White; Black or African American; Asian; Native Hawaiian and Other Pacific Islander | 1 |
| White; Black or African American; Asian; Some other race | 2 |
| White; Black or African American; Native Hawaiian and Other Pacific Islander; Some other race | 6 |
| White; American Indian and Alaska Native; Asian; Native Hawaiian and Other Pacific Islander | 6 |
| White; American Indian and Alaska Native; Asian; Some other race | 0 |
| White; American Indian and Alaska Native; Native Hawaiian and Other Pacific Islander; Some other race | 0 |
| White; Asian; Native Hawaiian and Other Pacific Islander; Some other race | 2 |
| Black or African American; American Indian and Alaska Native; Asian; Native Hawaiian and Other Pacific Islander | 0 |
| Black or African American; American Indian and Alaska Native; Asian; Some other race | 5 |
| Black or African American; American Indian and Alaska Native; Native Hawaiian and Other Pacific Islander; Some other race | 0 |
| Black or African American; Asian; Native Hawaiian and Other Pacific Islander; Some other race | 8 |
| American Indian and Alaska Native; Asian; Native Hawaiian and Other Pacific Islander; Some other race | 0 |
| **Population of five races:** | 10 |
| White; Black or African American; American Indian and Alaska Native; Asian; Native Hawaiian and Other Pacific Islander | 8 |
| White; Black or African American; American Indian and Alaska Native; Asian; Some other race | 1 |
| White; Black or African American; American Indian and Alaska Native; Native Hawaiian and Other Pacific Islander; Some other race | 0 |
| White; Black or African American; Asian; Native Hawaiian and Other Pacific Islander; Some other race | 0 |
| White; American Indian and Alaska Native; Asian; Native Hawaiian and Other Pacific Islander; Some other race | 1 |
| Black or African American; American Indian and Alaska Native; Asian; Native Hawaiian and Other Pacific Islander; Some other race | 0 |
| **Population of six races:** | 1 |
| White; Black or African American; American Indian and Alaska Native; Asian; Native Hawaiian and Other Pacific Islander; Some other race | 1 |

U.S. Census Bureau
Census 2000

**Standard Error/Variance documentation for this dataset:**
Accuracy of the Data: Census 2000 Summary File 1 (SF 1) 100-Percent Data (PDF 44KB)

EXHIBIT H

## Citizenship by Race and Hispanic/Latino Ethnicity by Educational Attainment: Boston City

Demographic Universe: Boston City (pop. 589,141), All Persons 18 Years and Older

### All Persons 18 Years and older

| US Citizenship status | Race and Ethnicity | Weighted (to Represent Total Universe of Persons) | | | | Unweighted (Actual Sample Counts of Persons) | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Less than high school graduate | High school graduate or higher | Total | Percent HS grad or higher | Less than high school graduate | High school graduate or higher | Total | Percent HS grad or higher |
| Yes | Spanish/Hispanic/Latino | 11,450 | 23,286 | 34,736 | 67.0% | 561 | 1,112 | 1,673 | 66.5% |
| | Non-Hispanic Black/African American | 20,315 | 58,851 | 79,166 | 74.3% | 1,006 | 2,834 | 3,840 | 73.8% |
| | Non-Hispanics, all other races | 32,488 | 241,512 | 274,000 | 88.1% | 1,636 | 11,551 | 13,187 | 87.6% |
| | Total | 64,253 | 323,649 | 387,902 | 83.4% | 3,203 | 15,497 | 18,700 | 82.9% |
| No | Spanish/Hispanic/Latino | 12,050 | 11,120 | 23,170 | 48.0% | 630 | 542 | 1,172 | 46.2% |
| | Non-Hispanic Black/African American | 6,471 | 11,590 | 18,061 | 64.2% | 270 | 538 | 808 | 66.6% |
| | Non-Hispanics, all other races | 11,265 | 32,061 | 43,326 | 74.0% | 569 | 1,500 | 2,069 | 72.5% |
| | Total | 29,786 | 54,771 | 84,557 | 64.8% | 1,469 | 2,580 | 4,049 | 63.7% |
| Grand Totals | | 94,039 | 378,420 | 472,459 | 80.1% | 4,672 | 18,077 | 22,749 | 79.5% |

### All Persons age 19 to 31

| US Citizenship status | Race and Ethnicity | Weighted (to Represent Total Universe of Persons) | | | | Unweighted (Actual Sample Counts of Persons) | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Less than high school graduate | High school graduate or higher | Total | Percent HS grad or higher | Less than high school graduate | High school graduate or higher | Total | Percent HS grad or higher |
| Yes | Spanish/Hispanic/Latino | 3,235 | 10,596 | 13,831 | 76.6% | 157 | 501 | 658 | 76.1% |
| | Non-Hispanic Black/African American | 3,494 | 17,145 | 20,639 | 83.1% | 163 | 803 | 966 | 83.1% |
| | Non-Hispanics, all other races | 3,804 | 99,975 | 103,779 | 96.3% | 187 | 4,617 | 4,804 | 96.1% |
| | Total | 10,533 | 127,716 | 138,249 | 92.4% | 507 | 5,921 | 6,428 | 92.1% |
| No | Spanish/Hispanic/Latino | 4,751 | 5,740 | 10,491 | 54.7% | 252 | 271 | 523 | 51.8% |
| | Non-Hispanic Black/African American | 1,347 | 4,242 | 5,589 | 75.9% | 49 | 194 | 243 | 79.8% |
| | Non-Hispanics, all other races | 2,330 | 17,957 | 20,287 | 88.5% | 115 | 817 | 932 | 87.7% |
| | Total | 8,428 | 27,939 | 36,367 | 76.8% | 416 | 1,282 | 1,698 | 75.5% |
| Grand Totals | | 18,961 | 155,655 | 174,616 | 89.1% | 923 | 7,203 | 8,126 | 88.6% |

Source: U.S. Census Bureau, Census 2000 5% Public Use Microdata File (PUMS) for Massachusetts

In addition to the desired estimates, the actual sample counts are also provided so that users will be aware of the sample sizes involved. The estimates are derived by multiplying the sample counts by appropriate weights. The Census Bureau calculates individual weights based on age, race, tenure, etc. to make the sample more representative of the total universe of persons and housing units. Since this is a 5% sample, the weights used average about 20.

Contact: Roy Williams, Mass. State Data Center, Donahue Institute, UMass/Amherst (413) 545-0176

Information on confidentiality protection, nonsampling error, and definitions, see http://advancedquery.census.gov/Help/Confidentiality.htm

Sample Data Tabulation - Boston City, 18yrs and older by citizenship by Hispanic or Latino by educational attainment

Geographic Summary Level - Place
Geographic Area - Place in [Boston City], Massachusetts (pop. 589,141)
Geographic Universe - People 18 Years and Older
Universe - All People
Citizenship and Educational Attainment (5) in
Less than 9th grade, not in universe (age less

| place | citizenship (2) | hispanic or latino (2) | less than 9th grade, no universe (age less than 9) Count | grade, no Count | school graduate or higher Count | graduate degree Count | degree Count | Total Count |
|---|---|---|---|---|---|---|---|---|
| Massachusetts | | | | | | | | |
| Boston city | Yes | Not Spanish/Hispanic/Latino | 15,862 | 36,045 | 51,967 | 202,676 | 82,125 | 146,680 | 354,983 |
| | | Spanish/Hispanic/Latino | 4,815 | 6,508 | 11,323 | 22,273 | 9,216 | 6,377 | 33,596 |
| | | Total | 20,677 | 42,553 | 63,290 | 225,349 | 91,351 | 153,350 | 388,579 |
| | No | Not Spanish/Hispanic/Latino | 8,415 | 8,600 | 17,015 | 43,425 | 13,407 | 9,969 | 60,440 |
| | | Spanish/Hispanic/Latino | 7,445 | 4,851 | 12,296 | 11,952 | 5,831 | 2,993 | 24,248 |
| | | Total | 15,860 | 13,451 | 29,311 | 55,377 | 19,238 | 12,958 | 84,688 |
| | Total | | 36,537 | 56,004 | 92,541 | 283,726 | 110,989 | 93,606 | 473,267 |

Source: U.S. Census Bureau, Census 2000 Sample Data File. Should cite the Census Bureau as the source of the data.

Detailed Tables - American FactFinder    **EXHIBIT I**    Page 1 of 2



**P9. RACE (TOTAL RACES TALLIED) [7] - Universe: Total races tallied**
Data Set: Census 2000 Summary File 1 (SF 1) 100-Percent Data

NOTE: For information on confidentiality protection, nonsampling error, and definitions, see
http://factfinder.census.gov/home/en/datanotes/expsf1u.htm

|  | Boston city, Massachusetts |
|---|---|
| Total races tallied: | 616,535 |
| White alone or in combination with one or more other races | 334,684 |
| Black or African American alone or in combination with one or more other races | 163,006 |
| American Indian and Alaska Native alone or in combination with one or more other races | 5,384 |
| Asian alone or in combination with one or more other races | 47,634 |
| Native Hawaiian and Other Pacific Islander alone or in combination with one or more other races | 1,565 |
| Some other race alone or in combination with one or more other races | 64,262 |

U.S. Census Bureau
Census 2000

---

**P10. HISPANIC OR LATINO BY RACE (TOTAL RACES TALLIED) [15] - Universe: Total races tallied**
Data Set: Census 2000 Summary File 1 (SF 1) 100-Percent Data

NOTE: For information on confidentiality protection, nonsampling error, and definitions, see
http://factfinder.census.gov/home/en/datanotes/expsf1u.htm

|  | Boston city, Massachusetts |
|---|---|
| Total races tallied: | 616,535 |
| Not Hispanic or Latino: | 523,225 |
| White alone or in combination with one or more other races | 300,117 |
| Black or African American alone or in combination with one or more other races | 151,246 |
| American Indian and Alaska Native alone or in combination with one or more other races | 3,846 |
| Asian alone or in combination with one or more other races | 46,988 |
| Native Hawaiian and Other Pacific Islander alone or in combination with one or more other races | 1,186 |
| Some other race alone or in combination with one or more other races | 19,842 |
| Hispanic or Latino: | 93,310 |
| White alone or in combination with one or more other races | 34,567 |
| Black or African American alone or in combination with one or more other races | 11,760 |
| American Indian and Alaska Native alone or in combination with one or more other races | 1,538 |
| Asian alone or in combination with one or more other races | 646 |
| Native Hawaiian and Other Pacific Islander alone or in combination with one or more other races | 379 |
| Some other race alone or in combination with one or more other races | 44,420 |

U.S. Census Bureau
Census 2000

---

**P11. HISPANIC OR LATINO [1] - Universe: People who are Hispanic or Latino**
Data Set: Census 2000 Summary File 1 (SF 1) 100-Percent Data

http://factfinder.census.gov/servlet/DTTable?_bm=y&-context=dt&-ds_name=DEC_2000_SF1_U&-CON...  9/9/20