UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
PAUL DELEO, JR., et al.                          )
                                    Plaintiffs    )
                                                  )
v.                                                )          Docket No. 03-12538-PBS
                                                  )
CITY OF BOSTON, et al.                            )
_____ )

PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR MOTION FOR
SUMMARY JUDGMENT AND/OR FOR PRELIMINARY INJUNCTION

Per the Court's instructions of Sept. 17, 2004, the Plaintiffs hereby submit their supplemental

brief in support of their motion for summary judgment and/or for preliminary injunction.

I.       ALL THE PLAINTIFFS WOULD HAVE BEEN REACHED FOR CONSIDERATION.

As discussed in previous filings and during the September 17 hearing, the Plaintiffs would have

all been reached for consideration by October 2003. In that round of hiring, the Defendants hired twelve

(12) non-veteran minority candidates off of the regular (non-female) certification list,[1] and there were

only nine (9) non-minority veterans ahead of the Plaintiffs for consideration.[2] [See Exs. 1 & 2.] This

assures that Plaintiff Paul DeLeo would have been reached with the highest score of 101, and there would

have been a certain number of openings for the remaining Plaintiffs to compete for due to the likely non-

selection of a number of the non-minority veteran candidates. During the two rounds of hiring in March

2002 and October 2003, nearly 49 percent of non-minority veterans were non-selected for various

disqualifying reasons. [See Ex. 1 & 3.] It is therefore a near certainty that several of the veterans ahead of

the Plaintiffs for consideration would also be disqualified. In that event, all of the Plaintiffs would have

_____

[1] They are: Dennis Medina [6], Richard Ace [6], Marco Castro [7], Robert Cordasco [7], Bienvenid Delacruz [7], Isabel Diaz [8], Gregory Eunis [8], Ismael Henriquez [9], Joey Key [10], Julian Little [10], Joseph Medina [10], and Jason Smith [11].

[2] They are Michael Lee [7], John Matthews [8], Matthew McKenna [8], John Gonsalves [9] Robert Stone [9], Denis McKeeney [9], Sylvester Egidio [10], Michael Dillon [10], and Matthew Carey [11]. Two female veterans who appear on the list as "Not Reached" – Stephanie Healey [11] and Carrie Sloane [11] – were actually reached and selected off the female certification, so they would not have competed with the Plaintiffs for the remaining spots.

been reached for consideration and at least some, if not all, of the Plaintiffs would likely have been selected because of their outstanding qualifications to become Boston police officers.

II.    MULTI-RACIAL DATA CANNOT PROPERLY BE CONSIDERED AND IN ANY EVENT WOULD NOT CHANGE THE FINDING OF PARITY.[3]

The data on multi-racial individuals is collected from the "race" question on the census, which allows individuals to choose up to six races that contribute to their racial makeup. [Aitken Supp. Aff. ¶ 2.] Importantly, this analysis only requires consideration of multi-racial black individuals, as all multi-racial Hispanic individuals are already included in the relevant population figures.[4] The Commonwealth and the City, however, only allow individuals to identify themselves as being of one race, so there is absolutely no way to determine how many individuals in the Boston Police Department might have marked black as one of their six races on the census form and yet would not consider themselves as black/African-American when self-identifying as one race for the Police Department. Undoubtedly, the number of black officers within the Department would have to be increased under this analysis specifically to account for officers who do not consider themselves to be black as their one race but who selected that race on the census form as some small part of their overall racial makeup.

As explained in previous filings, the Defendants and Intervenors asked the court to adopt the confusing multi-racial data in the Quinn case, but the First Circuit chose not use that data and thus implicitly decided against it. See Quinn v. City of Boston, 204 F. Supp. 2d 156, 162 n. 15 (D. Mass. 2002), rev'd 325 F.3d 18 (1st Cir. 2003). Ultimately, even using the multi-racial data would result in only a one percent difference between City population (40.12 %) and percentage of minority officers (39.02 %

---

[3] An important consideration in this matter is that the consent decree defines the relevant Hispanic population much more narrowly than the census, as the consent decree includes only those individuals who were "born in a Spanish-speaking country or . . . [were] raised in a home where the primary language was Spanish." [Ex. 4 ¶ 16.] Since the question of Hispanic ethnicity is much broader than the definition in the consent decree, the population figures would have to be adjusted accordingly and would ultimately cut into and possibly eliminate any increases due to the addition of multi-racial individuals.

[4] The numbers for the Hispanic population in the overall City population already include multi-racial individuals. [See Aitken Supp. Aff.] Because the question on Hispanic ethnicity is separate from the "race question," any individual of Hispanic ethnicity – whether black, white, or of another race – will show up in the number of Hispanic individuals.

on August 6, 2003), meaning that rough parity has been achieved.

III.    ENTRY-LEVEL POLICE OFFICERS IS THE PROPER VARIABLE TO USE.

In the Quinn decision, the First Circuit held that to use any variable broader than entry-level

positions in the parity calculation would not be narrowly tailored and would thus be unconstitutional.

Quinn, 325 F.2d at 32-33.  Based on the Quinn court's examination of the term "firefighter," the

Defendants in this case have argued, with no supporting evidence, that the City uses the term "police

officer" to include all uniformed officers.  However, in its own regulations, the Boston Police Department

defines the term "police officer" as including only the entry-level position.  [Ex. 5, § 3]  Therefore, under

the Quinn decision, the only proper variable to consider is entry-level officers.

IV.    THE COURT CANNOT LEGALLY IMPOSE BANDING WITHOUT FINDING THAT THE
       EXAM/SELECTION SYSTEM CONSTITUTES UNLAWFUL DISCRIMINATION, AN
       ISSUE NOT YET RAISED BY THE INTERVENORS OR THE COMMONWEALTH.

At oral argument the court indicated a significant interest in utilizing "banding" for future

selections.  However, there are significant legal impediments to ordering such a remedy in this case.  The

consent decree itself explicitly provides that once rough parity has been reached, selections shall be made

according to the civil service law.  If the court finds that rough parity has been achieved, it could not

constitutionally impose a new decree requiring banding unless the Defendants and/or the Intervenors

brought a claim alleging that the current examination system (1) has a disparate impact and (2) has not

been validated in accordance with EEOC guidelines.[5]  See 29 CFR § 1530 et. seq.  A new remedial

decree mandating banding would not be constitutionally permissible without a finding by the court that

the current selection system is discriminatory.  Therefore, while banding may be an appropriate idea

under the right circumstances, banding is inappropriate here unless the Defendants admit that the current

---

[5] While Plaintiffs do not necessarily disagree that the current selection system will create disparate impact and has not been validated, the defendants have failed to make such a claim.

exam selection system has a disparate impact and has not been validated under EEOC guidelines.[6]

V.    A MAJORITY OF COURTS IN POLICE AND FIRE CASES HAVE DETERMINED THAT LABOR POOL ANALYSIS MUST BE EMPLOYED UNLESS THERE IS NO SUCH RELIABLE DATA.

As a matter of constitutional equal protection law, the Supreme Court has indicated on several occasions that because any race-based remedy must be narrowly tailored to achieve the least possible harm to other non-protected individuals, any race-based remedy must be based on a comparison of the qualified "labor pool" with the percentage of minorities in the specific job in question. [See Pl. Reply at 10-11.]  The use of any other analysis is simply not constitutionally permitted.[7]

In Peightal v. Metropolitan Dade County, 940 F.2d 1394 (11th Cir. 1991), after remand, 26 F.3d 1545 (11th Cir. 1994), the Eleventh Circuit struggled with the need to use general or refined labor pool data in a case regarding entry-level firefighters.  In its first decision, the Eleventh Circuit remanded to the District Court for reconsideration of its decision to use general census data (and not more refined labor pool data) in light of the recent U.S. Supreme Court decision in Croson.  In his concurrence, Chief Judge Tjoflat set forth the criteria which would three years later be adopted by the Eleventh Circuit:

> General population figures . . . only serve as a proxy for the qualified applicant pool from which the employer is hiring.  Where evidence exists showing that the figures for the general population might not accurately reflect the pool of qualified job applicants, the value of such figures for evaluating the legality of an affirmative action plan is greatly diminished . . . .  [T]he district court, at the very least, could have compared the appellee's workforce to those members of the general population of Dade County who fall within the qualified age group.

940 F.2d. at 1411-1412 (internal citations omitted).

---

[6] If the court finds that parity has not been achieved but that the current decree is still unconstitutional, then the court could modify the decree to impose banding.  It must be made clear, however, that true banding would involve taking a range of scores (perhaps 100 down to 95), including veteran's preferences, requiring that all individuals in that group be considered for available positions, and then requiring the police department to conduct a merit-based selection system that, while taking diversity into consideration, did not make diversity a dispositive element of selection.  See Grutter v. Bollinger, 539 U.S. 306, 334 (2003).

[7] In Quinn, the court did not have to reach this issue since the Plaintiffs demonstrated parity notwithstanding any labor pool analysis.  Moreover, the First Circuit stated that it was constrained by its decision in Mackin and held that it was bound by the doctrine of stare decisis. Quinn, 325 F.3d at 35.  No such impediment is presented here.

4

Three years later, the Eleventh Circuit reviewed and affirmed the District Court's use of more refined labor pool data. In explaining its first decision, the court held:

> Although the court in <u>Teamsters</u> upheld the use of general population figures . . . in that case significant anecdotal evidence of discrimination bolstered the statistics in question . . . . The court in <u>Teamsters</u> cautioned that where the "evidence shows that the figures for the general population might not accurately reflect the pool of qualified applicants," this may diminish the value of the statistical comparison.

26 F.3d at 1555 (citations omitted). The Eleventh Circuit went on to uphold the District Court's use of labor pool data based on firefighter age restrictions. <u>Id.</u> The court indicated that it would have upheld a further refinement on the labor pool except that such data was not available and had not been produced. <u>Id</u>. Other courts have also required more refined labor pool data in police and fire hiring cases. <u>Danskine v. Miami-Dade Fire Dept.</u>, 253 F.3d 1288, 1295-1296 (11th Cir. 2001) ("a government affirmative action plan should not be based on general population figures when there exists more refined data establishing the proper labor pool"); <u>Janowiak v. City of South Bend</u>, 836 F.2d 1034, 1039-40 (7th Cir. 1988) (striking down an affirmative action hiring plan because it failed to compare "the percentage of minorities in the employer's workforce with the percentage of minorities in the relevant qualified area labor pool"); <u>Hammon v. Berry</u>, 826 F.2d 73, 77 (D.C. Cir. 1987) (holding, in fire department litigation, that "the relevant labor force consists of persons 20 to 28 years of age in the Washington metropolitan area").

For all of these reasons, it is clear that general population statistics are no longer constitutional. While it is true that some older cases used general population statistics simply because of the absence of more refined labor pool data, this absence was clearly remedied by the 2000 census, and the Plaintiffs have provided the court with ample and reliable statistical data with which to make the appropriate comparisons. Further, even if the court were to use only age-related data, as did at least three other Courts of Appeals, parity would have been achieved in 2000. [<u>See</u> Aitken Aff. ¶ 19.] Thus, for the court to ignore the relevant labor pool data and to use only general population data would be reversible error.

Respectfully submitted,

PAUL DELEO, JR., THOMAS BARRETT,
MICHAEL CONNEELY, MATTHEW
HOGARDT, BRENDAN DEVER, PATRICK
ROGERS, CHRISTOPHER CARR, and BRIAN
DUNFORD,

By their attorneys,


/s/  Alfred Gordon
Harold L. Lichten, BBO #549689
Alfred Gordon, BBO #630456
Pyle, Rome, Lichten & Ehrenberg, P.C.
18 Tremont Street, Suite 500
Boston, MA 02108
(617) 367-7200

Date:    September 24, 2004


## CERTIFICATE OF SERVICE

I hereby certify that, in addition to being electronically filed, a true copy of the above document was served on the attorneys of record for each party by U.S. Mail on September 24, 2004.

/s/  Alfred Gordon
Alfred Gordon