UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PAUL DELEO, JR., *et al.*,<br>      Plaintiffs,<br><br>  v.<br><br>CITY OF BOSTON, *et al.*,<br>      Defendants. | CIVIL ACTION<br>NO. 03-12538-PBS |

**THE COMMONWEALTH DEFENDANTS'** ***CORRECTED*** **POST-ARGUMENT BRIEF**

  Contrary to plaintiffs' contention, Boston is not yet in a position to be released from the Castro hiring protocol because parity has not yet been achieved in that city. The Commonwealth stands by its determination, based on the census data reflected in Exhibit A hereto, that the minority population of the City of Boston constituted 40.12% of the city's total population on April 1, 2000. Although this Court, in the Quinn litigation, made a finding that the minority population of the City of Boston was only 38.26% on that date (a figure later repeated by the First Circuit in its Quinn decision), the Commonwealth challenges that finding because it did not include nearly 11,000 Bostonians who are biracial or identify as part African-American.[1] The prior finding thus contravenes the only definitive authority on how to count biracial or multiracial individuals.[2] The Commonwealth was not a party to the Quinn litigation and thus is not bound by that court's finding. If this Court is unwilling to take judicial notice of official census data showing the proper minority population statistic to be 40.12%, then the Commonwealth insists upon an evidentiary hearing to determine the correct percentage of minorities in the City of Boston.

---

[1] According to 2000 census data, 10,203 Boston residents self-identified as Black/African-American and one other race (but not Hispanic). An additional 738 Bostonians self-identified as Black/African-American and more than one other race (but not Hispanic). See Exhibit B appended hereto.

[2] See Guidance on Aggregation and Allocation of Data on Race for Use in Civil Rights Monitoring and Enforcement, OMB Bulletin 00-02, Washington (March 9, 2000), available over the Internet at http://www.whitehouse.gov/omb/bulletins/b00-02.html.

The Intervenors' expert, Dr. Craig Moore,³ has now conceded that originally he double-counted certain individuals separately as one Black and one Hispanic resident when they are in truth simply one individual with both characteristics.⁴  After correcting for the double-counting errors, what remains unassailable is the Commonwealth's 40.12% statistic, because it is derived directly from official census tallies that clearly avoid the double-counting issue.  See Exhibit A.  In fact, the plaintiffs' expert does *not* dispute the underlying numbers forming this key percentage figure.  Compare Supplemental Affidavit of Dr. Norman Aitken (Docket #73, Exh. A), ¶ 16 with Exhibit A.

Plaintiffs' expert urges this Court, however, to ignore the more than 10,200 biracial (Black and one other race) Bostonians in the parity equation because candidates applying for the BPD are assertedly not given the option on official forms of identifying as such.  On its personal-data forms, HRD permits biracial (and multiracial) individuals to self-identify with whichever race they most closely associate.  Plaintiffs express concern that this might lead to an undercount of the number of minority BPD officers.  Given the vast number of Caucasian candidates and the relatively fewer number of minority candidates vying for the small number of openings in the hugely competitive BPD hiring process, the suggestion that any significant number of Black-Caucasian individuals are identifying with the BPD as Caucasian defies credulity.  Any undercount on this side of the ledger is surely dwarfed by the well-documented undercounting of minorities in the 2000 census.⁵

---

³  Plaintiffs are simply wrong to identify Dr. Moore as the Commonwealth's expert.  (See Pl. Reply Memo at 12; Transcript of Sept. 17, 2004, hearing at 14.)  He has been retained by the Intervenors alone.

⁴  See Moore Suppl. Aff. (Docket # 79, Exh. 2) at ¶ 6.  Regrettably, the undersigned counsel made a similar mistake in footnote 1 of the original version of this post-argument memorandum (Docket # 80).  That mistake, which did not affect the bottom-line 40.12% statistic, has now been corrected in this brief.

⁵  See authorities cited in Dr. Moore's original affidavit (Docket # 71) at ¶ 28 & n.2.  Moreover, past demographic trends strongly suggest that the percentage of minorities in Boston has grown larger than 40.12% since April 1, 2000.  The First Circuit has previously eschewed decennial census data in favor of more recent population estimates, leaving this Court free to do the same here if it chooses.  See Boston Chap., NAACP v. Beecher, 679 F.2d 965, 970 (1982) (noting that the minority population of Boston had grown from about 16% in 1970 to about 23% in 1974 (shortly before the 1975 Castro decree entered)).

The Commonwealth also stands by the process it made official in 1986 permitting communities subject to the Castro decree to gain release from that decree.[6] That process calls for appointing authorities to submit evidence that the percentage of minorities in their police department (of any rank) *equals* (or perhaps slightly exceeds) the percentage of minorities in the community. Since then, however, the courts have used the term "rough parity" – without further defining the concept – to describe an appropriate release point. Regrettably, this inchoate concept does not furnish a workable standard for the state personnel administrator, who is charged with overseeing implementation of the Castro decree statewide. What might pass for "rough parity" in one community almost certainly would not be reasonable in another. Here, plaintiffs urge that rough parity be declared when the disparity between the percentage of minorities in the community and the percentage of minorities on the police force (at the entry level only, they say) is two percent or less.[7] In Boston, that would translate into declaring parity when the BPD has **28** fewer minority patrolmen than called for under the decree.[8] A two percent disparity would be even less acceptable

---

[6] See Commonwealth's Decree-Clarification Memo, Docket # 49, Exhibit 6 (March 1986 memorandum from the state Personnel Administrator to appointing authorities regarding the exemption process).

[7] Plaintiffs' counsel misinformed the Court when they stated during the September 17th hearing that the percentage of entry-level BPD officers who were minorities in June of 2003 exceeded 39%. See Docket # 76 (hearing transcript) at 51 (Attorney Gordon stating: "[I]n June 2003, the percentage of entry level police officers was over 39 percent.") and 53 (Attorney Lichten stating: "the number as of June of 2003 . . . [was] 39.02 percent of minority police officers in the City of Boston."). In fact, the BPD strength reports for June 2003 show that entry-level Black or Hispanic officers constituted 37.89% of all such officers on June 9, 2003, and 38.78% on June 30, 2003. See Exhibits C and D hereto. Averaging the two percentages yields 38.3% and a disparity with the general population figure that is just shy of two percentage points. More to the point, the BPD was **25** minority officers short of what the decree requires in June of 2003 (*see* footnote 7, *infra*) and thus it was not unlawful for the defendants to continue to follow the decree protocol in the hiring process leading up to the October 2003 academy class.

[8] The total number of BPD patrol-men and -women has averaged 1,380 in the July 2002 to June 2004 period. See monthly BPD strength reports on file. If, as the decree mandates, the exact parity percentage goal is 40.12% (representing the percentage of minorities in the community), then 554 of the 1,380 entry-level officers must be minorities before parity has been achieved. Accepting 38.12% as the "rough parity" target would mean that only 526 of 1,380 patrol officers need be minorities (28 fewer than the exact parity goal of 554 minority patrol officers). At 38.3%, the gap is narrowed to 25 officers.

in other communities. For example, the Town of Winthrop is still subject to the Castro decree. See Docket # 49, Exh. 2 (Toni Wolfman Affidavit, Exh. A). According to official 2000 census data, Winthrop's minority population constituted 4.64% of the town's total population in April 2000. See Exhibit E hereto. No reasonable person would conclude that even rough parity should be declared when a mere 2.64% of the Winthrop police force consists of minorities.

The Commonwealth acknowledges, however, that exact parity might rarely be achieved due to the fact that most police departments do not hire new officers one by one. In recent years, Boston typically has hired about 40 to 50 new officers at one time. For this reason, the Commonwealth would endorse a concept of rough parity that calls for the percentage variables to be rounded off to the nearest whole number. In other words, were the relevant percentage of minority officers (on the whole force or at the entry level, as this Court ultimately determines) to someday reach 39.5%, then the Commonwealth would agree that rough parity has been achieved (because both key variables, rounded off, would equal 40) and Boston should be released from the Castro decree. A similar notion of rough parity would also condone the possibility that, as in Quinn, parity might not be declared until the percentage of minorities on the police force slightly *exceeds* the percentage of minorities in the community as the result of a group hiring of officers that bumps the percentage of minority officers from less than 39.5% to slightly over 40.12%.

Finally, the Commonwealth contends that even if this Court were to find that rough parity had been achieved prior to October 2003,[9] the *only* relief these plaintiffs could be entitled to at this juncture is a declaration that parity had been reached. Because banding is a process that the

---

[9] The Court is asked to bear in mind that the Commonwealth did not possess any of the relevant BPD "strength report" data prior to the filing of this lawsuit. See Docket # 55, Exh. B (McNeely depo. tr.) at 112. The Castro decree leaves it to the appointing authority (here the BPD) to advise HRD when it believes that parity has been achieved. See 1975 Decree, ¶ 18. With over 170 communities subject to the decree at its outset, HRD would have been saddled with an impossible burden were it charged with monitoring each community's progress towards parity. Even today, HRD lacks the staff to perform pre-parity monitoring.

defendants could have followed in 2003 (were Boston to be released from the decree by retroactive court order),[10] even the highest-scoring plaintiff (Paul DeLeo) would have found himself in a pool of dozens of candidates who scored in the same band.  Upon a determination by banding experts that DeLeo's test score was functionally the equivalent of candidates who scored some 2-3 points lower, his chances of being hired would rest on any number of other variables that the BPD lawfully could consider (including his race).  Given the indeterminacy of those other variables, and how they would be applied, it is impossible to conclude that even Paul DeLeo would have been hired in the absence of the Castro decree in October of 2003.  And now, this fall, it is undisputed that DeLeo is in contention with 75 candidates who enjoy a statutory preference and will be reached before him.  See Pltffs' Stmt. of Facts, Exh. 29; Def.-Intervenors' Stmt. of Facts, ¶ 68.

For these additional reasons, the Commonwealth continues to urge the Court to deny the plaintiffs' motion for summary judgment and/or preliminary injunctive relief.

        Respectfully submitted,

        COMMONWEALTH OF MASSACHUSETTS and its
        Chief Human Resources Officer RUTH BRAMSON

        By their attorneys:

        THOMAS F. REILLY
        ATTORNEY GENERAL

        /s/ Robert L. Quinan, Jr.
        _____
        Robert L. Quinan, Jr.
        Assistant Attorney General
        Government Bureau
        One Ashburton Place, Room 2019
        Boston, MA  02108
        BBO # 553010; (617) 727-2200, ext. 2554

Dated:  September 27, 2004

---

[10] Plaintiffs' contention that "[b]anding would require [the Court] to issue an order outside of the civil service law" (Docket # 76, 9/17/04 hearing transcript at 9) is flatly wrong.  See Ash v. Police Comm'r of Boston, 418 N.E.2d 622 (Mass. App. Ct. 1981) (discussed in the Commonwealth's summary judgment opposition memorandum (Docket # 72) at 27-28 n.19).