FILED
Clerk's Office
USDC, Mass,
Date _9-27-04_
By _____
Deputy Clerk

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

PAUL DELEO, JR., et al.,                    )
                                            )
                    Plaintiffs,             )
                                            )
v.                                          )    Docket No. 03-12538-PBS
                                            )
CITY OF BOSTON, et al.,                     )
                                            )
                    Defendants,             )
                                            )
BOSTON BRANCH OF THE NAACP, et al,          )
                                            )
                    Intervenors.            )

### INTERVENORS' CORRECTED SUPPLEMENTAL BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND/OR SUMMARY JUDGMENT

The Intervenors, with the Court's leave, submit this supplemental opposition to Plaintiffs'

Motion for Preliminary Injunction and/or Summary Judgment, in order to address questions

raised by the Court at the hearing on September 17, 2004 (hereinafter, the "Hearing").

I.    As A Matter of Law, Parity Has Not Been Reached Because The Proper Measure Is Based On The Percentage Of Minorities Among The Entire Police Force, Not Just Among Patrolmen.

The Castro Consent Decree defines the minority population within a police department,

for purposes of determining whether parity has been achieved, as the "complement of Black and

Spanish surnamed post-probationary officers" within that department. Plaintiffs concede that, if

the Court determines as a matter of law that this term refers to the entire police force (as opposed

to only entry-level police officers (patrolmen)), they "lose… under any theory." Transcript of

September 17, 2004 hearing ("Hrg. Tr.") at 50 (attached hereto as Exhibit 1).

In support of their argument that this Court should calculate parity based on the

percentage of minorities among *patrolmen*, Plaintiffs rely exclusively on the First Circuit's

decision in Quinn v. City of Boston, 325 F.3d 18 (1st Cir. 2001), in which the court calculated parity within the Boston Fire Department by comparing the population of firefighters against the minority population within the City.

Plaintiffs continued reliance on Quinn to support the use of the patrolman population is misplaced. Quinn *did not* hold, as a general rule, that the entry-level class is the appropriate body for determining the minority population of a municipal police department. Rather, Quinn applied basic rules of contract interpretation to determine how parity should be calculated *based on the specific language of the consent decree that governed hiring in the Fire Department*. Quinn teaches only that, in interpreting a consent decree, the Court should consider numerous factors, including the historical context of the consent decree, the custom and usage of terms in the decree within the department, dictionary definitions of those terms, and relevant case law. Id. at 29-32. Under First Circuit law, another important factor to consider is the conduct of the parties in enforcing the consent decree. See Mackin v. City of Boston, 969 F.3d 1273, 1276 (1st Cir. 1992) ("Few things evidence a decree's meaning more persuasively than an immutable, decade-old pattern of past practice under the decree, consensually engaged in by all sides in the underlying litigation that produced the decree.").

Several important differences between the Castro Consent Decree and the consent decree interpreted in Quinn militate against Plaintiffs' argument that Quinn requires calculating parity using "patrolmen". First, the decree in Quinn expressly provided that parity be calculated based on the percentage of minority *firefighters*. Second, the court found that the term "firefighter" was used within the Boston Fire Department to mean only entry-level hires who fight fires; the term "firefighter" was not used with the department itself to apply to members of the Fire Department at any rank higher than that of "firefighter" (a term that itself excluded officers).

See Quinn, 325 F.3d at 31. The Castro Consent Decree does not use the term "patrolman" (the

Police Department analogue to "firefighter") but instead the terms "police officer" and "post-

probationary officer." These terms are used in the Boston Police Department to refer to *all*

tenured police officers, not only entry-level officers, who are referred to separately as

"patrolmen." See Intervenors' Opposition at 20; see also Ints' SOF Ex. F (Police Department

strength report categorizing as "permanent officers" every rank from patrolman up through

superintendent-in-chief). Fourth, the context of the Castro Consent Decree itself demonstrates

that the parties intended that term to apply the entire department: Judge Wyzanski's original

conclusion of racial discrimination was based on a factual finding regarding the disparity

between the percentage of minorities in the Boston Police *force* and the percentage of minorities

in the population of Boston. See Castro v. Beecher, 334 F. Supp. 930, 935 (D. Mass.

1971)(comparing percentage of minorities in entire police department to percentage of minorities

in the population); see also Castro v. Beecher, 459 F.2d 725, 730 (1st Cir. 1972)(same). The

parties' formula for achieving parity simply tracked the same comparative formula that the court

itself had used in finding that discrimination existed. Finally, even if the term police officer is

ambiguous, it is appropriate for the Court to consider evidence of the parties' course of

performance. See Mackin, 969 F.3d at 1276. The Court has been provided with clear,

undisputed evidence that the parties to the Castro Consent Decree have assessed parity using the

minority population of *the entire police force, not entry-level patrolmen*, for over 30 years. See

Intervenors' Opposition at 20-21; see also Ints' SOF ¶ 54; Ps' SOF ¶ 11.

     Thus, if this Court follows Quinn as plaintiffs urge, it must consider all relevant factors

identified in Quinn and Mackin, and apply these factors to the *specific language of the Castro*

*Consent Decree.* Such application – and general principles of contract construction – requires

the conclusion that the terms "police officers" and "post-probationary officers" refer to the

Boston Police Department *as a whole*, not the smaller class of patrolmen.

II.    Plaintiffs Are Not Entitled To Summary Judgment Because There Is A Genuine Factual Dispute With Respect To The Minority Population of the City of Boston.

Summary judgment is inappropriate in any event because a genuine issue of material fact

exists regarding the percentage of minorities in the City of Boston, and, therefore, as to whether

parity has been achieved (regardless of how the percentage of minorities in the police department

is calculated). In particular, the experts disagree about whether Blacks/African-Americans who

are multiracial, i.e., who consider themselves to be not only Black/African-American but also of

another race, should be counted as part of the minority population of Boston or excluded. See

Moore Aff. ¶¶ 24, 26 and Moore Cor. Supp. Aff. (attached hereto as Exhibit 2) ¶¶ 6-7, 10-11;

compare Aitken Supp. Aff. ¶¶ 11, 16-19. If these people are counted, the total minority

population of Boston is 40.12%; if they are not, it is 38.26%.[1] Moore Cor. Supp. Aff. ¶¶ 6-7. As

the minority population of the Boston Police Department as a whole has never exceeded 33.4%,

and the percentage of minority patrolmen has never exceeded 38.77%, this critical factual

dispute is the difference between potential liability for Defendants and defeat for Plaintiffs.

On a motion for summary judgment, all reasonable inferences must be drawn in favor of

the adverse party. Here, the reasonable inference is that all persons who indicated in the Census

that they consider themselves Black or African American are counted as Black or African-

American for purposes of determining parity, and that even that percentage – 40.12% –

understates the total minority population of Boston. Plaintiffs' expert does not dispute that the

data on which *both* experts rely understates the minority population of Boston due to systemic

---

[1]  Dr. Moore has submitted a corrected supplemental affidavit addressing the issue of double-counting and concluding that he did double-count in his original affidavit. Dr. Moore's supplemental affidavit corrects for that mistake, provides a revised calculation of the total minority population in Boston and demonstrates that parity has not been achieved even using the (incorrect) measure of patrolman as the basis for comparison.

undercounting in the 2000 Census. <u>See</u> Moore Cor. Supp. Aff. ¶ 4. Further, Plaintiffs' expert

has crossed the line into pure advocacy, even admitting that he was offering "arguments" rather

than opinions grounded in his own expertise. <u>See</u> Aitken Supp. Aff. ¶ 16. Confronted with his

intentional failure to count thousands of persons who he concedes consider themselves Black or

African American, Dr. Aitken has substituted himself for the finder of fact, purporting to make

factual findings about the past conduct of the parties to the Castro Consent Decree and

speculating about how candidates for entry-level police officer position might think or act, all

without any evidentiary basis whatsoever. <u>See, e.g., id.</u> ¶¶ 8-11. Given this clear foray into

advocacy and the lack of evidentiary basis for Dr. Aitken's exclusion of almost 11,000 people

from the calculation of the Boston minority population, an evidentiary hearing is necessary to

enable the Court to weigh the evidence, make critical credibility determinations, and make

factual findings about how the population of Boston should be calculated.

Dated:  September 27, 2004

BOSTON BRANCH OF THE NATIONAL
ASSOCIATION FOR THE ADVANCEMENT
OF COLORED PEOPLE and
MASSACHUSETTS ASSOCIATION OF
MINORITY LAW ENFORCEMENT
OFFICERS,

By their attorneys,

Robin L. Alperstein
Wilmer Cutler Pickering Hale and Dorr LLP
300 Park Avenue
New York, New York  10022
(212) 937-7200

Nadine Cohen (BBO #090040)
Lawyers' Committee For Civil Rights
   Under Law of the Boston Bar Association
294 Washington Street, Suite 443
Boston, Massachusetts  02108
(617) 482-1145

/s/ Jennifer L. Carpenter
Harry T. Daniels (BBO #113800)
Mark D. Selwyn (BBO #565595)
Jennifer L. Carpenter (BBO #647214)
Christopher R. Noyes (BBO #654324)
jennifer.carpenter@wilmerhale.com
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, Massachusetts  02109
(617) 526-6000

## CERTIFICATE OF SERVICE

I, Jennifer Carpenter, hereby certify that a copy of the foregoing has been served via facsimile and first class mail this 27th day of September 2004 to the following attorneys of record:

Harold L. Lichten, Esq.
Pyle, Rome Lichten & Ehrenberg, P.C.
18 Tremont Street, Suite 500
Boston, MA  02108

Stephen G. Cox, Esq.
City of Boston
Boston City Hall, Room 615
Boston, MA  02201

Betsy Facher, Esq.
Office of the Legal Advisor
Boston Police Department
One Schroeder Plaza
Boston, MA  02120

Robert L. Quinan, Jr., Esq.
Attorney General's Office
One Ashburton Place, Room 2019
Boston, MA  02108-1698

/s/ Jennifer Carpenter
Jennifer Carpenter

- 6 -

# EXHIBIT 1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF MASSACHUSETTS

3

4

5  PAUL DeLEO, et al        )    C.A. No. 03-12538-PBS

6  VS.                      )    Courtroom No. 19

7  CITY OF BOSTON, et al    )    1 Courthouse Way

8                                Boston, MA  02210

9

10

11

12                  SEPTEMBER 17, 2004

13                      2:00 P.M.

14

15

16

17

18  BEFORE THE HONORABLE PATTI B. SARIS

19  UNITED STATES DISTRICT JUDGE

20

21

22

23

24              Valerie A. O'Hara

25            Official Court Reporter

```
 1   A P P E A R A N C E S:

 2        Pyle, Rome, Lichten, Ehrenberg, & Liss-Riordan, P.C,  by
     HAROLD L. LICHTEN, ESQ., and ALFRED GORDON, ESQ., 18 Tremont
 3   Street, Suite 500, Boston, Massachusetts  02108, for the
     Plaintiffs;

 4
          Boston Police Department, by BETSY J. FACHER, ATTORNEY,
 5   Office of the Legal Advisory, One Schroeder Plaza, Boston,
     Massachusetts  02120, for the Boston Police Department;

 6
          Office of the Attorney General, by ROBERT L. QUINAN, JR.,
 7   ASSISTANT ATTORNEY GENERAL, One Ashburton Place, Room 2019,
     Boston, Massachusetts  02108-1698, for the Commonwealth of
 8   Massachusetts;

 9        City of Boston, by STEPHEN G. COX, ASSISTANT CORPORATION
     COUNSEL, Boston City Hall, Room 615, Boston, Massachusetts
10   02201, for the City of Boston;

11        Wilmer, Cutler, Pickering, Hale and Dorr, LLP, by MARK D.
     SELWYN, ESQ., ROBIN ALPERSTEIN, ATTORNEY, HARRY T. DANIELS,
12   ESQ., and JENNIFER L. CARPENTER, ATTORNEY, 60 State Street,
     Boston, Massachusetts  02109, for Intervenors NAACP and MAMLEO;
13
          Lawyers' Committe for Civil Rights, by NADINE COHEN,
14   ATTORNEY, 294 Washington Street, Suite 443, Boston,
     Massachusetts  02108, for the Intervenors.

15

16

17

18

19

20

21

22

23

24

25
```

1  data when people are applying for the test, we have no way of

2  knowing how people in the Boston Police Department can identify

3  themselves.

4          What I can tell you is this, individuals, the

5  numbers of individuals who are considered minority in the

6  Boston Police Department under the Castro definition being

7  African American or Hispanic.  That number can only go up if

8  you started to talk about multi-race analysis because there

9  could be people out there who never called themselves --

10         THE COURT:  You're all talking pure speculation

11 on everyone's part.

12         MR. GORDON:  Your Honor, that's why the Supreme

13 Court and why the Plaintiffs in this case believe you should

14 take the analysis that the Supreme Court used and use the

15 people we know categorized themselves as African American and

16 Hispanic.

17         THE COURT:  Let me just ask you this.  Let's

18 assume for a minute if I go with the whole Boston Police force,

19 you lose, right, under any theory?

20         MR. GORDON:  Yes, your Honor.

21         THE COURT:  If I go with entry level, then it

22 becomes an exceptionally close question because it's either 38

23 or 40 percent.  There are 38 percent entry level and one is one

24 on one and one is a two percent differential.

25         MR. GORDON:  If I may just clarify, in June,

# EXHIBIT 2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PAUL DELEO, JR., THOMAS BARRETT, ) <br> MICHAEL CONNEELY, MATTHEW ) <br> HOGARDT, BRENDAN DEVER, ) <br> PATRICK ROGERS, CHRISTOPHER ) <br> CARR, and BRIAN DUNFORD, ) <br> ) <br>            Plaintiffs, ) <br> ) <br>       v. ) <br> ) <br> CITY OF BOSTON, Massachusetts, ) <br> RUTH BRAMSON, in her Official Capacity ) <br> as Chief Human Resources Officer for the ) <br> Commonwealth of Massachusetts and THE ) <br> COMMONWEALTH OF ) <br> MASSACHUSETTS, ) <br> ) <br>           Defendants, ) <br> ) <br> BOSTON BRANCH OF THE NATIONAL ) <br> ASSOCIATION FOR THE ) <br> ADVANCEMENT OF COLORED ) <br> PEOPLE and MASSACHUSETTS ) <br> ASSOCIATION OF MINORITY LAW ) <br> ENFORCEMENT OFFICERS, ) <br> ) <br>          Intervenors. ) | DOCKET NO. 03-12538-PBS |

## CORRECTED SUPPLEMENTAL AFFIDAVIT OF
## DR. CRAIG LAWSON MOORE

I, CRAIG LAWSON MOORE, submit this affidavit as a supplement to my

original affidavit of August 19, 2004 on behalf of the Boston Branch of the National

Association for the Advancement of Colored People and the Massachusetts Association

of Minority Law Enforcement Officers (the "Intervenors"). I declare as follows:

1.  I have been asked to examine and comment on the supplement to the original affidavit of the plaintiffs' expert witness, Dr. Norman D. Aitken, and to render an opinion as to whether the City of Boston has achieved "parity" within the meaning of the Consent Decree in the case *Castro v. Beecher.*

2.  My understanding is that the standard for achieving "parity" is whether the proportion of minority (defined as including residents who are Black or African American, and who are Hispanic or Latino) residents of the City of Boston has reached or exceeded the proportion of minority members of the Boston Police Department.

3.  In my original affidavit, I expressed the following opinions: (a) that the most conservative calculation of the total minority population of Boston based on the 2000 census data is 39.77% (calculated by considering those who consider themselves Black/African-American alone or Latino/Hispanic (but not also Black/African-American)) (see Aff. ¶ 16); (b) that the better way to calculate the total minority population of Boston is to count those who consider themselves Black/African-American (regardless of whether those persons also consider themselves to be of another race), and add that number to those who are Latino/Hispanic (but not also Black/African-American) (see Aff. ¶¶ 24-26); (c) that these estimates are both deeply conservative because the census itself undercounts and understates the minority population in the City of Boston (see Aff. ¶¶ 12, 28); and (d) that Dr. Aitken's attempt to estimate the number of minorities eligible to hold the position of entry level police officer is statistically flawed. See Aff. ¶ 31.

4.  Dr. Aitken challenges only two of my opinions in his Supplemental Affidavit ("Atiken Supp"). He does not challenge my opinion, or the evidence on which

it is based, that the 2000 census in fact undercounts the number of minorities in the City of Boston and therefore that any calculation of the number of minorities in Boston based on that census data understates that number. See, generally, Aitken Supp. Nor does Dr. Aitken attempt to rebut my opinion that his methodology for estimating the number of minorities in Boston eligible to hold the position of entry-level police officer is statistically flawed, inherently unreliable, and therefore should not be used.

5.     Dr. Aitken challenges my opinion on two grounds. First, he states that in calculating the more conservative estimate of 39.77%, I mistakenly included in that calculation persons who are both Black/African-American and Latino/Hispanic, thereby double-counting 8,897 people. See Aitken Supp. ¶¶ 13, 16. Second, he advocates that the Court should not include in the calculation of the total minority population the 10,941 persons who consider themselves to be Black/African-American and another race. Id. ¶¶ 11, 16-19. Dr. Aitken acknowledges that his calculation of the total minority population of Boston excludes nearly 11,000 people who identified themselves as Black/African-American in the 2000 Census, arguing that these people should not be considered minorities. Id. ¶ 16. I will address each of these challenges in turn.

6.     I have reviewed the census data upon which I relied in my original affidavit to calculate the most conservative (and less accurate) number of minorities in the city of Boston. Dr. Aitken is correct that I did not subtract from the 85,089 Latino/Hispanics those who are also Black/African-American, and that I should have. If that subtraction is made, **and if the people who consider themselves to be both Black/African-American and another race are excluded from the calculation,** the total percentage is 38.26%. However, as discussed in my original affidavit and explained

in further detail below, it would be inappropriate to exclude these "multiracial" people from the calculation of the total number of minorities, and therefore, the correct calculation of the percentage of minorities in the city of Boston based on the 2000 census is **40.12%**.

7.   Upon further examination of the 2000 Census tables, I conclude that the correct number of minority residents in the City of Boston – comprised of Black or African/American and Hispanic or Latino persons – includes: 85,089 Hispanic or Latino residents, 140,305 Black/African-American residents who are not Hispanic or Latino, and 10,941 Black/African-American residents who are also of another race but who are not Hispanic or Latino (for a total of 151,246 people who are Black/African-American alone or in combination with another race, but not also Hispanic/Latino).  The total minority population is therefore 236,335, or 40.12% of the 589,141 people in the Boston population.  All of these figures come from Table P4 of the Census data (attached hereto as Exhibit A) and are internally consistent.  This calculation does not include any double counting of persons who are both Black/African-American and Hispanic/Latino.

8.   Dr. Aitken agrees that the number of persons who are Black/African-American in combination with another race is 10,941.  See Aitken Supp. Aff. ¶ 16.  Dr. Aitken argues that I have not offered "any rationale" why the 10,941 persons who consider themselves to be Black/African-American as well as another race should be counted as part of the minority population of Boston.  Id. ¶ 15.  He argues, without statistical explanation, that it would be "methodologically invalid" to calculate the number of minorities in the City of Boston based on the Census data regarding persons who consider themselves Black/African-American and another race because the Boston

Police Department allegedly does not consider multiracial persons in its own calculation of minorities.  Id. ¶ 11.  He also argues that these people should be excluded because "there is no way to determine which of the multiple Races selected is the dominant or most important Race in the mind of the respondent." Id. ¶ 17.

        9.    It is my opinion that Dr. Aitken's argument for not counting thousands of persons who self-identify as Black/African-American is flawed and without statistical foundation.  He himself characterizes his opinion in this regard as "argument." See Aitken Supp. Aff. ¶ 16 ("[I]f the remaining multiracial individuals (10,941) are also not included in the minority total (as per my prior arguments)...")(emphasis added).

        10.    In my view, it is the job of the expert to use the available data from the census to calculate the number of minorities in the city of Boston.  That number is determined to be 236,335.  The number of minorities in the population of Boston does not depend on the Boston Police Department's method of counting its own workforce; just as it does not depend on how the Fire Department, or any other agency, calculates its work force.  If it did, then the minority population of Boston would not be a determinable number, but would shift depending on the counting methods of any particular agency. Therefore, I disagree with Dr. Aitken that counting the 10,941 people he prefers to exclude would lead to erroneous results.

        11.    It is also my opinion that whether a particular ancestry of a multiracial person is "dominant" in that person's mind is not relevant to the calculation of the number of minorities, and that the issue of "dominance" that Dr. Aitken raises does not provide a legitimate basis for excluding multiracial people who consider themselves Black/African-American.  My view is supported by the census questionnaire itself, which

-5-

asks, "What is person 1's race?  Mark x to *one or more races* to indicate *what this person considers himself/herself to be.*"  See Aitken Supp. App. Ex. A, Question 8 (emphasis added).  In selecting "Black, African Am. or Negro," therefore, respondents indicate that they consider themselves to be "Black, African Am. or Negro."  It is for precisely this reason that I believe these persons should be included in the calculation of the number of minorities in the city of Boston.

12.    It is also my opinion that Dr. Aitken's rationale for excluding these 10,941 people who self-identify as Black/African-American in addition to another race is based on impermissible and unsupported conjecture.  Specifically, he assumes that "multiracial individuals who were partially African-American but saw themselves as primarily of another race would have identified themselves as being also of the other race during the BPD application process."  Aitken Supp. Aff. ¶ 19.  No evidence whatsoever supports this hypothesis; it is simply invented to buttress an argument that itself is not based on statistical methodology, but rather a desire to prevent thousands of people from being counted.

13.    I reiterate here that the use of the labor pool statistics in any analysis of parity is inappropriate and unreliable for the reasons stated in my original affidavit.

### Conclusion

14.    I am still of the opinion that the Boston Police Department has not achieved parity.  Even assuming that parity is calculated by comparing the percentage of minorities who are tenured patrolmen to the percentage of minorities in the population of Boston based on the 2000 Census data, and taking care to avoid double counting, a disparity (38.7% v. 40.12%) still exists.  That disparity is greater if parity is measured

based on the number of tenured police officers in the Boston Police Department (33.4%

v. 40.12%).

Signed under the pains and penalties of
perjury the 27th day of September, 2004

_____
Craig Lawson Moore, Ph.D.

# EXHIBIT A

**U.S. Census Bureau**
**American FactFinder**

**P4. HISPANIC OR LATINO, AND NOT HISPANIC OR LATINO BY RACE [73] - Universe: Total population**
Data Set: Census 2000 Summary File 1 (SF 1) 100-Percent Data

NOTE: For information on confidentiality protection, nonsampling error, and definitions, see http://factfinder.census.gov/home/en/datanotes/expsf1u.htm.

| | Boston city, Suffolk County, Massachusetts |
|---|---|
| Total: | 589,141 |
| Hispanic or Latino | 85,089 |
| Not Hispanic or Latino: | 504,052 |
| Population of one race: | 485,878 |
| White alone | 291,561 |
| Black or African American alone | 140,305 |
| American Indian and Alaska Native alone | 1,517 |
| Asian alone | 44,009 |
| Native Hawaiian and Other Pacific Islander alone | 271 |
| Some other race alone | 8,215 |
| Population of two or more races: | 18,174 |
| Population of two races: | 17,294 |
| White; Black or African American | 1,719 |
| White; American Indian and Alaska Native | 652 |
| White; Asian | 1,521 |
| White; Native Hawaiian and Other Pacific Islander | 101 |
| White; Some other race | 3,866 |
| Black or African American; American Indian and Alaska Native | 1,064 |
| Black or African American; Asian | 382 |
| Black or African American; Native Hawaiian and Other Pacific Islander | 423 |
| Black or African American; Some other race | 6,615 |
| American Indian and Alaska Native; Asian | 72 |
| American Indian and Alaska Native; Native Hawaiian and Other Pacific Islander | 2 |
| American Indian and Alaska Native; Some other race | 62 |
| Asian; Native Hawaiian and Other Pacific Islander | 143 |
| Asian; Some other race | 561 |
| Native Hawaiian and Other Pacific Islander; Some other race | 111 |
| Population of three races: | 773 |
| White; Black or African American; American Indian and Alaska Native | 287 |
| White; Black or African American; Asian | 42 |
| White; Black or African American; Native Hawaiian and Other Pacific Islander | 5 |
| White; Black or African American; Some other race | 151 |
| White; American Indian and Alaska Native; Asian | 20 |
| White; American Indian and Alaska Native; Native Hawaiian and Other Pacific Islander | 1 |
| White; American Indian and Alaska Native; Some other race | 14 |
| White; Asian; Native Hawaiian and Other Pacific Islander | 22 |
| White; Asian; Some other race | 49 |
| White; Native Hawaiian and Other Pacific Islander; Some other race | 12 |
| Black or African American; American Indian and Alaska Native; Asian | 22 |
| Black or African American; American Indian and Alaska Native; Native Hawaiian and Other Pacific Islander | 0 |
| Black or African American; American Indian and Alaska Native; Some other race | 41 |
| Black or African American; Asian; Native Hawaiian and Other Pacific Islander | 10 |
| Black or African American; Asian;Some other race | 46 |
| Black or African American; Native Hawaiian and Other Pacific Islander; Some other race | 36 |
| American Indian and Alaska Native; Asian; Native Hawaiian and Other Pacific Islander | 1 |
| American Indian and Alaska Native; Asian; Some other race | 1 |
| American Indian and Alaska Native; Native Hawaiian and Other Pacific Islander; Some other race | 2 |

| | |
|---|---|
| Asian; Native Hawaiian and Other Pacific Islander; Some other race | 11 |
| Population of four races: | 96 |
| White; Black or African American; American Indian and Alaska Native; Asian | 41 |
| White; Black or African American; American Indian and Alaska Native; Native Hawaiian and Other Pacific Islander | 2 |
| White; Black or African American; American Indian and Alaska Native; Some other race | 23 |
| White; Black or African American; Asian; Native Hawaiian and Other Pacific Islander | 1 |
| White; Black or African American; Asian; Some other race | 2 |
| White; Black or African American; Native Hawaiian and Other Pacific Islander; Some other race | 6 |
| White; American Indian and Alaska Native; Asian; Native Hawaiian and Other Pacific Islander | 6 |
| White; American Indian and Alaska Native; Asian; Some other race | 0 |
| White; American Indian and Alaska Native; Native Hawaiian and Other Pacific Islander; Some other race | 0 |
| White; Asian; Native Hawaiian and Other Pacific Islander; Some other race | 2 |
| Black or African American; American Indian and Alaska Native; Asian; Native Hawaiian and Other Pacific Islander | 0 |
| Black or African American; American Indian and Alaska Native; Asian; Some other race | 5 |
| Black or African American; American Indian and Alaska Native; Native Hawaiian and Other Pacific Islander; Some other race | 0 |
| Black or African American; Asian; Native Hawaiian and Other Pacific Islander; Some other race | 8 |
| American Indian and Alaska Native; Asian; Native Hawaiian and Other Pacific Islander; Some other race | 0 |
| Population of five races: | 10 |
| White; Black or African American; American Indian and Alaska Native; Asian; Native Hawaiian and Other Pacific Islander | 8 |
| White; Black or African American; American Indian and Alaska Native; Asian; Some other race | 1 |
| White; Black or African American; American Indian and Alaska Native; Native Hawaiian and Other Pacific Islander; Some other race | 0 |
| White; Black or African American; Asian; Native Hawaiian and Other Pacific Islander; Some other race | 0 |
| White; American Indian and Alaska Native; Asian; Native Hawaiian and Other Pacific Islander; Some other race | 1 |
| Black or African American; American Indian and Alaska Native; Asian; Native Hawaiian and Other Pacific Islander; Some other race | 0 |
| Population of six races: | 1 |
| White; Black or African American; American Indian and Alaska Native; Asian; Native Hawaiian and Other Pacific Islander; Some other race | 1 |

U.S. Census Bureau
Census 2000


**Standard Error/Variance documentation for this dataset:**
Accuracy of the Data: Census 2000 Summary File 1 (SF 1) 100-Percent Data (PDF 44KB)