UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                               )
PAUL DELEO, JR., THOMAS         )
BARRETT, MICHAEL CONNEELY,      )
MATTHEW HOGARDT, BRENDAN DEVER,)
PATRICK ROGERS, CHRISTOPHER     )
CARR, and BRIAN DUNFORD,        )
        Plaintiffs,             )
                                )
            v.                  ) CIVIL ACTION NO. 03-12538-PBS
                                )
CITY OF BOSTON, Massachusetts;  )
RUTH BRAMSON, in her capacity   )
as Chief Human Resources        )
Officer of the Commonwealth     )
of Massachusetts; and           )
COMMONWEALTH OF MASSACHUSETTS,  )
        Defendants,             )
                                )
BOSTON BRANCH OF THE NATIONAL   )
ASSOCIATION FOR THE             )
ADVANCEMENT OF COLORED PEOPLE   )
and MASSACHUSETTS ASSOCIATION   )
OF MINORITY LAW ENFORCEMENT     )
OFFICERS,                       )
        Intervenors.            )
_____)
```

**MEMORANDUM AND ORDER**

November 23, 2004

Saris, U.S.D.J.

## I.  INTRODUCTION

Plaintiffs, eight white male applicants to be Boston police officers, contend that the consent decree that has governed police hiring in the City of Boston for over thirty years should no longer be in effect because, under the terms of the decree, the City has achieved parity between the percentage of police

officers who are African-American or Hispanic and the percentage of these minorities in the City population.  They also argue that the City's gender-based police hiring violates the Equal Protection Clause of the Fourteenth Amendment to the Constitution, Title VII of the Civil Rights Act of 1964, and Massachusetts law.  The Court allowed the motion of the Boston Branch of the NAACP and the Massachusetts Association of Minority Law Enforcement Officers to intervene as party defendants.  Fed. R. Civ. P. 24.  Plaintiffs have moved for a preliminary injunction and summary judgment.  The City has moved for clarification of the consent decree, and the Commonwealth, City and intervenors have all joined in opposition to plaintiffs' motions.

After hearing, the Court concludes that the City met its target under the consent decree at the time of the October 2003 police class hiring and holds that plaintiffs' motion for summary judgment with respect to the consent decree is **ALLOWED**.  Boston is released from further compliance with the decree.  Plaintiffs' motion for summary judgment based on allegations of gender-based discrimination in July 2002 is **DENIED**.

## II.  BACKGROUND

Each of the following facts is undisputed, except as noted.

### A.  History of the Castro Decree

In 1970, six black and two Spanish-surnamed plaintiffs who

had applied unsuccessfully to become Boston police officers filed suit against various Massachusetts public entities and public officials. Castro v. Beecher, 334 F. Supp. 930, 934 (D. Mass. 1971) [hereinafter Castro I]. The plaintiffs alleged that the defendants' police recruitment and hiring practices discriminated against them, in violation of the plaintiffs' rights under the Fourteenth Amendment to the United States Constitution; 42 U.S.C. §§ 1981, 1983; and Massachusetts law. Id. at 934 n.1. At the time, the black population of the City was approximately 16.3% of the total population, but about 3.6% of the Boston police force was black. Id. at 935.

Eschewing quotas, Judge Wyzanski ruled that the civil service examinations that police applicants were required to take "were discriminatory against minorities which did not share the prevailing white culture." Id. at 943. On appeal, the First Circuit agreed, in part, but opted for stronger remedies with a more immediate impact. See Castro v. Beecher, 459 F.2d 725, 737 (1st Cir. 1972) [hereinafter Castro II]. It remanded the case for "further provision" as to the relief provided, which included the creation of a priority pool of certain black and Spanish-surnamed applicants who were to be hired according to a suggested range of ratios, provided they first passed a non-discriminatory job-related examination. Id. The First Circuit held: "We believe that preferential status for the priority pool will yield

3

a significant increment of black and Spanish-surnamed police
officers in the near term." <u>Id.</u>

On remand, Judge Wyzanski approved a consent decree ("the
Castro decree") that was intended "[t]o counteract the
unconscious lopsidedness of the [police] recruitment of the
past." <u>Castro v. Beecher</u>, 365 F. Supp. 655, 659 (D. Mass. 1973)
[hereinafter <u>Castro III</u>]; <u>see</u> <u>id.</u> app. A at 660 (Consent Decree
and Final Judgment). In establishing civil service priority
pools, Judge Wyzanski wrote:

> [T]here is a *prima facie* presumption that on a job-
> related examination which is reasonably set to meet
> merely the requirements (and not something above the
> requirements) of a police patrolman's job, the
> percentage of successful black and Spanish-speaking
> persons who would choose to be patrolmen and who also
> would meet the requirements of the job would nearly
> approximate the percentage of blacks and Spanish-
> speaking persons in the population of the Commonwealth.

<u>Id.</u> app. B at 665 (Opinion of March 22, 1973). The Court has
modified and supplemented the Castro decree in the years since
its initial approval. <u>See</u> <u>Castro v. Beecher</u>, 386 F. Supp. 1281,
1286-87 (D. Mass. 1975) [hereinafter <u>Castro IV</u>]; <u>Castro v.
Beecher</u>, 522 F. Supp. 873, 874-76 (D. Mass. 1981) [hereinafter
<u>Castro V</u>] (describing history of the Castro decree and related
litigation). In the process, Judge Caffrey established the
parity target that mirrored the parity target established in the
litigation over discrimination against firefighter applicants.

<u>Castro IV</u>, 386 F. Supp. at 1286 (citing <u>NAACP v. Beecher</u>, 371 F. Supp. 507 (D. Mass. 1974), <u>aff'd</u>, 504 F.2d 1017 (1st Cir. 1974)).

## B.  <u>Police Hiring Process</u>

An applicant to the Boston Police Department ("BPD") must meet certain eligibility requirements to be considered for hiring as a police officer.  Each applicant must (1) pass a police entrance examination; (2) be at least nineteen and younger than thirty-two years old (thirty-six if the applicant is a veteran); (3) have a valid Massachusetts driver's license; (4) be a citizen of the United States; (5) have a high school diploma, equivalency certificate, or three years of experience in the United States Armed Forces; (6) be able to read and understand English; (7) not have been convicted of a felony; and (8) be a resident of the City and have been so for at least one year.  (Callahan Depo. at 12-16, 24-25; Callahan Depo. Ex. 1 (City of Boston website); McNeely Depo. Ex. 1 (HRD Announcement No. 6700), Ex. 2 (HRD Announcement No. 8655).)

Pursuant to the terms of the Castro decree, the Human Resources Department ("HRD") of the Commonwealth of Massachusetts, which administers the police entrance examination, organizes BPD applicants who meet the eligibility requirements into two groups: one that contains all black and Hispanic applicants and another that contains all other applicants. (Consent Decree dated January 7, 1975 ¶¶ 20-23; McNeely Depo. at

17, 19.)  HRD ranks the applicants in each group, first according
to certain statutory preferences, such as veteran status, and
then by their exam scores.  (Consent Decree dated January 7, 1975
¶ 20; McNeely Depo. at 17, 19, 49, 70.)  HRD then merges
applicants from the two groups onto a certification list,
alternating between applicants from each group.  (McNeely Depo.
at 17-18.)  This system is intended to "facilitate the
appointment ... of one minority policeman for each white
policeman" that the City hires.[1]  Castro V, 522 F. Supp. at 875.
A municipality may also request a certification list from HRD for
police hiring based on particular criteria, such as foreign
language skill or gender.  (Callahan Depo. at 76-78, 81-83.)

    HRD forwards the certification list to the City.  (McNeely
Depo. at 14-16.)  To be considered for hiring, each applicant
must sign the list, thereby agreeing to accept police employment
if it is offered.  (Callahan Depo. at 17; McNeely Depo. at 41.)
Under civil service requirements, the City may then consider for
hiring, in rank order, a certain number of applicants who signed
the list.  That number is twice the number of police positions
for which the City intends to hire, plus one.  (McNeely Depo. at
47, 56; Callahan Depo. at 66-67.)  The City is not strictly
required to hire any particular applicant within this pool.
(Intervenors' & Commonwealth Defendants' Rule 56.1 Statement at

---

[1]    In the context of the Castro decree, "minority" means
black or Hispanic.

9.)  If an applicant is considered for hiring, the applicant must submit to a medical examination, a psychological examination, and a background investigation. (Callahan Depo. at 19-22.)

**C.  Release from the Castro Decree**

The Castro decree applied to every Massachusetts municipality with a minority population of at least one percent. (Consent Decree dated January 7, 1975 ¶ 24.)  A municipality may seek release from the terms of the decree when it "achieves a complement of minorities commensurate with the percentage of minorities within the community."  (Consent Decree dated January 7, 1975 ¶ 24; Caggiano Aff. ¶¶ 3, 6-7.)  If the Commonwealth and the original Castro plaintiffs agree that the municipality has reached this target, the municipality is released from further compliance with the decree.  (Caggiano Aff. ¶¶ 3, 6-7; Wolfman Aff. ¶ 7.)  Today, twelve municipalities, including the City, remain subject to the Castro decree.  (Wolfman Aff. ¶ 9, Ex. A.)

**D.  The Present Litigation**

Each of the eight plaintiffs in this case is a non-minority male who applied unsuccessfully to become a Boston police officer.  Each took the police entrance examination in April 2001.  Plaintiff Paul DeLeo scored 101 on that exam; each other plaintiff scored 100.  Each plaintiff also satisfied the other eligibility requirements for BPD hiring. (DeLeo Aff.; Barrett Aff.; Conneely Aff.; Hogardt Aff.; Dever Aff.; Rogers Aff.; Carr

Aff.; Dunford Aff.)

The City requested a certification list from HRD to hire
forty-five police officers for its March 2002 class. (Callahan
Depo. at 69-70, 73; Public Safety Civil Service Requisition dated
Sept. 7, 2001.) Each of the plaintiffs' names appeared on the
list that HRD provided and each signed the list. (Certification
list dated Sept. 14, 2001.) However, none of the plaintiffs was
reached for consideration for the March 2002 class. (HRD
Certification #211023 Report Supplement.)

In July 2002, the City requested a certification list of
female applicants to fill fifteen BPD positions. (Letter from
Edward Callahan dated July 23, 2002.) None of the plaintiffs'
names appeared on that list, from which the City subsequently
hired eleven applicants. (Callahan Depo. at 104-05.)

The City requested another certification list from HRD to
hire thirty-eight police applicants for its October 2003 class.
(Public Safety Civil Service Requisition dated July 8, 2002.) As
before, although each of the plaintiffs' names appeared on the
list, none of the plaintiffs was reached for consideration. (HRD
Certification #220831 Report Supplement.) However, as defendants
and intervenors concede, if the Castro decree had not been in
effect and the applicants' rank on the certification list been
based solely on statutory preferences and exam scores, at least
plaintiff DeLeo would have been reached for consideration.

The City requested another certification list from HRD to

hire additional police applicants for a new class scheduled to begin in October 2004.  This list was based on the results of the April 2003 police entrance examination, which each of the plaintiffs took.  None of the plaintiffs was selected from this list.

Plaintiffs brought this action to challenge the continued application of the Castro decree to the City.  They argue that the City has "achieve[d] a complement of minorities commensurate with the percentage of minorities within the community" and, therefore, that its continued adherence to the terms of the Castro decree violates their equal protection rights.  They also challenge the July 2002 female-only hiring as discriminatory.

### III.  STANDARD OF REVIEW

"Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  Barbour v. Dynamics Research Corp., 63 F.3d 32, 36 (1st Cir. 1995) (quoting Fed. R. Civ. P. 56(c)).  "To succeed [on a motion for summary judgment], the moving party must show that there is an absence of evidence to support the nonmoving party's position."  Rogers v. Fair, 902 F.2d 140, 143 (1st Cir. 1990); see also Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

"Once the moving party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial.'"  Barbour, 63 F.3d at 37 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).  "There must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.'"  Rogers, 902 F.2d at 143 (quoting Anderson, 477 U.S. at 249-50) (citations and footnote in Anderson omitted).  The Court must "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor."  Barbour, 63 F.3d at 36.

## IV.  DISCUSSION

**A.  Standing**

The Court first resolves intervenors' challenge to plaintiffs' standing to bring this action.  Article III of the Constitution requires that the plaintiff "has suffered or is threatened by injury in fact to a cognizable interest, that the injury is causally connected to the defendant's action, and that it can be abated by a remedy the court is competent to give."  New Eng. Reg'l Council of Carpenters v. Kinton, 284 F.3d 9, 17 (1st Cir. 2002) (citation omitted).  "[A] plaintiff must ensure

10

that he establishes standing for each claim and for each form of relief sought." <u>Donahue v. City of Boston</u>, 304 F.3d 110, 116 (1st Cir. 2002); <u>see also</u> <u>Cotter v. City of Boston</u>, 323 F.3d 160, 166 (1st Cir. 2003) ("The standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted.").

However, "a plaintiff may have standing to assert an equal protection claim for prospective relief, even if he or she does not have standing to pursue a claim for damages.  Where a plaintiff challenges an on-going race conscious program and seeks prospective relief ... the relevant injury ... is the inability to compete on equal footing.  Thus, a plaintiff may have standing to pursue a claim for prospective relief if he or she has or is likely to be exposed to unequal treatment." <u>Donahue v. City of Boston</u>, 371 F.3d 7, 12 (1st Cir. 2004) (internal quotations and citations omitted), <u>cert. denied</u>, 73 U.S.L.W. 3296 (U.S. Nov. 15, 2004) (No. 04-345).  Such a plaintiff "need not affirmatively establish that he would receive the benefit in question if race were not considered," <u>Donahue</u>, 304 F.3d at 119 (quoting <u>Texas v. Lesage</u>, 528 U.S. 18, 21 (1999) (per curiam)), but must "be able to show that he is able and ready to apply for the benefit and that the challenged discriminatory policy prevents him from doing so," <u>Donahue</u>, 371 F.3d at 12 (internal quotations and brackets omitted).  <u>See also</u> <u>Cotter</u>, 323 F.3d at 166 (quoting <u>Lesage</u>, 528

11

U.S. at 21) (no standing where "it is undisputed that the
government would have made the same decision regardless" of use
of "impermissible criterion").

At hearing, defendants conceded that at least plaintiff
DeLeo would have been reached for hiring consideration for the
October 2003 class if the names on the certification list for
that class had been ranked solely according to statutory
preferences and exam scores.  Therefore, the requirements of the
Castro decree are the cause in fact of the City's failure even to
consider plaintiff DeLeo for hiring in the October 2003 class.

Moreover, each plaintiff in this case has standing for an
equal protection claim for prospective relief.  See Donahue, 304
F.3d at 117, 119-20 (plaintiff did not have standing for damages
claim regarding BPD hiring because he "was too far down the list
to be even remotely considered for hiring" but showed unequal
treatment necessary "to seek forward-looking relief.").  Each is
"able and ready" for hiring consideration because each satisfies
all of the eligibility requirements requisite for BPD hiring
consideration.  See Donahue, 371 F.3d at 12. (Plaintiff Affs.)
Therefore, although determination of the relief for which each

plaintiff has standing may require a more particularized inquiry, the plaintiffs have standing to bring this action.

**B.    <u>Applicability of Castro Decree to the City</u>**

Plaintiffs move for summary judgment primarily on the ground that the City has achieved "a complement of minorities commensurate with the percentage of minorities within the community" under the terms of the Castro decree and that, therefore, the City is released from further compliance.

"[D]istrict courts enforcing public law consent decrees have, in general, broad discretion in determining ... whether the objectives of the decree have been substantially achieved." <u>Navarro-Ayala v. Hernandez-Colon</u>, 951 F.2d 1325, 1337 (1st Cir. 1991). "[C]ourts should be flexible in considering requests for relaxation of, or release from, decrees which were initially established to bring about needed institutional reforms." <u>Mackin v. City of Boston</u>, 969 F.2d 1273, 1275 (1st Cir. 1992). "What is requisite is a large-minded approach, with a willingness of ... courts constantly to re-examine what has been done, and what may still properly be done to achieve the best solution which the judicial process permits." <u>Castro III</u>, 365 F. Supp. at 663 (Opinion of March 22, 1973); <u>see also</u> <u>Mackin</u>, 969 F.2d at 1278 (Court decisions regarding consent decrees are "at bottom an exercise of equitable power.").

The party seeking release from a consent decree bears the burden of proof. See Quinn v. City of Boston, 325 F.3d 18, 37 (1st Cir. 2003) ("[T]he parties urging that parity has been achieved ... bear the burden of proof."); cf. Rufo v. Inmates of the Suffolk County Jail, 502 U.S. 367, 383 (1992) ("a party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree"). "[A] central consideration ... is whether the agency in question has come into compliance with constitutional requirements. Put another way, an inquiring court should ask whether the goals of the litigation, as incorporated in the outstanding decree, have been completely achieved." Mackin, 969 F.2d at 1275; see also id. at 1276 ("An intrusion by a federal court into the affairs of local government should be kept to a bare minimum and not be allowed to continue after the violation has abated and its pernicious effects have been cured.").

The parties in the present litigation dispute several issues regarding the City's continued adherence to the Castro decree: (1) the method for calculating the "complement of minorities" within the BPD, (2) the method for calculating the "percentage of minorities within the community", (3) the numbers for the respective statistics, (4) the meaning of "commensurate with", and finally, whether, considering each of the previous issues, the City has achieved the threshold for release from the decree.

The Court considers each of these issues in turn.

    **1.**  **The Police Complement of Minorities**

The first issue to resolve in determining whether the City has reached the threshold for release from the Castro decree is the method of measuring the "complement of minorities" within the BPD.

This Court is guided by the First Circuit decision in <u>Quinn v. City of Boston</u>, 325 F.3d 18 (1st Cir. 2003), which concerned the consent decree that governed Boston Fire Department hiring ("fire department decree").  <u>See also</u> <u>Castro V</u>, 522 F. Supp. at 876 ("The litigation involving the members of the Fire Department has followed a substantially similar course down through the years ...."). In <u>Quinn</u>, plaintiffs sought to extinguish the fire department decree as it applied to the City.  325 F.3d at 25. That decree contained a release provision nearly identical to the release provision in the Castro decree.  <u>Beecher</u>, 371 F. Supp. at 523 (fire department decree allowing release of municipality when it "achieves a complement of minorities commensurate with the percentage of minorities within the community").  The parties in <u>Quinn</u>, like the parties in this case, disputed the components of the calculation necessary to trigger release.  325 F.3d at 28-36. In construing the fire department decree, the First Circuit articulated the governing legal principle: "[B]ecause this litigation challenges a judicial decree affording race-based

relief, any interpretation of the decree or any application of it in practice must survive strict scrutiny.  This standard obliges an inquiring court to make a binary finding that the race-based relief is not only justified by a compelling governmental purpose but also narrowly drawn to fit the contours of that purpose." Id. at 28 (citations omitted).

In Quinn, the First Circuit held that the relevant fire department statistic was the percentage of minorities within the entry-level rank only.  Id. at 35.  The court devoted much of its discussion to its limited interpretation of the term "firefighter" as used in the fire department decree.  Id. at 30-35.  However, the court also stated that "[t]he litigation underlying the [fire department] decree arose out of discriminatory practices in recruitment and hiring *into entry-level positions*."  Id. at 30 (emphasis in original).  A broader reading of the term "firefighter" "would effectively transform an instrument carefully crafted *to eliminate discrimination in recruitment and hiring* into general leverage favoring minorities in a much wider variety of matters."  Id. at 32 (emphasis added). "Logically, the parties must have intended that term to refer to the class of jobs open to external hiring: entry-level firefighter positions."  Id. at 31.

16

The same reasoning applies here.  The <u>Castro</u> litigation of
the 1970s had the same origins as the fire department litigation.
<u>See</u> <u>Castro I</u>, 334 F. Supp. at 934 ("This action ... presents
claims that state and city officials *in recruiting and
hiring* policemen discriminated against certain minorities."
(emphasis added)).  The respective consent decrees had the same
aims and, indeed, used much of the same language.

Intervenors argue that "police officer", as used in the
Castro decree, should receive a broader interpretation than the
First Circuit gave "firefighter" in <u>Quinn</u>.  However, the Castro
decree mainly uses "police officer" in its description of the
entry-level hiring process. (Castro decree dated January 7, 1975
¶¶ 2 ("police officer appointments"), 7 ("police officer
applicants"), 16 ("candidates for police officer positions").)
The decree seems to use "police officer" synonymously with
"patrolman."  <u>See</u> <u>Castro III</u>, 365 F. Supp. at 660 (approving
consent decree and addressing it to appointing authorities that
have "requested certification of police patrolmen or
equivalents"); <u>id.</u> at 656-58, 660, 664-66 (discussing case in
context of "patrolmen" applicants).  In other contexts, the term
appears similarly limited.  <u>See</u> <u>Boston Police Superior Officers
Fed'n v. City of Boston</u>, 147 F.3d 13, 18 (1st Cir. 1998) (in
context of consent decree concerning BPD promotions, "'police
officers' means not all officers ... but instead 'patrolmen,' or

those officers who might be elevated to sergeant"); BPD Rules &
Procedures Rule 101, May 4, 1998, at 2 (distinguishing "police
officer" position from other BPD non-civilian positions, such as
"sergeant", "lieutenant", and "captain").  Indeed, the Quinn
court cited favorably the definition of "police officer" as
equivalent to "patrolman."  325 F.3d at 32 (citing Boston Police
Superior Officers, 147 F.3d at 17-18).

Defendants and intervenors also argue that restricting the
BPD analysis to the entry-level rank ignores their own past
practice for measuring BPD progress under the Castro decree.  See
Mackin, 969 F.2d at 1276 ("Few things evidence a decree's meaning
more persuasively than an immutable, decade-old pattern of past
practice under the decree, consensually engaged in by all sides
in the underlying litigation that produced the decree.").  The
First Circuit rejected a similar argument in restricting its
analysis of fire department progress to the entry-level rank,
however.  See Quinn, 325 F.3d at 34-35 (rejecting defendants'
reliance on "past practice" and "attempt to apply language
derived from Mackin to that practice" where doing so would
"change the meaning of plain language and thus ... validate an
unlikely interpretation that is implausible in the context of the
underlying litigation").

Finally, defendant Commonwealth and intervenors argue that
limiting the calculation of the BPD "complement of minorities" to

18

the entry-level rank creates a disincentive to the promotion of minorities.  Again, the First Circuit rejected a similar argument in <u>Quinn</u>.  <u>See</u> <u>id.</u> at 34 ("[A]lleging that unconstitutional hiring practices within the [fire department] have caused a disparate impact on the number of minorities in the higher echelons is a heavy charge.  Such an allegation should not be addressed in the abstract, but, rather, should be squarely propounded by an injured party with standing to sue and litigated to a just conclusion.").  As the <u>Quinn</u> court noted, for many years a separate consent decree governed promotions within the BPD.  <u>Id.</u> at 32 (citing <u>Boston Police Superior Officers</u>, 147 F.3d at 17-18).

        The First Circuit has recently validated the narrowly drawn affirmative action promotion of minority officers to further the compelling state interest in a diverse police force that meets the City's operational needs.  <u>Cotter</u>, 323 F.3d at 172 n.10 ("We are much more sympathetic to the argument that communities place more trust in a diverse police force and that the resulting trust reduces crime rates and improves policing.  This operational needs justification has been cited as a compelling state interest by other Circuits.").  Nothing in the record suggests that the Castro decree was originally intended to address promotional discrimination through the use of priority hiring pools, nor would a priority hiring pool be a narrowly drawn solution for discrimination in promotion.  <u>See</u> <u>Quinn</u>, 325

F.3d at 32 ("including higher ranks within the compass of the term 'firefighter' would mean that the [fire department] decree was not narrowly tailored"); id. at 35 (broader interpretation "would open the decree to constitutional attack").

Previous Castro cases have occasionally referred to the percentage of minorities in the BPD as a whole.  See Castro V, 522 F. Supp. at 876 (Judge Caffrey noting in 1981 that he had approved a supplemental decree in 1976 that released certain municipalities "which had attained parity of the percentage of blacks and hispanics in police service with the percentage of blacks and hispanics in [the] municipal population"). Apparently, however, a dispute over this standard has never been litigated.  In light of the First Circuit's more recent analysis of similar circumstances in the fire department litigation, therefore, such references are not controlling here.  See Quinn, 325 F.3d at 29 (rejecting "the assumption that [the definition of 'firefighter'] had been fully litigated and settled in early proceedings"); id. at 35 (rejecting broader definition of "firefighter" in part because it was "never directly challenged").

Applying the doctrine of strict scrutiny, the Court concludes that the percentage of minorities within the BPD entry-

20

level rank is the appropriate measure for the "complement of
minorities" within the BPD.

**2.    The Percentage of Minorities within the Community**

This Court has consistently defined "the percentage of
minorities within the community" as the percentage of minorities
in the City population.  From the beginning, this Court has used
this statistic as its yardstick.  See Castro I, 334 F. Supp. at
935 (measuring minority population in City as a whole); see also
Castro V, 522 F. Supp. at 876 (same); Beecher, 371 F. Supp. at
514 (same for fire department decree).  In addition, the First
Circuit held that language in the fire department decree nearly
identical to that in the Castro decree "unambiguously requires
the use of the percentage of minorities in the general
population."  Quinn, 325 F.3d at 36 (citing Beecher, 371 F. Supp.
at 523).

Plaintiffs contend that the Supreme Court has required
reference to the "qualified labor pool", rather than the
population at large, under the circumstances of this case.  See
City of Richmond v. Croson, 488 U.S. 469, 501-02 (1989) ("But
where special qualifications are necessary, the relevant
statistical pool for purposes of demonstrating discriminatory
exclusion must be the number of minorities qualified to undertake
the particular task.").  Again, the First Circuit's experience
with the fire department decree is instructive.  In Quinn, the
First Circuit held that use of the percentage of minorities in

21

the City population to measure the fire department's progress under the consent decree was "fully consistent" with Supreme Court precedent. 325 F.3d at 36; see also Mackin, 969 F.2d at 1279 (upholding district court's use of general population instead of "the relevant labor pool").

Moreover, the eligibility requirements for BPD applicants are not "special qualifications" that require reference to the qualified labor pool. See Croson, 488 U.S. at 501-02. The Supreme Court has distinguished special qualifications from skills "that many persons possess or can fairly readily acquire." Hazelwood Sch. Dist. v. United States, 433 U.S. 299, 308 n.13 (1977); see Boston Police Superior Officers, 147 F.3d at 21 (recognizing special qualifications for promotion of BPD sergeants to lieutenant where applicants were required to be BPD sergeants who had passed an exam for the lieutenant position). BPD entry-level positions, like other entry-level positions, "require no special prior abilities because they are, in fact, 'designed to provide expertise.'" Peightal v. Metro. Dade County, 26 F.3d 1545, 1554 (11th Cir. 1994) (quoting Johnson v. Transp. Agency, 480 U.S. 616, 632 (1987)); id. at 1554 n.13 (neither driver's license requirement nor "educational requirement of a high school diploma or its equivalent" for entry-level firefighters constitute special skills).

Consequently, the percentage of minorities in the City population, not the qualified labor pool, is the appropriate

22

measurement of "the percentage of minorities within the community."

### 3. The Numbers

The parties do not dispute how the numbers for the police line up: the percentage of minorities in the BPD entry-level rank reached 37.39% in March 2002, 38.79% in June 2003, and 38.82% in October 2003.  The parties disagree, however, as to the minority population of the City.  Plaintiffs contend that, based on the 2000 U.S. Census, the black and Hispanic population of the City is 38.26% of the total population.  See Quinn, 325 F.3d at 37 (relying upon the district court's finding that as of 2000 "blacks and Hispanics constituted slightly over 38% of Boston's overall population").  Defendants and intervenors argue that this statistic excludes those who self-identified on the Census as bi-racial or multi-racial and that including those persons raises the relevant population to 40.12% of the total City population.[2]

As of June 2003, the percentage of minorities in the BPD entry-level rank, 38.79%, had surpassed plaintiffs' figure for the percentage of minorities within the total City population, 38.26%.  If plaintiffs' statistic is the right one, by June 2003 the BPD had "achieve[d] a complement of minorities commensurate with the percentage of minorities within the community."

---

[2]    The 2000 U.S. Census was the first to provide this option for self-identification.  The BPD has no comparable classifications or means for identifying BPD personnel.

However, even by October 2003 the percentage of minorities in the BPD entry-level rank, 38.82%, was still 1.3% below defendants' and intervenors' figure for the "percentage of minorities within the community."[3]  If defendants' and intervenors' statistic is right, the City's release from the Castro decree as of October 2003 depends on the definition of "commensurate with" as used in the decree.  The Court considers that definition below.

### 4.  "Commensurate With"

This Court has previously referred to the "commensurate with" threshold for release from the Castro decree as "parity." See Castro V, 522 F. Supp. at 875 (describing the "parity target").  However, the First Circuit has since defined the "actual objective" of "commensurate with" in the fire department decree as "rough parity."  Mackin, 969 F.2d at 1277; see also Quinn, 325 F.3d at 28, 37 (requiring "parity (or, at least, rough parity)"); id. at 49 (Lipez, J., dissenting) (release threshold is "demonstrably attainable rough parity").  This Court finds no ground for interpreting "commensurate with" in the Castro decree any differently.  Therefore, rough parity is the appropriate standard for release from the Castro decree.

---

[3]     Intervenors suggest that the Court also consider evidence that the Census undercounts minorities.  However, the courts, the City, and the original Castro plaintiffs each have consistently relied on the Census as the source of community population figures.  See, e.g., Quinn, 325 F.3d at 37 (relying on district court finding based on 2000 Census). (Wolfman Aff. ¶ 6; Callahan Depo. at 27-28.)

However, neither this Court nor the First Circuit has established a mathematical measurement for either parity or rough parity. See, e.g., Quinn, 325 F.3d at 29 (noting no previous definition of parity). Defendants argue that the rough parity standard must be examined in the context of the particular municipality at issue. They assert that a margin of 1.3%, in the context of a municipality the size of Boston, is simply too large to constitute even rough parity.

This Court agrees that it must examine the rough parity standard in the context of this case and the City's experience under the Castro decree. When the Court entered the Castro decree in the 1970s, its purpose was "[t]o counteract the unconscious lopsidedness of the [police] recruitment of the past." Castro III, 365 F. Supp. at 659. At that time, black representation in the BPD was approximately one-fifth of the black population's percentage of the total City population. Castro I, 334 F. Supp. at 935. In over thirty years, the minority population as a percentage of the total City population has increased substantially. During the same period, minority representation within the BPD has grown even faster. As a result, thirty-four years after the original Castro litigation, continued application of the Castro decree to the City depends on, at most, the 1.3% margin between 38.82% and 40.12%.

In other words, circumstances have changed significantly in the three decades since the Court first entered the Castro

decree.  See Wessmann v. Gittens, 160 F.3d 790, 802 (1st Cir.
1998) (The continued validity of remedial action depends not only
"on the mere existence of a past judicial finding [of
discrimination], but, rather, on a variety of considerations,
including what transpired since the time of that finding.");
Mackin, 969 F.2d at 1276 ("Dissolution or relaxation of a consent
decree may be justified in a variety of circumstances ...."); cf.
Rufo, 502 U.S. at 384 ("A party seeking modification of a consent
decree may meet its initial burden by showing ... a significant
change either in factual conditions or in law.").  As a result,
in the context of this case, even if defendants' statistic is
assumed to be true, the margin is sufficiently slim to constitute
rough parity.  The difference between plaintiffs' statistic for
the minority population of the City and defendants' and
intervenors' statistic is, therefore, immaterial.

Using either statistic, I conclude that the City had
achieved the goal of the Castro decree as of October 2003.  See
Mackin, 969 F.2d at 1275.  The City's adherence to the decree in
the October 2003 hiring cycle was unconstitutional.  See Quinn,
325 F.3d at 37 ("[T]he City's continued resort to race-based
preferences from and after the time when parity was achieved
fails the second prong of the strict scrutiny analysis.").  The
Court enters summary judgment in the plaintiffs' favor with
respect to that hiring cycle.

C.  **Female Police Hiring**

Plaintiffs also challenge as unconstitutional the City's July 2002 request for a certification list of female BPD applicants and the subsequent hiring from that list.  Courts must subject such gender-based classifications to "heightened scrutiny."  Nev. Dep't Human Res. v. Hibbs, 538 U.S. 721, 728 (2003).  "Gender-based discrimination violates equal protection unless it 'serves important governmental objectives and ... the discriminatory means employed are substantially related to the achievement of those objectives.'"  Laro v. New Hampshire, 259 F.3d 1, 10 (1st Cir. 2001) (quoting United States v. Virginia, 518 U.S. 515, 533 (1996)).

The City's July 2002 request and subsequent hiring satisfy both prongs of the heightened scrutiny standard.  The City has an ongoing operational need to hire female police officers for investigations, the handling of female suspects and female prisoners, and interaction with female victims of sexual assault and rape.  See Cotter, 323 F.3d at 172 n.10 (noting that other Circuits have held the "operational needs justification" to be a compelling state interest).  Plaintiffs have put forth no evidence that defendants used discriminatory means not substantially related to the objective of hiring additional female police officers.  See Mass. Gen. Laws ch. 41, § 97B (2004) ("Each [police] department shall make efforts to employ women police officers" in a rape reporting and prosecution unit.); id. ch. 31, § 21 (Consideration for certain civil service positions

may be limited by gender if the positions "require custody or

care of a person of a particular sex."). Therefore, the court

rejects plaintiffs' challenge to the July 2002 request and

subsequent hiring. The motion for summary judgment on this issue

is **DENIED**.

### D.  The Remedy

The circumstances have changed in the weeks since the Court

took this case under advisement because the City has hired its

October 2004 police class. Plaintiffs seek an injunction

ordering the City to hire them. At oral argument, to obviate the

need for the requested preliminary injunction, the City suggested

the creation of a special hiring class for plaintiffs, like the

special firefighter class created for the Quinn plaintiffs, in

the event that (1) the Court declared that the City is released

from the terms of the Castro decree, (2) plaintiffs are otherwise

qualified, and (3) plaintiffs would have been reached for hiring

consideration in the absence of the consent decree. See

generally Quinn v. City of Boston, 279 F. Supp. 2d 51 (D. Mass.

2003) (order on remand requiring hiring and other equitable

relief for Quinn plaintiffs). In supplemental briefing, the City

stated that it would hire a new police class in spring 2005, and

suggested that a special class would no longer be necessary.

As noted above, the parties agree that plaintiff DeLeo would

have been reached for consideration for the October 2003 class.

However, the record is insufficient to support a finding that

DeLeo would have been hired in that class, or that any other plaintiff would have been reached or hired either in that class or in the October 2004 class. This decision also leaves open the question of whether the City had achieved rough parity as of the March 2002 hiring, and whether any plaintiff would have been reached by then.

It is worth adding that the Commonwealth opposes any prospective order that requires strict rank-order hiring because the Commonwealth may in the future institute certification of police applicants based on banding principles. See Boston Police Superior Officers, 147 F.3d at 24 n.5 ("[S]ome courts, endorsing the 'banding' approach, have approved affirmative action plans allowing the employer to depart from strict rank order and promote minority candidates from within a band of scores.") (citations omitted). Banding makes sense because, to meet its operational law enforcement and community policing needs, the City may be indifferent to a minimal point difference between two candidates. The Court declines to issue a prospective order that crafts a hiring procedure to replace the Castro decree.

### V. ORDER

Within 15 days, all counsel shall propose to the Court a form of equitable relief with respect to the named plaintiffs based on the rulings set forth above. Plaintiffs' motion for a preliminary injunction is **DENIED** without prejudice. Plaintiffs' motion for summary judgment is **ALLOWED** with respect to the

29

consent decree only.  The motion for summary judgment with
respect to the July 2002 gender-based hiring is **DENIED**.


                              /s/ Patti B. Saris


                              _____
                              PATTI B. SARIS
                              United States District Judge