UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.  03-12538-PBS

PAUL DELEO, JR., THOMAS BARRETT,
MICHAEL CONEELY, MATTHEW HOGARDT,
BRENDAN DEVER, PATRICK ROGERS,
CHRISTOPHER CARR, BRIAN DUNFORD, and
DONALD WIGHTMAN
        Plaintiffs,

v.

CITY OF BOSTON, Massachusetts, RUTH
BRAMSON, in her capacity as Chief Human
Resources Officer of the Commonwealth of
Massachusetts; and the COMMONWEALTH OF
MASSACHUSETTS,
        Defendants,

BOSTON BRANCH OF THE NATIONAL
ASSOCIATION FOR THE ADVANCEMENT
OF COLORED PEOPLE and
MASSACHUSETTS ASSOCIATION OF
MINORITY LAW ENFORCEMENT
OFFICERS,
        Intervenors.

**MEMORANDUM IN SUPPORT OF
DEFENDANT CITY OF BOSTON'S OPPOSITION TO PLAINTIFFS' MOTION FOR
ATTORNEYS' FEES AND COSTS**

**I.    INTRODUCTION**

    **A.    THE ALLEGATIONS.**

       On December 17, 2003, the Plaintiffs filed a Complaint alleging that Defendants City of

Boston ("City") and Commonwealth of Massachusetts ("Commonwealth") violated their rights

under the Equal Protection Clause of the Fourteenth Amendment, and thus Defendants were

liable pursuant to 42 U.S.C. §1983.  (Ex. A, at ¶22).  The Plaintiffs served their Complaint on the

City February 5, 2004, and subsequently amended it March 5, 2004 to add counts alleging

violations of Title VII of the Civil Rights Act of 1964 and of M.G.L. ch. 151B, §4.  (Ex. B, at ¶¶23-24).  Both Complaints alleged that in March 2002 and October 2003 the Boston Police Department ("Department") hired officers, and the Plaintiffs were not reached for consideration pursuant to the Civil Service List.  (Ex. B, at ¶11).  The Plaintiffs alleged that in March 2002 and October 2003 the number of minority entry-level officers in the Department had achieved "rough parity" with the number of minorities in the relevant labor pool, and thus the selection process utilized was unlawful.  (Ex. B, at ¶19);  See Castro v. Beecher, 365 F. Supp. 655 (D.Mass.1973); Castro v. Beecher, 522 F. Supp. 873, 875 (1981).  The Plaintiffs also alleged that the Defendants had no constitutionally justifiable reason for hiring candidates solely because they were women.  (Ex. B, at ¶¶13, 19).  Finally, the Plaintiffs alleged that the Defendants never complied with the Court's order requiring them to devise a valid nondiscriminatory selection process for the position of police officer in the City of Boston.  (Ex. B, at ¶21).

     **B.**        **THE LITIGATION.**

     Answers to the Plaintiffs Complaint were filed by the City and the Commonwealth, and on May 5, 2004 the Boston Branch of the National Association for the Advancement of Colored People ("NAACP") and the Massachusetts Association of Minority Law Enforcement Officers ("MAMLEO") filed a Motion to Intervene, which the Court allowed.  On May 11, 2004, the City filed a *Motion For Clarification of Consent Decree,* together with a *Motion To Expedite,* under the original Castro v. Beecher case.  (Ex. C, at 5-16).  The following day the City filed a *Motion to Stay Proceedings* in this case, pending the clarification being sought.  (Ex. C, at 1-4). Cognizant of the First Circuit's decision in Quinn v. City of Boston, 325 F.3d 18 (1st Cir. 2003), the City attempted to cut to the chase and address immediately what it perceived was the primary issue: is the complement of minorities for purposes of parity to be calculated by comparing the

percentage of minority *entry level* patrolmen to the percentage of minorities in the City's general population, or comparing the percentage of minority officers in the *entire police force*, to the percentage of minorities in the City's general population.  (Ex. C, at 7-12).  The City hoped that addressing this central issue expeditiously would minimize litigation costs.

Two depositions were held.  After the filing of a *Motion For Summary Judgment and/or Preliminary Injunction* by the Plaintiffs, opposed by the Defendants, a hearing was held on September 17, 2004.  On November 23, 2004, this Court issued a Memorandum and Order.  The Order denied the Plaintiffs' Motion for Preliminary Injunction; held that the City met its target under the consent decree at the time of the October 2003 police class hiring and thus allowed Plaintiffs' motion for summary judgment with respect to the consent decree in that regard; rejected the Plaintiffs' argument that the qualified labor pool is the relevant percentage of minorities in the community; did not reach the Plaintiffs' allegations that the City met its target under the consent decree at the time of the March 2002 police class hiring; and rejected the Plaintiffs' allegations that the hiring of women pursuant to special certifications was unconstitutional.  Further, the Court did not reach the Plaintiffs' allegations that the Defendants never complied with the Court's order requiring them to devise a valid nondiscriminatory selection process for the position of police officer in the City of Boston.

### C.    THE RELIEF.

Pursuant to the Court's Order, and immediately upon examining data provided by the Commonwealth regarding scores, the City proposed equitable relief to the Plaintiffs.  The Court explicitly found the record "insufficient to support a finding" that any Plaintiff other than Paul DeLeo would have been reached either in March 2002 or in the October 2004 class. *Memorandum and Order,* November 23, 2004, at p.28-29.  Nevertheless, the City proposed that

each named Plaintiff, in addition to a newly added Plaintiff, would be considered for appointment during the next Boston Police Academy class, assuming they met all instatement criteria. The City's proposal was accepted without negotiation.

### D.    THE FEES AND COSTS.

The Plaintiffs now seek approximately $97,000 in attorneys' fees and costs associated with this case.[1] The City opposes the Plaintiff's Motion and requests that adjustments be made to account for duplicative hours, hours attributable to the Commonwealth and Intervenors, unnecessary hours, anticipated fees, incorrect core/non-core distinctions, excessive hourly rates, adjustment of the Lodestar, and excludable costs.

## II.    DISCUSSION

### A.    CALCULATING THE LODESTAR.

Under 42 U.S.C. § 1988, this Court has the discretion to "allow the prevailing party [in a civil rights action] . . . a reasonable attorney's fee as part of the costs" to which that party is normally entitled under Fed. R. Civ. P. 54(d). 42 U.S.C. § 1988(b).[2] The fact that Plaintiffs were the prevailing parties does not mean that they can recover for all the time spent in this litigation. Culebras Enters. Corp. v. Rivera-Rios, 846 F.2d 94, 102 (1st Cir. 1988). The purpose of § 1988 is to "ensure effective access to the judicial process for persons with civil rights grievances . . . not to serve as full employment or continuing education programs for lawyers and paralegals." Lipsett v. Blanco, 975 F.2d 934, 938 (1st Cir. 1992) (internal citation and quotation omitted).

---

[1] The City would not deny the Plaintiffs' statement in their *Motion For Attorneys' Fees* that the parties conferred in good faith in an attempt to resolve these post-trial matters. The City would, however, clarify that the parties remain "far apart" at this juncture because the Plaintiffs responded to an offer of the City with a final, take-it-or-leave-it (exorbitant) number, ending all further discussions or negotiation. Given this fact, the City considers the Plaintiffs' suggestion that the case be referred to mediation without purpose. In the event the Plaintiffs are willing to move from their take-it-or-leave-it number, they need only contact the City directly to conduct further negotiation.

[2] The City regards the provisions of M.G.L. ch. 151B, §9 as without consequence, given the clearly dominant constitutional issues upon which this case was decided.

As the fee applicant, Plaintiffs' counsel bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and the reasonable hourly rates. Hensley v. Eckerhart, 461 U.S. 424, 437 (1983). The attorney's account of the value of the legal services and the amount of time spent must be scrutinized with care. Grendel's Den, Inc. v. Larkin, 749 F.2d 945, 950 (1st Cir.1984). The Court is obligated to make an independent assessment of what constitutes a reasonable award. Ciulla v. Rigny, 89 F.Supp.2d 97, 104 (D.Mass.2000).

It is well-settled that a reasonable fee is determined through the so-called "lodestar" approach, as outlined by the United States Supreme Court in Hensley. Under the "lodestar" paradigm, the Court must determine a lodestar figure by multiplying the number of hours productively expended by counsel by a reasonable hourly rate. Hensley, 461 U.S. at 433. This figure represents an initial estimate of reasonable fees. Id. at 434. Once the lodestar figure is determined, the Court has the discretion to reduce the award for various reasons based on factors particular to the case at hand. Id. Thus, although adhering to the time-and-rate-based method of fee calculation, the Court may nevertheless fashion a lodestar which differs substantially from the fee requested by the prevailing party. Coutin v. Young & Rubicam P.R., Inc., 124 F.3d 331, 337 (1st Cir. 1997).

1.    **Reasonable Hours Expended.**

Typically, a Court proceeds to compute the lodestar amount by ascertaining the time counsel actually spent on the case "and then subtracting from that figure hours which were duplicative, unproductive, excessive, or otherwise unnecessary." Lipsett, 975 F.2d at 937. (quoting Grendel's Den, 749 F.2d at 950).

a.    **Duplicative Hours.**

5

Duplicative work ought not be considered in the calculation of attorney's fees. <u>Hensley</u>, 461 U.S. at 433-34; <u>Grendel's Den, Inc.</u>, 749 F.2d at 950. On June 21, 2004, attorney Harold Lichten took the deposition of Edward Callahan, Director of Human Resources for the Boston Police Department. Nevertheless, Plaintiffs' billing indicates that on June 21, 2004, attorney Alfred Gordon "prepare[d] for deposition." On June 25, 2004, attorney Alfred Gordon took the deposition of Sally McNeely of the Commonwealth's Human Resources Division. Nevertheless, Plaintiffs' billing indicates that on June 23, 2004, attorney Harold Lichten "prepare[d] for McNeely deposition." Billing for the preparation of a deposition that the attorney was not taking is duplicative and ought not be considered.

### b.    Hours attributable to the Commonwealth and the Intervenors.

The Commonwealth was a co-Defendant in this case and the NAACP and MAMLEO were Intervenors ("non-City parties"). The City takes issue with any presumption that every fee and cost in this case must be born by the City. There are a number of fees that, on their face, were either wholly or partially generated by contact with non-City parties or other work specific to those parties. For that reason, work performed on the following days should wholly or partially be eliminated as to the City: 2/23/04; 3/29/04; 5/13/04; 5/18/04; 5/26/04; 6/10/04; 6/11/04; 7/7/04; 7/16/04; 7/20/04; 7/30/04; 8/6/04; 8/6/04; 8/11/04; 8/16/04; 8/18/04; 8/24/04; 9/3/04; 9/27/04; and 10/4/04.

In addition, Attorney Gordon indicates in his Affidavit that he "drafted the successful motion for protective order relating to the Intervenors' request to unnecessarily depose all of the Plaintiffs, which would have led to much increased costs related to this litigation." *Plaintiffs' Motion For Attorneys' Fees and Costs,* at Exhibit E, ¶7. The City had absolutely nothing to do with the deposition notices sent by the Intervenors that necessitated the Plaintiffs' protective

order.  While granting of the order may indeed have reduced costs, research and drafting of the order expended approximately <u>fifteen hours</u> between June 23, 2004 and July 1, 2004.  The City should not bear the burden of any fees or costs that are wholly or partially attributable to other parties.

To the extent the Court is unwilling to extract hours related to non-City parties, the City requests that those hours be considered as a factor in adjusting the lodestar.  <u>See</u> <u>Coutin</u>, 124 F.3d at 339.

### c.    Unnecessary hours.

There are significant fees and costs in this case associated with the Plaintiffs' expert witness, Dr. Norman Aiken.  The City submits that an expert was not necessary to address the constitutionality of the Boston Police Department's hiring in March 2002 or October 2003.  Further, the expert's primary function was analysis in support of an argument that was rejected by the Court.  Fees and costs associated with the Plaintiffs' expert should therefore not be considered.

The question Dr. Aiken was asked to address, as identified in his *Affidavit*, was "whether parity had been achieved between the minority composition of the Boston Police Department (BPD) and the appropriate percentage of minorities within the City of Boston, before or during the time the Plaintiffs applied for the Patrolman Position."  *Plaintiffs' Rule 56.1 Statement of Facts Not in Material Dispute In Support Of Their Motion For Summary Judgment,* at Exhibit K, ¶4.  There was no dispute regarding the minority composition of the Boston Police Department.  Dr. Aiken's task was therefore to address the second factor: the "appropriate" percentage of minorities within the City of Boston.  <u>Id.</u>  Dr. Aiken identified two alternative approaches to this parity question as "the racial/ethnic composition of the total population of Boston or the

racial/ethnic composition of the labor pool from which the city will accept application." Id. at ¶5.

The 2000 Census published by the Bureau of the Census clearly identifies the racial/ethnic composition of the total population of the Boston. Dr. Aiken identified the minority population of Boston as 38.26 percent of the total population simply by attaching an exhibit that summarized information printed, on another exhibit, from a United States Census website. Id. at ¶15. An expert was not necessary for the Plaintiffs to identify this statistic.

The primary function of Dr. Aiken was to analyze the second "alternative approach" he identified: the racial/ethnic composition of the "labor pool from which the city will accept application." Id. at ¶5. The purpose of this analysis was to bolster Plaintiffs' argument that the proper comparison in this matter is the minority percentage of entry-level police officers compared to the minority percentage in the qualified labor pool. This argument was explicitly rejected by the Court.

Work performed on the following days associated, wholly or in part, with the Plaintiffs' expert witness should be eliminated: 5/10/04; 5/26/04; 6/14/04; 6/21/04; 6/28/04; 7/8/04; 7/9/04; 7/13/04; 7/14/04 (AG); 8/11/04; 8/12/04; 8/13/04; 8/20/04; 8/23/04; 8/25/04; 8/26/04; 8/30/04; 8/31/04; 9/1/04; and 9/9/04.

To the extent the Court is unwilling to extract hours related to the Plaintiffs' expert witness, the City requests that those hours be considered as a factor in adjusting the lodestar. See Coutin, 124 F.3d at 339.

### d. Anticipated fees relating to monitoring and resolving continued compliance matters.

The Plaintiffs seek fees for an "estimated" ten hours "relating to monitoring and resolving continued compliance matters." *Plaintiffs' Motion For Attorneys' Fees and Costs,* at

Exhibit F.  There is no explanation for what the Plaintiffs mean by monitoring and resolving, what is meant or even envisioned by "compliance matters," and more importantly by what method or reasoning such actions, even if required, would necessitate ten hours of time.  These hours should be eliminated.

2.     <u>**Reasonable Hourly Rates.**</u>

a.     **Core vs. Non-Core.**

It is common in the First Circuit to distinguish between "core" work and "non-core" work, and to compensate attorneys accordingly.  "Under the First Circuit's taxonomy, core legal work 'includes legal research, writing of legal documents, court appearances, negotiations with opposing counsel, monitoring, and implementation of court orders' . . . . Non-core work, on the other hand, 'consists of less demanding tasks, including letter writing and telephone conversations.'" <u>Alfonso v. Aufiero</u>, 66 F. Supp. 2d 183, 196 (D. Mass. 1999)(quoting <u>Brewster v. Dukakis</u>, 3 F.3d 488, 492 n.4 (1st Cir. 1993)).  In keeping with approved First Circuit practice, the Court applies rates for non-core hours at two-thirds the approved billing rates assigned for core legal work.  <u>Guckenberger v. Boston Univ.</u>, 8 F. Supp. 2d 91, 102 (D. Mass. 1998).

In the Plaintiffs' *Motion*, they attach two billing records for this case.  The first, contained in their Exhibit C, is precisely the document that was sent to the City prior to attempting negotiations in this matter.  The City relied upon this document to make detailed fee calculations, which primarily involved dividing the tasks between "core" and "non-core," which the Plaintiffs had not done.  In making its calculations, the City was mindful of the Court's approach in <u>Alfonso</u>, whereby the Court faced a number of mixed entries containing core, non-core, and clerical tasks with a single time figure.  <u>Alfonso</u>, 66 F.Supp. at 197.  Consistent with its past practice, the Court in <u>Alfonso</u> divided the hours in all such mixed entries equally between the

9

component categories.  Id.; citing Guckenberger, 8 F.Supp. 2d at 102 (considering mixed entries as one-half core, one-half non-core).

The Plaintiffs billing is replete with mixed entries.  For each such entry, where one time is given for a description containing core work and non-core work, the City divided the time by half.  Given the number of mixed entries, this had a significant effect on the final core/non-core tally.

In the Plaintiffs' *Motion*, they attach a document not seen before as their Exhibit F, which breaks mixed entries into core/non-core hours.  Significantly, however, the division of mixed entries is not by two.  The City is not able to discern any pattern in the division, and thus assumes that the Plaintiffs have attempted with each mixed entry to fairly reflect the amount of time spent on core work and the amount of time spent on non-core work.  The City respectfully questions whether this division reflects contemporaneous record keeping.[3]  In the event the billing records contained in their Exhibit F are not contemporaneous, then the Court should divide the total hours in all such mixed entries equally between the component categories; i.e. by half.  Alfonso, 66 F.Supp. at 197.

The City also respectfully disagrees with a number of designations Plaintiffs make regarding the work performed.[4]  The City believes that work performed on the following days

---

[3] In discussions with the Plaintiffs about the City's results of the core/non-core division, and the ultimate effect this had on the total fees that were appropriate, at no time did Plaintiffs counter with any of the information provided in Exhibit F nor suggest that such information existed.  Indeed, the Plaintiffs requested the core/non-core breakdown the City had done.  When the City responded that this was the Plaintiffs' burden to provide, there was no response.

[4] By way of summarizing, based upon the Court's record review in Alfonso, the following tasks are designated as core: the time spent performing specified legal research; drafting and editing legal documents for submission to the Court and defendants; reviewing legal submissions of opposing parties; appearing in court and preparing for hearings and trial; preparing for and taking depositions; and performing other tasks involving independent legal thought.  The Court designated as non-core, however: all entries for writing and reviewing correspondence; telephone calls (including calls to opposing counsel); all entries for conferences or consultations with third parties; meetings with plaintiffs other than those preparing for their depositions or immediately before trial; responding to discovery requests; issuing subpoenas and noticing depositions; writing memos to the file; scheduling and for travel; the time spent performing various tasks under the general heading "File Review"; and the time spent preparing fee petitions.  Alfonso, 66 F.Supp. at 196.

are improperly designated as core work, or are designated entirely as core work when the entries

also contain non-core work: 12/2/03; 12/5/03; 12/22/03; 1/2/04; 1/6/04; 1/9/04; 3/29/04; 5/11/04;

5/19/04; 6/2/04; 6/9/04; 8/4/04; 8/6/04 (AG); 8/10/04; 8/16/04; 8/18/04; 8/19/04; 9/28/04;

1/4/05; and 1/5/05.

### b.     Hourly Rates for Each Attorney.

To determine a reasonable hourly rate, the Court must find the prevailing hourly rate for

attorneys with similar skill, experience and reputation in the Boston area.  See Blum v. Stenson,

465 U.S. 886, 895 n.11 (1984).  The burden is on the Plaintiffs to provide this Court with

affidavits and other forms of evidence that: (1) establish the lawyer's' skills and experience; and

(2) informs the Court of the prevailing market rate in the community for attorneys with such

qualifications.  Martino v. Massachusetts Bay Transp. Auth., 230 F. Supp. 2d 195, 205 (D. Mass.

2002), citing Blum, 465 U.S. at 895-896 n.11.  As with the tabulation of reasonable hours, the

Court should not accept attorney submissions at face value but rather should "assign more

realistic rates to time spent." Guckenberger, 8 F. Supp. 2d at 103 (quoting Coutin, 124 F.3d at

337).

The Plaintiffs' *Motion For Attorneys' Fees* contains affidavits that establish the two

attorneys' experience and skill.  What the *Motion* fails to do beyond mere conclusory claims,

however, is inform the Court of the prevailing market rate in the community for attorneys with

similar qualifications.[5]

---

[5] Each attorneys' affidavit attempts to side-step their burden with a perfunctory footnote indicating that "[s]hould the amount of this hourly rate come into dispute, I am prepared to offer further evidence and supporting affidavits proving that this rate is commensurate with a Boston attorney with my level of experience…"  Firstly, the time to offer such evidence was upon filing the *Motion*.  See Deary v. City of Gloucester, 9 F.3d 191, 198 (1st Cir. 1993)(requiring other evidence of prevailing market rate besides affidavits of participating attorneys themselves). Secondly, the amount could not more clearly be in dispute.  This fact was explicitly discussed on the three occasions this matter was sought to be resolved between the parties.

While prior cases do not necessarily provide precedent regarding the reasonableness of the fees awarded, they nevertheless provide a reflective picture of what is happening in the market.  System Mgmt., Inc. v. Loiselle, 154 F. Supp. 2d 195, 210 (D. Mass. 2001), rev'd on other grounds, 303 F.3d 100 (1st Cir. 2002).  Thus, a look at what Massachusetts courts have awarded as attorney's fees in recent cases is a helpful aid in weighing the appropriateness of a calculated rate.  McDonough v. City of Quincy, 2005 U.S. Dist. LEXIS 1137, *21 (D.Mass. 2005).

### i.    Attorney Harold Lichten's Reasonable Hourly Rate.

Attorney Harold Lichten requests an hourly rate of $325 in this case.  Attorney Lichten's hourly rate should be $265.  Particularly instructive in assessing the prevailing market rate in the community for attorneys with Attorney Lichten's qualifications is Chief Judge William Young's assessment of Attorney Howard Friedman, who he described as "one of the foremost practitioners in this field [of civil rights litigation] and, indeed, is sought out to teach the bar concerning these issues." Zurakowski v. D'Oyley, 46 F. Supp. 2d 87, 89 n.2 (D. Mass. 1999).  Attorney Friedman graduated from law school in 1977 and is a member of the Bar of the Supreme Court, the SJC, the First Circuit and the United States District Court for the District of Massachusetts.  Norris v. Murphy, 287 F. Supp. 2d 111, 117 (2003).  He has been engaged in private practice since 1981, emphasizing throughout civil rights litigation; has tried many police misconduct cases; is a member of several bar associations and has held leadership roles in those and other organizations; and has lectured on police civil liability and has published articles on civil rights litigation.  Id. at 117-118.

In Zurakowski, even with such stellar credentials, and even though his "conduct, efficiency, and professionalism" during the trial was described by Judge Young as "exemplary

throughout," Attorney Friedman commanded an hourly rate of $240 for core work.  46 F. Supp. 2d at 89.  In late 2003, four years after <u>Zurakowski</u> and again before Judge Young, Attorney Friedman sought an hourly rate of $325.  The Defendant opposed, arguing that recent awards in civil rights cases have been at an hourly rate of $200 to $250 per hour, making the $325 rate exorbitant. <u>Norris</u>, 287 F. Supp. 2d at 118 (<u>citing</u> <u>Martinez v. Hodgson</u>, 265 F. Supp.2d 135, 143 (D. Mass., 2003)(finding a rate of $350 per hour excessive in light of recent precedent ranging from $225 to $250)).  The Court found the Defendant's point to be well taken, and concluded that a reasonable hourly rate for Attorney Friedman was $265. <u>Id.</u>

Seventeen months after <u>Norris</u> was decided, the City submits that an hourly rate of $265 continues to be appropriate for the level of experience and the reputation of attorneys such as Howard Friedman and Harold Lichten.  Further, this hourly rate is consistent with other cases that address the subject of reasonable fees for civil wrights cases.  <u>See, e.g.</u>, <u>Martino</u>, 230 F. Supp. 2d at 205-06 (awarding $200.00 as hourly rate for civil rights attorney); <u>System Mgmt., Inc.</u>, 154 F. Supp. 2d at 210 (approving an hourly rate of $235.00 for an attorney with twenty-four (24) years of experience and an hourly rate of $200.00 for an attorney with eleven (11) years experience); <u>Ciulla v. Rigny</u>, 89 F. Supp. 2d 97, 104 (D. Mass. 2000)(awarding attorney hourly rate of $200.00); <u>Connolly v. Harrelson</u>, 33 F. Supp. 2d 92, 95-96 (D. Mass. 1999)(approving hourly rate of $200.00 for civil rights attorney with twenty-five years of experience); <u>McLaughlin by McLaughlin v. Boston Sch. Comm.</u>, 976 F. Supp. 53, 62 (D. Mass. 1997) (Garrity, J.)(awarding civil rights attorney $200.00 hourly rate).

In support of his request for an hourly rate of $325, Attorney Lichten cites two cases decided in 2002.  Both are distinguishable from this case.

In <u>Dahill v. Boston Police Department</u>, Civ. Act. No. 98-cv-11441-DPW, the plaintiff, who was hearing impaired, was terminated from the Boston Police Department on the basis that his "auditory deficiencies" rendered him incapable of effectively and safely performing the essential duties of a police officer.  <u>Dahill v. Police Dep't of Boston</u>, 434 Mass. 233, 235 (2001). The plaintiff alleged that that the Department violated the Americans with Disabilities Act ("ADA") and Rehabilitation Act.  The plaintiff was one of the first hearing-impaired police officers to file such a suit in the country.  *Dismissed Cop Hopeful Won't Hear Of Quitting*, Boston Herald, July 2, 1998, p.6.   The District Court certified to the Supreme Judicial Court the question of whether the plaintiff's use of mitigating measures should be considered as to the state law claim.  <u>Id.</u> at 233.  Ultimately, litigation lasted almost four years, culminating in a ten day jury trial in the District Court and a jury verdict in favor on the Plaintiff in February, 2002.

In <u>Sprague v. United Airlines, Inc.</u>, Civ. Act. No. 97-12102-GAO, the plaintiff received an offer from United Airlines to work as a line mechanic.  The plaintiff alleged that when members of United's upper management learned that he was deaf, the offer was rescinded. Sprague sued United, arguing that he was denied the job because of his disability, in violation of the ADA.  He sought damages for back pay and emotional distress, punitives and an injunction ordering United to hire him as a line mechanic.  In 2002, after almost five years of litigation and a thirteen day bench trial, Judge O'Toole found for the Plaintiff and ordered United to pay $321,281 in damages plus interest, costs and other monies. The judge also ordered United to hire Sprague as a line mechanic.

The experience and skill that must be brought to bear in lengthy, hard-fought litigation, particularly litigation that ends in trial, is certainly a factor the Court should consider in determining a reasonable hourly rate.  For reasons discussed further in Section I.A.3 *infra*,

however, this case is not of that nature.  The fees that Attorney Lichten has received in two other

cases does not establish for this Court the prevailing market rate, nor speak to the

appropriateness of that rate in this particular case.

### ii.    Attorney Alfred Gordon's Reasonable Hourly Rate.

Attorney Alfred Gordon requests an hourly rate of $250 in this case, based upon his

experience and knowledge of litigation in employment and labor matters.[6]  Attorney Gordon's

hourly rate should be $175.  Particularly instructive in assessing the prevailing market rate in the

community for attorneys with Attorney Gordon's qualifications is the recent case of

McDonough, 2005 U.S. Dist. LEXIS 1137.  In that case, decided only two months ago, the

Plaintiff sought to recover damages for acts of retaliation allegedly taken against him by the City

of Quincy.  The Plaintiff's claims were pursuant to Title VII, 42 U.S.C. 2000e § 1, et seq., as

amended ("Title VII"), and Chapter 151B of Massachusetts General Laws.  After almost three

years of litigation, a jury verdict was returned in favor of the Plaintiff, awarding $300,000 in

damages.  The Plaintiff then sought attorney's fees in the amount of $144,706 and costs in the

amount of $8,990.

The lead attorney, Marisa A. Campagna, submitted an affidavit that revealed "an

impressive and lengthy background in employment law."  Id. at *21.   The Court found that

"Attorney Campagna has been licensed to practice law in Massachusetts for over fifteen years

and has concentrated in employment law for eleven years… [s]he has been sole representative

counsel in fifteen jury trials and several other jury waived trials… Campagna further notes that

she co-authored briefs in several successful cases in Massachusetts courts and for several years

has participated substantially in the Massachusetts Chapter of the National Employment Lawyers

---

[6] The City respects the experience of Attorney Gordon in labor law.  This case, however, did not concern itself with labor law.

Association." Id. Attorney Campagna requested an hourly rate of $300 and submitted supporting affidavits and information. Taking into account Attorney Campagna's eleven years of experience in employment law, the length and complexity of the case, and the rates awarded to civil rights attorneys in the Boston area recently, the Court found that $200 was a reasonable hourly rate. Id.

In addition, assisting counsel Mary-Ellen Manning requested an hourly rate of $225 and submitted an affidavit indicating that she has been licensed to practice law since 1991, has been admitted to practice before the United States Supreme Court, has done considerable work on employment discrimination claims for several years, that at the time of filing was representing federal court plaintiffs in a race discrimination case and in a civil rights case, and had been lead counsel in one jury trial and in several jury waived trials. Id. at *22-23. Given that her experience was less than Attorney Campagna, that she had only spent the last nine years active in the field, and that she had failed to indicate that she has spent the majority of her time on relevant cases, the Court found that a reasonable and appropriate hourly rate considering the prevailing market rates for assistant counsel with comparable experience in the Boston area was $150.00. Id. at *23.

Also instructive in this case is the Court's analysis regarding Howard Friedman's associate, Myong J. Joun, in Norris. 287 F.Supp.2d at 118. Attorney Joun filed an affidavit wherein he indicated that he graduated from law school and began practicing law, in particular civil rights litigation, in 1999; that for two years during law school he worked full-time as a paralegal in Attorney Friedman's office; that he was a member of the bar of the SJC, the First Circuit and the United States District Court for the District of Massachusetts; and that he was a member of numerous bar associations, and held leadership roles in two of them. Id. The Court

concluded, in late 2003, that a rate of $125 per hour was reasonable for Attorney Joun, and the rate of $75 per hour was reasonable for the less demanding work.  Id.

Based upon the Court's analysis in McDonough and Norris, and taking into account the experience and qualifications described in attorney Alfred Gordon's *Affidavit*, the City believes an hourly rate of $175 is more than reasonable.

### 3.     Adjustment of Lodestar.

This Court has "extremely broad" discretion in setting a fee award, and may do so for various reasons based on factors particular to the case at hand.  See Lipsett, 975 F.2d at 937; Hensley; 461 U.S. at 434.  The City submits that, taking into account the degree of success, the nature of this litigation, and the role and actions of the City, there should be a 30% reduction in the Lodestar.

First, the degree of success should be considered.  In adjusting the lodestar for the results obtained, a court "'may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success.'" Andrade v. Jamestown Hous. Auth., 82 F.3d 1179, 1191 (1st Cir. 1996)(quoting Hensley, 461 U.S. at 436).  On this point, it should be noted that there are a total of nine individual Plaintiffs.  Since it was conceded that one, Paul DeLeo, had standing, the Court reached the constitutional issues raised by the Plaintiffs. Nevertheless, the Court's decision can hardly be cast as a success for the remaining eight Plaintiffs; indeed, the Court found the record "insufficient to support a finding that… any other Plaintiff would have been reached or hired either in [March 2002] or in the October 2004 class." *Memorandum and Order,* November 23, 2004, at p.28-29.  The Court's decision was only a success for these Plaintiffs as a result of the relief offered by the City.

Moreover, the Court denied the Plaintiffs' Motion for Preliminary Injunction; rejected the Plaintiffs' argument that the qualified labor pool is the relevant percentage of minorities in the community; did not reach the Plaintiffs' allegations that the City met its target under the consent decree at the time of the March 2002 police class hiring; and rejected the Plaintiffs' allegations that the hiring of women pursuant to special certifications was unconstitutional. Further, the Court did not reach the Plaintiffs' allegations that the Defendants never complied with the Court's order requiring them to devise a valid nondiscriminatory selection process for the position of police officer in the City of Boston.

Second, while the City agrees with Attorney Lichten's description of <u>Quinn v. City of Boston</u>, 325 F.3d 18 (1st Cir. 2003) as a "watershed case," the same cannot be said of this case. *Plaintiffs' Motion For Attorneys' Fees and Costs,* Exhibit D, at ¶7. Quinn involved four years of contentious litigation, leading to the First Circuit. The City vigorously opposed the Plaintiffs' claims and fought to maintain the practice of hiring under the consent decree. The issues raised in <u>Quinn</u> were novel. The result, and victory, was significant.

In this case, to be sure, the Court's Order has changed the way in which the Boston Police Department hires its entry-level patrolmen. This case did not, however, cover any new ground. This case was an extension of <u>Quinn</u>, applying its principles to the Police Department as opposed to the Fire Department.[7] The Complaint was served on the City February 5, 2004, and by November 23, 2004 a decision was rendered. In the nine months this case was litigated, only two depositions were taken, a *Motion for Preliminary Injunction and/or Summary Judgment* was filed by the Plaintiff and opposed, there were miscellaneous reply briefs, and a hearing was conducted. This rapid sequence lies in stark contrast to the protracted litigation, including trial,

---

[7] The fact that, following lengthy litigation, attorneys' fees paid by the City in <u>Quinn</u> totaled $125,000 makes a $97,533.21 request in this case particularly unreasonable.

in the two cases cited by Attorney Lichten in support of his fees, and discussed in Section II.A.2.b.i *supra*.

Finally, at every turn the City did everything in its power to minimize litigation costs and expenses. While not conceding liability to the Plaintiffs, the filings in this case make clear that the City's primary interest was getting clear and quick direction on the constitutionality of its hiring practice, not in protracted litigation. The City's *Motion For Clarification of Consent Decree,* together with its *Motion To Expedite* and *Motion to Stay Proceedings* was intended to reach as soon as possible the issue which it submits ultimately decided the case. The points on which the City offered the most opposition (using the qualified labor pool for calculation purposes, the constitutionality of certifying females only, and opposing a preliminary injunction) were all decided in its favor. When the time came to propose equitable relief, the City's offer resulted in the minimum amount of continued litigation and thus cost to the City and its taxpayers. Awarding the Plaintiffs $97,000 in fees, or anywhere even close to that number, "would constitute an intolerable windfall," at the expense of the people of Boston. See Coutin, 124 F.3d at 339.

**B.     Costs**

The attorneys' reasonable and necessary costs and expenses may be awarded to a prevailing party pursuant to 42 U.S.C. § 1988. Culebras Enters. Corp., 846 F.2d at 103 (citing Palmigiano v. Garrahy, 707 F.2d 636, 637 (1st Cir. 1983)). For reasons discussed in Section II.A.1.b *supra*, however, the City should not be required to pay costs associated with non-City parties. Specifically, costs incurred on July 2, 2004 totaling $47.58 should be eliminated as to the City.

Also, for reasons discussed in Section II.A.1.C *supra*, the Plaintiffs' should not be entitled to costs associated with their expert witness.  The following costs should therefore be eliminated:

| | | |
|---|---|---|
| 9/3/04 | FedEx to Norman Aitken | $20.52 |
| 9/4/04 | FedEx to Norman Aitken | $29.14 |
| 9/30/04 | Dr. Norman Aitken – expert fee | <u>$1,935.00</u> |
| | | $1,984.66 |

Finally, the City takes issue with the following:

| | | |
|---|---|---|
| 7/15/04 | Bowne Business Solutions – photocopies, velo binding, exhibit tabs | $1,295 |

First, this fails to identify the number of copies made.  For reasons already stated, the City should not bear the burden of costs associated with copies to non-City parties.

Second, these copying costs are simply exorbitant on its face.  Without further explanation or break-down, it can only be speculated why $1,295 was reasonable or necessary to copy a *Motion For Preliminary Judgment and/or Summary Judgment* with an accompanying *Statement of Facts* for the Court and a total of four parties.

Finally, the Defendants and Intervenors all have counsel who are part of the Court's electronic filing system.  Although this Court session requires that a courtesy copy of all dispositive motions be filed, there is no provision or requirement that copies of such motions be served on the parties.  To undertake a task at such expense was simply unnecessary.

## III.    <u>CONCLUSION</u>

For the foregoing reasons, the Defendant City of Boston hereby opposes *Plaintiffs' Motion For Attorneys' Fees and Costs* and respectfully requests this Honorable Court make the requested adjustments.

Respectfully submitted,

DEFENDANT CITY OF BOSTON
Merita A. Hopkins
Corporation Counsel, City of Boston
By its attorney,


S/Stephen G. Cox
_____
Stephen G. Cox,  BBO# 566943
Assistant Corporation Counsel
City of Boston Law Department
Room 615, Boston City Hall
Boston, MA  02201
(617) 635-4064